**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JOHN DOE | Case No. |
| Plaintiff | Judge: |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| LITTLE MIAMI SCHOOL DISTRICT, ET AL | |
| | (ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED) |
| Defendants | |

Pursuant to Fed. R. Civ. Proc. 65, Plaintiff John Doe requests an Order of this Court prohibiting the defendants, Little Miami School District and the School Board President, sued in his official capacity, from unconstitutionally prohibiting a teacher from hanging a "Hate Has No Home Here" Flag in his classroom solely due to the inclusion of a rainbow indicating the inclusion of LGBTQ rights.

**TABLE OF CONTENTS**

FACTS.................................................................................................................................................1

ARGUMENT .....................................................................................................................................8

    A.    The Standard For Resolution Of This Motion ....................................................8

    B.    Plaintiff Has A Substantial Likelihood Of Success On The Merits.......................8

        1.    The *Pickering* Test.....................................................................................9

        2.    Application Of The *Pickering* Test...........................................................10

        3.    *Kennedy v. Bremerton School Dist.* ............................................................14

    C.    Irreparable Harm...................................................................................................18

    D.    Public Interest And Harm To Third Parties.........................................................19

    E.    Nominal Bond Should Be Imposed.....................................................................20

CONCLUSION ...............................................................................................................................20

ii

**TABLE OF AUTHORITIES**

Cases

*Barber v. Rounds,* 169 F.4th 577 (5th Cir. 2026)...................................................................17

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226 (1990) ................................19

*Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530 (6th Cir. 2020) ...................................10

*Cajune v. Indep. School Dist. 194*, 105 F.4th 1070 (8th Cir. 2024)........................................10

*City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427 (6th Cir. 2014) .........................................8

*Cohen v. California*, 403 U.S. 15 (1971) ...................................................................................19

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................................................9, 12

*Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110 (7th Cir. 2013)...................................12

*D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518 (6th Cir. 2007) ..........................................18

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) ............................................10

*Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 158 F.4th 732 (6th Cir. 2025) .........................18

*Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495 (6th Cir. 1996) ......................................................9

*Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D.Ohio 2016) ..........................................20

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................................................................19

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ................................................................................1

*Ford v. Cty. of Grand Traverse*, 535 F.3d 483 (6th Cir. 2008).................................................9

*G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)..................20

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ..........................................................................9, 17

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644 (6th Cir. 2007) .......................................8

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529 (6th Cir. 2008)........................9

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011) .......................................17

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) ...........................................*passim*

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) ....................................................................14

*McPhail v. Roanoke Cty. School Bd.*, W.D.Va. No. 7:25-cv-242, 2026 U.S. Dist. LEXIS 12561 (Jan. 22, 2026) ................................................................................................13

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).......................................................12, 15, 18

*Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884 (6th Cir. 2000) ...........................................8

*Nokes v. Miami Univ.,* S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017) ............................................................................................................ 20

*Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524 (6th Cir. 2014) ........................................ 8

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't,* 305 F.3d 566 (6th Cir. 2002) ............................... 18

*Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) ................................................... 9

*Pickering v. Board of Education,* 391 U.S. 563 (1968) .......................................................... *passim*

*Polk v. Montgomery Cty. Pub. Schools,* 166 F.4th 400 (4th Cir. 2026) ...................................... 11, 18

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir. 1996) ....................................... 8

*Rankin v. McPherson,* 483 U.S. 378 (1987) ................................................................................ 12

*Shelton v. Tucker,* 364 U.S. 479 (1960) ...................................................................................... 1

*Tennessee v. Cardona,* 737 F. Supp. 3d 510 (E.D. Ky. 2024) ..................................................... 18

*Theis v. Intermountain Edn. Serv. Bd. of Dirs.,* D.Or. No. 2:25-cv-00865-HL, 2025 U.S. Dist. LEXIS 161571 (Aug. 20, 2025) ................................................................. 17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503 (1969) ............................................ 11

*United States v. Virginia,* 518 U.S. 515 (1996) ........................................................................... 13

*W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943) ....................................................... 12

*Ward v. Polite,* 667 F.3d 727 (6th Cir. 2012) ............................................................................ 12

*Warner v. Chambers-Smith,* S.D.Ohio No. 2:24-cv-1565, 2025 U.S. Dist. LEXIS 259689 (Dec. 16, 2025) .............................................................................................. 20

*Wood v. Fla. Dep't of Educ.,* 142 F.4th 1286 (11th Cir. 2025) ................................................... 18

Statutes and Other Authorities

Board Policy 5780.01 ..................................................................................................... 3, 13

R.C. 3313.473 ............................................................................................................... 2, 13

Federal courts "have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Indeed, "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Because it has been clear for generations that teachers do not lose their constitutional rights inside the schoolhouse gate, and that government may not squelch one viewpoint while favoring another, the Little Miami School District violated a teacher's constitutional rights when it insisted that the teacher remove a "Hate Has No Home Here" Flag from his classroom solely due to the inclusion of LGBTQ content.

**FACTS**

This case involves the efforts of Little Miami School Board to remove a small classroom flag bearing the message "Hate Has No Home Here." The poster, which had hung in John Doe's classroom for approximately four years without generating any complaints, displayed five hands holding heart-shaped icons representing, among other things, the American flag, a peace sign, a rainbow Pride flag, and a transgender Pride flag.



1

Plaintiff John Doe is a history teacher at Little Miami Schools. John Doe first hung the Hate Has No Home Here Flag in his classroom in 2022. The Hate Has No Home Here Flag is one of a number of displays in his classroom, including an American Flag and a Bengals Flag. John Doe also has a "COEXIST" poster in another location of his classroom; that poster uses various religious symbols from around the world for letters, including the Star of David.

This case arose in the context of a history by members of the Little Miami School Board of animus towards the message that LGBTQ individuals are entitled to equal rights. Notably:

- In September 2023, the District decided to scale back and alter their Scholastic Book Fairs following complaints about the inclusion of certain graphic novels centering on a gay boy.

- In October 2023, the District removed books from vending machines operated by the school's PTO. On information and belief, the District was reviewing the books to determine if they had views of LGBTQ rights that were contrary to the views of certain School Board Members.

- In December 2024 the school board sought to introduce a policy that would limit classroom displays. Although ostensibly neutral, commentary on social media and public comment focused on photos of classrooms with LGBTQ symbols, including various signs and stickers containing rainbow coloring displayed in classrooms, which contained messages such as "Safe Space," "I am a safe person," and "You are safe with me." This policy was not adopted.

In January 2025, the Ohio Assembly passed H.B. 8, known as the Ohio Parent's Bill of Rights. This Statute provides that school districts "provide parents the opportunity to review any instructional material that includes sexuality content" and "Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and be permitted to participate in an alternative assignment." R.C. 3313.473(B)(1)(b). The Statute, R.C. 3113.473(G)(5), defines "sexuality content" as follows:

"Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting.

"Sexuality content" does not mean any of the following:

2

… (c) Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

In October 2025, following the adoption of HB5, the School Board adopted Board Policy 5780.01, entitled Parents' Bill of Rights.[1] This Policy was adopted to comply with H.B. 8. The Policy provides:

Prior to providing instruction that includes sexuality content or permitting a third party to provide such instruction on behalf of the District, the Board will provide parents the opportunity to review any instructional material that includes sexuality content. Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and shall be permitted to participate in an alternative assignment.

The Policy defines "Sexuality content" as follows:

"Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting. "Sexuality content" does not mean any of the following:

… C. Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

Against this background, the dispute about the Hate Has No Home Here Flag began in September 2025. At that time, the High School Principal approached John Doe. The Principal stated that Defendant David Wallace, the President of the School Board, had come to John Doe's classroom earlier one morning and took pictures of the Hate Has No Home Here Flag.

In January 2026, at a School Board meeting, Wallace read Board guidelines around displays on building laws. A Board member then reached out to the Superintendent with a question about two posters, including the Hate Has No Home Here Flag.

---

[1]The Policy is available here:
https://go.boarddocs.com/oh/lmls/Board.nsf/goto?open&id=DP9MRY5B4A79

3

In February, 2026, the High School Principal informed John Doe that Wallace had contacted the Superintendent and was requesting that John Doe take down the Hate Has No Home Here Flag. Wallce later clarified that he was making the request as a School Board Member, and not as a parent. The High School Principal said that he would not order John Doe to remove the Hate Has No Home Here Flag.  John Doe refused to comply with Wallace's request.  John Doe subsequently, at the Principal's request, drafted an email to defend the display of the Hate Has No Home Here Poster. John Doe provided specific American History and AP European History curriculum standards indicating that "the specific content standards … where I feel the flag I have in my room… is especially applicable."

On February 3, 2026 the Superintendent wrote an email indicating that she had "reviewed the poster in question and its association with the attached curricula standards."  She provided her opinion that while the poster "contains symbols of identities" she did not "believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."

The next day, John Doe met with the Principal and Superintendent.  The Superintendent indicated that Wallace was now requesting that the Superintendent order John Doe to remove the Hate Has No Home Here Flag.  John Doe explained that the Hate Has No Home Here Flag was not some "meaningless display" but that he had put a lot of thought into purchasing and displaying the Flag. John Doe expressed his belief that Little Miami had a diverse student population that the District had a legal, ethical, and moral obligation to support.  John Doe also indicated that the Hate Has No Home Here Flag was intended to symbolize support for marginalized students who could be some of the most at-risk students.  The Superintendent told John Doe that she would not order him to take down the Hate Has No Home Here Flag.

4

Following John Doe's meeting with the Superintendent and the High School Principal, the Board's new outside counsel, Omar Tarazi,[2] emailed the Superintendent and Wallace.  Tarazi focused on the message conveyed by the rainbow image in the Hate Has No Home Here Flag.  Tarazi stated that the Board policy would not be implicated if the same message is "displayed over a neutral image, such as the American flag or a generic student image."   Tarazi disagreed with the Superintendent's opinion and suggested that the Hate Has No Home Here Flag could reasonably be viewed as presenting or describing sexual concepts or gender ideology which implicate parental notification and opt-out requirements under HB 8 and District policy.

John Doe responded to Tarazi's email by suggesting that "this flag is at most an incidental reference as I do not explicitly provide instruction on the flag or incorporate it into my curricular materials." John Doe also noted the alternative display suggested by Tarazi was not acceptable because it would, in part, minimize the message of support for LGBTQ students.  He wrote:

> My concern is that attempting to find a different, "neutral" image may inadvertently lead to the erasure of LGBTQ+ representation. My preference would be to discuss any additional representation that could potentially be added to the existing flag, rather than removing any of the represented groups.

---

[2] Tarazi was hired by the School Board in January 2026; he replaced an attorney who had worked for the School Board since 1994.  Some observers noted Tarazi's "alignment with conservative groups." *Attorney said to 'wage culture wars' hired by Little Miami school board* – Cincinnati Enquirer, Jan. 12, 2026 (https://www.cincinnati.com/story/news/education/2026/01/12/columbus-attorney-omar-tarazi-hired-by-little-miami-school-board/88069131007/).

Tarazi, ironically, previously appeared on Fox News a few years ago to discuss LGBTQ issues in schools and decried what he perceived as censorship of conservative teachers who did not wish to follow school policies requiring them to refer to transgender students by their preferred names or pronouns: "you [teachers] better keep your mouth shut if you don't like this, if you know what's good for you, and that's the kind of conversations we're hearing directly from teachers who are afraid, you know, to speak out publicly about the issue…"  Fox And Friends, September 25, 2022 (https://www.foxnews.com/video/6312824441112).

On February 16, 2026 John Doe sent another email to the Superintendent to reiterate that the Hate Has No Home Here Flag's sole intent has always been a general, extra-curricular, message of inclusion and anti-bullying. He stated:

> The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology. My purpose and intent in purchasing that flag for my classroom four years ago was to convey a general message of inclusion. There is no subversive message or hidden intent underlying the flag. It is simply intended to convey that bullying and/or targeting will not be tolerated. I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class.

John Doe further emphasized that the Flag was never controversial until Wallace raised the issue:

> from what I can tell, [the Hate Has No Home Here Flag] has not had the effect of engaging students on sexual concepts or gender ideology, as they have for the most part not mentioned the flag to me at all, either during in-class discussions, in submitted assignments, or during one-on-one discussions outside of class.

On February 25, 2026, the Board of Education voted 4–1 to order the Hate Has No Home Here Flag's removal. The issue was framed as a determination of whether the poster constituted "sexuality content" HB 8 and Policy 5780.01. Comments from Board Members made it clear that the decision was not based on the words of the flag itself, but rather an effort to silence the pro-LGBTQ message associated with the rainbow imagery. Comments from School Board members made it clear that the opposition to the Fate Has No Home Here Flag was focused on a combination of the association of the rainbow symbol with a position on LGBTQ rights that the Board Members disagreed with and anti-LGBTQ animus. One Board Member said:

> I mean, *you've got the colors that we all now associate with certain groups that not everyone agrees with in terms of their values.* But you also have the American flag, which involves everyone, and then you alluded to the pink and white and blue, which I'm not, as [unintelligible] with that transgender. So it is unfortunate that it's all kind of muddled together. And *I feel like if you could just have the message without bringing in certain aspects and certain values that not everyone else has, that it would be more acceptable.* And when you're in a public system,

6

you've got lots of different people with lots of different values and backgrounds and religions, so you have a really challenging circumstance where you can all come together and focus and have shared a shared focus. And so everyone kind of has to veil certain parts of themselves in order for that to happen.  (Emphasis supplied.)

Another Board Member said:

We love people. Jesus loved people. But I tell you what he didn't love he didn't love sin, and He let that be known. All you have to do is read the word. It's right there. It's not it's not me saying that's his, that's his words. He loved all people. He loved all people, but he told them to go and sin no more. He didn't condemn them. He loved them, but he didn't leave them as they were, because where their lifestyle, where it was going, was not going to be a good place. *So when you label all those different rainbow things there and the trans things you're identifying with that, and you expect us to love that and to even like it, but we don't, but we do love people. And so if you want to put a sign up, it says hate has no home here, yeah, but the rainbow colors puts it into another category.*  (Emphasis supplied.)

On March 4, the Board issued a Statement claiming that "The decision was not based on the phrase "Hate Has No Home Here." Instead, the Board claimed that HB 8 and the Board Policy "require parental notification and the opportunity to review and opt out when classroom materials, under the totality of the circumstances, go beyond incidental references and engage students on sexual concepts or gender ideology."

This litigation followed.

7

**ARGUMENT**

**A.     The Standard For Resolution Of This Motion**

The purpose of a preliminary injunction is to preserve the *status quo*.[3] *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).  In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524, 532-533 (6th Cir. 2014).  In First Amendment cases, however, "'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because… the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action].'" *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007), *quoting Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000).

**B.     Plaintiff Has A Substantial Likelihood Of Success On The Merits**

This case, like most cases involving free speech by government employees, ultimately involves a delicate balancing test.  On one hand, a teachers' duties as an educator make it imperative that the school can control the types of information they impart to young minds. On the other hand, these broad duties could conceivably encompass all expression—no matter how personal—if there is a

---

[3] In this case, the *status quo* is that John Doe is permitted to maintain the Hate Has No Home Flag in his classroom.  The fact that the school forced him to remove the flag before this suit was filed does not change this analysis.  The "*status quo*," for purposes of injunctive relief, is "the last actual, peaceable, noncontested status which preceded the pending controversy." *Oruganti v. Noem*, S.D.Ohio No. 2:25-cv-00409-ALM-EPD, 2025 U.S. Dist. LEXIS 74269, at *6 (Apr. 18, 2025) (collecting cases).  In *Oruganti* this Court observed: "As a number of federal courts of appeal have recognized, it is sometimes necessary to require a party who has recently disturbed the *status quo* to reverse its actions, but such an injunction restores, rather than disturbs, the *status quo ante*." *Id.* at fn 2 (collecting cases).

8

slight chance students could witness it.   As shown *infra,* the answer to how the *Pickering* test comes out is found in *Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022).

      **1.**        **The *Pickering* Test**

The First Amendment (as incorporated through the Fourteenth) prohibits state legislatures from "mak[ing any] law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This free speech right, as it is incorporated through the Fourteenth Amendment, applies to states and municipalities, including municipal school boards. *See West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures -- Boards of Education not excepted."). [4]

The First Amendment's protections extend to public-school teachers and students, "neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 597 U.S. at 527.  First Amendment protections also extend to government employees: a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983); *See also Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968).  In *Pickering* the Court established a framework to evaluate government employee free speech claims. 391 U.S. at 568.   In *Connick*, the Supreme Court held that a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." 461 U.S. at 140.  And, in *Garcetti*, the Court reaffirmed that "the First Amendment protects a public

---

[4] Plaintiff brings his constitutional claims under 42 U.S.C. § 1983.  To state a claim under Section 1983, a plaintiff must allege: "(1) a deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008).  By its terms, § 1983 authorizes suits against state and local officials for injunctive relief.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-3 (1984). School districts are "persons" for purposes of § 1983.  *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008); *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 505 (6th Cir. 1996).

employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." 547 U.S. at 417.

To resolve the private-citizen/government-employee tension, the Sixth Circuit employs a two-step framework under *Connick, Pickering,* and *Garcetti. Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530, 537 (6th Cir. 2020); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). At step one, employees must show that in expressing themselves they were speaking as citizens (rather than in a capacity as government employees) about a matter of public concern. If the employees satisfy step one, they must then demonstrate, at step two, that their interest in speaking outweighs the state's interests in promoting the efficient delivery of public services. *See Pickering,* 391 U.S. at 568.

### 2.    Application Of The *Pickering* Test

Little Miami Schools, like other public schools, play an important role not only in educating and guiding, but instilling national values, such as respect for free speech. One method used by the Little Miami School Board to accomplish this task is to permit students to be exposed to the rich diversity of backgrounds and opinions held by high school faculty. By opening classroom walls to the non-disruptive expression of its teachers, the district could provide students with a healthy exposure to the diverse ideas and opinions of its individual teachers with little disruption to teaching. Little Miami has chosen a different path, choosing to silence views that deviate from a particular view on LGBTQ issues. Not only does the First Amendment prohibit this form of censorship, but by squelching John Does' classroom flag, the school district does a disservice to students.

Step One.

Students and parents all understand that teachers control the messages conveyed by their classroom displays and there is little likelihood of confusion that students will perceive that the Hate Has No Home Here Flag expresses the view of the School Board. *Cf. Cajune v. Indep. School Dist. 194*, 105 F.4th 1070, 1081 (8th Cir. 2024) ("we find that the public would perceive private persons, and not

10

the District, as having spoken through… posters" at a school). John Doe, by placing the Hate Has No Home Here Poster on the wall, was speaking as a citizen rather than in his capacity as a government employee about a matter of public concern.[5] Over the last four years, John Doe has continuously hung banners on the wall of his assigned classrooms, including an American Flag and a Bengals Flag. John Doe did not hang the banners as part of the curriculum he teaches, nor did he use the banners during any classroom sessions or periods of instruction. Rather, John Doe hung his banners pursuant to a long-standing policy, practice, and custom of permitting teachers to display personal messages on their classroom walls. In fact, in December of 2024, the school board considered but declined to adopt a a policy that would limit classroom display, allowing only U.S. and Ohio state flags and curriculum-related materials to be displayed.[6]

There is also little question that the message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community.[7] The February 2026 School Board meeting confirms this conclusion, as members of the community and elected officials had a lot to say about the topic. Indeed, one thing is clear: large segments of the community both agree and

---

[5] It certainly is not the case that within the four walls of the classroom, and perhaps most of the school building, teachers never speak as private citizens and thus retain no speech protections. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("teachers [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").

[6] Wallace stated that the policy was aimed at teacher speech, stating, "As a parent, we should not have to worry that children are being subjected to materials that go against our household values and beliefs." Although ostensibly neutral, commentary on social media and public comment focused on photos of classrooms with rainbows, including various signs and stickers which contained messages directed at LGBTQ students, such as "Safe Space," "I am a safe person," and "You are safe with me."

[7] One judge presciently observes the futility of the School Board's actions:

> Across all levels of education—elementary to college—LGBT rights, DEI, antisemitism, systemic racism, and innumerable other issues have made our schools hotbeds of vehement sociopolitical debate. Silencing voices and compelling affirmations to government-preferred messaging do nothing to temper the vitriol; on the contrary, such actions foster further hostility.

*Polk v. Montgomery Cty. Pub. Schools*, 166 F.4th 400, ___ (4th Cir. 2026) (Wilkinson, J., dissenting).

11

disagree with the sentiment expressed by the Hate Has No Home Here Flag. *Connick*, 461 U.S. at 146.

*Cf. Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) ("By forbidding ]a professor] from describing

his views on gender identity… [the university] silenced a viewpoint that could have catalyzed a robust

and insightful in-class discussion.").[8]

Step Two

The Hate Has No Home Here Flag caused no disruption or interference in his classroom or

elsewhere in the school.[9]  Nobody ever suggested that the Hate Has No Home Here Flag interfered

with the basic educational mission of the school district.  There were no objections to the presence or

messages of the Hate Has No Home Here from students, parents, or school administrators until the

winter of 2026 – and, then, apparently *only* from Wallace.  *Cf. McPhail v. Roanoke Cty. School Bd.*, W.D.Va.

---

[8] "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (school officials could not compel students with a religious objection to say the Pledge of Allegiance).  The First Amendment's "free-speech guarantee also generally prohibits . . . compelling an individual 'to utter what is not in her mind'… in the public school setting." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012), *quoting Barnette*, 319 U.S. at 634.

[9] The relevant issue under Step Two is not the weight of the governmental interest considered in abstract terms but, instead, how the speech at issue actually affects the government's interest in providing services efficiently.  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).  Under *Rankin,* it is the speech's detrimental effect on the efficient delivery of public services that provides the government a legitimate interest in suppressing it.  483 U.S. at 384 (expressing concern that unsupported claims of disruption would permit the government "to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech").

In *Rankin,* the Supreme Court found a law enforcement agency's interests in maintaining efficiency were not threatened by inappropriate comments about President Reagan's assassination attempt where there was no evidence the comments "disturbed or interrupted other employees." 483 U.S. at 389. The District must, thus, provide some evidence for the Court to evaluate whether the government's claims of disruption appear reasonable. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013) ("[A]n employer's assessment of the possible interference caused by the speech must be reasonable—the predictions must be supported with an evidentiary foundation and be more than mere speculation.").

No. 7:25-cv-242, 2026 U.S. Dist. LEXIS 12561, at *31-32 (Jan. 22, 2026) (on 12(b)(6) standard, finding that wearing and displaying rainbows did not disrupt efficient operation of school).

In reviewing First Amendment claims of public school teachers, the Sixth Circuit has focused on whether the speech in question was "curricular" in nature. *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 340 (6th Cir. 2010) (First Amendment protections for teachers did not extend to "what, when and how" subjects are taught to students). *See also Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007) ("The First Amendment is not a teacher license for uncontrolled expression at variance with established curricular content."); *Griswold v. Driscoll*, 616 F.3d 53, 59 (1st Cir. 2010) ("there is no denying that the State Board of Education may properly exercise curricular discretion…"). Here, the Hate Has No Home Here Flag is clearly extra-curricular, as it is not part of activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). The School Board's action has nothing to do with curriculum and everything to do with members of the School Board attempting to silence those with whom they disagrees on the matter of LGBTQ identity and status.

The actual justification offered by the School Board was that the district feared violating the Ohio Parent's Bill of Rights and the District's Parents Rights Policy.[10] The fear was not justified and reliance of these justifications was pretextual. This Statute and Policy address "sexuality content," defined" as "any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting." R.C. 3113.473(G)(5); Board Policy 5780.01. There is no realistic danger that an observer would think that the Hate Has No Place Here Flag violated

---

[10] This Court should not permit Defendants to offer any additional justifications. "Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Kennedy*, 597 U.S. at 543 n.8, *quoting United States v. Virginia*, 518 U.S. 515, 533 (1996).

either the Ohio Parent's Bill of Rights and the District's Parents Rights Policy.  The inclusion of a rainbow symbol, among other symbols, does not constitute "instruction, presentation, image, or description of sexual concepts or gender ideology."  And, even if somehow it did, it would fall under an exception for incidental references "occurring outside of formal instruction."[11]  The inapplicability of the policy is confirmed by contemporaneous emails.  John Doe sent an email stating that the flag's sole intent has always been a general message of inclusion and anti-bullying, noting that "The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology."  The Superintendent stated her opinion that she did not "believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."  *Cf. Kinney v. Weaver*, 367 F.3d 337, 364 (5th Cir. 2004) ("to give deference to unfounded predictions of harm would allow the government arbitrarily to punish speech under the guise of preempting disruption.").[12]

### 3.    *Kennedy v. Bremerton School Dist.*

In *Kennedy*, *supra*, a football coach led students in a prayer on the playing field at the conclusion of each game. When he continued the practice after being told by the school district to stop, he was not rehired as coach.  He then sued, asserting that the District's actions violated his First Amendment rights to free speech and free exercise of religion.  The Supreme Court agreed with the coach.  The Court first acknowledged that the First Amendment's protections extend to teachers, but also acknowledged that the speech rights of public school employees are not "boundless" because in

---

[11] Notably, the Policy does not prohibit sexuality content, it merely requires notice to parents.  The burden of providing notice is minimal, as the School District could have, presumably, merely sent an email to all parents.

[12] The fact that Wallace initiated the controversy is significant in the *Pickering* analysis.  In order for the School Board's interest in efficiency to carry any weight in the *Pickering* balance, the inefficiency must have been *caused by the employee's actions*, not by the employer's reaction to the employee's first amendment activities.  Otherwise, the government's repressive reaction to an employee's First Amendment activities could always be used to justify the suppression of free speech.

"addition to being private citizens, teachers… are also government employees paid in part to speak on the government's behalf and convey its intended messages." 597 U.S. at 527. To determine whether the District had violated the coach's free speech rights, the Court applied the analysis in *Pickering* and *Garcetti*.

The Free Speech question in *Kennedy* ultimately turned on a single question: did the coach "offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?" 597 U.S at 529. The Court concluded that the coach had engaged in private speech. The Court explained the Coach was not engaged in speech ordinarily within the scope of his duties as a coach and that he was not seeking to convey a government-created message. The Court said, "He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." 597 U.S. at 529-530.

The Court's discussion of the coach's free speech claim is dispositive of this case. The relevant lesson of *Kennedy* is that the interest of a school board is limited when a teacher is speaking outside of his traditional duties. In this case, the Board's decision turned on a desire to stifle debate on gender identity, "a hotly contested matter of public concern." *Meriwether,* 992 F.3d at 506 (discussing whether individuals can have a gender identity inconsistent with their sex assigned at birth). School administrators recognized that the inclusion of the rainbow symbol on the Hate Has No Place Here Flag carried a message of equality based on gender identity and support for LGBTQ students. Members of the School Board disagreed with that message. *See supra.* By forbidding John Doe from including gender identity as a prohibited form of "hate," Little Miami seeks to silence that particular viewpoint.[13]

---

[13] As noted by the Sixth Circuit in the university context, a school's position on gender identity "goes both ways." *Meriwether*, 992 F.3d at 507. The First Amendment is not concerned with whether speech

In *Kennedy*, the Court determined that the school's interest was limited because the controversial speech was outside of his assigned duties as a coach, even though it occurred on school property.  597 U.S. at 530.  Similarly, John Doe's ordinary job duties include the teaching of history to the appropriate state standards; it is generally not within his job to teach anything with regard to LGBTQ issues.[14]  *Kennedy* also teaches that it does not matter that the flag appears in a classroom and is visible during class time.  Finally, the *Kennedy* Court rejected an approach which focused on the fact that "teachers and coaches often serve as vital role models."   Significantly for this case, the Court held that schools may not "treat… everything teachers… say in the workplace as government speech subject to government control."  597 U.S. at 531.  The Court, further, recognized that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'"

Indeed, what the *Kennedy* Court said about the football coach's prayer can easily be substituted with John Doe's display of the Hate Has No Home Here Flag:  this was (i) private speech, not government speech; (ii) not within the scope the duties as a teacher; (iii) not pursuant to government policy; (iv) not seeking to convey a government-created message; and (v) not instructing, discussing the curriculum, or encouraging better classroom performance.  *Kennedy* is controlling authority and compels a finding that there is substantial likelihood of success on the merits because the display of

is conservative, moderate, liberal, progressive, or somewhere in between. What matters is that Americans, despite their views, will not be censored or suppressed by the Government.  John Doe was attacked by a conservative leaning school board, but times and the prevailing political winds change.  A ruling in favor of the school here would mean that a future district could prohibit teachers from refusing to express a sincerely held religious belief that John Doe's views on gender identity are incorrect.  "Without sufficient justification, the state cannot wield its authority to categorically silence dissenting viewpoints."  *Id* (collecting cases).

[14] To the extent that teaching about discrimination, which would include discrimination against LGBTQ individual, is part of John Doe's job, he believed that the message on the flag is consistent with various state standards.  Of course, noting that the message of the Hate Has No Home Here Flag is consistent with state standards does not make the Flag, by itself, part of the curriculum.

the Hate Has No Home Here Flag did not owe its existence to John Does' responsibilities as a public employee.[15]

Finally, the *Kennedy* Court rejected the suggestion that everything that happens in a school is government speech because it happens during class time and because schools pay teachers to speak in class. Not every word uttered by a teacher in the classroom is the speech of the government. In *Kennedy* the Supreme Court warned against "commit[ting] the error of positing an excessively broad job description by treating everything teachers and coaches say in the workplace as government speech subject to government control." 597 U.S. at 530-31 (internal quotation marks and citation omitted) The Court rejected as dispositive that the prayers took "place 'within the office' environment—here, on the field of play" but, instead, "focused on the scope of his duties as a coach." 597 U.S. at 530, quoting *Garcetti*, 547 U. S., at 421. *Cf. Barber v. Rounds,* 169 F.4th 577 (5th Cir. 2026) ("*Kennedy* clearly

---

[15] Prior to *Kennedy*, the leading case on this issue was *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011). In *Johnson* the Ninth Circuit held a high school math teacher's use of religious messages as decorations in his classroom was not protected speech. The Ninth Circuit reasoned that the teacher's duties encompassed such communications because the school had a specific policy regulating the content of classroom banners and because "expression is a teacher's stock and trade, the commodity she sells to her employer in exchange for a salary." *Id.* at 967. The Ninth Circuit further elaborated that "because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers necessarily act as teachers for purposes of a Pickering inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." Id. at 968.

While not explicitly overruled by *Kennedy, Johnson* is of limited precedential value after *Kennedy*. The Supreme Court in *Kennedy* rejected the Ninth Circuit's broad view of the role of school employees. The Ninth Circuit's application of the government speech doctrine in *Johnson* turned on the teacher's presence in the classroom or at school, but the Supreme Court in *Kennedy* recognized that this focus would impermissibly allow a school to "fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." 597 U.S. at 531. *See Theis v. Intermountain Edn. Serv. Bd. of Dirs.*, D.Or. No. 2:25-cv-00865-HL, 2025 U.S. Dist. LEXIS 161571, at *23 fn 6 (Aug. 20, 2025) (noting that "*Johnson* must be reexamined in light of *Kennedy*" and that "*Johnson's* broad statement that 'teachers necessarily act as teachers for purposes of a *Pickering* inquiry when at school or… in the general presence of students,' is of questionable precedential value in light of *Kennedy's* direction to consider the scope and context of the speech.").

17

established that school officials may not impose categorical, visibility-based restrictions on an employee's" First Amendment activities).

The Sixth Circuit, in a recent case involving student speech on LGBTQ and transgender issues, like the *Kennedy* Court, took a similarly broad view of free speech in the schools. *Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 158 F.4th 732, 738 (6th Cir. 2025). In invalidating a rule that prohibited the misgendering of students, the Court noted that "no laws give members of our society the 'right' to avoid messages they dislike." 158 F.4th at 750. The court emphasized that gender-based viewpoints are protected views and protected forms of expression under the First Amendment. The Court said:

> Our society continues to debate… many other issues surrounding transgender rights. The school district may not skew this debate by forcing one side to change the way it conveys its message or by compelling it to express a different view

158 F.4th at 738. *See also Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286 (11th Cir. 2025) (denying injunction to enjoin Florida statute requiring the use of pronouns correlating with biological sex); *Meriwether*, 992 F.3d at 492 (professor stated a plausible violation of the First Amendment for refusing to call a transgender student by their preferred pronouns); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 571 (E.D. Ky. 2024) (observing that rule requiring the use of preferred pronouns "raised serious First Amendment implications"). *But see Polk supra,* 166 F.4th at ___ (4th Cir. 2026) (holding that "how a teacher addresses a particular student in a particular classroom… is merely a part of that teacher's job description" and a curricular decision).

## C. Irreparable Harm

The violation of constitutional rights is presumed to constitute irreparable harm, *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). *See also D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 522 (6th Cir. 2007) ("'the loss of First Amendment freedoms, for even minimal

18

periods of time,' is presumed to constitute irreparable harm"), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**D.     Public Interest And Harm to Third Parties**

An injunction will not cause any harm to third parties or the School Board.  Little Miami remains able to enforce its policies and regulations in a manner consistent with the language in HB8 and the Constitution.  Any suggestion that viewing the Hate Has No Home Here Flag  will cause harm to students, is not well taken.   "[S]econdary school students are mature enough… to understand that a school does not endorse…  speech that it merely permits on a nondiscriminatory basis." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).  Even if this Court were to credit the School Board's moral objections to LGBTQ students (and it should not), [16] this Court should view skeptically any claim that John Doe's students would view the inclusion of a rainbow symbol next on a flag as an endorsement of anyone being LGBTQ. *Mergens*, 496 U.S. at 250 ("The proposition that schools do not endorse everything they fail to censor is not complicated."); *Cohen v. California*, 403 U.S. 15, 22-23 (1971) (rejecting idea that government can exercise ideas "from the public discourse… acting as guardians of public morality").

Finally, an injunction is also in the public interest.  Preserving the *status quo* will benefit education by ensuring that students are exposed to the marketplace of ideas.  This Curt has observed: "The public has an interest in protecting the freedom of speech, and 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Warner v. Chambers-Smith*, S.D.Ohio No.

---

[16] One Board Member who spoke out against the Hate Has No Home Here Flag recently resigned from the school board after social media posts he made came to light in which he denied the Holocaust and praised Hitler.  Little Miami School Board member resigns over pro-Hitler social media posts – WVXU, March 12, 2026. (https://www.wvxu.org/education/2026-03-12/little-miami-school-board-resigns-nazi-social-media-posts).

2:24-cv-1565, 2025 U.S. Dist. LEXIS 259689, at *17 (Dec. 16, 2025), *quoting G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

E.     **Nominal Bond Should Be Imposed**

Federal Rule of Civil Procedure 65 provides that "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Little Miami School District is an educational institution. Accordingly, because money is not an issue for the Defendants and the school is not likely to suffer any potential losses if an injunction is granted, this Court should not require a bond. *Nokes v. Miami Univ.,* S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 at *42 (Aug. 25, 2017) ("There is no requirement of a bond" for injunction against school); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 713 (S.D.Ohio 2016) (setting nominal bond of $1 for preliminary injunction against school).

## CONCLUSION

Pursuant to Fed. R. Civil P. 65, this Court should, following a hearing, grant a Preliminary Injunction prohibiting Little Miami Schools from prohibiting John Doe from displaying the Hate Has No Home Here Flag in his classroom.

Respectfully submitted,


        /s/ Joshua A. Engel
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

20