**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| JOHN DOE | Case No. 1:26-cv-00351-MWM |
| Plaintiff | Judge: Matthew W. McFarland |
| v. | |
| LITTLE MIAMI SCHOOL DISTRICT, ET AL | RESPONSE TO MOTION TO DISMISS |
| Defendants | |

Plaintiff respectfully submits this Response to Defendants' Motion to Dismiss. (Doc#10.)

Defendants' Motion fails to address the test for government employee speech established by the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 140 (1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006); and *Pickering v. Board of Education*, 391 U.S. 563 (1968). This is likely because in displaying the Hate Has No Home Here Flag, Plaintiff was speaking on a matter of public concern and there was no allegation that the display, which had been present for four years without incident, undermined the school's interest in promoting the efficient delivery of public services. Instead of addressing the *Pickering* factors, Defendants argue that the School Board's decision is essentially unreviewable merely because the Board asserts that it was interpreting the District's Parents Rights Policy. Def. Memo at PageID#72. Defendants cite no authority for this audacious claim. And they can't. The Supreme Court has been clear that even when a governing body justifies its decision to restrict speech by pointing to a facially neutral policy, it may still have engaged in unlawful viewpoint discrimination if it acts with an improper motive. *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995), *citing Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

**TABLE OF CONTENTS**

FACTS..................................................................................................................................1

ARGUMENT .......................................................................................................................5

   A.    The Standard For Resolution Of This Motion ........................................................5

   B.    The Complaint States A Claim For Violation Of Free Speech ............................6

        1.    The First Amendment Applies To Teachers As Government
             Employees..................................................................................................6

        2.    This § 1983 Claim Relies On The *Pickering* Test...............................6

             a.    Defendants Have Waived Any Arguments Under *Pickering* By
                 Failing To Address The Applicable Standard......................................7

             b.    The Complaint States A Valid Claim Under The *Pickering*
                 Standard ..........................................................................................8

        3.    The Hate Has No Home Here Flag Is Not Curricular..............................11

        4.    The Complaint Alleges That The Board's Reliance On The Parental
             Rights Policy Was Pretextual .................................................................14

        5.    *Kennedy,* Not *Mahmoud*, Governs This Case ..................................17

   C.    Wallace Is An Appropriate Defendant......................................................................20

CONCLUSION ..................................................................................................................20

**TABLE OF AUTHORITIES**

Cases

*Abdulsalaam v. Franklin Cty. Bd. of Comm'rs*, 637 F. Supp. 2d 561 (S.D. Ohio 2009)................................8

*Am. Freedom Defense Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356 (D.C. Cir. 2018) ....................................................................................................................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................5

*Ashford v. Univ. of Mich.*, 89 F.4th 960 (6th Cir. 2024) ...............................................................11

*Barber v. Rounds,* 169 F.4th 577 (5th Cir. 2026)........................................................................13

*Barnes v. McDowell*, 848 F.2d 725 (6th Cir. 1988).......................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................................6

*Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530 (6th Cir. 2020) .....................7

*Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015)......................................................................11

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891 (6th Cir. 2001)...........................................9

*Brown v. Commr. of Social Sec.*, S.D.Ohio No. 2:20-cv-424, 2021 U.S. Dist. LEXIS 46533 (Mar. 12, 2021)........................................................................................................................8

*Cajune v. Indep. School Dist. 194*, 105 F.4th 1070 (8th Cir. 2024)................................................19

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .........................................................15

*City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488 (1986) ................................15

*Connick v. Myers*, 461 U.S. 138 (1983)...........................................................................*passim*

*Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788 (1985)............................16

*Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110 (7th Cir. 2013).........................................10

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) ..................................................7

*Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 158 F.4th 732 (6th Cir. 2025).........18

*Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, N.D. Ohio No. 3:15-cv-666, 2017 U.S. Dist. LEXIS 188005 (Nov. 14, 2017) ......................................................................................8

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). ...............................................................................6

*Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495 (6th Cir. 1996) ........................................................7

*Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332 (6th Cir. 2010) ....................................................................................................................12

*Ford v. Cty. of Grand Traverse*, 535 F.3d 483 (6th Cir. 2008)......................................................7

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................................................*passim*

*Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938 (Aug. 12, 2024)..................................................................................13

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)............................................................12

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529 (6th Cir. 2008).............................7

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) ...............................................*passim*

*Kentucky v. Graham*, 473 U.S. 159 (1985)...........................................................................20

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ...................................................................... 17-18

*McPhail v. Roanoke Cty. School Bd.*, W.D.Va. No. 7:25-cv-242, 2026 U.S. Dist. LEXIS 12561 (Jan. 22, 2026) ...........................................................................................10

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)..............................................................9

*Monroe v. Pape*, 365 U.S. 167 (1961) .................................................................................20

*Nielsen v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566 (E.D.Mich. 2025)...............................15

*Olivieri v. Ward*, 766 F.2d 690, (2d Cir. 1985)....................................................................16

*Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) .........................................7

*Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) .....................................i

*Pickering v. Board of Education*, 391 U.S. 563 (1968)................................................*passim*

*Pittsburgh League of Young Voters Edn. Fund v. Port Auth.*, 653 F.3d 290 (3d Cir. 2011) ..........16

*Platt v. Mansfield*, 162 F.4th 430 (4th Cir. 2025)..............................................................17

*Polk v. Montgomery Cty. Pub. Schools*, 166 F.4th 400 (4th Cir. 2026) ...................................9

*Rankin v. McPherson*, 483 U.S. 378 (1987) ......................................................................10

*Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65 (1st Cir. 2004) ............................................16

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995) ........................i

*Sanchez v. Discount Rock & Sand Inc.*, S.D.Fla. No. 4:18-cv-10097-KMM, 2022 U.S. Dist. LEXIS 54878 (Feb. 9, 2022) ...........................................................................................7

*SQN Capital Mgt., LLC v. ST Holdings TOPCO, LLC*, S.D.Ohio No. 2:19-cv-1268, 2019 U.S. Dist. LEXIS 176898 (Oct. 11, 2019)...........................................................................8

*Struckel v. Macomb Cty.*, E.D.Mich. No. 2:20-CV-12995-TGB, 2021 U.S. Dist. LEXIS 167595 (Sep. 3, 2021) ...........................................................................................7

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..............................................6, 9

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ......................................................................9

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, (6th Cir. 2007) .............................................11

Other Authorities

Board Policy 5780.01 .............................................................................................*passim*

R.C. 3313.473 ......................................................................................................*passim*

**FACTS**

This case involves the efforts of Little Miami School Board to remove a small classroom flag bearing the message "Hate Has No Home Here."  Plaintiff is a history teacher at Little Miami Schools. The poster, which had hung in Plaintiff's classroom for approximately four years without generating any complaints, displayed five hands holding heart-shaped icons representing, among other things, the American flag, a peace sign, a rainbow Pride flag, and a transgender Pride flag.  (Complaint ¶¶ 3-4.) Plaintiff first hung the Hate Has No Home Here Flag in his classroom in 2022.   (Complaint ¶ 11.) The Hate Has No Home Here Flag is one of a number of displays in his classroom, including an American Flag, a Bengals Flag, framed photographs of Presidents and civil rights leaders with quotes, a Rosie the Riveter poster, and some Uncle Sam "I Want You" recruitment posters.  Plaintiff also has a "COEXIST" poster in another location of his classroom; that poster uses various religious symbols from around the world for letters, including the Star of David. (Complaint ¶ 11.)

This case arose in the context of a history by members of the Little Miami School Board of animus towards the message that LGBTQ individuals are entitled to equal rights.  Notably:

- In September 2023, the District decided to scale back and alter their Scholastic Book Fairs following complaints about the inclusion of certain graphic novels centering on a gay boy.

- In October 2023, the District removed books from vending machines operated by the school's PTO.  On information and belief, the District was reviewing the books to determine if they had views of LGBTQ rights that were contrary to the views of certain School Board Members.

- In December 2024 the school board sought to introduce a policy that would limit classroom displays.  Although ostensibly neutral, commentary on social media and public comment focused on photos of classrooms with LGBTQ symbols, including various signs and stickers containing rainbow coloring displayed in classrooms, which contained messages such as "Safe Space," "I am a safe person," and "You are safe with me."  This policy was not adopted.

(Complaint ¶ 13.)

In January 2025, the Ohio Assembly passed H.B. 8, known as the Ohio Parent's Bill of Rights. This Statute provides that school districts "provide parents the opportunity to review any instructional

1

material that includes sexuality content" and "Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and be permitted to participate in an alternative assignment." R.C. 3313.473(B)(1)(b). The Statute, R.C. 3113.473(G)(5), defines "sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting.
>
> "Sexuality content" does not mean any of the following:
>
>> … (c) Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Complaint ¶ 14.) In October 2025, the School Board adopted Board Policy 5780.01, entitled Parents' Bill of Rights. This Policy was adopted to comply with H.B. 8. The Policy provides:

> Prior to providing instruction that includes sexuality content or permitting a third party to provide such instruction on behalf of the District, the Board will provide parents the opportunity to review any instructional material that includes sexuality content. Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and shall be permitted to participate in an alternative assignment.

The Policy defines "Sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting. "Sexuality content" does not mean any of the following:
>
>> … C. Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Complaint ¶ 15.)

Against this background, the dispute about the Hate Has No Home Here Flag began in September 2025. At that time, the High School Principal approached Plaintiff. The Principal stated that Defendant David Wallace, the President of the School Board, had come to Plaintiff's classroom earlier one morning and took pictures of the Hate Has No Home Here Flag. (Complaint ¶ 16.) In

2

February, 2026, the High School Principal informed Plaintiff that Wallace had contacted the Superintendent and was requesting that Plaintiff take down the Hate Has No Home Here Flag. Wallce later clarified that he was making the request as a School Board Member, and not as a parent. The High School Principal said that he would not order Plaintiff to remove the Hate Has No Home Here Flag. Plaintiff refused to comply with Wallace's request. Plaintiff subsequently, at the Principal's request, drafted an email to defend the display of the Hate Has No Home Here Poster. Plaintiff provided specific American History and AP European History curriculum standards indicating that "the specific content standards … where I feel the flag I have in my room… is especially applicable." (Complaint ¶¶ 18-19.)

On February 3, 2026 the Superintendent wrote an email indicating that she had "reviewed the poster in question and its association with the attached curricula standards." She provided her opinion that while the poster "contains symbols of identities" she did not "believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." (Complaint ¶ 20.) The next day, Plaintiff met with the Principal and Superintendent. The Superintendent indicated that Wallace was now requesting that the Superintendent order Plaintiff to remove the Hate Has No Home Here Flag. Plaintiff explained that the Hate Has No Home Here Flag was not some "meaningless display" but that he had put a lot of thought into purchasing and displaying the Flag. Plaintiff expressed his belief that Little Miami had a diverse student population that the District had a legal, ethical, and moral obligation to support. Plaintiff also indicated that the Hate Has No Home Here Flag was intended to symbolize support for marginalized students who could be some of the most at-risk students. (Complaint ¶ 21.) The Superintendent told Plaintiff that she would not order him to take down the Hate Has No Home Here Flag. (Complaint ¶ 22.)

3

Following Plaintiff's meeting with the Superintendent and the High School Principal, the Board's counsel, Omar Tarazi, emailed the Superintendent and Wallace. Tarazi focused on the message conveyed by the rainbow image in the Hate Has No Home Here Flag. Tarazi stated that the Board policy would not be implicated if the same message is "displayed over a neutral image, such as the American flag or a generic student image." Tarazi disagreed with the Superintendent's opinion and suggested that the Hate Has No Home Here Flag could reasonably be viewed as presenting or describing sexual concepts or gender ideology which implicate parental notification and opt-out requirements under HB 8 and District policy. (Complaint ¶ 22.)

Plaintiff responded to Tarazi's email by suggesting that "this flag is at most an incidental reference as I do not explicitly provide instruction on the flag or incorporate it into my curricular materials." Plaintiff also noted the alternative display suggested by Tarazi was not acceptable because it would, in part, minimize the message of support for LGBTQ students. He wrote:

> My concern is that attempting to find a different, "neutral" image may inadvertently lead to the erasure of LGBTQ+ representation. My preference would be to discuss any additional representation that could potentially be added to the existing flag, rather than removing any of the represented groups.

(Complaint ¶ 24.) February 16, 2026 Plaintiff sent another email to the Superintendent to reiterate that the Hate Has No Home Here Flag's sole intent has always been a general, extra-curricular, message of inclusion and anti-bullying. He stated:

> The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology. My purpose and intent in purchasing that flag for my classroom four years ago was to convey a general message of inclusion. There is no subversive message or hidden intent underlying the flag. It is simply intended to convey that bullying and/or targeting will not be tolerated. I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class.

(Complaint ¶ 26.) Plaintiff further emphasized that the Flag was never controversial until Wallace raised the issue:

4

from what I can tell, [the Hate Has No Home Here Flag] has not had the effect of engaging students on sexual concepts or gender ideology, as they have for the most part not mentioned the flag to me at all, either during in-class discussions, in submitted assignments, or during one-on-one discussions outside of class.

(Complaint ¶ 26.)

On February 25, 2026, the Board of Education voted 4–1 to order the Hate Has No Home Here Flag's removal. The issue was framed as a determination of whether the poster constituted "sexuality content" HB 8 and Policy 5780.01.  Comments from Board Members made it clear that the decision was not based on the words of the flag itself, but rather an effort to silence the pro-LGBTQ message associated with the rainbow imagery.  These comments were focused on a combination of the association of the rainbow symbol with a position on LGBTQ rights and anti-LGBTQ animus. (Complaint ¶ 28.)  On March 4, the Board issued a Statement claiming that "The decision was not based on the phrase "Hate Has No Home Here." Instead, the Board claimed that HB 8 and the Board Policy "require parental notification and the opportunity to review and opt out when classroom materials, under the totality of the circumstances, go beyond incidental references and engage students on sexual concepts or gender ideology."  (Complaint ¶ 29.)

This litigation followed.

### ARGUMENT

Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

*Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

### A.     The Standard For Resolution Of This Motion

A motion to dismiss under Rule 12(b)(6) attacks the complaint by alleging that it "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Doe v. Baum*, 903

5

F.3d 575, 581 (6th Cir. 2018).  Plausibility is not probability; plausibility "simply calls for enough fact to raise a reasonable expectation that discovery" will be fruitful. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### B.   The Complaint States A Claim For Violation Of Free Speech[1]

#### 1.   The First Amendment Applies To Teachers As Government Employees

The First Amendment prohibits state legislatures from "mak[ing any] law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This free speech right, as it is incorporated through the Fourteenth Amendment, applies to states and municipalities, including municipal school boards. *See West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures -- Boards of Education not excepted.").

Defendants do not contest that the First Amendment's protections extend to public-school teachers and students, "neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 597 U.S. at 527.  *See also* First Amendment protections also extend to government employees: *Connick*, 461 U.S. at 140 (1983) (a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.").  *Garcetti*, 547 U.S. at 417 ("the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern").

#### 2.   This § 1983 Claim Relies On The *Pickering* Test

Plaintiff brings his constitutional claims under 42 U.S.C. § 1983.  To state a claim under Section 1983, a plaintiff must allege: "(1) a deprivation of a right secured by the Constitution or laws of the

---

[1] Defendants assert that the requests for declaratory and injunctive relief are "derivative of [Plaintiff's] underlying constitutional claim."  Def. Memo. at PageID#79.  This is confusing.  Plaintiff has not asserted a separate count for declaratory and injunctive relief, as declaratory judgments and injunctions are not causes of action but, rather, are remedies tied to some other cause of action.

6

United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008). In this case, Plaintiff alleges the deprivation of his First Amendment Free Speech rights by Defendants acting under color of law.[2]

To resolve the private-citizen/government-employee tension in the injunction/declaratory relief context, the Sixth Circuit employs a two-step framework under *Connick, Pickering,* and *Garcetti. Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530, 537 (6th Cir. 2020); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). At step one, employees must show that in expressing themselves they were speaking as citizens (rather than in a capacity as government employees) about a matter of public concern. If the employees satisfy step one, they must then demonstrate, at step two, that their interest in speaking outweighs the state's interests in promoting the efficient delivery of public services. *See Pickering*, 391 U.S. at 568.

### a. Defendants Have Waived Any Arguments Under *Pickering* By Failing To Address The Applicable Standard

Defendants fail to address the applicable standard under the Supreme Court's public employee jurisprudence. Specifically, Defendants fail to cite *Connick, Pickering* or *Kennedy* at all, and address *Garcetti* only in passing. This amounts to a waiver of any argument that the Complaint fails to state a claim under this line of cases. *See Struckel v. Macomb Cty.*, E.D.Mich. No. 2:20-CV-12995-TGB, 2021 U.S. Dist. LEXIS 167595, at *21 (Sep. 3, 2021) (finding waiver where defendants "neglect to address prong..." of *Pickering* test). *Cf. Sanchez v. Discount Rock & Sand Inc.*, S.D.Fla. No. 4:18-cv-10097-KMM, 2022 U.S. Dist. LEXIS 54878, at *22 (Feb. 9, 2022) ("Courts in this district frequently find that a party waives claims when failing to address the applicable standard").

---

[2] By its terms, § 1983 authorizes suits against state and local officials for injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-3 (1984). School districts are "persons" for purposes of § 1983. *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008); *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 505 (6th Cir. 1996).

Waiver may also be found because the failure to address the applicable caselaw renders Defendants' arguments conclusory and undeveloped. *Abdulsalaam v. Franklin Cty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009) (collecting cases) (holding that undeveloped arguments are waived). This Court has found that arguments are waived when they are "conclusory and undeveloped" such as arguments "comprised of, at most, a reiteration of the applicable standards." *Brown v. Commr. of Social Sec.*, S.D.Ohio No. 2:20-cv-424, 2021 U.S. Dist. LEXIS 46533, at *32 (Mar. 12, 2021). *See also SQN Capital Mgt., LLC v. ST Holdings TOPCO, LLC*, S.D.Ohio No. 2:19-cv-1268, 2019 U.S. Dist. LEXIS 176898, at *12 (Oct. 11, 2019) (where party has not "cited any authority in support of their position… The Court declines to develop the argument…"); *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, N.D. Ohio No. 3:15-cv-666, 2017 U.S. Dist. LEXIS 188005, *8 (Nov. 14, 2017) (declining to "add flesh to the bones of a party's skeletal… argument").

**b.    The Complaint States A Valid Claim Under The *Pickering* Standard**

Step One.

Plaintiff, by placing the Hate Has No Home Here Poster on the wall, was speaking as a citizen rather than in his capacity as a government employee about a matter of public concern. Over the last four years, Plaintiff has continuously hung banners on the wall of his assigned classrooms, including an American Flag and a Bengals Flag. Plaintiff did not hang the banners as part of the curriculum he teaches, nor did he use the banners during any classroom sessions or periods of instruction. Rather, Plaintiff hung his banners pursuant to a long-standing policy, practice, and custom of permitting teachers to display personal messages on their classroom walls.

There is also little question that the message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community.[3] The February 2026 School

---

[3] One judge presciently observes the futility of the School Board's actions:

8

Board meeting confirms this conclusion, as members of the community and elected officials had a lot to say about the topic. Indeed, one thing is clear: large segments of the community both agree and disagree with the sentiment expressed by the Hate Has No Home Here Flag. *Connick*, 461 U.S. at 146. *Cf. Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) ("By forbidding ]a professor] from describing his views on gender identity… [the university] silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion.").[4]

Step Two.

The Sixth Circuit considers various factors in undertaking the balancing required in prong two, including impairment of discipline by superiors, detrimental impacts on close working relationships, undermining of a legitimate goal or mission of the employer, impeding the performance of the speaker's duties, or impairing harmony among co-workers. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 899 (6th Cir. 2001). Factors which are relevant to this balancing analysis "include the manner, time, and place of the employee's expression, and the context in which the dispute arose." *Barnes v. McDowell*, 848 F.2d 725, 733 n.9 (6th Cir. 1988).

Defendants do not claim that the Hate Has No Home Here Flag undermined efficiency in any way. The Complaint alleges that the Hate Has No Home Here Flag has not caused any disruption or

---

> Across all levels of education—elementary to college—LGBT rights, DEI, antisemitism, systemic racism, and innumerable other issues have made our schools hotbeds of vehement sociopolitical debate. Silencing voices and compelling affirmations to government-preferred messaging do nothing to temper the vitriol; on the contrary, such actions foster further hostility.

*Polk v. Montgomery Cty. Pub. Schools*, 166 F.4th 400, ___ (4th Cir. 2026) (Wilkinson, J., dissenting).

[4] "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," *Barnette*, 319 U.S. at 642 (school officials could not compel students with a religious objection to say the Pledge of Allegiance). The First Amendment's "free-speech guarantee also generally prohibits . . . compelling an individual 'to utter what is not in her mind'… in the public school setting." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012), *quoting Barnette*, 319 U.S. at 634.

9

interference in the classroom or elsewhere in the school, or any way interfered with the ability of the school to complete its educational mission.[5] (Complaint ¶¶ 36-37.) There were no objections to the presence or messages of the Hate Has No Home Here from students, parents, or school administrators until the winter of 2026 – and, then, apparently *only* from Wallace. *Cf. McPhail v. Roanoke Cty. School Bd.*, W.D.Va. No. 7:25-cv-242, 2026 U.S. Dist. LEXIS 12561, at *31-32 (Jan. 22, 2026) (on 12(b)(6) standard, finding that wearing and displaying rainbows did not disrupt efficient operation of school). In fact, the Complaint alleges that the Hate has No Home Here Flag is *consistent* and *reinforces* the school's educational standards. (Complaint ¶ 19.) If not for the School's District's decision to draw attention to the matter, it appears the School District's operations would have continued undisturbed.

Defendants have an additional problem under prong two. *Even if* the Hate Has No Home Here Flag constituted gender ideology as that term is used in the Revised Code or the District Policy, The Revised Code and the District Policy require only notification – which would be minimal and not disruptive. The Revised Code establishes a process for parents to raise concerns to the principal, superintendent, and ultimately the school board. R.C. 3313.473(B)(5). Defendants never address or

---

[5] The relevant issue under Step Two is not the weight of the governmental interest considered in abstract terms but, instead, how the speech at issue actually affects the government's interest in providing services efficiently. *Rankin*, 483 U.S. at 388 (1987). Under *Rankin,* it is the speech's detrimental effect on the efficient delivery of public services that provides the government a legitimate interest in suppressing it. 483 U.S. at 384 (expressing concern that unsupported claims of disruption would permit the government "to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech").

In *Rankin,* the Supreme Court found a law enforcement agency's interests in maintaining efficiency were not threatened by inappropriate comments about President Reagan's assassination attempt where there was no evidence the comments "disturbed or interrupted other employees." 483 U.S. at 389. The District must, thus, provide some evidence for the Court to evaluate whether the government's claims of disruption appear reasonable. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013) ("[A]n employer's assessment of the possible interference caused by the speech must be reasonable—the predictions must be supported with an evidentiary foundation and be more than mere speculation.").

10

explain how following this process would undermine efficiency, much less undermine efficiency in way that outweighs Plaintiff's free speech interests.

> **3.     The Hate Has No Home Here Flag Is Not Curricular**

Defendants suggest that there is "a curricular connection" between the Hate Has No Home Here Flag and Plaintiff's teaching duties.[6]  Def. Memo at PageID#75.  Defendants further argue that the Complaint "describe[s] classroom speech and classroom environment messaging, not private citizen speech occurring outside the instructional setting."  *Id.*   This is not the correct test for determining if speech is public or private.  Simply because speech occurs in a classroom does not make it curricular or government speech.  The fact that there is *some* connection between the Hate Has No Home Here Flag and the school's curriculum is just one of several factors for the Court to consider.  Whether speech is pursuant to an employee's official duties "depends primarily on whether the speech is 'ordinarily within the scope of an employee's duties.'"  *Ashford v. Univ. of Mich.*, 89 F.4th 960, 972 (6th Cir. 2024), *quoting Boulton v. Swanson*, 795 F.3d 526, 533-34 (6th Cir. 2015).

To determine whether the employee made the speech pursuant to her ordinary job duties, courts "look to factors like the speech's 'impetus,' setting, audience, and general subject matter.'"  *Id. quoting Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007).   In this case, the relevant context is Plaintiff's desire to express "legal, ethical, and moral" support for Little Miami's a diverse student population. (Complaint ¶ 21.)   The Hate Has No Home Here Flag was Plaintiff's effort to "symbolize support for marginalized students who could be some of the most at-risk students."  (*Id.*) There is no allegation that the Hate Has No Home Here Flag was used for any teaching purposes.  As

---

[6] Defendants attempt to make a meal out of Plaintiff's email stating that the Hate Has No Home Here Flag is consistent with the school's teaching objectives. (Complaint ¶ 19.)  However, Plaintiff's emails only states that the message conveyed by the flag is consistent with the school's curricular standards, not that he used the flag in teaching.  Defendants ignore the later emails stating, "I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class."  (Complaint ¶ 26.)

11

HB5 and the School's policy recognize, "incidental references… occurring outside of formal instruction or presentations" are not curricular. (Complaint ¶¶ 14-15.)

Defendants rely on *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 340 (6th Cir. 2010), to argue that the speech in this case was "curricular" in nature. In *Evans-Marshall*, the Sixth Circuit held that teachers do not have a First Amendment right to select books and methods of instruction for use in the classroom. That, of course, is not this case. The Hate Has No Home Here Flag was not curricular because it is not related to the selection of books, method of instruction, or other activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Nor is the inclusion of a rainbow image on the Hate Has No Home Here Flag "instruction, presentation, image, or description of sexual concepts or gender ideology" under the School Board's Policy. This Court need go no further than the statement of the Superintendent, who wrote that the Hate Has No Home Here Flag was not curricular because the primary purpose was not "to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." (Complaint ¶ 20.)

Defendants' argument runs flat into *Kennedy*. In *Kennedy*, *supra*, a football coach led students in a prayer on the playing field at the conclusion of each game. When he continued the practice after being told by the school district to stop, he was not rehired as coach. He then sued, asserting that the District's actions violated his First Amendment rights to free speech and free exercise of religion. The Supreme Court agreed with the coach.[7] The Free Speech question in *Kennedy* ultimately turned on the

---

[7] The Court first acknowledged that the First Amendment's protections extend to teachers, but also acknowledged that the speech rights of public school employees are not "boundless" because in "addition to being private citizens, teachers… are also government employees paid in part to speak on the government's behalf and convey its intended messages." 597 U.S. at 527. To determine whether the District had violated the coach's free speech rights, the Court applied the analysis in *Pickering* and *Garcetti*.

same question presented in this case: did the coach "offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?" 597 U.S at 529. The Court concluded that the coach had engaged in private speech for purposes of the *Pickering* test. The Court explained the Coach was not engaged in speech ordinarily within the scope of his duties as a coach and that he was not seeking to convey a government-created message.[8]

The *Kennedy* Court specifically rejected Defendants' suggestion that everything that happens in a school setting is, by definition, curricular and warned against "commit[ting] the error of positing an excessively broad job description by treating everything teachers and coaches say in the workplace as government speech subject to government control." 597 U.S. at 530-31 (internal quotation marks and citation omitted). The Court specifically rejected as dispositive that the coach's prayers took "place 'within the office' environment—here, on the field of play" but, instead, "focused on the scope of his duties as a coach." 597 U.S. at 530, q*uoting Garcetti*, 547 U. S. at 421. *Cf. Barber v. Rounds,* 169 F.4th 577 (5th Cir. 2026) ("*Kennedy* clearly established that school officials may not impose categorical, visibility-based restrictions on an employee's" First Amendment activities). In this way, this case is like the post-*Kennedy* decision in *Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938, at *35-36 (Aug. 12, 2024). In *Geraghty*, the court considered whether using preferred names and pronouns was part of a middle school teacher's ordinary job duties. The court concluded that the teacher's job was to teach to state standards.[9] Notably, relying on

---

[8] *Kennedy* rejected a broad approach which focused on the fact that "teachers and coaches often serve as vital role models" holding that schools may not "treat… everything teachers… say in the workplace as government speech subject to government control." 597 U.S. at 531. The Court, further, recognized that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'"

[9] In *Geraghty,* the court noted that the teacher was not addressing "LGBTQ issues" as part of the curriculum. In this case, some of the standards touch on LGBTQ history within the context of civil rights, but Defendants never suggest the Hate Has No Home Here Flag is inconsistent with these standards and is an independent concept.

13

*Kennedy*, the *Geraghty* court rejected the idea that the speech was not private merely because it took place in the classroom setting and during class time. 2024 U.S. Dist. LEXIS 142938, at \*36.

The Court need to no further to deny the Motion. Applying the *Pickering* test, as the Court did in *Kennedy,* application of the policy (even if correct) unduly burdened Plaintiff's free speech rights. The Complaint alleges that Plaintiff sent put up the Hate Has No Home Here Flag as a citizen, not a teacher. Plaintiff, thus, has a First Amendment cause of action based on the employer's reaction to the speech. *Garcetti*, 547 U.S. at 418.

### 4. The Complaint Alleges That The Board's Reliance On The Parental Rights Policy Was Pretextual

Defendants appear to ask the Court to skip the *Pickering* analysis and hold that there is no First Amendment violation whenever a school board, exercising unreviewable discretion, declares that the speech implicates the notification provisions Ohio Parent's Bill of Rights and the District's Parents Rights Policy.[10] Def. Memo. at PageID#76. Defendants cite no authority for the proposition that compliance with a policy can overcome the rights described in the *Kennedy-Garcetti-Pickering* line of cases.

But even if such authority existed, it would be inapplicable because the Complaint alleges the Board's decision was pretextual. The Complaint states: "The justification offered by the School Board – that district feared violating the Ohio Parent's Bill of Rights and the District's Parents Rights Policy – was not justified and pretextual." (Complaint ¶ 40, PageID#14-15.) To support this allegation, the Complaint states that this Statute and Policy address "sexuality content," defined as "any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided

---

[10] The Ohio Parent's Bill of Rights and the District's Parents Rights Policy does not even give the Board the ability to remove items from the classroom. Instead, the policy provides only that parents should be "notified." In the (unlikely) event a parent lodged an objection, the Policy describes a procedure for resolution of the concerns. R.C. 3313.473(B)(5).

in a classroom setting." R.C. 3113.473(G)(5); Board Policy 5780.01. The Complaint draws a reasonable inference that there was no realistic danger that an observer would think that the Hate Has No Place Here Flag violated either the Ohio Parent's Bill of Rights or the District's Parents Rights Policy. The Complaint states that the inclusion of a rainbow symbol, among other symbols, does not constitute "instruction, presentation, image, or description of sexual concepts or gender ideology." And, *even if somehow it did*, it would fall under an exception for incidental references "occurring outside of formal instruction."[11]

Defendants nonetheless appear to claim an unreviewable power to interpret the District's Parents Rights Policy – a policy which only required notice, not the removal of materials – as a broad speech code which they can interpret however they see fit. Def. Memo at PageID#72 ("the Board acted under Ohio's Parents' Bill of Rights and Board Policy 5780.01 in determining whether the display triggered parental-notification and opt-out procedures"). Defendants cite no authority for this power – which is not surprising since it is contrary to Supreme Court authority which explains that when First Amendment concerns are involved, a reviewing court "may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, (1986), *quoting City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22, (1984). *Cf. Nielsen v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566, 602 (E.D.Mich. 2025) (students could survive summary judgment on free speech claim by showing that "purportedly viewpoint-neutral reason… was merely pretext for viewpoint discrimination").

This Court, particularly on a motion to dismiss standard, should not accept Defendants' justifications at face value. Start with the observation that "the government rarely flatly admits it is

---

[11] Notably, as noted *supra*, the Policy does not prohibit sexuality content, it merely requires notice to parents.

engaging in viewpoint discrimination" and "the recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive" *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), *citing Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 811 (1985) (cautioning that the "existence of reasonable grounds for limiting" speech "will not save a regulation that is in reality a facade for viewpoint-based discrimination"). *See also Pittsburgh League of Young Voters Edn. Fund v. Port Auth.*, 653 F.3d 290, 297 (3d Cir. 2011) ("the recitation of a nondiscriminatory rationale is not sufficient standing alone because it could be a cover-up for unlawful [viewpoint] discrimination"). Then consider the observation that "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine." *Olivieri v. Ward*, 766 F.2d 690, 691 (2d Cir. 1985).

Courts examine the context of government decisions in order to determine whether they constitute viewpoint discrimination. *Ridley*, *supra*, is perhaps the leading decision. In that case, the court considered a transit authority's rationale for rejecting pro-marijuana advertisements. The court identified three main considerations "which will lead a court to conclude that, despite the seemingly neutral justifications offered by the government, nonetheless the decision to exclude speech is a form of impermissible discrimination." The *Ridley* court said:

> First, statements by government officials on the reasons for an action can indicate an improper motive. Second, where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive. Third, suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent.

390 F.3d at 87 (citations omitted). [12]  The *Ridley* court concluded that the exclusion of the marijuana ads was pre-textual viewpoint discrimination after, *inter alia*, considering statements by officials suggesting a distaste for the viewpoint expressed and evidence that the rejection of these advertisements did not actually serve the claimed purpose.  390 F.3d at 87-88.

In this case, the Complaint posits as evidence of pretext not only (i) the facial inapplicability of the policy, but also (ii) statements made by government officials concerning the reasons for an action which appear to express animus towards the message conveyed in the Hate Has No Home Here Flag and (iii) the historical background of the decision and animus towards the LGTQ community expressed by Board members.  The history of efforts to ban book and other admissions by Board Members is probably enough for 12(b)(6) purposes.  One explained the vote to remove the Bate Has No Home Here Flag by stating, "I mean, you've got the colors that we all now associate with certain groups that not everyone agrees with in terms of their values…. And I feel like if you could just have the message without bringing in certain aspects and certain values that not everyone else has, that it would be more acceptable."  (Complaint ¶ 29(b).)  Another said, "So when you label all those different rainbow things there and the trans things you're identifying with that, and you expect us to love that and to even like it, but we don't…"  (Complaint ¶ 29(c).)

**5.** ***Kennedy,* Not *Mahmoud*, Governs This Case**

Defendants claim *Mahmoud v. Taylor*, 606 U.S. 522 (2025), authorizes the Board's actions.  Def. Memo. at PageID#78.  This over-reads the decision and ignores the discussion of the rights of school employees in *Kennedy*.  In *Mahmoud*, the Court held that parents had a free exercise right to opt out of instruction using LGBTQ-friendly books that substantially interfered with the religious development

---

[12] Other circuits have generally adopted the *Ridley* test.  *See Pittsburgh League of Young Voters Educ. Fund* 653 F.3d at 297-98; *Am. Freedom Defense Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356 (D.C. Cir. 2018); *Platt v. Mansfield*, 162 F.4th 430, 441 (4th Cir. 2025).

17

of their children. Two key facts were present in *Mahmoud* that are not present here. First, the materials were part of the curriculum. Second, the materials were not presented in a neutral manner, but, rather, were presented as part of a curriculum that was hostile to certain religious viewpoints and designed to impose upon students a pressure to conform. The record in *Mahmoud* established that the school Board had an expectation that teachers would use the LGBTQ-Inclusive Books as part of instruction and class discussion in a way that made "it clear that instruction related to the storybooks" did more than merely expose students to the fact that LGBTQ people exist and encouraged students to treat others with kindness. 606 U.S. at 553-554.

In contrast, this case concerns the free speech rights of a teacher, not the free exercise rights of parents considered in *Mahmoud*. The Complaint alleges that the District "generally permits teachers to display personal items on the walls of their classrooms and teachers are given a lot of freedom to decorate classrooms." (Complaint ¶ 14.) The Complaint further alleges the Hate Has No Home Here Flag's sole intent was a non-curricular general message of inclusion and anti-bullying. Plaintiff twice affirmed that he never incorporated the flag into the curriculum. (Complaint ¶¶ 24, 26.) The Complaint asserts:

> The Hate Has No Home Here Flag was extra-curricular, as it was not part of activities supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

(Complaint ¶ 38.) Assuming these facts to be true for 12(b)(6) purposes, this clearly takes this case outside of *Mahmoud*. In this case, like in *Kennedy,* students and parents all understand that teachers control the messages conveyed by their classroom displays and there is little likelihood of confusion that students will perceive that the Hate Has No Home Here Flag expresses the view of the School Board or is part of the curriculum. [13] *Cf. Cajune v. Indep. School Dist. 194*, 105 F.4th 1070, 1081 (8th Cir.

---

[13] The Sixth Circuit, in a recent case involving student speech on LGBTQ and transgender issues, like the *Kennedy* Court, took a similarly broad view of free speech in the schools. *Defending Edn. v. Olentangy*

2024) ("we find that the public would perceive private persons, and not the District, as having spoken through… posters" at a school).

*Kennedy,* unlike in *Mahmoud,* involved private speech that happened to occur on school property. 597 U.S. at 530. The *Kennedy* Court explained the Coach was not engaged in speech ordinarily within the scope of his duties as a football coach and that he was not seeking to convey a government-created message. The Court said, "He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." 597 U.S. at 529-530. Similarly, Plaintiff's ordinary job duties include the teaching of history to the appropriate state standards; it is generally not within his job to teach anything with regard to LGBTQ issues.[14] The Court, further, recognized that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" Indeed, what the *Kennedy* Court said about the football coach's prayer can easily be substituted with Plaintiff's display of the Hate Has No Home Here Flag: this was (i) private speech, not government speech; (ii) not within the scope the duties as a teacher; (iii) not pursuant to government policy; (iv) not seeking to convey a government-created message; and (v) not instructing, discussing the curriculum, or encouraging better classroom performance.[15]

---

*Local School Dist. Bd. of Edn.*, 158 F.4th 732, 738 (6th Cir. 2025). In invalidating a rule that prohibited the misgendering of fellow students, the Court noted that "no laws give members of our society the 'right' to avoid messages they dislike." 158 F.4th at 750. The court emphasized that gender-based viewpoints are protected views and protected forms of expression under the First Amendment. 158 F.4th at 738. The school district in *Defending Edn.* Did "not even tr[y] to describe its general mandate to use preferred pronouns 'as part of the school curriculum.'" 158 F.4th at 747.

[14] To the extent that teaching about discrimination, which would include discrimination against LGBTQ individuals, is part of Plaintiff's job, the message on the flag is consistent with various state standards. Of course, as noted *supra,* the fact that the message of the Hate Has No Home Here Flag is consistent with state standards does not make the Flag, by itself, part of the curriculum.

[15] The Supreme Court in *Kennedy* recognized that a focus on the mere presence of teachers in the classroom focus would impermissibly allow a school to cite policy or Establishment Clause concerns

19

## C.      Wallace Is An Appropriate Defendant

The Complaint asserts claims against the School Board and Wallace in their official capacity. The Complaint alleges certain actions by Wallace that were independent of Board actions and that he "has the authority to provide all of the injunctive relief sought in this Complaint." (Complaint ¶ 7; Complaint ¶¶ 16-18.) Wallace was also named as a defendant in the event that Defendants claimed to be acting pursuant to State law. *See, e. g., Monroe v. Pape*, 365 U.S. 167 (1961).

To the extent that Defendants' Motion may be seen as an admission that there are no jurisdictional barriers to the School Board providing all requested relief and that Wallace would be bound by the judgment sought in this case and would be prohibited from acting outside of official School Board action, Plaintiff acknowledges that they would not be required to name an individual in their complaint in order to obtain complete relief. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (claim against a municipal official in his or her official capacity is tantamount to a suit against the municipal entity).

## CONCLUSION

The Motion should be denied.

Respectfully submitted,

  /s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

---

as justification to "fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." 597 U.S. at 531.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this April 21, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel