# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| GEORGE MCINTYRE | Case No. 1:26-cv-00351-MWM |
| Plaintiff | Judge:  Matthew W. McFarland |
| v. | |
| LITTLE MIAMI SCHOOL DISTRICT, ET AL | REPLY TO RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION |
| Defendants | |

Plaintiff respectfully submits this Reply to Defendants' Response to the Motion for Preliminary Injunction.  (Doc#3, Doc#13.)  This Reply is accompanied by the Affidavit of George McIntyre.

Defendants' Motion fails to address the test for government employee speech established by the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 140 (1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006); and *Pickering v. Board of Education*, 391 U.S. 563 (1968).   This is a fundamental flaw in Defendant's argument, as these cases establish a balancing test.  Defendants assert that the School Board was acting to support a Parental Rights Policy.  But that, by itself, is not enough.  Even assuming that Defendants acted to support that interest (instead of what was very possibly viewpoint discrimination), the Court *still* must weigh the Plaintiff's free speech interest against the interest of the District, as an employer, in promoting the efficiency of the public services.  *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), *citing Pickering*, 391 U.S. at 568).  The failure of Defendants to offer any evidence or argument on these issues is fatal to this Opposition.

i

**TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................................1

    A.   Discovery And An Evidentiary Hearing Is Needed To Resolve Factual
        Disputes.............................................................................................................................1

    B.   Defendants Have Waived Any Arguments Under *Pickering* 'Step Two' By
        Failing To Address The Applicable Standard.................................................................3

    C.   Plaintiff Has A Substantial Likelihood Of Success On The Merits.......................................4

        1.   Defendants Do Not Contest The First Amendment Applies To
              Teachers Or That Plaintiff Was Speaking As A Citizen Rather About A
              Matter Of Public Concern.........................................................................................4

        2.   *Pickering* Step One: The Hate Has No Home Here Flag Is Not
              Curricular .................................................................................................................4

        3.   *Pickering* Step Two:  Defendants Do Not Present Any Evidence To
              Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is
              Outweighed By The District's Interests In Promoting The Efficient
              Delivery Of Public Services ......................................................................................9

        4.   The Board's Reliance On The Parental Rights Policy Was Pretextual
              And Impermissible Viewpoint Discrimination............................................................11

    C.   Irreparable Harm.............................................................................................................14

    D.   Public Interest And Harm To Third Parties.........................................................................15

    E.   Nominal Bond Should Be Imposed....................................................................................16

CONCLUSION ...........................................................................................................................16

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Barnes v. McDowell*, 848 F.2d 725 (6th Cir. 1988)................................................................1

*Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530 (6th Cir. 2020) .....................3

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)................................................................7

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891 (6th Cir. 2001)......................................1

*Cajune v. Indep. School Dist. 194*, 105 F.4th 1070 (8th Cir. 2024)....................................14

*Calef v. Budden*, 361 F.Supp.2d 493 (D.S.C. 2005) ...............................................................7

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ..............................................11

*City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488 (1986) .....................11

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................*passim*

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) ...........................................3

*Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.,* 158 F.4th 732 (6th Cir. 2025).........................14

*Deltondo v. School Dist. of Pitt.,* W.D.Pa. No. 2:22-cv-350, 2024 U.S. Dist. LEXIS 210469 (Jan. 18, 2024) ............................................................................................1

*Dutton v. Shaffer*, ___ F.4th ___, 6th Cir. No. 25-5352/25-5391, 2026 U.S. App. LEXIS 9437 (Apr. 1, 2026) ......................................................................................14

*Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332 (6th Cir. 2010) ...........................................................................................6

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)................................................................*passim*

*Garrett v. Morgan Cty. Sheriff's Office*, N.D.Ohio No. 1:23CV2011, 2026 U.S. Dist. LEXIS 25970 (Feb. 9, 2026) .....................................................................................4

*Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938 (Aug. 12, 2024). .......................................................8

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)......................................................5

*Internatl. Assn. of Fire Fighters v. Bentley,* N.D.Ala. Civil Action No. CV-11-S-1054, 2012 U.S. Dist. LEXIS 53031 (Apr. 9, 2012) .......................................................................2

*Johnson v. City of Battle Creek,* W.D.Mich. No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300 (May 10, 2005) .............................................................................................9

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) ...................................*passim*

*L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) ......................................15

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) ..................................................12

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ..........................................................................13

*McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076 (N.D.Fla. 2016) .....................12

*Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir. 1991)............................................5

*Navigators Specialty Ins. Co. v. Guild Assocs.,* S.D.Ohio No. 2:14-CV-1676, 2016 U.S. Dist. LEXIS 163484 (Nov. 28, 2016*)* ........................................................................................... 3

*Nielsen v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566 (E.D.Mich. 2025)................................... 12

*Oruganti v. Noem*, S.D.Ohio No. 2:25-cv-00409, 2025 U.S. Dist. LEXIS 74269 (Apr. 18, 2025) ............................................................................................................................................ 14

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566 (6th Cir. 2002) .............................. 14

*Pickering v. Board of Education*, 391 U.S. 563 (1968) .............................................................*passim*

*Pittsburgh League of Young Voters Edn. Fund v. Port Auth.*, 653 F.3d 290, 297 (3d Cir. 2011) ...............2, 12

*Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65 (1st Cir. 2004) ...................................................... 2

*Shelby Cty. Deputy Sheriff's Assn. v. Shelby Cty. Sheriff's Office*, W.D.Tenn. No. 07-2420-JPM, 2007 U.S. Dist. LEXIS 105712 (Nov. 14, 2007) ..................................................................... 9

*Struckel v. Macomb Cty.*, E.D.Mich. No. 2:20-CV-12995-TGB, 2021 U.S. Dist. LEXIS 167595 (Sep. 3, 2021).......................................................................................................... 3

*Thomas v. Great Lakes Water Auth.,* E.D.Mich. No. 18-13033, 2020 U.S. Dist. LEXIS 171891 (Sep. 21, 2020) ................................................................................................... 4

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................................................. 9

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) ....................................................................... 15

*Vlaming v. W. Point School Bd.,* 302 Va. 504 (2023) .................................................................... 9

*Warner v. Chambers-Smith*, S.D.Ohio No. 2:24-cv-1565, 2025 U.S. Dist. LEXIS 259689 (Dec. 16, 2025)............................................................................................................... 15

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007) .................................................... 4

Other Authorities

Board Policy 5780.01 ........................................................................................................*passim*

R.C. 3313.473 .....................................................................................................................*passim*

## ARGUMENT

### A.     Discovery And An Evidentiary Hearing Is Needed To Resolve Factual Disputes

Further discovery and an evidentiary hearing is necessary in this case.

Discovery and an evidentiary hearing will assist the Court in resolving factual disputes about the application of the *Pickering* factors under the relevant Supreme Court authority.  *Connick v. Myers*, 461 U.S. 138, 140 (1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022).  Specifically, discovery and an evidentiary hearing is helpful to resolve factual disputes about whether the Hate Has No Home Here Flag was curricular, *i.e.* whether it is related to the selection of books, method of instruction, or other activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Discovery and an evidentiary hearing is also helpful to resolve factual disputes about whether and to what extent the Hate Has No Home Here Flag actually affected the District's interest in providing services efficiently, including the factors outlined by the Sixth Circuit in *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 899 (6th Cir. 2001): any detrimental impacts on close working relationships, any undermining of a legitimate goals of the District; and any impact on the performance of Plaintiff's duties.  Finally, discovery and an evidentiary hearing would assist the Court in applying the balancing required by the *Pickering* test, *i.e.* determining if Plaintiff's free speech interests outweigh the efficiency interests of the government as employer, including "the manner, time, and place of the employee's expression, and the context in which the dispute arose." *Barnes v. McDowell*, 848 F.2d 725, 733 n.9 (6th Cir. 1988). *Cf. Deltondo v. School Dist. of Pitt.,* W.D.Pa. No. 2:22-cv-350, 2024 U.S. Dist. LEXIS 210469, at *13-14 (Jan. 18, 2024) (permitting discovery because "No *Pickering* balancing test could be performed without some context of why Plaintiff's speech initiated the chain of events that form the background of this case.").

1

Discovery and an evidentiary hearing are also necessary because Defendants assert that the Court should accept the Board's "institutional explanation" of its decision without any further inquiry. Def. Memo. at PageID#99. Discovery and an evidentiary will aid the Court in determining whether the School Board engaged in impermissible viewpoint discrimination. Defendant's assertion of a viewpoint-neutral explanation does not end the matter because "the government rarely flatly admits it is engaging in viewpoint discrimination" and "the recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive" *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), *citing Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 811 (1985) (cautioning that the "existence of reasonable grounds for limiting" speech "will not save a regulation that is in reality a facade for viewpoint-based discrimination"). *See also Pittsburgh League of Young Voters Edn. Fund v. Port Auth.*, 653 F.3d 290, 297 (3d Cir. 2011) ("the recitation of a nondiscriminatory rationale is not sufficient standing alone because it could be a cover-up for unlawful [viewpoint] discrimination"). Discovery on the pretext issue may be limited to the inquiries suggested by the *Ridley* court that may "lead a court to conclude that, despite the seemingly neutral justifications offered by the government, nonetheless the decision to exclude speech is a form of impermissible discrimination." To wit:

> First, statements by government officials on the reasons for an action can indicate an improper motive. Second, where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive. Third, suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent.

390 F.3d at 87 (citations omitted). *See also Pittsburgh League of Young Voters Edn. Fund*, 653 F.3d at 297 (adopting *Ridley* factors). *Cf. Internatl. Assn. of Fire Fighters v. Bentley,* N.D.Ala. Civil Action No. CV-11-S-1054, 2012 U.S. Dist. LEXIS 53031, at *14 (Apr. 9, 2012) (permitting discovery because "viewpoint discrimination argument depends on proving the motivation of former [those] who crafted and navigated the enactment of the" policy "rather than simply focusing upon the cold, printed text").

2

**B.** **Defendants Have Waived Any Arguments Under *Pickering* 'Step Two' By Failing To Address The Applicable Standard**

Defendants fail to address the applicable two step standard under the Supreme Court's public employee jurisprudence described in *Connick, Pickering,* and *Garcetti.* Pl. Memo at 36-3, *citing Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530, 537 (6th Cir. 2020); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). The steps:

I.  Whether the employee was speaking as a citizen (rather than in a capacity as government employees) about a matter of public concern.

II.  Whether the employee's interest in speaking outweighs the government's interests in promoting the efficient delivery of public services.

Defendants fail to cite *Connick* or *Pickering* or *Kennedy* at all, and address *Garcetti* only in passing. More importantly, Defendants fail to engage in the *Pickering* balancing test.

Arguably, although not explicitly stated in relation to the relevant doctrinal framework, Defendants' argument that the Hate Has No Home Here Flag is curricular addresses the 'Step One' question of whether Plaintiff was speaking as a citizen (rather than in a capacity as government employee) about a matter of public concern. Def. Memo at PageID#97-98; *but see infra.*

As for Step Two, however, Defendants offer no evidence or argument that the Hate Has No Home Here Flag was disruptive or undermined a legitimate governmental interest, much less that the District's interests in promoting the efficient delivery of public services outweighs Plaintiff's free speech interests. (*Compare* Mcintyre Aff. ¶ 3.) This amounts to a waiver of any argument concerning Step Two of the *Pickering* test. *See Struckel v. Macomb Cty.*, E.D.Mich. No. 2:20-CV-12995-TGB, 2021 U.S. Dist. LEXIS 167595, at *21 (Sep. 3, 2021) (finding waiver where defendants "neglect to address prong..." of *Pickering* test). *See also Navigators Specialty Ins. Co. v. Guild Assocs.,* S.D.Ohio No. 2:14-CV-1676, 2016 U.S. Dist. LEXIS 163484, at *31 (Nov. 28, 2016) ("A party waives opposition to an argument by failing to address it in her responsive brief."); *Thomas v. Great Lakes Water Auth.,*

3

E.D.Mich. No. 18-13033, 2020 U.S. Dist. LEXIS 171891, at *21 (Sep. 21, 2020) ("when a party fails to address an argument, the argument is potentially waived"); *Garrett v. Morgan Cty. Sheriff's Office*, N.D.Ohio No. 1:23CV2011, 2026 U.S. Dist. LEXIS 25970, at *21-22 (Feb. 9, 2026) ("It is well established that, if a party fails to address an argument raised in a motion or brief in opposition, a district court may deem that party to have waived opposition to that argument.") (collecting cases).

**C.     Plaintiff Has A Substantial Likelihood Of Success On The Merits**

**1.     Defendants Do Not Contest The First Amendment Applies To Teachers Or That Plaintiff Was Speaking As A Citizen Rather About A Matter Of Public Concern**

Defendants do not contest that the free speech guarantees of the First Amendment apply to Defendants.  *See* Pl. Memo. at PageID#36.  Nor do Defendants contest that the message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community.  *See* Pl. Memo. at PageID#37-38.

**2.     *Pickering* Step One: The Hate Has No Home Here Flag Is Not Curricular**

Defendants suggest that the Hate Has No Home Here Flag is not protected speech because it constitutes "classroom speech and classroom environment messaging, not private citizen speech occurring outside the instructional setting." Def. Memo. at PageID#97-98.

As an initial matter, Defendants fail to apply the correct test for determining if speech is public or private.  To determine whether employee speech is pursuant to ordinary job duties, courts "look to factors like the speech's 'impetus,' setting, audience, and general subject matter.'" *Id. quoting Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007).   In this case, the relevant context is Plaintiff's desire to express "legal, ethical, and moral" support for Little Miami's a diverse student population. (Verified Complaint ¶ 21.)   The Hate Has No Home Here Flag was one of many flags and posters in Plaintiff's classroom, some of which (like the Bengals and FCC flags) have nothing to do with the

school at all.  (McIntyre Aff. ¶ 4.)  Plaintiff's intent was to symbolize support for marginalized students who could be some of the most at-risk students.  He explains:

> The Hate Has No Home Here Flag was part of my efforts to symbolize support for marginalized students who could be some of the most at-risk students.  I believe that some members of the school board and the community at large have, through actions and public statements, expressed hostility towards many marginalized students, particularly LGBTQ students.  The Hate Has No Home Here Flag was simply a reminder that students must treat all of their classmates with mutual respect, regardless of personal opinions or beliefs.

(McIntyre Aff. ¶ 5.)

Plaintiff acknowledges that in-classroom speech made by an educator as part of a curriculum is not speech on a matter of public concern for *Pickering* purposes.  Plaintiff, however, has been clear that the Hate Has No Home Here Flag is not curricular. What is curricular speech?  Defendants do not offer a definition.[1]  In *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988), the Supreme Court defined the "curriculum" as having two components: (i) school-sponsored expression bearing the imprimatur of the school (ii) that is supervised by faculty members and designed to impart

---

[1] Compare Pl. Memo. at PageID#40 ("the Hate Has No Home Here Flag is clearly extracurricular, as it is not part of activities 'supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.'"), *quoting Hazelwood*, 484 U.S. at 271.

Instead of offering a definition, Defendants, without citation to any authority, repeatedly use the terms "classroom expression" and "classroom environment messaging." *See e.g.* Def. Memo at PageID#97, 99, 102.  This term "classroom expression" does not seem to have any doctrinal significance and does not seem to have been used in the Sixth Circuit over the past 50 years.  Defendants *may* be referring to a pre-*Garcetti-Kennedy* case from the Tenth Circuit which applied the *Hazelwood* test to determine whether statements by teachers in a classroom were protected by the First Amendment. *Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir. 1991) (holding teacher's in-classroom comments about a rumor regarding two of his students was not protected speech, noting "we distinguish between teachers' in classroom expression and teachers' expression in other situations that would not reasonably be perceived as school-sponsored").  The term "classroom environment messaging" seems to have been invented by Defendants (or an AI; the stitching together of plausible-sounding terminology that has no established doctrinal basis is an indicator of AI-generated legal writing).

5

particular knowledge to the students..[2] The Hate Has No Home Here Flag is not curricular under the *Hazelwood* definition in both ways. First, the Hate Has No Home Here Flag was not selected by the School Board and does not bear the imprimatur of the District.[3] Second, Plaintiff never used the Hate Has No Home Here Flag as part of his methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag. Plaintiff in his Affidavit states this clearly and unequivocally:

> The Hate Has No Home Here Flag was not a school-sponsored expression bearing the imprimatur of the school or designed to impart particular knowledge to the students. I never used the Hate Has No Home Here Flag as part of my methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag. Similar to other items I have displayed in my classroom, The Hate Has No Home Here Flag was at most an incidental reference to topics discussed in class; I did not explicitly provide instruction on the Hate Has No Home Here Flag or incorporate it into my curricular materials.
>
> My display of the Hate Has No Home Here Flag was private speech not within the scope the duties as a teacher or pursuant to any school board policy or part of an effort to convey a government-created message. In displaying the Hate Has No Home Here Flag I was not instructing, discussing the curriculum, or encouraging better academic performance.

(McIntyre Aff. ¶¶ 6-7.) The better view of the Hate Has No Home Here Flag is as an incidental reference to matters and subjects occurring outside of formal instruction or presentations, which, as

---

[2] In *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 340 (6th Cir. 2010), the Sixth Circuit did not explicitly define the term, but suggested that it included the selection of books and methods of instruction for use in the classroom.

Defendants reliance in *Evans* is misplaced. Def. Memo. at PageID#97. In *Evans,* the question for the court was whether a public high school teacher had a First Amendment right to select books and methods of instruction for use in the classroom without interference from public officials. In answering that question with a "no," the Sixth Circuit held merely that "the First Amendment does not protect primary and secondary school teachers' in-class curricular speech." 624 F.3d at 342. The case has nothing to say about non-curricular speech.

[3] In fact, as should be obvious, the opposite is true: a majority of the School Board opposes the message of including LGBTQ symbols..

the Revised Code and School's policy recognize, would not be part of a school's curriculum. (Verified Complaint ¶¶ 14-15; Policy, Doc#13-7, PageID#141.); R.C. 3313.473(B)(1)(b).

Defendants offered no independent evidence otherwise.  Instead, Defendants point to emails from Plaintiff explaining how the Hate Has No Home Here Flag is "applicable" to "specific content standards" for the classes he teaches.  Def. Memo. at PageID# 97.  In Defendants' telling of the story, these mails "contradict" Plaintiff's claims that the Hate Has No Home Here Flag is extra-curricular. Def. Memo. at PageID#97.  Context remains important here.  These emails were written as a follow-up to a meeting between Plaintiff and the Principal in response to specific issues raised by Wallace and state only that the Hate Has No Home Here Flag is consistent with content standards.  (Verified Complaint ¶19; Email, Doc#13-8, PageID#147.)   Why is this significant?  Because messages that are *inconsistent* with content standards could potentially undermine the efficient provision of educational services for *Pickering* Part Two purposes.  *Cf. Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991) (state's interest in the effective administration of classrooms outweighs a professor's interest in teaching religiously-based material which hampered the State's ability to effectively educate its students); *Calef v. Budden*, 361 F.Supp.2d 493, 500 (D.S.C. 2005) (teacher's use of instructional time to discuss her politics with the students in the class, rather than teaching them, "interfered with the operation of the school and undermined its mission").  Plaintiff has cleared up any confusion by asserting in his affidavit, "Although the message of the Hate Has No Home Here Flag is consistent with state and AP standards, the Hate Has No Home Here Flag was not used for any teaching purposes."  (McIntyre Aff. ¶ 6.)  Defendants offer no contradictory evidence.

Defendants' arguments fail because they cherry-pick portions of the email exchanges while ignoring the parts of these emails where Plaintiff explicitly states the Hate Has No Home Here Flag was not used for instructional purposes.  On February 3, 2026, Plaintiff explained that the Hate Has No Home Here Flag was simply "a reminder that [students]  must treat their classmates with mutual

7

respect, regardless of personal opinions or beliefs." (Email, Doc#13-8, PageID#148.) On February 9, 2026, Plaintiff explained that the Hate Has No Home Here Flag was not used for instructional purposes:

> Similar to other items I have displayed in my classroom, I would say this flag is at most an incidental reference as I do not explicitly provide instruction on the flag or incorporate it into my curricular materials.

(Email, Doc#13-8, PageID#144.) The Superintended agreed, writing

> I do not believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement…

(Email, Doc#13-8, PageID#146.) Defendant's position otherwise is particularly problematic because the District's Counsel – who signed Defendant's Response – *said exactly the opposite in an email.* On February 2, 2026, Mr. Tarazi acknowledged that "the teacher's position is that… they do not explicitly refer to the flag or incorporate it into curricular materials." (Email, Doc#13-8, PageID#143.)

Defendants' argument runs flat into *Kennedy,* a decision that applied the *Pickering* test in a school setting. The *Kennedy* Court made it clear that all speech occurs in school setting is not necessarily curricular or school sponsored. Instead the *Kennedy* Court recognized what Defendants do not --- school employees, even on school grounds, may engage in speech that is not ordinarily within the scope of their official duties. 597 U.S. at 530. In this way, this case is like the post-*Kennedy* decision in *Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938, at *35-36 (Aug. 12, 2024). In *Geraghty*, the court considered whether using preferred names and pronouns was part of a middle school teacher's ordinary job duties. The court concluded that the teacher's job was to teach English to state standards.[4] Notably, relying on *Kennedy*, the *Geraghty* court

---

[4] In *Geraghty,* the court noted that the teacher was not addressing "LGBTQ issues" as part of the curriculum. In this case, some of the standards touch on LGBTQ history within the context of civil rights, but Defendants never suggest the Hate Has No Home Here Flag is inconsistent with these standards and is an independent concept.

8

rejected the idea that the speech was not private merely because it took place in the classroom setting and during class time. 2024 U.S. Dist. LEXIS 142938, at *36. The court said, "Defendants make much of the fact that" the speech occurred in the classroom setting and during class time, but that, under *Kennedy*, was not "dispositive" because, the teacher "did not 'shed [her] constitutional rights' when she entered the classroom." 2024 U.S. Dist. LEXIS 142938, at *36, *quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). *Cf. Vlaming v. W. Point School Bd.,* 302 Va. 504, 573 (2023) (holding that teacher's use of pronouns in classroom "does not involve a teacher demanding the right to teach a different curriculum from the one that he was hired to teach").

    **3.**    ***Pickering* Step Two: Defendants Do Not Present Any Evidence To Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is Outweighed By The District's Interests In Promoting The Efficient Delivery Of Public Services**

Once Plaintiff establishes that some of his speech is protected, the burden is shifted to the Defendant to show adequate justification for its actions. *Connick*, 461 U.S. at 150. *See Johnson v. City of Battle Creek,* W.D.Mich. No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300, at *32-33 (May 10, 2005) ("the entire *Pickering-Connick* line of cases establishes that employee speech, even if protected, may be the occasion of discipline if the public employer bears its burden of showing that its legitimate interests outweigh the employee's interest in speaking"); *Shelby Cty. Deputy Sheriff's Assn. v. Shelby Cty. Sheriff's Office*, W.D.Tenn. No. 07-2420-JPM, 2007 U.S. Dist. LEXIS 105712, at *13 (Nov. 14, 2007) ("Under *Connick* and *Pickering,* once Plaintiffs establish that some of their activity is protected, the burden is shifted to the government to show adequate justification for its acts"). Plaintiff states in his Affidavit that the Hate Has No Home Here Flag did not negatively impact the District:

> I am not aware of any claims by school administrators, school board members, or parents that the Hate Has No Home Here Flag affected the District's interest in providing services efficiently. The presence of Hate Has No Home Here Flag has not had any detrimental impact on my working relationships with other teachers or administrators or undermined my ability to teach my classes in accordance with state standards.

(McIntyre Aff. ¶ 3.)   Accordingly, even if the Court determines that Defendants have not waived arguments on this part of the *Pickering* test by failing to submit evidence that contradicts this evidence, *see supra*, Defendants cannot meet their burden on the merits.

Defendants *seem* to suggest (without explicitly stating) that the presence of a Hate Has No Home Here Flag undermines a legitimate governmental interest in compliance with the Parental Rights law and Policy.  Def. Memo at PageID#99-100.  For example, Defendants respond only in a conclusory manner to the evidence from the Superintendent that the Policy does not even apply to because the Hate Has No Home Here Flag does not meet the definition of "sexuality content." Defendants never explain that the Superintendent was wrong, they merely assert that "the Board made the final determination."[5]  *See* Pl. Memo. at PageID#41; Def. Memo. at PageID#100.  Defendants assert, instead, that the Revised Code and the District Policy required the removal of the Hate Has No Home Here Flag, suggesting that "the policy's procedural requirements had to be followed before the poster could remain in place."  Def. Memo. at PageID#100.  But this is not what the Revised Code and the Policy state.  The Revised Code and the Policy provide only that the District provide parents "the opportunity to review any instructional material that includes sexuality content."  R.C. 3313.473(B)(1)(b); (Policy, Doc#13-7, PageID#141.)  The Revised Code and the Policy then set forth a process for resolving any parental concerns starting with the principal and then progressing the superintendent and school board.   R.C. 3313.473((B)(5); (Policy, Doc#13-7, PageID#142.) Defendants have no evidence that the burden of providing notice and, in the event a parent raised a

---

[5] The lack of explanation is notable because the Superintendent submitted an Affidavit.  (Doc#13-13, PageID#206-207.)  The Court should find it highly significant that, when offered the opportunity to contest or clarify her statement that the Hate Has No Home Here Flag did not implicate the Policy, she simply remained silent, offering no opinion or evidence any evidence to contradict Plaintiff's assertions in the Verified Complaint or Motion.

concern, using the process outline in the Revised Code and the Policy, would cause enough disruption or inefficiency to outweigh Plaintiff's free speech interests.

### 4.        The Board's Reliance On The Parental Rights Policy Was Pretextual And Impermissible Viewpoint Discrimination

The Court need go no further. Applying the *Pickering* test, as the Court did in *Kennedy,* application of the policy (even if correct) unduly burdened Plaintiff's free speech rights. Plaintiff, thus, has substantial likelihood of success on his First Amendment cause of action based on the employer's reaction to the speech. Plaintiff, however, offers a separate First Amendment violation: the Board engaged in impermissible viewpoint discrimination. (*See* Verified Complaint ¶ 39.)

Defendants appear to ask the Court to simply hold that there can be no First Amendment violation whenever a school board, exercising unreviewable discretion, declares that the speech implicates the notification provisions Ohio Parent's Bill of Rights and the District's Parents Rights Policy.[6] Def. Memo. at PageID#99-100. Defendants cite no authority for the proposition that the claim of compliance with a policy can overcome the rights described in the *Kennedy-Garcetti-Pickering* line of cases. Defendants nonetheless appear to claim an unreviewable power to interpret the District's Parents Rights Policy – a policy which only required notice, not the removal of materials – as a broad speech code which they can interpret however they see fit. But Supreme Court authority explains that when First Amendment concerns are involved, a reviewing court "may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, (1986), *quoting City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22, (1984). *Cf. Nielsen*

---

[6] The Ohio Parent's Bill of Rights and the District's Parents Rights Policy does not even give the Board the ability to remove items from the classroom. Instead, the policy provides only that parents should be "notified." In the (unlikely) event a parent lodged an objection, the Policy describes a procedure for resolution of the concerns. R.C. 3313.473(B)(5).

*v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566, 602 (E.D.Mich. 2025) (students could survive summary judgment on free speech claim by showing that "purportedly viewpoint-neutral reason… was merely pretext for viewpoint discrimination").

Defendants rely heavily on the *post hoc* statement from the School Board, suggesting that the Board's *post hoc* statement about the action supports a conclusion that the Board did not intend to ban any message. Def. Memo. at PageID#99. This, on its face, remains a disputed claim. One Board member observed when the motion was made to adopt this statement:

> This statement does not reflect what the motion was that passed. The motion was just yes or no. There's a problem there. The policy cited in this motion does not support this action. This is clear.

(Transcript, Doc#13-6, PageID#130.) Defendants face another, bigger, problem: this statement has no relevance or weight. Courts have observed that "a government cannot generally put forth after-the-fact evidence of a purportedly viewpoint-neutral policy, as this could lead to *post-hoc* rationalizations for viewpoint discrimination" *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1109 (N.D.Fla. 2016), *citing Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 296. *Cf. Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988) (observing that "post hoc rationalizations… are far too easy, making it difficult for courts to determine in any particular case whether" government is "permitting favorable, and suppressing unfavorable, expression").

In this case, there is evidence that the Board was using the Parents Rights laws and policy as pretext. There is an uncontested history of animus in the forms of efforts to ban books and other materials related to LGBTQ students by Board Members. (*See* Verified Complaint ¶ 13; McIntyre Aff ¶ 5.) This has gone beyond what Defendants characterize, *inter alia,* as "curriculum," or "instructional materials." Def. Memo at PageID#101. Evidence of animus outside of the instructional setting includes the removal of rainbow "safe space" stickers by teachers and restrictions on books made available by private companies and the PTO. (Verified Complaint ¶ 13.) Further, statements by

12

Board Members made it clear that the motivation for the decision was not about curricular matters but whether the inclusion of LGBTQ symbols on the Hate Had No Home Here Flag was contrary to the values of the Board Members.  One explained the vote to remove the Bate Has No Home Here Flag by stating,  "I mean, you've got the colors that we all now associate with certain groups that not everyone agrees with in terms of their values…. And I feel like if you could just have the message without bringing in certain aspects and certain values that not everyone else has, that it would be more acceptable."  (Transcript, Doc#13-4, PageID#119.)  Another said, "So when you label all those different rainbow things there and the trans things you're identifying with that, and you expect us to love that and to even like it, but we don't…"  (Transcript, Doc#13-4, PageID#121.)

Defendants claim *Mahmoud v. Taylor*, 606 U.S. 522 (2025), authorizes the Board's actions.  Def. Memo. at PageID#78.  This over-reads the decision and ignores the discussion of the rights of school employees in *Kennedy*.  In *Mahmoud*, the Court held that parents had a free exercise right to opt out of instruction using LGBTQ-friendly books that substantially interfered with the religious development of their children.  Two key facts were present in *Mahmoud* that are not present here.  First, the materials were part of the curriculum.  Second, the materials were not presented in a neutral manner, but, rather, were presented as part of a curriculum that was hostile to certain religious viewpoints and designed to impose upon students a pressure to conform.  The record in *Mahmoud* established that the school Board had an expectation that teachers would use the LGBTQ-Inclusive Books as part of instruction and class discussion in a way that made "it clear that instruction related to the storybooks" did more than merely expose students to the fact that LGBTQ people exist and encouraged students to treat others with kindness. 606 U.S. at 553-554.

In contrast, this case concerns the free speech rights of a teacher, not the free exercise rights of parents considered in *Mahmoud*.  The curriculum in *Mahmoud* went far beyond books sitting silently on classroom shelves or posters on a wall. Those materials were deployed by teachers with lesson

13

plans designed to subvert children's religiously grounded views on marriage and gender. In this case, like in *Kennedy,* students and parents all understand that teachers control the messages conveyed by their classroom displays and there is little likelihood of confusion that students will perceive that the Hate Has No Home Here Flag expresses the view of the School Board or is part of the curriculum. *Cf. Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.,* 158 F.4th 732, 753 (6th Cir. 2025) (school district's ban on the use of biological pronouns regulates personal expression and speech on a public concern in a way that discriminates based on viewpoint); *Cajune v. Indep. School Dist. 194*, 105 F.4th 1070, 1081 (8th Cir. 2024) ("we find that the public would perceive private persons, and not the District, as having spoken through… posters" at a school).

## C.      Irreparable Harm

Defendant fails to address the controlling authority cited by Plaintiff that a violation of constitutional rights is presumed to constitute irreparable harm. Pl. Memo. at PageID#45-46 citing, *inter alia, Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). The Sixth Circuit recently reaffirmed this legal principle. *Dutton v. Shaffer*, ___ F.4th ___, 6th Cir. No. 25-5352/25-5391, 2026 U.S. App. LEXIS 9437, at *40-41 (Apr. 1, 2026) (noting that it is "'well-settled' that even short deprivations of First Amendment freedoms 'unquestionably constitute[] irreparable injury,'"), *quoting Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

Defendants argue, without any citation, that the relief requested in this Motion will not preserve the *status quo.* Def. Memo. at PageID#102. Defendants ignore this Court's prior holding that the "status quo," for purposes of injunctive relief, is "the last actual, peaceable, noncontested status which preceded the pending controversy." Pl. Memo. at PageID#35, fn. 3, *citing Oruganti v. Noem*, S.D.Ohio No. 2:25-cv-00409, 2025 U.S. Dist. LEXIS 74269, at *6 (Apr. 18, 2025) (collecting cases).

14

Finally, Defendants suggest there is no irreparable harm because Plaintiff was permitted to put up a substitute poster with a similar, "Hate Has No Home Here," message. Def. Memo. at PageID#102, *citing* (Exhibit, Doc#13-11, PageID#203). The record developed so fair indicates that School Board members specifically objected to the inclusion of "rainbow" (i.e. LGBTQ inclusive) imagery, not the phrase "Hate Has No Home Here." Board Members were explicit on this point. One said: "we do love people and so if you want to put a sign up that says 'hate has no home here' yea, but the rainbow colors puts it into a another category. (sic)" (Transcript, Doc#13-4, PageID#121.) Another said: "two of the symbols up there we know are gender identity or sexual orientation in nature. The blue and pink and white is the transgender, and the pride. The words alone 'hate has no place here' absolutely agree with it should be everywhere." (Transcript, Doc#13-4, PageID#118.) This argument also ignores the email from Plaintiff explaining that the replacement image was not equivalent because "attempting to find a different, 'neutral' image may inadvertently lead to the erasure of LGBTQ+ representation." (Email, Exhibit 13-8, PageID#144.)

**D.      Public Interest And Harm to Third Parties**

Defendants do not suggest that students or any third parties will be harmed by an injunction. Nor do the Defendants address this Court's and the Sixth Circuit's holding that it is "always" in the public interest to prevent the violation of a party's constitutional rights. Pl. Memo. at PageID#46-47 *citing inter alia Warner v. Chambers-Smith*, S.D.Ohio No. 2:24-cv-1565, 2025 U.S. Dist. LEXIS 259689, at *17 (Dec. 16, 2025). Defendants, instead, argue that that Little Miami would be harmed if it could not "enforce a duly-adopted parental-notification policy." Def. Memo. at PageID#102. This begs the question, as Defendants remain able to enforce policies and regulations, except when they conflict with the Constitution. This is why in constitutional cases, the likelihood-of-success factor is often dispositive. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 414 (6th Cir. 2023); *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

15

**E.** **Nominal Bond Should Be Imposed**

Defendants do not contest that if an injunction is granted, this Court should not require a bond.

## CONCLUSION

Following discovery and an evidentiary hearing, the Motion should be granted.

Respectfully submitted,

 /s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this April 23, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel

16