Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

_____

GEORGE MCINTYRE,

      Plaintiff,

   v.                       Case No.

LITTLE MIAMI SCHOOL DISTRICT, ET     1:26-cv-00351-MWM

AL.,

      Defendant.

_____

DEPOSITION OF DAVID WALLACE IN HIS PERSONAL CAPACITY

AND AS A 30(b)(6) CORPORATE REPRESENTATIVE FOR LITTLE

MIAMI SCHOOL BOARD

DATE:         Monday, June 8, 2026

TIME:         10:02 a.m.

LOCATION:     Remote Proceeding

              Engel & Martin LLC

              4660 Duke Drive

              Mason, OH 45040

REPORTED BY:  Marianne Hissong

JOB NO.:     8223145

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF GEORGE MCINTYRE:

JOSHUA ENGEL, ESQUIRE

Engel & Martin LLC

4660 Duke Drive

Mason, OH 45040

engel@engelandmartin.com

(513) 445-9600

ON BEHALF OF DEFENDANT LITTLE MIAMI SCHOOL DISTRICT:

OMAR TARAZI, ESQUIRE

Omar Tarazi Law Office

5635 Sandbrook Lane

Hillard, OH 43026

otarazi@tarazilaw.com

(614) 226-2823

Page 4

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Email from Mr. Tarazi, 1/18/26 | 79 |
| Exhibit 15 | Email to Ms. Morgan, 1/29/26 | 80 |
| Exhibit 16 | Building Pictures | 88 |
| Exhibit 17 | FCC Pride Poster | 100 |
| Exhibit 18 | Email Chain, 2/2/26 -2/16/26 | 109 |
| Exhibit 19 | McIntyre Affidavit | 138 |

D O C U M E N T S   R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Social Media Posts Related to Classroom Display Policy | 17 |

Page 3

I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Engel | 6 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of 30(b)(6) Deposition - McIntyre vs. Little Miami School Board (LMSD) | 20 |
| Exhibit 2 | Photo of Flag | 22 |
| Exhibit 3 | Defendant's Responses to Plaintiff's Interrogatories | 23 |
| Exhibit 4 | Ohio Revised Code Section 3313.473 | 33 |
| Exhibit 5 | Parents' Bill of Rights | 33 |
| Exhibit 6 | Bricker Graydon Presentation | 41 |
| Exhibit 7 | Little Miami Local Schools - Guidance Document | 43 |
| Exhibit 8 | American History Model Curriculum | 55 |
| Exhibit 9 | AP European History Part Topic 9-14 | 61 |
| Exhibit 10 | Non-Discrimination Policy | 69 |
| Exhibit 11 | Bullying Policy | 70 |
| Exhibit 12 | Anti-Harassment Policy | 70 |
| Exhibit 13 | Tarazi Memorandum | 76 |

Page 5

P R O C E E D I N G S

THE REPORTER: Okay. Good morning. My name is Marianne Hissong. I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 10:02 a.m.

This begins the deposition of David Wallace taken in the matter of George McIntyre vs. Little Miami School District, et al. on June 8, 2026, taken remote via Zoom.

I'm a notary authorized to take acknowledgments and administer oaths in Ohio. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn in, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time, will everyone in

2 (Pages 2 - 5)

Page 6

attendance please identify yourself for the record, beginning with the taking attorney.

MR. ENGEL: Hi. My name is Joshua Engel. I am counsel for the plaintiff.

MR. TARAZI: Omar Tarazi, 84165, counsel for the defendants.

MR. WALLACE: David Wallace, current president of the Little Miami School Board.

THE REPORTER: Thank you.

Hearing no objection, I will now swear in our witness.

Mr. Wallace, can you please raise your right hand?

WHEREUPON,

DAVID WALLACE,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: We're on the record.

MR. ENGEL: Okay. Thank you.

EXAMINATION

BY MR. ENGEL:

Q   Good morning, sir.

A   Morning.

Q   Please -- I think you already did, but can

Page 7

you indicate how to spell your name, too?

A   Wallace, David Wallace. Last name is W-A-L-L-A-C-E.

Q   All right. And where are you employed?

A   I am employed with Little Miami as a school board member, and I'm also a project manager with JLL, Jones, Lang & LaSalle.

Q   Have you ever been in a deposition before?

A   That time with you before, that -- I don't know if that's a deposition or --

Q   Yeah. I know you -- I was trying to remember this morning. You testified in court once in front of the magistrate judge in Warren County?

A   Yep, yep, yep. That time with you.

Q   Okay. But I don't recall -- I don't think we had a deposition in that case; right?

A   No. Correct.

Q   Have you ever had to do a deposition other than that or testify in court other than that?

A   No.

Q   Okay. Well, the standard here -- the practice here is slightly different than a trial or a hearing in front of a judge. Basically, the way it works is I get to ask you some questions, and you get the answer them to the best of your ability. A couple

Page 8

rules I always have about that.

First, make sure that your answers are out loud. Those normal human interactions where you nod or you point or gesture or anything like that, that we use when we talk to our -- in real life, the court reporter can't write down. So just make sure if you can, all your answers are verbal. Fair enough?

A   Fair enough.

Q   All right. If I ask you question and you don't understand it, please ask me to clarify; okay?

A   Okay.

Q   This is our practice to speak out loud, yeah. And in particular, I'd ask that if I ask you a question, just give the words their common meaning, unless in the field you're working in the words have a specific definition or is what we call a term of art; okay?

A   Okay.

Q   You are not a hostage here. So if at any point you need to take a break, please let us know, and we will do so. The only thing I ask in that situation is if there's a question pending, we'll just answer that question, and then we'll take the break.

I'm going to use Zoom to share documents, and I see you have your laptop on there. If for some

Page 9

reason you can't read a document or need to see other parts of the document, let us know, and we can email them or send them to your counsel or anything like that.

A   Okay.

Q   But I think most people have gotten pretty used to reading things on screen.

A   Yes.

Q   The other thing about Zoom is sometimes there is a lag in the answers of the questions. So I will do my best to pause to give you a chance to answer or complete your answer, but I'm not always great at it. And sometimes we get lost.

And so if for some reason you feel that you need to finish an answer, and I've already asked next question, just let me know, and we'll let you finish your answer; okay?

A   Okay.

Q   Finally, since we are dealing with school matters -- I don't think this will come up. But if it does, we're going to try to avoid using the names of any students on the record. So if you need to refer to a student, we'll just use initials or find some other way to do it. But that way we don't have to take any actions to protect the FERPA rights of

3 (Pages 6 - 9)

Page 10

students; okay?

A   Okay.

Q   All right.  You've indicated that your current position, you're president of the Little Miami School Board.  How long have you had that spot?

A   January of 2025.  So that is about 18 months.

Q   When were you elected to the school board?

A   November of 2024.

Q   Have you held any other elected positions?

A   Yes.  I was a township trustee, I think from 2013 to 2017.

Q   Anything else?

A   No.

Q   Do you have any experience in education, either professionally or from an educational background standpoint?

A   Yes.

Q   What is that?

A   I was a schoolteacher for Cincinnati Public Schools.  Got my degree in middle childhood education from the University of Cincinnati.  And I taught from 2003 to about, I think, 2007, seventh and eighth grade social studies.

Q   Why did you leave that position?

Page 11

A   I had an opportunity to go full-time in the Ohio National Guard.

Q   And how long were you in the National Guard?

A   Twenty years active federal.

Q   Are you still part of the National Guard?

A   No.

Q   Do you hold any other military positions right now?

A   No.

Q   Well, we thank you for your service on that.  You mentioned your education at University of Cincinnati.  Do you have any other degrees beyond high school?

A   I have an associate in criminal justice from Xavier.  And I have a masters from Central Michigan business -- business administration with a concentration in acquisitions.

Q   Do you have any -- well, let me word this a different way.  Have you ever been charged with or convicted of a crime?

A   No.

Q   What is your current address?

A   3115 Shale Ridge, Morrow, OH 45152.

Q   Okay.  How long have you lived there?

A   Since 2009.

Page 12

Q   Okay.  Do you own any other property?

A   No.

Q   Okay.  Are you living anywhere else?

A   Yes.  Sometimes I -- I have stayed somewhere else.

Q   Where is that location?

A   Maineville.

Q   How often are you staying at the Maineville location?

A   A couple times a week.

Q   Do you have any children -- again, don't tell me their names on the record here, but in Little Miami schools?

A   Yes.  I have two.  Well, no.  Correction, correction.  I have one.  One just graduated.

Q   Yeah.  I heard that.  Congratulations on that.

A   Thank you.

Q   And what grade is the other one in?

A   Sophomore.

Q   Did any of those students have Mr. McIntyre for a teacher?

A   I believe my oldest one did.  But it had to do with -- it wasn't history, it was like -- I don't know.  Shame on me for not knowing, but it was like

Page 13

criminology and courts or -- or what -- the other class he teaches.

Q   Okay.  So she had him for a class in her senior year it sounds like?

A   I do not know if it was last -- might have been junior year.  I do not know.

Q   Okay.  What did you do to prepare for this deposition?

A   Just kind of thought about my time on the school board the last two years.

Q   Okay.  Who did you meet with to prepare for this deposition?

A   I didn't meet with anybody.

Q   Just so we're clear, did you meet with your attorney?

A   I -- I talked to the attorney about the deposition and kind of what to expect.

Q   Okay.  And I don't want to know what was said during that conversation.  Was anyone else present during that meeting?

A   No.

Q   Did you talk to the superintendent about your deposition?

A   No.

Q   Did you talk to her about her deposition?

4 (Pages 10 - 13)

Page 14

A   No.

Q   Did you ever discuss with her what her anticipated testimony might be?

A   No.

Q   Did you -- and when I asked that question, same questions for Mr. Harleman, the principal. Did you discuss with him his intended testimony?

A   No.

Q   And when I say that, that means directly or indirectly. In other words, did you receive any information about what they might testify about?

A   No.

Q   Did you search for documents related to this case?

A   No. I probably should have, but no.

Q   Okay. In other words, do you ever use your phone for school business?

A   I have an Outlook account through school that's on my phone.

Q   Okay. Do people ever text you about school business?

A   No.

Q   So people don't text you about something that's going on before the school board and want you to vote one way or another or anything like that?

Page 15

A   No, no.

Q   Do people ever message you through a personal email account on school board issues?

A   No.

Q   Do you ever text with other school board members?

A   Very, very rarely, but yes. Can I -- can I clarify that -- that answer?

Q   Yeah.

A   Okay. I've texted the board members to let them know, "Hey, we're having a special meeting. Does this date work for you?" That's pretty much the extent. I think maybe once or twice with Mandy, and I believe you have those transactions.

Q   Do you ever discuss school board issues on any social media sites?

A   No. Not -- not lately, I should clarify that; right? Not recently, but, as you know, we have talked about school board issues before.

Q   Okay. And so let's focus on the last year. Have you posted anything about school board issues over the past year on any social media sites?

A   Yes. Let me -- let me clarify. That policy that we were trying to put through that you're well aware of, was that in the last year? Or was the

Page 16

before the last year? That would be -- that would have been my last emails on social media.

Q   Okay. So was that -- there's two different policies that I think we're going to talk about. One is a parental rights policy and another is a classroom display policy. Which one are you referring to?

A   Yes. Classroom display. I'm sorry. Classroom display.

Q   Okay. So you believe that there was -- which social media sites do you think there was stuff on about this?

A   You would know. It was my school board Facebook page and probably about three or four other community Facebook pages where I just posted on there, no interaction with anyone.

Q   Did you ever DM with anyone about these issues?

A   No.

Q   Do you post on any message boards or any other online sites?

A   No.

Q   So when you were asked to respond documents, do you know if you produced those Facebook posts about the display policy to counsel?

A   No.

Page 17

Q   Okay. So we'd ask if you could do that at your earliest convenience. Obviously, it's not --

A   I'll -- I'll be honest with you, Josh, I -- I will do my best to find them. I don't have a Facebook account. So if you have those from the previous, would you be able to produce those?

Q   We can look as well. So let's all just try to do our best --

A   I appreciate that.

Q   -- and we'll see what we can find.

A   I'm trying like hell to stay off of social media. It's very toxic.

Q   Completely understand. Did anyone ever attempt to intimidate you or get you to change your testimony about this case?

A   No. Not that I'm aware of. I -- yeah. No. I haven't spoke to anybody.

Q   All right. And I know Mr. Tarazi is your counsel. He's also counsel for the school board?

A   Yes.

Q   Okay. How was he selected as the school board attorney?

MR. TARAZI: Objection. What does this have to do with anything?

//

5 (Pages 14 - 17)

Veritext Legal Solutions

www.veritext.com

888-391-3376

Page 18

BY MR. ENGEL:

Q You can go ahead and answer. The objection's noted.

A The board voted in January to appoint him as our law director.

Q Okay. How did the board become aware of Mr. Tarazi?

A Mandy and Dan met Omar -- or Mr. Tarazi, I guess while last --

MR. TARAZI: Hold on a second. Objection. Only testify if you have personal knowledge, and this is something we should have clarified at the beginning.

THE WITNESS: I'm sorry.

MR. TARAZI: If you're guessing or you weren't there or things like that, then don't testify to things if you don't have personal knowledge on.

MR. ENGEL: Well, since this is discovery, rule 26 would allow me to inquire. So to the best of your knowledge, and then whether it's admissible or not, we'll get into later.

But so go ahead and finish your answer, please.

THE WITNESS: Yeah. I -- I was introduced to him through Mandy and Dan.

Page 19

BY MR. ENGEL:

Q Do you have any knowledge about how Mandy and Dan met him?

A No.

Q How much is Mr. Tarazi paid by the district each month?

A It's an hourly rate. I have not seen the -- the bill yet.

Q Okay. And he's also representing you in this litigation?

A As my position on the Little Miami School Board, yes.

Q And how much is he being paid for that?

A I do not know.

Q Do you know his hourly rate?

A $300.

Q Have you ever heard of something called the National School Boards Leadership Council?

A I believe so. Is -- is that the one with Kelly Kohls? Or is that different?

Q What do you know about it? I'm not sure.

A Honestly, I -- I don't get caught up into those. That's why I was asking you. I -- I --

Q So if it is the organization you think it might be, what do you know about that organization?

Page 20

A That I don't -- I don't align 100 percent with them. If -- if this is the one we're talking about, I -- I do not align with all of their views. So -- what's that?

Q What views do you not align with?

A Special education. I don't believe about taking kids out of the classroom is the best way to teach. And I don't necessarily line up with, I guess, the students as a second language. That's -- that's I'm aware of.

I don't -- I honestly didn't do enough research to tell you anything really more about it, but it's been brought up a few times in meetings where that is their stance. And I -- I disagree with them.

Q Okay. So I am going to -- if I can share screens correctly, show you what we'll mark as Exhibit 1. Are you able to see this document here?

(Exhibit 1 was marked for identification.)

A Yes. I have to adjust my screen here.

Q All right. I need to move some things around here, too. So -- okay. And let me mark this -- we'll call this Exhibit 1. Stamp on it. Okay. So Exhibit 1 appears to be the notice of 30(b)(6) deposition. And this is what I think off the

Page 21

record we spoke about a little bit earlier. Have you seen this document before?

A Yes.

Q Okay. And so you understand that you are here to testify not just in your personal capacity, but also as a representative of the Little Miami School Board on the four topics listed here?

A Yes.

Q And are you prepared to do so?

A Yes.

Q As part of your duty as a designated witness, you're required to make reasonable inquiries as to the topics that you may not have personal knowledge about. Have you done so?

A Yes.

Q And what did you do?

A I -- I looked over some of these policies a -- a few months ago.

Q Did you do anything else to prepare for your role as the district representative?

A No.

Q Did you speak to anyone else?

A No.

Q Okay. Just so we are setting our topics here, we will mark as Exhibit 2. Exhibit 2 is a

6 (Pages 18 - 21)

Page 22

two-page document of two photographs. Have you seen these images before?

(Exhibit 2 was marked for identification.)

A   Yes.

Q   Okay. And it looks like on page 2, that's what we've called the "Hate Has No Home Here" flag. You're familiar with that; right?

A   Yes.

Q   Okay. So if we talk about the flag in general, you understand what we're talking about here; right?

A   Yes.

Q   And these are the -- the image on page 2 with Bates number 659 at the bottom, that's the flag that you saw in the classroom and that the School Board voted to removed?

A   Yes.

Q   Okay. And that's a fair and accurate depiction of that flag?

A   Yeah. The -- of the -- yeah, the poster, yes.

Q   On the first page of this exhibit with Bates number -- well, it's hard to read. It looks like 658. Is that a fair and accurate depiction of where the

Page 23

flag was in the classroom?

A   Yes.

Q   All right. We'll come back to that in a second, but I just wanted to get some other things here. I'm showing you, which is Exhibit 3, is Defendant's Responses to Plaintiff's First Set of Interrogatories. And you've seen this before; right?

(Exhibit 3 was marked for identification.)

A   Yes.

Q   Okay. And you helped craft the responses to this?

A   Yes.

Q   And if we go to the last page, we see a verification. That's your signature?

A   Yes.

Q   Okay. And you verify that these were true and accurate to the best of your knowledge?

A   Yes.

Q   So let me ask you about a couple of these. Turn first interrogatory number 9. There you are asked to "State the basis for any contention that the "Hate Has No Home Here" flag actually affect the district's interest in providing services efficiently, including any detrimental impacts on close working

Page 24

relationships, any undermining of legitimate goals of the district, and any impact on the performance of plaintiff's duties." Do you remember reviewing that question?

A   Yes.

Q   And you answered in your response that "The board's determination ... that the flag not be displayed pending completion of applicable parental notifications and opt-out procedures was not based on a finding of actual disruption to district operations or to plaintiff's performance of his duties." Did I read that accurately?

A   Yeah. Yes. Well --

Q   Okay. And --

A   Yes. You read correct. Thank you for zooming in.

Q   And is that true?

A   Yeah. I -- I believe it -- it to be true. I think that there's been some disruption, obviously. What we're having right now within the district is a disruption that -- that we're talking about this opt-out not being followed.

Q   So just so we clarify, when you're talking about any disruption, you're talking about things that happened as a result of this lawsuit?

Page 25

A   Well, I -- I believe that the disruption is -- is by -- when -- when the parents are not notified. And the fact that we are having this discussion right now, whether it be through the lawsuit or whether it be through a discussion, the fact that the board took time to have to rule on this item in the classroom.

Q   Okay. I think I understand where you're coming from. So what you're saying is that the fact that board members and everyone else had to get involved, that itself was a disruption; right?

A   Yes.

Q   Okay. So I'm going to ask some very lawyerly questions here, and I apologize. But other than that, did the flag itself cause any disruption in the school?

A   I believe through discussion that yes. It -- it is a distraction. That, you know, the sexuality was brought into the classroom. I think that space is very limited on a classroom wall, and items up there should be up there to reinforce what is being taught.

Q   So how specifically did the flag have a detrimental impact on the ability of Mr. McIntyre to teach?

7 (Pages 22 - 25)

Page 26

A    I -- I just think it was a -- a distraction to the students.

Q    Did any students complain that this was a distraction?

A    Without getting into my own personal details, I've not heard from anyone outside of my family. I've heard from other parents about the item in the classroom.

Q    Prior to -- let's pick a date, January 1 of 2026, had anyone complained that the flag was a distraction?

A    Yes.

Q    Who was that?

A    I had heard from a few parents. One of them was -- Silas Shelton brought it to my attention. I believe he was the one that brought it to my attention.

Q    And when was that?

A    Probably shortly after I got elected, if not during the campaign before I was elected. That was one of the things that I ran for office on, was removing the classroom from distractions, getting the -- getting the -- the politics out of the classrooms. It was not limited only to that --

Q    What other distractions? I'm sorry.

Page 27

A    Hang on. I'm sorry.

Q    Sorry. Did you complete your answer?

A    No. I didn't.

Q    Go ahead.

A    It was one where it was mentioned about removing the classrooms from distractions. Not only was this poster as an example, there were other items throughout the district that were on the walls that, in my opinion, were distractions. Regardless of what side of the aisle you stood on, there was many classrooms that had items up that did not reinforce the curriculum.

Q    What were those items?

A    You had a "Don't Tread on Me" flag. You had a Obama poster. You had a Mitch McConnell poster -- or a poster. You had a -- what was the other ones? You had Reagan. You had one classroom that did not have one item that pertained to the subject that was being taught in the classroom, and that was in the middle school.

Q    Anything else?

A    No. That's what comes to mind. I'm -- I'm sure there might be more, but what comes to mind right now, that's it.

Q    Okay. You used the term distraction. What

Page 28

does the term distraction mean in this context?

A    Distraction is -- how I use -- how I use it is when you're taking away from the focus of the lesson. So if -- if you're teaching a class, like I said, I think you have very limited space in the classroom from when I was a school teacher. You had to put the items up that you want to be important. You only have so much advertising space in the classroom wall.

And one of the things is if you're teaching a lesson, items that should go up that reinforce what you want the students to learn, you put on the walls. Or other teachers have used it to build bonds with the children by putting flags or posters up as well.

Q    So your view is that only things directly related to the curriculum should be up on the walls?

A    Well, that was my view so we can get rid of the distractions.

Q    So is it your view that anything that's not directly related to the curriculum is a distraction?

A    Not necessarily, no.

Q    So what differentiates between non-curricular items that are a distraction and non-curricular items that aren't a distraction?

A    I -- I think it's the -- I guess the items

Page 29

that are up there. I -- I don't believe an American Flag is a distraction to the lesson. I think that's a requirement by state law. But some of the classrooms were getting out of control with -- again, like I said, that one teacher had every item in the classroom and not one that reinforced the standards.

Q    And I just want to make sure I understand the term distraction. How specifically did the displays of these items that you've described interfere with the ability of the school to deliver the lessons it wanted to deliver?

A    Well, I will tell you from experience with my own child that the one teacher in question I actually had removed from his classroom because of the items on the walls. He wanted to have sidetracked conversations with the local elections coming up. And that's where I thought that was not what my daughter signed up for. And certainly not what I was tracking the class was going to be.

Q    What do you mean by sidetrack conversations?

A    Well, he -- he wanted to talk about the senate race, the Ohio Senate race of -- what was it, 20 -- I don't know when was it. But the -- of Bernie Moreno and when was that race? Was that -- whenever that was. Two years ago, I think, or a year ago.

8 (Pages 26 - 29)

Page 30

But those are the ones that I'm talking about. And he would have a poster in the back that would kind of talk about another item that was not a class -- that pertained to the instruction.

Q And which teacher was this?

A Shoot. I can't think of his name. Eighth -- I think it was an eighth-grade social studies teacher.

Q Okay. So it's not the plaintiff in this case?

A No, no, no, no.

Q Okay. Well, let me ask you this about -- while we're still in interrogatory number 9. There's a discussion of notice having to be provided. How is notice provided?

A Notice is provided when the parents are given a -- a note or an email sent home with the opportunity to opt out.

Q I mean, how hard is it to send in the email -- I mean, maybe it is. Maybe it isn't. I don't know. Is it difficult to send an email to every student in a class?

A It shouldn't be, no.

Q It's not very expensive; is it?

A No.

Page 31

Q Are you aware of any students who have opted out of classes at Little Miami?

A They -- they wanted to have -- I think it was Megan's Law that I did hear that some parents did opt out of that instruction.

Q Anything else?

A No.

Q Are you aware of any other notice that's been provided to parents pursuant to the Parents' Bill of Rights?

A Megan's law was -- parents were notified. And they actually had -- the material was available for the parents to look at so they can make an informed decision on opting out.

Q I'm going to skip ahead to interrogatory number 11 that asked you to "State the basis for any contention that the message conveyed on the "Hate Has No Home Here" flag related to matters of political, social, or other concern in the community."

And you said, "Well, the flag's imagery was perceived by community members as conveying positions on contested social issues." Is that still your view?

A Yes.

Q Okay. So in other words, you agree that it conveyed a position on a matter of political, social,

Page 32

or other concern of community?

A Yes.

Q And just now looking at interrogatory number 13, it asks you to "Describe all classroom displays by teachers that have been removed from 2021 to the present. Provide the reasons for removal."

And you indicated "The only classroom display removed was the "Hate Has No Home Here" flag." Is that still your testimony?

A Yes. Well, let me see. Yeah. And -- and then those Safe Space stickers --

Q Yeah. Tell me about that. Why were those removed from the classrooms?

A I don't know. You'll -- I did not remove those stickers. That was before I was on the board.

Q Did you make any inquiry as to why they were removed as you sit here as a 30(b)(6) deponent?

A No. I -- I asked why they were up.

Q And who did you ask?

A Either Dr. Harleman or Dr. Huelsman. I don't remember. They gave me a tour before I was elected back in, like, May of 2024. Was it '24? The election was in November. The -- the school year prior to me being elected.

Q Okay. What do you remember about that

Page 33

conversation?

A I asked him why they were on some classrooms and not on others. And he just looked blanking -- a blank stare at the door. Did not answer. I asked him how long they were up for. And again, he just shrugged his shoulders he didn't know and stared straight ahead at the door.

Q Anything else happen as a result of that conversation?

A No. No. At that time, I didn't even go in the classrooms. It was just walking the hallways.

Q Okay. That was 3. So let's mark Exhibits 4 and 5. So Exhibit 4 is going to be a copy of Revised Code Section 3313.473, otherwise known as House Bill 8. And you're familiar with this legislation?

(Exhibit 4 was marked for identification.)

A Somewhat, yes.

Q Okay. And then Exhibit 5 will be the Parents' Bill of Right policy, which is board policy number 5780.01. And you're familiar with this; right?

(Exhibit 5 was marked for identification.)

A Yes.

Q Okay. Now both of these, I believe, have a

9 (Pages 30 - 33)

Page 34

definition of sexuality content in them.  Is that right?

A   I believe so.

Q   Okay.  And I believe they're the same definition in both; right?  And I'm looking at --

A   Probably.  I think ours pretty much just mirrored the State's.

Q   Okay.  And then you've answered my question; right?  Is your intention was to mirror the State's; right?

A   Yes.

Q   So in the statute it says "Sexuality content means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting."  And I read that correctly?

A   Yes.

Q   Okay.  And then there's an exception for incidental references, which you talk about?

A   Yes.

Q   Okay.  And the same language appears in the Parents' Bill of Rights; right?

A   Yes.

Q   Okay.  And I'm showing you that on the screen right now.  Okay.  So you're familiar with

Page 35

these definitions?

A   Yes.

Q   Okay.  You helped craft the Parents' Bill of Rights policy, Exhibit 5?

A   No.

Q   Were you on the board --

A   What's that?

Q   You were on the board when that was adopted; right?

A   Correct, yes.

Q   Okay.  So you obviously read it before you voted on it; right?

A   Yes.

Q   And you had a chance to under ask any questions about it?

A   Yes.

Q   And you understood what you were voting for?

A   Yes.

Q   Okay.  And you probably read it very carefully before you voted on it?

A   Yes.

Q   So I'm looking at that definition of sexuality content.  And it says "Any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in the

Page 36

classroom setting."  I read that right?

A   Yes.

Q   What does the term "sexual concepts" mean?

A   I would say --

MR. TARAZI:  I would be objecting to the degree you're asking him for a legal definition, but he can answer as it relates to his opinion.

THE WITNESS:  Yeah.  Se sexual concepts just in general about different sexualities or sexuality in general.

BY MR. ENGEL:

Q   So do you have a working definition of sexual concepts that you applied when you take action as a board?

A   Well, just -- just what I said as far as the sexual ideologies being -- being introduced.

Q   What does the term gender ideology mean?

A   Well, I said -- I said -- well, I said the sexual ideology and that can be heterosexual, homosexual, all the others that I believe has to be part of House Bill 8 where the parents need to be informed.

Q   Okay.  So but I'm trying to understand what it is.  Like if I'm someone, like I am, trying to figure out is this topic a sexual concept?  What does

Page 37

that term in a simple definition, sexual concepts mean?

A   Is that going to be introduced, discussed, viewed I -- I guess, sexual in nature.

Q   What do you mean by sexual in nature?

A   Well, I -- can I give you an example?

Q   Sure.

A   We had a English as a second language teacher give a -- well, had the kids watch a movie.  And in that movie, the person that was being interviewed showed family pictures of when he was a child of probably about, I don't know, maybe 8 years old, full frontal nudity family photos with all the -- all the children being naked.  I thought that now would fall under the sexual content.

And Mrs. Morgan, I had her notify all the parents about what had happened because this was after the fact.  So that would fall in the lines of sexuality content being -- I don't believe it was appropriate.

Q   I'm just asking, can you give me a definition, a simple definition, of the term sexual concepts?

MR. TARAZI:  He's already given -- objection.  He's already given you the definition.

10 (Pages 34 - 37)

Veritext Legal Solutions

www.veritext.com                                                                888-391-3376

Page 38

It's broad.  He's already asked and answered.

BY MR. ENGEL:

Q   You can go ahead, sir.  I'm not sure I understood.  So that's okay.

A   Well, no -- no -- like I -- like I said, sexual in nature, whether it be a -- a visual or audio or -- or written.

Q   Okay.  What about that term that's in here in your policy, gender ideology?  What does that term mean?

A   How -- how I interpret gender ideology is just the -- again, sexualizing the -- the different genders.

Q   What do you mean by sexualizing the different genders?

A   Well, let's go -- let's -- can you go to the policy?  Can you bring up that policy portion, please?

Q   Yeah.  It should be on your screen there.

A   Where I'm at here.  That's the sexual -- you said the gender ideology; right?

Q   Yes.  See, I've highlighted the section.

A   All right.  Sexual content means any oral, written instruction presented image or description of sexual concepts or gender ideology.  Okay.  Well, that would -- that would be then just identifying the

Page 39

different genders in a -- in a -- the sexual manner.

Q   What do you mean in a sexual manner?

A   Well, the -- the different genders that somebody may feel inclined to discuss, the different genders.

Q   So any discussion of gender is by definition gender ideology?

A   When -- when it's discussing different genders, yes.  I -- I believe it to be that way.

Q   So if I had a health class and in this health class, I said the average height of men is bigger than the average height of women.  Is that gender ideology?

A   I -- I would argue that, yes; right?  But -- but now the -- now we talk about the description of sexual concepts or gender ideology.  Yeah.  I mean, it -- it's talking about genders; correct?

Q   Yeah.  So if I am a teacher at the school, and I wanted to know what these terms meant, sexual concepts, gender ideology, are there any documents I could look to, to find a definition?

A   I would just look through this policy for clarification.  And if not, then probably go before the board.  And again, I -- I think it's just how each

Page 40

board member interprets these -- these words.

Q   So there wasn't the intent of the board then to adopt any of these definitions from another document; right?

A   Well, in -- in the absence of our own policy, we adopted the one from State.

Q   Okay.  But from the State HB 8; right?

A   Yes.  I --

Q   Which also doesn't define --

A   -- got it from.  I don't --

Q   But which uses the exact same definition; right?

A   Yeah.  Yes.

Q   Okay.  In other words, nowhere in HB 8 or the revised code you're aware of are the terms sexual concepts or gender ideology defined; are there?

A   I've not read all of House Bill 8, but I -- I don't know the answer to that.

Q   Okay.  Well, we can look at Exhibit 4, and you're free to look at the whole document.  I'll represent to you that those terms are not defined in Exhibit 4 either since it's --

A   Okay.

Q   You're not aware of anywhere else, in other words?

Page 41

A   No.

Q   Okay.  So just to be clear then, let me show you what we'll mark as Exhibit 6, which is guidance from Bricker Graydon.  Have you --

(Exhibit 6 was marked for identification.)

A   Who is Bricker Graydon?

Q   A law firm.  This was produced, looks like in discovery, titled HB 8 Parents' Bill of Rights.  Have you ever seen this document before?

A   I don't believe so.  I don't recall.

Q   Okay.  And in particular, I want to look down at the end.

A   Who produced this during discovery?

Q   You did.

A   Okay.

MR. TARAZI:  The district did.

THE WITNESS:  The district, okay.  Thank you.

BY MR. ENGEL:

Q   It does not appear that this -- and when they talk about that definition, they don't provide a definition either; right?

A   Sexual content means any oral written -- it provides what's not sexual content.

11 (Pages 38 - 41)

Page 42

Q Here it is. So if I look at page 5 -- or sorry, page 3 of the document, there's a section that says what's not defined. Gender ideology not defined in ORC court decisions or Merriam-Webster. You have no reason to believe that's incorrect; right?

A I -- I've never looked. But yeah, I -- I have no reason not to or -- I never looked it up.

Q Okay. And then it says the term does appear in a new executive order. You guys didn't rely on that executive order in crafting your policy; right?

A When was that executive order done?

Q 1/20/2025 from the federal government.

A I do not know if that was included in the House Bill 8 or not. It may have been. I -- I do not know. Like I said --

Q This isn't a trick question; right? You guys --

A No, no, no, no. I'm -- I'm being honest, Joshua, I -- I do not know. House Bill 8, like I said, was created in -- in Columbus, and we mirrored theirs. So you're asking me whether this was included or not? I -- I do not know.

Q Okay. When you crafted your policy then, you didn't intend to adopt the definition from some executive order from the federal government then;

Page 43

right?

A Well, I -- I think what we wanted to do was adopt House Bill 8.

Q So let me ask this very, again, lawyerly question. There was no discussion as you adopted your policy about this executive order represented in this document?

A No. Sorry, one second here. Let me turn my phone off. I apologize.

Q Take your time.

A There you go. Little Miami Middle School. Let me turn this thing off here. Shoot. I'm sorry. Get some more on it. Power off. Thank you. Sorry about that.

Q You're fine. Like we said, if you ever need to take a break, let us know. And then, so I'm going to show you what's been marked Exhibit 7, Little Miami Schools, Ohio House Bill 8 Parents' Bill of Rights guidance document. Have you seen this document before?

(Exhibit 7 was marked for identification.)

A Can you scroll down more? The answer is I should recall it. But this does not -- I -- I know there was information sent from Mrs. Morgan to the

Page 44

board. This may have been one of the items.

Q Okay. And, again, simply it says here, definition of sexuality content. It repeats that including any oral or written instruction, presentation, image of sexual concepts and gender ideology. But this doesn't contain any definition of those two terms; right? Sexual concepts and gender ideology?

A No.

Q Are you aware any other documents that might address what those terms mean?

A No. I -- I think if you go to the average person, they would understand what is being discussed through gender ideology and sexual content. As I -- as I mentioned you, I may not have your lawyer definition, but certainly everyone understands gender ideology is going to be discussing different genders as well as your sexual concept is going to be talking about sexuality.

Q And so your understanding of the policy is that teachers are prohibited from discussing any of these topics without providing prior notification to the parents?

A Except for the items that are -- what did we say? Health class? Yeah. I mean the assumption is

Page 45

you're going to be discussing sexuality. Megan's law gave an opt-out because they were talking about -- it came down to the age inappropriateness.

And that is -- is what triggered the opt-out notification of the parents; right? Because we're talking at a very young age and parents may not wanted their children to be exposed to that ideology or sexual content.

Q But for purposes of our discussion, let's, for the next few minutes, focus on what we'll call regular high school classes, English, history, math, social studies, those types of classes; okay?

Would acknowledging the existence of gay students be sexuality content?

A What -- what do you mean acknowledging them?

Q Just that. Would saying, "Hey, there are gay people out there." Is that sexuality content?

A If -- if you just mentioned, "Hey, there's gay people out there," and that was the end of the discussion? Is that what you're saying?

Q Yeah.

A I -- I don't know how that would be relevant to a class, but if -- if it's part of the discussion, and the teacher's just going to make a comment of, "Hey, there are gay people out there," I -- I guess I

12 (Pages 42 - 45)

Page 46

would have to see how -- -- what kind of context is it -- is it mentioned in.

Q   Okay. Well, for example, if acknowledging that the prior Secretary of Transportation was gay, would that be sexuality content?

A   It depends how it's being used. I -- I certainly don't understand the -- the -- whether it's relative or not as far as anyone's sexuality, whether the -- the person before him was a heterosexual. You know, I -- I don't understand how any of that would be relevant to teaching the class.

Q   I'm not asking if you thought it was relevant to teaching class. If it, for whatever reason, was relevant to the class and was discussed, is that considered sexuality content?

A   If -- if you go back to our policy, I would say that if was mentioned just in the statement, I -- I -- again, I -- I don't think it makes sense to do it. But if you're asking me, is that sexuality. Then I would say based on that, it would probably want be one that we would probably need to look at to review prior to instruction.

If -- if the teacher wants to go down the list of who's -- the sexuality of all the appointed positions in our government. I would probably would

Page 47

say "Yeah. We probably need to look at that," just because I -- again, I don't see the relevance for a Ohio academic standard to go over the sexuality of any of the people performing their duties.

Q   Okay. Well, let me give you some other examples. Well, in general, is there, do you believe, a difference between instruction that addresses sexuality and instruction that teaches about sexual conduct and relationships?

A   All right. Say that again.

Q   Is there a difference between instruction that addresses sexuality and instruction that teaches about sexual conduct or relationships?

A   I guess. I -- when you're saying those with the words, I guess I don't see a difference. But if you want to give me an example or what you mean by the between instruction and the other. Are we going back to, "Hey, is our secretary of state gay or -- or homosexual." or "This is what he does"? I -- I don't -- I guess I'm -- I'm not understanding exactly what you're asking.

Q   Yeah. Okay. So let me try some examples here. Maybe that'll help.

A   All right.

Q   There's a famous Supreme Court decision on

Page 48

birth control called Griswold. I don't know if you're familiar with it or not.

A   No.

Q   Is a class lesson that mentions this decision sexuality content?

A   Mm-hmm.

Q   The answer is yes?

A   No, no. I'm sorry. I'm -- I'm -- yes as in agreeing with you. I thought you were going to keep talking. I'm sorry.

Q   No. Is a class lesson that mentions this decision sexuality content, because the topic of the decision was birth control?

A   Yes. I -- I believe that parent should be informed if that discussion -- because you're saying the result of that case involved birth control. And I think that should be a family decision. The parents should be aware of -- without knowing the case, I don't know if they're going to come out in favor of birth control, against birth control -- or without knowing the case the relevance of birth control.

But just on the surface, if you're asking me to identify whether a case that mentions birth control, should parents be notified? Yes.

Q   So it would be impossible to teach the

Page 49

reasoning in the Supreme Court, you're saying, without notifying parents ahead of time, simply because the decision dealt with birth control?

A   Well, I -- I think the research would have to be done prior to the decision and let parents be aware of exactly what is going to be discussed and how it's being discussed. I think that is where a letter home to the parents with an opportunity for them to opt out.

But informing the parents, "Hey, this is what we're going to be discussing." Birth control, I know some people with religious beliefs are against it or for it. And I think that's where it would come down to the obviously age appropriateness. But I think parents should be aware of that being a discussion, yes.

Q   Okay. What about a lesson about an obscenity trial and free speech issues? Would that be sexual content?

A   Again, I -- you're saying obscenity in general. I guess it would all go back to age appropriateness and without a specific example, I can't give you that. Now, if it's going to go obscenity, where it's going to turn into a -- a Larry Flynt trial, certainly, I would say that is definitely

13 (Pages 46 - 49)

Page 50

inappropriate, and parents would have the option to opt out. I would argue, you know, how I would like to see that lesson prior to being introduced to students.

Q  Well, that's a great example. Do you believe it constitutes sexuality content to talk about Larry Flynt's case in front of the U.S. Supreme Court and the reasoning that the U.S. Supreme Court had on first amendment issues?

A  It depends how in detail they go. And again, it goes back to age appropriateness and are they going to be talking about the sexuality? I -- without -- you're asking me questions without seeing the lesson. Again, I would err on the side of caution and inform parents prior to any discussion so parents can be informed whether they want their children to be introduced to this or not.

Q  So would parental notice be required before someone taught about the biography of say, Margaret Sanger, who was arrested for distributing information about contraception?

A  Again, it depends how much in detail it's going to go about. But it should be included on a syllabus to parents. And again, without getting into the details, I -- I don't know how that's going to be introduced. But certainly this -- this topic, I would

Page 51

say definitely parents should be aware that it is being discussed.

Q  So I assume that Shakespeare is taught in some of your classes; right?

A  I would assume so, yes.

Q  Okay. So if a teacher wanted to teach the play As You Like It, where there is a character disguised as -- a young woman disguises herself as a young man. Is that considered sexuality content?

A  What grade is this being taught in?

Q  I'd say high school.

A  Okay. We're saying high school?

Q  Yeah.

A  Are the parents --

Q  Do the parents need notice before you teach the play As You Like It?

A  It depends how much in -- I mean, on the surface, Shakespeare I think was pretty calm. But it would depend on what angle the teacher's going to be teaching it. If we're going to be talking about -- and this is going to lead into another discussion beyond Shakespeare, when they want to put it into modern terms, then absolutely yes.

Q  Is parental notice required before a teacher teaches Twelfth Night, where a character disguises

Page 52

themselves again as a person of the other gender?

A  On the surface, if -- if we're reading a Shakespearean play, I would say probably not. If the discussion's going to lead to the gender ideology more than just a -- a mention in it, then I would say yes.

Q  What do you mean lead -- but again, what's that term gender ideology mean? I'm trying to figure out how would the discussion lead into gender ideology if you're just describing what goes on in the play?

A  Is the purpose -- and I guess it would have to go down to what is the purpose; right? Is -- is it age appropriate, and is it sexual in nature? Again, I don't care if it's heterosexual, homosexual; okay? I don't believe sexuality needs to be brought into the classroom. I think there are many more plays that are probably more appropriate than the ones that you've mentioned.

Q  How about Merchant of Venice?

A  -- I'd like to give him credit for writing a lot more than just those two.

Q  Okay. How about Merchant of Venice? Portia disguises herself as a young lawyer. Lawyers love that play.

MR. TARAZI:  I object.

MR. ENGEL:  -- without providing -- let

Page 53

me finish, please, Omar.

BY MR. ENGEL:

Q  Can you teach Merchant of Venice without providing prior notice to --

A  Again, Joshua, you're asking me these questions. On the surface, I would say probably it -- it is not going to be an issue teaching those, if we're talking about the age and appropriateness; right? If the teacher then wants to go into a lecture on the -- the behaviors of whether it be heterosexual or homosexual, when -- when he wants to get -- or she wants to get into sexuality in general, then I would say that is inappropriate. You know, you're asking me these hypothetical questions. I -- I can't answer that.

Q  Well, I'm just trying to figure out how your policy works. I mean, does any mention of people acting in a way that does not confirm with their biological gender constitute sexuality content or gender ideology?

A  If -- if we're reading a Shakespearean play and it is mentioned, I would say probably not. Is it being reinforced and discussed in more detail? I would say probably it would be. But just on the surface reading of Shakespearean play, I would say

14 (Pages 50 - 53)

Page 54

probably not.  But again, it goes back to what is the lesson consist of?  As a parent, that's what I would want to know.

Q   So in a history class, for example, is -- is parental notification required before a teacher has a lesson on Stonewall?

A   I don't know what Stonewall is.

Q   They have movement on the gay rights movement as part of the civil rights movement.  Is parental notification required then?

A   I -- I would have to see that lesson; right?  I mean, I -- I -- you know, I've never -- I'd have to see that lesson.

Q   Sure.  Well, let's look at the Ohio Curriculum then.

A   But I would -- I would say, you know, it's not bad to err on the side of caution and let parents be aware that that's what you're going to be discussing.  'Cause as a parent, I've noticed that I have to do a lot of reteaching when -- when my children get home.

MR. ENGEL:  I think we're up to -- is it 7?

THE REPORTER:  No.  We are on 8.

//

Page 55

BY MR. ENGEL:

Q   We're on 8.  Okay.  We'll do 8.  So Exhibit 8 is the Ohio model curriculum for American History.  You're familiar with this document?

(Exhibit 8 was marked for identification.)

A   I'm -- I'm familiar with the Ohio Academic Standards, but if you can scroll -- zoom in on it.  I've not seen this particular -- I'm sorry.  I'm using my laptop, and it's very tiny.

Q   I understand.  I'm going to make it bigger here in a second.  So I'm going to go to content statement 24.  So when we talked about content, the McCarthyism and stuff like that, does that require parental notification?

A   The -- I would say no.  What I know of McCarthyism, no.  And I guess that's where I -- is there something I don't know about McCarthyism?  It was just the accusing everyone being a communist.

Q   Well, have you heard about the -- there's the blacklist, the Lavender List or Lavender Scare.  You ever heard of that?

A   No.

Q   So you don't have an opinion about whether that is sexuality content or not?

Page 56

A   Correct.  I always thought McCarthyism was just communism.

MR. TARAZI:  Can we take a five-minute break just to go to the bathroom, if you don't mind?

MR. ENGEL:  Yeah.  Let me -- can I just finish these couple questions on this and then --

MR. TARAZI:  Okay.

BY MR. ENGEL:

Q   Yeah.  So looking at content 27 talks about civil rights organizations.  Is parental notification needed to teach the topics described here?

A   No.  If it's not sexual in nature; right?  Or gender ideology, I -- I don't believe parents need to be informed.  But we go back to McCarthyism and there's more to it than I'm aware of.  Like I said, I'm a -- I'm a parent, and -- and I was tracking that my child is just going to learn about the communism fear; right?

But now you're telling me something that I was unaware of.  Definitely I would like to know if they're going to be teaching that to my child, the sexuality or the gender ideology.

Q   So is teaching about the gay liberation movement sexuality content?

A   I would say yes.  Without seeing the lesson,

Page 57

as a parent, I would like to know what exactly they're teaching.

Q   How is teaching about the gay liberation movement different than teaching about the civil rights movement for African Americans or women?

A   Because I feel very knowledgeable in that area that I -- that I can be aware with my child.  But again, one thing as -- as a parent, Josh, and I assume you have children, too.  One -- one of the concerns is how are they teaching this topic; right?

Now, I would have an issue if they're teaching about -- we -- we talk about the freedom marches or anything like that, and -- and they're taking the opposite side of my family's values; okay?  I would be very upset with that; right?  No different than if -- if we're talking about these other sexuality or gender ideology discussions, I would like to know how it's being framed and how it's being taught.

Q   If it's just being framed and taught that this happened in a history class?

A   If it's just being taught that this happened, I would probably like to be aware of it.  Yes.  I -- I believe that falls into the angle of this -- the -- the parent notification.  "Hey, this

15 (Pages 54 - 57)

Veritext Legal Solutions

Page 58

week this is what's going to be taught. And you have an -- you have an option to opt out if you do not want your child to be participating in that discussion."

Q Do you know if any parental notifications were provided before American History is taught at Little Miami?

A I'm not aware, no.

Q Okay. And then let me ask you one other, and then we'll take a break. Topic 32, is parental notification required, do you believe, under the policies for content standard 32?

A I am unaware if anything was sent out.

Q Okay. Do you believe it should have been sent out?

A Yes.

Q And why is that?

A I would like to see what those lessons were and how it's being taught. Again, are we talking -- we're talking this is high school; correct? This is a high school standard.

Q This is a high school standard from the State of Ohio.

A All right. What grade is this high school standard being taught? And I say that because obviously there's a difference between your freshman

Page 59

as well as your seniors, but I think parents should be aware of what is being taught. Yes. Saying, "Hey, this week we're going to be talking this."

Because I think as a parent, I like to be informed as far as what is being taught so I can ask my child about what they're learning. And if it's a -- if it is a question -- if it's a topic that I would like to stay -- stay close attention to, then absolutely. I would like to be aware.

Q Okay. I just want to be clear about your testimony here, because I'm hearing a lot of your personal views, which I respect. And I just want a yes or no --

A As a school board president -- as a school board president, those should be going out, yes.

Q Okay. Do you believe -- now let me ask -- I'm going to ask, again, a very lawyerly question here, which I think is a yes or no. And then you can explain. Do you believe that content statement 32 requires parental notification pursuant to your existing Parental Bill of Rights policy?

A Parts of it, yes.

Q Why?

A As -- as discussed, the -- the parts of it have to do with sexuality and gender ideology. That

Page 60

portion of it would trigger the Parental Bill of Rights. Now, one of the -- one of the challenges that I've had, Josh, is that the superintendent and I do not necessarily agree with this.

I was elected by the community two years ago. And that is one thing that I am trying to incorporate is to keep parents notified and give them the opportunity to opt out. Without having a child in some of these classes, I have yet to see some of these syllabuses.

MR. ENGEL: Okay. We had a request to take a break, which I think is a fair request. Is that okay now, Omar?

MR. TARAZI: Yeah, just five minutes.

MR. ENGEL: Okay.

THE REPORTER: Okay. We are going to go off the record at 11:15.

(Off the record.)

THE REPORTER: Okay. We are back on the record, 11:24.

BY MR. ENGEL:

Q All right. Back on the record. I am going to show you what we've marked as Exhibit 9, which is the topics from AP European history, topic 9-14. And it indicates that the learning objective is explain

Page 61

how and why European culture changed in the period following World War II to the present.

And you could see some of the historical developments taught, including the effects of World War and economic depression, organized religion continued to play a role in European society. Arts were defined by experimentation and some other things. And then at the end, various movement including women's movements, political and social movements, gay and lesbian movements, and others work for expanded civil rights.

Is it your view that parental notification should have been provided before teaching that lesson?

(Exhibit 9 was marked for identification.)

A Yes. For the -- for the gay and lesbian movements, yes.

Q So you believe that --

A Without --

Q -- the mention of the fact that the gay and lesbian movements existed, that constitutes sexuality content and notice was required?

A No, no, no. You -- you mentioned that it's going to be a lesson; right? And I guess is the lesson going to be focused on the gay and lesbian

16 (Pages 58 - 61)

Page 62

movements or is it just -- or is the lesson going to be consisting of what you just said where you read off, "Hey, these political and social movements, gay and lesbian movements and others worked to expand civil rights. Next page." Right?

Or are you wanting to spend time going over the -- the sexuality and nature of this movement or the gender biology?

Q   What if it's just a lesson, an hour-long lesson, on the history of the gay civil rights movement, the important events and the important people involved. Does that require parental notification?

A   With House Bill 8, I would say yeah. With our Little Miami policy as a parent, again, I'm -- I can go through the lens of that, I would like to be informed, yes.

Q   So you would like to be informed -- you're saying as a parent, anytime there's any mention of gay people in the class?

A   If -- if the focus is going to be about gay people; okay? Now, if it's mentioned, "Hey, like I said, there's been various movements. You had the blah blah blah movement," I would say probably not. But if you're then going to spend an hour now

Page 63

discussing in detail this movement, I would probably like to be aware of what's being taught. And that's where you can opt out and say, "Hey, we're going to be talking about the gay and lesbian movements. You have an option to keep your child in, or you can have your child removed for that one-hour period." Right?

Like I said, with Megan's Law, the parents were informed of the lesson. They could see the lesson in advance, and they can make their informed decision. And I think that's what probably would solve 90 percent of our discussion you and are having right now, Josh, if we can provide more specific details instead of just the broad brush as far as what's going to be discussed.

And without that, that's where I think the House Bill 8, the opt-out plays in with the sexuality so the parents are informed of what's being taught.

Q   Is acknowledging that gay and lesbian students have the right to an education without harassment a sexual concept or gender ideology?

A   I would -- I would refrain that to every student belongs in -- in that class. I'm not sure why we have to single out any particular group, but I think every student deserves that right.

MR. ENGEL:   Okay.  Could you read back

Page 64

my question, please? It's a yes or no question. I'd like a yes or no answer.

A   Okay.

THE REPORTER:  Just one moment, please. Are you acknowledging that -- excuse me. Let me get back to it here. There's a lag on my system. One second.

THE WITNESS:  But if you're -- if you're going to single out a group and tell -- and ask me does this group deserve --

MR. ENGEL:  Hold on, she's --

THE WITNESS:  Say again?

MR. ENGEL:  Let's do it this way. Let's let the court reporter write down -- and I'll just re-ask the question; okay?

THE WITNESS:  No.  I'm fine.  Can you please not call me chief?

MR. ENGEL:  I didn't call you chief. I said please. Could we please?

All right. Marianne, are you ready?

THE REPORTER:  Yes.

BY MR. ENGEL:

Q   All right. Is there anything you wanted to add before I re-ask the question?

A   Are you talking to me?

Page 65

Q   Yes.

A   Yeah. I -- I believe all students deserve this, but if you're going to ask me a single group, if you can go ahead and read it now.

Q   Yes or no, is acknowledging that LGBTQ students have the right to an education without harassment a sexual concept or gender ideology?

A   On the surface, no. Or yes. I mean, everyone deserves that. Yes. Every student deserves that. And if you're asking me, do the LGBTQ kids deserve that, the answer is yes.

Q   I'm not asking you if -- that's not the question I asked.

A   Read the question again. All right. Read the question again. I'm sorry.

Q   I'm referring specifically to your policies. Is acknowledging that LGBTQ students have the right to an education without harassment a sexual concept or gender ideology?

A   No. No. If -- if you're -- yeah, no. It is not a sexual ideology if you're saying that all students deserve this. If you're saying the LGBT kids deserve this, I would say no, it's not. If you're going to go into detail about sexuality and what constitute that, then I would say yes. But right now,

17 (Pages 62 - 65)

Page 66

on the surface, no. Everyone's entitled to a -- a safe learning environment.

Q Again, I'm going to ask this as a yes or no question, and I'll give you a chance to explain. Is the idea that bullying and harassment based on sexual orientation is prohibited a gender ideology or sexual concept?

A No. Now, can I expand -- can I expand on that now, Josh?

Q Yeah, please.

A Okay. No. Every student deserves to be safe. Bullying is absolutely not tolerated at any level to any group. But the question was -- you asked me if that group -- I would say absolutely in -- in the concept of Little Miami students; right? Or were you trying to go with the -- the movement? I -- I don't -- that's where I'm getting confused of what you're asking me.

Q I just -- it was a simple question.

A I understand it was, but I'm -- I'm trying to make sure I answer it correctly, because if you're trying to say that, "Well, that's what the -- that's what they're trying to do in this movement." Right? I would then say -- let's -- that -- that opens up about the sexuality ideology. If you're asking me

Page 67

about Little Miami students; right? I would say absolutely they deserve to be free of harassment and bullying.

Q What movement are you talking about?

A The movement that you've referenced before in this 20th and 21st century culture, arts, and demographic trends.

Q Okay. I get it. I get it. I understand. So but let me pull it back just so we're clear on the record here. And I apologize for being redundant, but referring to -- put aside Exhibit 9 for a moment. I'm asking generally. Applying your policy, is the idea that bullying and harassment based on sexual orientation is prohibited a gender ideology or sexual concept?

A I will tell you, bullying in general is not sexual or ideology in general. Bullying is -- should be addressed; right? Doesn't -- doesn't matter what group you're in, bullying is bullying, and I'm 1,000 percent opposed to it.

Q Okay. So just so we're clear, being opposed to bullying based on sexual orientation, is that a gender ideology?

A No. Bullying in general is not a sexual ideology. I don't understand why you're bringing the

Page 68

sexual ideology into this. Bullying -- I'm opposed to any type of bullying.

Q So if I specifically say I'm opposed to the bullying of gay kids, you wouldn't say I'm engaging in sexuality content as that term is defined in your policies; would you?

A No. No. If you made that comment, I would say no. Now, if you went into the comment explaining what constitute gay kids, then I would say probably now we're -- now we're crossing the line where we're having to -- we're going into sexuality. But a simple comment saying, "I'm opposed to bullying gay kids," I would say no.

Q All right. So let me show you -- does Little Miami prohibit discrimination and bullying based on sexual orientation?

A I'd have to pull the policy, but I know that's been an issue. Bullying's been a -- a concern at Little Miami that I've talked to the superintendent about. But I -- I don't -- I'm not aware -- they might decide examples as to why.

Q Well, when you say bullying. Are you talking about bullying of gay kids in particular, or just bullying in general?

A No, no, no. Bullying in general.

Page 69

Q Are you aware of any problems involving bullying of gay or lesbian kids?

A I am not, other than what was been -- provided at the school board meeting.

Q What was provided at the school board meeting?

A I -- I think some students came up with examples. I spoke with Regina, and I don't believe any of those were confirmed as "bullying." But they certainly raised a concern that that behavior is not to be tolerated toward any group of students.

Q So do you know if the Little Miami policies themselves prohibit bullying or discrimination on the basis of sexual orientation?

A I -- without bringing up the policy, I -- I don't know offhand. I -- I just know the behaviors --

Q Okay. We can do that. Let's pull up your non-discrimination policy, which we'll mark as Exhibit 10.

(Exhibit 10 was marked for identification.)

A All right. So this is not the bullying. This is the non-discrimination?

Q Yeah. We'll get to the bullying in a second here. We'll mark them both if you want.

18 (Pages 66 - 69)

Page 70

A   Sure.

Q   The bullying policy, we'll call Exhibit 11. There we go.  And the anti-harassment policy, we will call Number 12.

(Exhibit 11 and Exhibit 12 were marked for identification.)

A   Perfect.

Q   Now you're familiar with these policies?

A   Yes.

Q   Looks like -- you know, let's look at the anti-harassment policy first since I got off on the screen.  That appears to have been adopted in October 2025 when you were on the board; right?

A   Yes.

Q   And you read it before you adopted it?

A   Yes.

Q   And you made sure it covered everything you wanted it to cover?

A   Yeah.  I -- I didn't commit it to memory, but yes, we -- we had a lot of them.  What was going on during that time, we were converting the old policies over to new policies.  I did not sit in on the -- the review board that -- that did this conversion.  But yes, I -- I did pass it.

Q   Okay.  And so if I look down at this policy,

Page 71

there's a section that describes types of prohibited behavior.

A   Yep.

Q   One is race, color harassment -- I'm on page 4 here.

A   Okay.

Q   Another is religious creed harassment.

A   Yep.

Q   Another is national origin ancestry harassment.

A   Yep.

Q   Another is disability harassment.

A   Yep.

Q   Where in this policy does it indicate that harassment against gay and lesbian children is prohibited?

A   If you go to our bullying policy.

Q   Okay.  So nowhere in the anti-harassment policy that you're aware of, does it mention a prohibition on harassment of people based on sexual orientation?  Is that right?

A   I -- I -- without -- without looking at it right now, if it -- if you didn't not highlight it, then I would say it's not in there.  But it'll be covered under the anti-bullying policy.

Page 72

Q   Okay.  So that's Exhibit 11 that was also adopted in October 2025; right?

A   Yes.

Q   And you were on the board when that happened?

A   Yes.

Q   And you read it before you voted on it?

A   Yes.

Q   And so where -- and feel free to take all your time to read it.  Where in this policy does it prohibit bullying based on sexual orientation?

A   Scroll up.  Harassment -- any intentional written -- it would be covered with -- with the heterosexual children as well.  That -- that would be the -- I guess you're asking the homosexual and the heterosexual children are both covered under this bullying.

Q   And where does it indicate that in the policy?

A   Where does it say the -- harassment, intimidation, or bullying toward a student.  The second paragraph, first sentence.  Yeah, right there.  "Harassment, intimidation, or bullying toward a student, whether of other students, staff, or third parties is strictly prohibited and will not be

Page 73

tolerated."  So they will be a student or a teacher depending on what they fall into.

Q   And they have to occur more than once it looks like in order to constitute bullying; right?

A   Yes.

Q   So is using the "N" word permitted in the Little Miami Schools?

A   Go back to the harassment policy.

Q   So under the harassment policy, using the "N" word once would be prohibited; right?

A   That is correct.

Q   But what about using the "F" word in reference to a gay student?  Is that permitted?

A   No.  Go back to -- go back to the bullying.

Q   Yeah.  Bullying has to occur more than once.  So if I call someone the "F" word once, you're okay; right?

A   Well, no.  Go back up.  Go back up.  Harassment, intimidation, or bullying -- or bullying.  It doesn't say bullying.  It says "Harassment, intimidation, or bullying toward a student, whether by other students, staff, or third parties is strictly prohibitive and will not be tolerated."

So the "F" word as you're referring to -- I think I -- we're going to guess that we know what that

19 (Pages 70 - 73)

Veritext Legal Solutions

www.veritext.com                    888-391-3376

Page 74

word is, and I want to say that would fall under harassment and intimidation.

Q   Okay.  But it only --

A   And that will be -- that will be dealt with.

Q   But it only constitutes harassment, intimidation, or bullying if it occurs more than once though; right?

A   Well, it -- it would still be disciplined. It may not fall under the bullying discipline, but that name calling is certainly not tolerated.

Q   And if we look at the non-discrimination policy, number 11, does that include any language specifically prohibiting discrimination against gay and lesbian children?

A   Let's read this thing here.

Q   I'm going to scroll up.

A   I'm trying to read.  It might -- it might be in the top part.  I'm sorry.  Who's controlling this? Is that --

Q   That's me.  I'm sorry.  So I'm looking at page 3.  It lists a bunch of different ways that people can be subject to discrimination.  Age, disability, national origin, race, religion.

A   Right.  Well, scroll back up.  Scroll -- there -- well, if we go back up there all the way

Page 75

toward the top here, we talk about -- an employee who's alleged to have been subjected to conduct that can be -- I can't -- I'm sorry.  You're going too fast for me.

Q   All right.  You tell me where you need to be.

A   All right.  Hold on.  Let's see -- let's -- what I'm saying is if we read it right here, you're going to find out that that conduct is not going to be tolerated; okay?  Whether it be in this harassment, whether it be in the bullying, or whether it be in the other student Code of Conduct, regardless of anybody's sexuality, whether you're a heterosexual child, whether you're a homosexual child, none of this should be tolerated.  And -- and our policies cover all this.

Q   It's fair to say --

A   A lot of these policies, Josh, overlap; right?  So a policy might be bullying, but you'll find out other policies that we have in our district will cover these same -- these same behaviors or same items to protect our students.  So it's not necessarily a one size fits all that you'll find out that a lot of these documents that we have, these policies, will overlap and -- and protect our students.

Page 76

Q   So why do your policies specifically prohibit discrimination harassment based on race, religion, and other characteristics, but not sexual orientation?

A   I would say a -- a lot of ours are adopted by Neola and -- and a lot of them mirror what the law requires.  So I -- I don't know for certain, but my guess is these are -- these are what the State of Ohio or -- or the federal government requires groups to be protected.  So that's why this policy was created.

Certainly, we're not going to -- Little Miami is not going to lean on this one policy to play referee whether behavior's good or not, because we have other policies within the district that will cover down on a lot of this behavior you're discussing.

Q   Okay.  Let's go back to then our discussion of the Parents' Bill of Rights policy.

A   Okay.

Q   And then let me show you a undated memorandum from Mr. Tarazi, which we'll mark as Exhibit 13.  Have you ever seen this document before?

        (Exhibit 13 was marked for
        identification.)

A   Yes.

Page 77

Q   When did you see it first?

A   This past winter, I believe.

Q   How did this document come to exist?

A   Scroll down here -- shoot.  All these days -- all these things kind of mush together, but I believe we had a discussion at our board meeting.  And I think it was clarifying this for the staff to make sure the staff was aware.  And -- and this was from -- yeah.

Q   Did you request Mr. Tarazi that you draft this memo.

A   For clarification, yes.  It was requested.

Q   Okay.  Was it requested by you?

A   It may have been.  It may have been.  I know --

Q   Did you have any conversations with Mr. Tarazi about HB 8 and the board policy?

A   Yes.

Q   When's the first time you spoke to him about it?

A   Probably January.

Q   Okay.  And what did you talk about?

A   Well, at -- at the time, as you recall, Josh, we had that policy from Buckeye, Big Walnut, about the flags in display policy.  And that was

Page 78

really a "scorched earth" policy that we were looking to amend. Then in discussion, we discussed House Bill 8 to see how this would go. And I think this was a policy then that was sent out to the staff so they're aware of House Bill 8.

Q Did any of your discussions with Mr. Tarazi include the flag at the center of this case?

A For House Bill 8? No. That particular one? No. I don't believe so, no.

Q Do you know if this memo was ever actually sent out?

A No.

Q Do you know if this memorandum was ever adopted as a board policy?

A This was -- well, if you look at the top, it was just with the -- I believe it was just -- excuse me, clarifying our board policy. Right? I think it says "Memorandum does not create a new board policy. It is intended to assist with consistent implementation of existing legal requirements and district procedures."

Q Okay. Do you have any knowledge of whether this policy was actually sent to anybody?

A Yeah. The fact that -- yeah. You -- you asked that -- yeah. The -- the fact that Regina said

Page 79

she sent it out tells me that it was sent out.

Q So I want to look at -- let's see if this helps with some of the timeline. Mark this as Exhibit 14. It's a series of emails. Top one is Sunday, January 18th at -- looks like 6 p.m. from Mr. Tarazi to you. This is at Bates number 286.

(Exhibit 14 was marked for identification.)

A Yes.

Q Do you remember receiving this email?

A Vaguely, yes. But --

Q And he is asking you to review the attached draft word memo he put together. Is that what you think was the document we've just been talking about, Number 13?

A Yes.

Q Okay. Did you review that document?

A I did.

Q Did you provide him with any comments or suggestions?

A I do not recall. I may have, but I -- I do not recall.

Q And it looks like on here was a email January 18th, 2026 with a draft memo and any changes. Do you know what attached to this email?

Page 80

A No. That wasn't sent to me. I don't think I was on that.

Q Okay. So we'd have to ask either Regina or Omar what was in there; right?

A Yes.

Q And then let's mark -- we up to 15, an email January 29, 2026 that you wrote to Ms. Morgan --

(Exhibit 15 was marked for identification.)

A Scroll back up. I'm sorry. Can I read that? I don't recall that. Let me just read. Well, there you go. Then she -- she shared it with me.

Q Okay. So it looks like first -- yeah --

A Hold on one second. I'm sorry. Cool.

Q So if I'm reading the exchange right first, there's a email that Mr. Tarazi wrote on January 23rd on classroom displays; right?

A Yes.

Q Okay. And on page 2, first full paragraph reads "The immediate concern here relates to a specific classroom poster that some believe may constitute sexuality content." What's he referring to there?

A It may be this poster, "Hate Has No Home Here." I believe that's --

Page 81

Q Okay. Do you know that, or are you guessing?

A I believe that's the case, yes.

Q Okay. And why do you believe that's the case?

A Looking at the timeline, it would probably match up with that poster.

Q Okay. And then he writes for that issue, adoption of the Big Walnut policy is not necessary. What's the Big Walnut policy?

A The Big Walnut policy was scorched earth. It was pretty much bearing the walls down to only content material, American flag, and -- and a few other items. And -- and we were trying not to go that route of scorched earth.

Q And then he suggests that it's -- under the board that it's possible that the classroom poster was sexuality content; right?

A Yes.

Q And then he suggests two bullet points here, what he describes as a common sense and objective standard.

A Yes.

Q Okay. Do you know what the source of that standard that Mr. Tarazi adopted was?

21 (Pages 78 - 81)

Veritext Legal Solutions

www.veritext.com                                                      888-391-3376

Page 82

A   Yeah.  I -- I believe it has to do with how the -- the election in our community went where the community overwhelmingly voted to remove -- well, to vote candidates in that would remove sexuality concepts and gender ideology from the classrooms and focus on academics.

Q   Well, I'm just trying to figure out what the source of the law he's citing is here.  So he writes, first bullet point "A lesson activity, display, or material is likely to be considered sexuality content if a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."

A   Right. I would --

Q   Do you know where he got that standard from?

A   I would ask Omar that question.

Q   Okay.  Are you aware of any case or statute or anything that uses this reasonable observer standard?

A   I'm by no means a law expert, Josh.  I -- I would not be able to begin to -- to cite law.  But give me about five minutes, let me get on chat GPT, and I'll find something for you.

Q   Well, no, no, no.  We definitely don't want

Page 83

to do that.  Do you -- I mean, I guess we'd have to ask Omar, right, where he got that from.

A   Yeah.

Q   Okay.  And same thing, it's primary purpose language.  Do we know where that -- do you know where that came from?

A   From our -- our law director.

Q   Okay.  But you don't know where he got that from; right?  He didn't cite any sources or anything here; right?

A   No.  We -- we may -- may have had discussion, but, again, I -- I don't know offhand, no.

Q   Okay.  Do you recall any of those discussions that you had with him around this time?

A   We -- we had discussions, but I -- I don't recall anything specific.  I'll -- I'll be honest with you.  Hell, it's been, you know, six, seven months ago.  I -- I -- or six months ago.

Q   Okay.  And he writes, "Importantly, the test is not whether someone agrees or disagrees with the message."  Do you agree with that?

A   Yes.

Q   And then he describes to process it out in the board; right?

A   Yes.  And -- and the board agreed with this

Page 84

implementation, this plan to implement it.

Q   Was there ever a vote taken on that?

A   I do not know if it was a policy or more of a procedure.  I think this is probably coming in with the procedure that was not voted on.  I think a procedure was incorporated.

Q   And you wrote to Regina, it looks like, "Can you work with Omar to have a letter sent out by you to the district"?

A   Yes.

Q   Do you know if that letter ever went out?

A   This is the letter we're talking about.

Q   Do you know if this ever went out as a letter to the district?

A   Well, if you look below, that was the letter that it went -- that went out.  You asked me earlier.  Hold on.  No, not this one.  I'm sorry.  The -- the one he sent to the staff.

Q   Well, yeah.  So he sent one.  It looks like this email, the first email from Omar is January 23rd.  And then six days later you say, "Can you work with Omar to have a letter sent out by you"?

A   Yes.

Q   Do you know if Regina after January 29th ever sent out a letter?

Page 85

A   No.  Regina did not.  I -- I don't believe Regina did.  I wanted her to, but I know Regina is very weak in this area.  And I wanted her to own the procedure and -- and take more ownership in it.  But I think she was very hesitant.

Q   What do you mean weak in this area?

A   I -- I -- in my opinion, I think she struggles with -- to be -- to be a leader in the district.

Q   What do you mean by that?

A   I -- I think she tries to be non-confrontational and tries to become too friendly and at times does not enforce the board's policy fairly or accurately.  I think -- I think she picks and chooses what policies to follow and what policies not to follow.

Q   So does Little Miami have any policy on teacher displays?

A   Yes.  I would have to -- I would have to bring that display up.  There's -- there is a policy that addresses it.

Q   And what policy is that, if you know?

A   I do not.

Q   Okay.  Now --

A   I -- I think it -- it talks about

22 (Pages 82 - 85)

Page 86

controversial displays, controversial items.

Q   Okay.  This is a point of confusion here, because looking back at Exhibit 3 in your response to interrogatories.

A   Yep.

Q   I think you were asked, interrogatory number 8, "Describe the district's policies and practices for teacher displays on classroom walls."  The answer is "The district's longstanding practice has been to afford teachers considerable latitude in personalizing their classroom environments."  Is that accurate?

A   Yes.

Q   Okay.  And then there is a couple of policies that are cited, the Parents' Bill of Rights policy.

A   Yes.

Q   And then the bullying policy, and then the student parent rights policy, and some mission statements.  Are you aware of any other policies that directly address what a teacher can and can't put on their wall?

A   Yeah.  I -- I believe it has to do with the -- shoot, controversial lessons.  There's a policy that addresses that or it used to under the old policy.

Page 87

Q   Okay.  That's not -- I don't see any mention of that in your interrogatory answer.

A   Okay.

Q   Okay.  So you're saying there's a different policy out there?

A   Yeah.  There's a -- there used to be one. I -- I thought it got switched over when we went to Neola about teaching controversial topics.

But I know House Bill -- the -- House Bill 8 superseded the old one on controversial topics in some regards.

Q   Okay.  So is it the position of Little Miami Schools that everything a teacher displays on the wall constitutes the endorsement of Little Miami Schools?

A   Yeah.  At the end -- at the end of the day, I -- I believe the school is responsible for what is and isn't on the walls.

Q   Okay.  So if we look at Exhibit 2, for example, I see a Bengals sign up there.  Does Little Miami School endorse the Bengals?

A   Well, again, the Little Miami Schools are -- is responsible for everything that's on the walls. Necessarily an endorsement, no.  Acknowledging the teacher endorses it, yes.

Q   So someone who came into this classroom

Page 88

would understand that the teacher supports the Bengals, not necessarily Little Miami Schools supports the Bengals?

A   Yeah.  As a whole, yes.

Q   So if I'm an Eagles fan, for example, I shouldn't be offended if I come into this classroom?

A   It -- it depends.  Maybe if you're a Browns fan, but no.  For the most part you should not be. The teacher does have some leeway as -- as discussed.

Q   Okay.  Fair enough.  And so let me -- then we'll mark as Exhibit 16 --

A   But let -- let's clarify that though. Again, we're not talking about anything that is sexualized or gender ideology with the Bengals poster; right?

Q   I understand.  So I think we're up to Exhibit 16.  Sixteen?  And this is a set of pictures that were taken by the plaintiff and a district representative.  They're produced -- it looks like Bates numbers 766 through --

(Exhibit 16 was marked for identification.)

A   When and where was this displayed?

Q   Well, let me finish here.  These are pages 766 through 830.  And these are pictures taken, I

Page 89

believe, during the last week of school, around the school.

A   Okay.  I -- I -- yeah.  I -- I had not walked through the school since January.

Q   Okay.  So I'm just going to ask you about a couple of these whether they -- so there's a picture, for example, of Harry Potter, something from Harry Potter.  Is that --

A   I was going to ask what that was.

Q   Is that considered sexuality content?

A   We're -- we're going to say, are they addressing the sexual or gender ideology or sexual content?  I would say on the surface of this, no. I'm -- I'm not aware of Harry Potter, but on the surface, no.

Q   Okay.  And what about this little sign "Growth happens here"?

A   No.  I believe -- again, it goes back to, is it -- you know what I mean?  We can ask this question. Is there sexual concepts, gender ideology, are those being portrayed or meant to in -- in any of these posters we're showing?

Q   So for example, a teacher has, on page 3, a picture of Garfield.  This isn't a -- someone who came into the school would understand it's a teacher likes

23 (Pages 86 - 89)

Page 90

Garfield, not necessarily Little Miami Schools that likes Garfield?

A Yeah. I -- I don't know where this -- in relation, I do not know where this is being displayed. How much square footage we have of this. Is it prominently displayed? Is it behind the desk? You know what I mean? Without putting that in perspective, I have no idea.

What grade is this; right? Those are the -- those are the questions I think we have to look at for anything that's on the walls; right?

Q So can a teacher have a picture of their family up on the wall?

A I would say yes. I mean, they have that personal space by their desk.

Q Okay. So it's permissible to have a picture of their spouse on the wall?

A Sure.

Q And is it permissible to have a picture of their spouse if their spouse is the same sex as a teacher?

A Yeah. And it goes back to what you said, is it permissible to have a picture of their family? And the answer is yes.

Q So if their family depicted a gay

Page 91

relationship, is parental notification required before the teacher can have that picture up on their wall?

A Where is the picture being displayed? Is it prominently on the wall or is it at their desk? I don't --

Q Either one. Does that make a difference?

A Well, I -- I think who's the -- who's the intended audience for that display; right? Is -- is the dis is the intended audience the teacher to sit at his or her desk and look at the family? I would say that's nice.

Is the intent to advertise it to the children? I would say regardless of whether they're heterosexual or homosexual, I -- they don't -- I don't think that really is a part of the curriculum.

Q So I'm looking at Exhibit 2 here. Yeah. It looks like this is Mr. McIntyre's room, and it looks like behind his desk, he's got some decent size pictures of his family there.

A Well, there you go. I don't -- I can't see the pictures. I don't know who they are of. I mean, I -- I can't see what they're of, I guess I should say.

Q I'll represent you, that's his family. That's his wife.

Page 92

A Okay. Wife. Okay. I'm sorry. I couldn't see if that -- I -- I don't know anything about Mr. McIntyre to be honest.

Q Nothing in Little Miami's policies prohibits that; right?

A Correct.

Q Okay. And if that picture that we have on the -- it looks like the left side of the wall, it shows him and his wife. If that was a same-sex couple, would that make a difference?

A No.

Q So that would be permissible?

A Yeah. It's his family. I mean, there's no policy on the family; right?

Q Okay. So look at some of the pictures here around the room. Okay. Someone displayed a Steelers poster. Again, that's not an endorsement of the Steelers by Little Miami Schools; right?

A Okay.

Q What about this picture? "All humans are" -- looks like imaginary -- I don't know if it's cut off "imaginary because we have eyes." Some rainbow colors on here. Is that rainbow color problematic?

A No.

Page 93

Q Is a reference to the Gilmore Girls sexuality content?

A I have no idea who the Gilmore Girls are. And I have no idea what it reads. If -- but the question I would ask you is, is it -- are they -- they addressing sexuality or -- or -- you know, or gender ideology; right? That's kind of the -- the litmus test.

Q Okay. SpongeBob, not a problem, even though it's in Spanish?

A Right. Well, I hope it's in the Spanish class. The assumption would be. All right?

Q Or Bengals pictures. That's not an endorsement. Everyone understands that that's just the teacher's viewpoint; right?

A Sure.

Q And the teachers have a right to express their viewpoint about what football team they like?

A Yes. Yes. I -- I would say, again, we are very limited on the amount of space that we have on the walls; right? So I think we need to be careful what we advertise, but okay. I see where you're going. Okay.

Q You could have adopted a policy, for example, that says no sports-related signs up on

24 (Pages 90 - 93)

Page 94

walls, but you didn't.

A   Well, right, right, Josh.  You -- we had a discussion about that.  You and I did; right?  We -- we've talked about this policy before; right?

Q   Okay.  Yeah.  But now we're on the record and --

A   We could have, you're correct.

Q   -- writing down what we say, so we got to do it again.

A   Okay.  Yes, we could have.

Q   But you didn't; right?  I mean, that's just the reality; right?  The reality is people can post things that aren't necessarily curriculum-related on their school walls.

A   Yes.  And that was one thing that we were working to do, was kind of limit that space as to what could be permissible and what's not permissible.  Originally, we wanted to use all the space to remove politics, whether it be political, gender ideology, sexual content, tried to remove all of that under that one bill that you and I discussed at length.  So --

Q   But that wasn't adopted; right?

A   What's that?

Q   I guess what I'm trying to do is there's two separate conversations going on here it feels to me

Page 95

like.  One is what we think should happen, and the other is what were the rules in effect at the time.

A   All right.  Nope, you're correct.

Q   And I want to focus on that latter part; right?

A   Perfect.

Q   The rules in effect at the time that brings us to this conversation here today and this lawsuit, nothing prohibited --

A   Correct.

Q   Nothing -- or let me put it another way.

MR. TARAZI:  Can I pause you both?  Try not to over-talk each other because the court reporter's going to have a hell of a time trying to separate it out.  So --

MR. ENGEL:  We like to talk.  That's fine.

BY MR. ENGEL:

Q   So, Mr. Wallace, let me ask the question this way.  At the time of the incidents that bring us to this lawsuit, teachers were not strictly limited to placing items on their wall that was related to the curriculum.  Is that correct?

A   Until that letter on the procedure that was sent out by Regina was sent out to the teachers that

Page 96

put the left and right limits on what can be displayed in the classrooms.  Right?  When House Bill 8, when Little Miami adopted it, and then that letter that you referenced earlier was passed out that then put left and right limits on what can be displayed in classrooms.

Q   Well, if I read that letter, it put limits on things that were -- whether they're considered sexuality content or not; right?

A   Correct.  Sexual and gender ideology.  Correct.

Q   But I asked a different question though.  Nothing required teachers to only place curriculum related items on their walls?

A   Correct.  You're right.  Correct.

Q   And simply because it was on the wall doesn't mean it's related to the curriculum?

A   Correct.

Q   And simply because it's on the wall doesn't mean that the Little Miami Schools is endorsing that viewpoint?

A   Correct.

Q   So for example, I'm showing a picture of someone out of the Tottenham Spurs; right?

A   Right.

Page 97

Q   Little Miami probably doesn't have a position about the Premier League teams; right?

A   No.  Well, except they got rid of Ange Postecoglou so we can talk about that later.  But yes.

Q   Fair enough.

A   No.  You're right.  You're right.  You're right.  Right?  There's -- and again, it goes down to now, are we talking about sexual ideology or -- or you know, sexual concepts or -- or gender ideology.  And that's the litmus test based on the -- the procedure that was used when we adopted House Bill 8.

So you're going through these pictures here, and I'll tell you everyone is welcome.  That's great.  Nothing wrong there.

Q   And so we're looking at page number 786 and this, despite the fact that it has some rainbow imagery on it, you don't believe constitutes sexuality content?

A   Correct.  Right.  The periodic table.

Q   Yeah.  And so --

A   Right.  Now, I will tell you --

Q   -- Ginsburg on page 792 --

A   Right, right.  Now --

THE REPORTER:  Excuse me.  Excuse me.  There's been quite a lot of overlap talking.  And we

25 (Pages 94 - 97)

Page 98

need to talk one at a time for a clear record.  Thank you.

BY MR. ENGEL:

Q    Let me ask the question.  I'm looking at document number 792.  Is that document considered sexuality content?

A    No.  Well, I -- what does it say women in all places where decisions are being -- okay.  No.

Q    And then on page 801, it looks like there's a rainbow dolphin.  Is that sexuality content?

A    I -- in how it's used, I -- but by looking at it on the surface, no.

Q    What about the rainbow element on page 803?

A    No.

Q    And the Guardians of the Galaxy picture on page 812.  Is that sexuality content?

A    No.  I -- again, I'm going to assume.  I don't know anything about the Gardens of Galaxy, but I would assume there it's not.

Q    Okay.  And the rainbow imagery on document number 814, is that sexuality content?

A    What does it say?  I would say no.  My -- my guess is this is probably for the younger kids.  I'd say no.

Q    Okay.  What about the sign on page 815?  It

Page 99

says "Hate Has No Home Here," has a rainbow flower in the middle?

A    What -- I would say, looking at this -- what -- what grade is this in, by the way?

Q    This is in the high school.

A    High school.  I -- I had not seen this poster, and I really don't know how it's -- it's being used or if it's being referenced in discussion or where it's being actually displayed.

Q    Well, looking --

A    A "Hate Has No Home -- Hate Has No Home Here," I -- I don't think that on -- on the surface, the messaging, no.  I don't -- I don't think that message hate has no home is an issue.

Q    Is the rainbow imagery in the middle of this flag an issue?

A    I -- I didn't even catch the rainbow imagery.  Its kindness, peace, equality, love, inclusion, hope, diversity.  I -- on the surface, no.

Q    Document number 822, it looks like that's the -- is that the Buddha?  Is that --

A    I have no idea.

Q    -- sexuality content?

A    No.

Q    Again, if this is on a prominently displayed

Page 100

in the classroom, no one would think that Little Miami's endorsing Buddhism; right?

A    I would not.  I -- I just -- yeah.  No. I -- I don't think there's an issue with that at all.  The -- the assumption these are going to be age and classroom appropriate; right?

Q    Yeah.  These are off in the high school.

A    Okay.

Q    What about -- I think I saw -- so we talked a little bit about sports teams.  Someone could put up, for example, a poster supporting FC Cincinnati; right?

A    Right.

Q    And that wouldn't be considered problematic in any way?

A    No.  I -- I guess it would have to be, let's see what the poster looks like; right?  But if you're going to speak generally, this is the poster.  I would say no.

Q    Okay.  What about exhibit -- we'll call this Exhibit 17 poster that FC Cincinnati recently put out for their pride night.

(Exhibit 17 was marked for identification.)

A    Okay.  What is this?  Does this say anything

Page 101

on the bottom of it?

Q    It's just -- would that be considered sexuality content?

A    Probably not.  I think it's just people there.  I can't really see any symbols -- if there's symbols inside that I'm missing, maybe.  But I -- looking at this, I don't see --

Q    So there's the word pride, for example, in here.  Does that convert it to sexuality content?

A    Where do I see pride?  I, myself, would -- would wait for a parent to say something if they have an issue and like to hear what -- what their reasoning is behind it.  I don't see pride at all in there.  Do I?  I see -- I see joy, FCC, legacy, love.  I don't see pride at all in there.

Q    Can you see my cursor?

A    Hold on a second.

Q    Right to the right of the crown, it says the word pride.

A    In the person's hair.  I -- I would say right now, probably not.  It'd probably go unnoticed.  You know what I mean?  I -- I probably wouldn't make a -- a thing of it.  I -- but again, like I said, I -- I -- with House Bill 8, I'd be curious to see what a parent has to say, but myself, no.

26 (Pages 98 - 101)

Page 102

Q   Okay.  So let's talk about --

A   Because I don't believe pride in itself is a gender ideology or sexuality.

Q   Okay.  So let's talk about Exhibit 2.

A   Yes.

Q   Why is Exhibit 2 sexuality content?

A   Because it has the -- the symbolism of the -- what is it, the transgender flag and the -- the pride flag predominantly displayed.  "Hate Has No Home Here", and it has those two items.  Again, if we were to chop off this poster, this said "Hate Has No Home Here" with nothing underneath it, I don't think we would be discussing anything right now.

But when we put on the -- the sexuality symbols, I think that is -- and the gender ideology, I think that is -- prompts House Bill 8.

Q   Do you believe that this flag conveys a district-created message?

A   Do I believe -- well, like I said, when things are on the wall, I think Little Miami's responsible for everything that's on the walls; right?  That's what we have House Bill 8, so we can kind of reign in the left and right limits.

But yes, I believe Little Miami has the responsibility of what's on the walls.  I mean, at the

Page 103

end of the day, these classrooms belong to the community.

Q   Do you believe that students understood him to be conveying a message from the district when he put that sign up on the wall?

A   With the -- the sexuality and the -- certainly, yes.  There -- there was a message being sent with sexual ideology -- gender ideology and sexual concepts, yes.

Q   Was that message the teacher's message?  Or was that message the district's message?

A   Well, again, I -- I think it starts with the teacher.  But if the district is aware of it, and -- and tolerates it, then it becomes the -- the school's message; right?  That's why at -- at the school board level, that's why we approve or made our decision on whether that's appropriate or not.  Under House Bill 8, whether it -- whether it triggered parent notification.

Q   Okay.  So the district agrees that hate has no home in the district; right?

A   Correct.

Q   Okay.  And the district agrees that bullying and harassment of students based on sexual orientation is prohibited?

Page 104

A   Yes.

Q   Are you aware of any efforts by Mr. McIntyre to instruct students by displaying this flag?

A   Yes.

Q   What exactly are you aware of?

A   In an email, he referenced that he uses that for instruction.  And at our school board meeting, Mrs. Morgan reiterated that he has used that for instructional purposes --

Q   What -- sorry.

A   -- which I didn't -- yeah.  I -- I didn't understand because she mentioned talk about hate has no home and points up to the flag and talks about Judaism; right?  The anti-Semites.  And I don't -- I don't see that symbol up there.  So "Hate Has No Home Here" selectively chose the sexual concept and -- and the gender ideology, but has left off other items that are for instruction.

But based on House Bill 8, based upon those two symbols as being referenced in instruction, that should have triggered parent notification.

Q   I'm going to dig down a little bit there.  So I asked you if he was instructing students by displaying the flag and what evidence you have.  And you mentioned an email that he sent --

Page 105

A   Where he mentioned --

Q   Are you aware of any other emails or statements other than the one you just mentioned by Mr. McIntyre stating that he instructed students by using this flag?

A   Yes.  Mrs. Morgan referenced that at our school board meeting when we were voting on whether that should have triggered parental notification.

Q   Okay.  Anything else?

A   And she -- and she reinforced that that was used as part of his instruction.

Q   Anything else?

A   No.  Other than those items right there.  That he's --

Q   Are you aware of any dates or times when he explicitly used the flag in support of a lesson?

A   No.  But according to Mrs. Morgan, he used that periodically throughout the year.  Quite often, I believe was her words.  But I'd have to go back to the -- to the video to see.

Q   Okay.  And we're going to talk to her later today so we can ask her.

A   Sure.

Q   So when did you first become aware of this flag?

27 (Pages 102 - 105)

Page 106

A   It was after I got elected.  Probably -- I'm trying to think here.  I don't -- I don't know. I -- I'd say probably soon after I got elected, I was made aware of it.

Q   Okay.  So I think in your interrogatory answer -- maybe this refreshes your memory, it says "In September '25, David Wallace visited plaintiff's classroom and observed the flag."

A   That's probably about right.

Q   So you believe that September 2025 is the first time you observed the flag?

A   Yes.  And that makes sense 'cause that would have been probably right after we had open houses where again, I can't remember if I was the one that saw it.  Or if someone brought it to my attention, and I followed up by walking in the classroom and saw it.

Q   Okay.  Who was that person who brought it to your attention?

A   I -- I mentioned Silas.  He might have been the one -- it may not have been him.  I don't -- maybe shouldn't throw him under the bus.  I -- I don't recall who -- who it was, but I remember looking -- peeking in some of the classrooms during that open house and meet the teacher night 'cause I -- like I said, I have children that went there.  So I was kind

Page 107

of checking out --

Q   Are you aware of any parent complaints that had been received by the principal or superintendent about the flag?

A   Other than that parent mentioned it to me, and I think he shared it with other parents who then asked me about it.  But I -- I do not know if any formal complaint was to the school.  Or if they went through me to go to the school.

Q   So what actions did you take in September 2025 about the flag?

A   That's when we started talking about the -- Big Walnut, about removing the flags and display policy.  I think that was the timeline.  I don't -- all these days mushed together, but I'm thinking that was about the timeline that we were talking about it. And this was before the election would have been.

So that's when I went back and -- and took a picture of it.  And then we talked about Big Walnut, and then that's when the board flipped.  And we talked about House Bill 8.

Q   Okay.  And Big Walnut.  That's another school district?

A   Yes.

Q   Okay.  And they had a very -- just so we're

Page 108

clear, they had a very restrictive policy on classroom displays?

A   Yeah.  It was a "scorched earth" policy.

Q   Okay.  Now, so I'm just focusing on September 2025.  Did you communicate with the superintendent or the principal about the flag at that time period?

A   Yes.  I -- I went to the superintendent, and I had this and there was another item that I asked if she can get removed.

Q   And what was the response?

A   She went to the teacher, and voluntarily removed the -- the pride flag -- or I guess it was a pride heart.  And then this teacher pushed back.  And then she came back to me and said that "No.  He's not going to remove it."

Q   Okay.  And that took until January then; right?

A   Yeah.  I mean, there wasn't a whole lot to do with the election coming up and everything.  It was kind of -- everything just kind of pumped the brakes until the new board took over.

Q   Now we're up to Exhibit 18, which is this email chain I think you referenced.  And so I'm showing you a series of emails.  Looks like the last

Page 109

date is February 16, 2026 and the first one is February 2, 2026.  You've seen this chain of emails before?

(Exhibit 18 was marked for identification.)

A   I may have.  I -- I --

Q   I think you referenced it in an earlier conversation.

A   Okay.

Q   So just so we're clear, you know, you said there was an admission from the teacher that he used it in instruction.  Did you mean this February 2, 2026 email?

MR. TARAZI:  If you can give him a chance to look at it because you've been moving it up and down quite fast.  So go ahead and take a look at the email and see if you remember it.  If you do, then talk -- if you don't.

THE WITNESS:  All right.  Scroll back up if you could.  So that's Kevin to -- or the teacher to Kevin; right?  She redacted his name.  I assume that's him; right?  Let's scroll back up.

BY MR. ENGEL:

Q   Which way?  I'm sorry.

A   Go to the top of the email, the beginning of

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

Page 110

the email. I want to say -- is this the one -- scroll back? Is this one Regina -- all right. Scroll down. Is that from the teacher? Yeah. Okay. I -- I believe I've seen this, yes. I don't know if I've seen all of the -- I'll be honest. I don't know if I've seen all of those emails, you know, in the chain. A lot of the times I'll get stuff, and I'll be -- get like the middle of the chain or the end of the chain, so --

Q Okay. Well, so let me ask you about a couple of these here. Let's walk through them here. These are important. So first, let's start at the very end, this February 2nd email.

A All right.

Q He writes, "I do not ultimately care what students personally believe, and I do not share my personal beliefs with my students." Do you have any reason to believe that's inaccurate?

A I -- I don't know the gentleman.

Q Okay. Well, do you have any evidence that that statement is inaccurate?

A I do not.

Q Okay. He writes, "I do expect my students to engage in material we have to cover in a respectful and intellectual manner, grounded in facts." No

Page 111

reason to disagree with that; right?

A Correct.

Q No reason to think that that is not a true statement?

A Correct.

Q Next thing he writes is "The flag is a reminder that they must treat their classmates with mutual respect regardless of personal opinions or beliefs." Any reason to think that statement is inaccurate?

A Yes.

Q What is that?

A Well, I don't believe the flag reminds anybody that they treat the classmates with mutual respect. I think the comment plate, the -- the "Hate Has No, Home Here" is the reminder. But the sexuality and the -- the "genderology" represented on that flag is not reminding them of mutual trust and respect. It is, again, identifying the -- the sexuality.

But the -- the hate has no home wording on its own, I don't think anyone argues. I think that's a beautiful message. It's when you put it with the sexual content and gender ideology that then I believe the message is being changed.

Q And obviously -- sorry. Were you done?

Page 112

A Well, I -- I don't think it's a matter of -- and I will say, you know, we -- we talk -- we're -- I know we're hitting on one area; okay? But I want you to understand and be very clear, this does not have to do with the homosexuality. I think this has to do with just in general. I guess these kids are so inundated with all this garbage, and I think parents need to be aware of what is being introduced to them in the classrooms on a daily basis.

So I think I believe that -- that the flags do have more of a meaning than just a treat your classmates with mutual respect. Because there's a lot of -- I guess the question is asked what groups are not identified on that poster? If Regina -- if Mrs. Morgan mentioned anti-Semite is something that he teaches, the question I would ask is, "Well, why isn't that on there?" Right? Why isn't that on there? Why is the American Flag on there backwards?

There's reasons behind what -- what is being displayed. And I think that's the -- the issue at hand is the sexualization and the -- the gender ideology.

Q Okay. So let me ask you about this statement in the email. This is expressing the teacher's view; right?

Page 113

A Okay.

Q Do you have any reason to believe that that was not a sincerely-held belief by the teacher? I know you disagree with it, but do you have any reason to think that he's not telling what he believes himself at that time?

A I -- I do not know the teacher, and I can't try to get in that teacher's head about what he actually believed and what he did not believe.

Q Do you have -- so let me ask it in a lawyerly manner. Do you have any evidence that what he said there is not a true reflection of his beliefs?

A No. I do -- I do not know that. And I will say I do not care. I do not care what he personally thinks, what he -- what he privately thinks, what he publicly -- I do not care.

My issue is what he is portraying in the classrooms triggering House Bill 8 and requiring a parental notification when we talk about sexuality and gender ideology. So as far as what he personally thinks, I -- not to be mean, I -- I just don't care.

Q Okay. Now, at the beginning of the email, he writes that -- he lists "Specific content standards for each where I feel the flag I have in my room, which says "Hate Has No Home Here" is especially

29 (Pages 110 - 113)

Page 114

applicable."

A   Okay.

Q   Is that the language that you were referring to where you believe he indicated he used a flag in teaching?

A   Yes.  That's -- the "Hate Has No Home Here" -- you're asking me is that -- do I believe that is the flag that we've been discussing with the -- the sexuality and the gender ideology symbols on it?  Yes.

Q   Okay.  So this is the email you were referring to in your previous answers?

A   Yes.  Well, no, no.  This email that he's -- he says he's teaching, yes.

Q   So your belief is that by saying that the flag is applicable to these standards, that means he uses it as part of his instruction?

A   That would be my interpretation of applicable, yes.  I guess the question is why else would it be on the room if it's not?

Q   What's the definition of the word applicable?

A   I -- I -- whether -- whether it applies to or not.

Q   Okay.  If I told you the definition means having relevance, fit, suitable, or right to be

Page 115

applied or appropriate, does that seem like it fits?

A   Sure.  Yeah.

Q   And so do you believe there is a difference between saying something is relevant to what's being taught and saying I actually use it in my teaching?

A   Yeah.  When it's -- when it's referenced in the classroom; right?  If it's on the wall, and the teacher says he references it in his instruction, I would say yes, that is referenced/applicable; right?

Q   Okay.  So where in this email does he say he references it during his instruction?

A   This email -- I don't believe this email is in there.  I don't know.  Let's see.  Let's read it here.  "For each where I feel the flag I have in my room, which says "Hate Has No, Home Here" is especially applicable."  Right?  So he's referencing that it applies to these lessons underneath; right?  That's what I would think applicable means.

And he's saying it applies there, but if you look at this right here, okay, the Plains Wars, I don't see that as being sexuality or -- or gender ideology.  And -- and you go down this list; right?  And -- and I think that's what it is for something that has been displayed very prominently.  Looking at this sheet right here, I don't see anything that is

Page 116

for the -- what is it, the transgender flag or the pride flag.

Again, it goes back to the sexuality and the gender ideology and the parents being informed of what is being taught so they have the option to opt out.  So I guess it raises another question as to if he's saying this is all applicable, I would like to see the lesson plans.  And I think I mentioned that in January.  I'd like to see the lesson plans of how these are applicable.  How is the transgender flag and the pride flag applicable in this discussion?

And if it is applicable, then we go back to Little Miami board policy of House Bill 8 triggering parental notification.

Q   Anything else?

A   No.

Q   Okay.  So let me see if I understand your testimony.  Is it your testimony that by the teacher using the word applicable, he meant that he actually uses the flag during instruction?

A   Yes.  And coupled with Mrs. Morgan stating that he references it during his discussion -- during his instruction.

Q   Have you spoken to Mrs. Morgan about that issue --

Page 117

A   No.

Q   -- since this lawsuit started?

A   No.

Q   So the next email in this chain is February 3rd from Ms. Morgan.  And she says, "I reviewed the poster in question and its association with the attached curricular standards.  I do not see the poster contain symbols of identities."

And then she writes, "I do not believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."  I take it you disagree with her?

A   Yes.

Q   And that's for all the reasons you've stated?

A   Correct.  And that's why the board went ahead and four -- four out of five board members voted to have that poster removed until parental notification was done with that poster in question.

Q   Did you have any conversations with Ms. Morgan before she sent this February 3rd email?

A   No.  Not that -- not that I can recall.  Her -- her and I really don't speak that much, especially when it comes to these items that I know

30 (Pages 114 - 117)

Page 118

her and I disagree on.

Q   All right.  So then it looks like in the next day the lawyers get involved, which always makes things better.  Mr. Tarazi sent an email at 12:17, and you received a copy of this email.

A   Okay.

Q   Now, you weren't on the original email chain from Ms. Morgan -- it looks like on February 3rd.  Do you know why you were added to this chain?

A   To give me situational awareness?  One -- one of the issues that I've had with Mrs. Morgan is she selectively includes me on -- on emails and selectively excludes me.  So I -- I do not know how this originated or what have you.  But yes, I saw that I was included on it so I can be in the loop.

Q   Okay.  Do you know who decided to bring Mr. Tarazi in the loop on this question?

A   Probably me.  I -- or -- or I don't know.  Maybe Mrs. Morgan, if you look at her email.

Q   Yeah.  It looks like Ms. Morgan copied her.  Do you know, did you tell her to copy Mr. Tarazi or include him in this?

A   I -- I don't recall.

Q   And in Mr. Tarazi's email, he indicates what his understanding of the teacher's message below was;

Page 119

right?

A   Okay.

Q   Do you know how he got that understanding?

A   You would have to ask him.

Q   Right.  I mean -- well, that's a great point.  I mean, do you know if he ever spoke to the teacher about this issue?

A   I do not know.

Q   Do you know if he spoke to the principal about this issue?

A   I do not know.  I -- I don't want to speculate, but I would imagine he's working through the superintendent.

Q   Okay.  But you'd just be speculating.  You don't know if he actually had a conversation with the superintendent?

A   I -- I do not know.

Q   Do you know if he actually viewed the pictures?

A   Yeah.  You know, again, you'd have to ask him.  The assumption is that he's seen what we're talking about.  But you --

Q   Well, don't assume.  Right?  He told you earlier not to assume.  Do you have any knowledge that he actually viewed the images before he wrote about this

Page 120

what his understanding was?

A   Do I know for certain?  I mean, we're having a discussion on this.  I would -- I would like to think he did.  But I -- I don't know.  You'd have to ask him if he saw it.  But the -- the assumption is yes, since we're having this long discussion, I would hope that our legal counsel has seen this poster prior to just going -- typing away.

No.  The answer is yes.  He had to have seen it.  Hell, look, he's referencing, hate has no place here.  I -- he's our legal -- he -- he would have to have seen the poster.

Q   Well, he might have seen the email chain where it's mentioned, but --

A   No.  He would have seen --

Q   -- actually saw the poster or not.

A   No.  He would have seen the poster.

Q   Do you know that?  Or you're assuming it?

A   I will assume it.  I -- I didn't send him a picture of it.  I don't recall.  So if you want to play that, then I -- yeah.  I -- I do not know.  You'll have to ask him.

Q   Fair enough.  I mean, that's --

MR. TARAZI:  Can I pause you for a quick second?  This is already on the record that this

Page 121

email chain had all the attachments with images.  It's already part of the federal docket.  So there is all the attachments with the imagery part of the same email chain as the attachment, just so that we don't confuse the record here.

MR. ENGEL:  Yeah.  No.  We appreciate the clarification.  If you want to testify, you're certainly welcome to be a witness of the matter, but --

MR. TARAZI:  No.  I'm just saying that this record is incomplete because you don't have the attachments.

MR. ENGEL:  Anything else you want to add?

MR. TARAZI:  Nope.

BY MR. ENGEL:

Q   All right.  Do you know if Mr. Tarazi viewed the actual classroom?

A   Again, you had -- you'd -- I -- I do not know if he saw the classroom or if he just went off the pictures.

Q   Do you know if he reviewed the model curriculum from the State of Ohio that was referenced by the teacher?

A   Yes.

31 (Pages 118 - 121)

Page 122

Q   You know that he did review it?

A   Well, it's right there.

Q   Well, here's the excerpts.  Do you know if he actually went to the web page and reviewed the actual curriculum?

A   Yes.

Q   How do you know that?

A   In -- in discussion.

Q   Do you know if he reviewed any of Mr. McIntyre's teaching materials?

A   Other than what was sent to him through discovery would be my assumption.  I mean, you're asking me these questions, Josh, I -- what was -- whatever you -- was provided to him, he saw.  Or what he provided to you obviously shows that he saw it.

Q   What is the word supporting mean?

A   "Supporting aspects of social studies curriculum, including topics that may involve sexual orientation."  I -- I -- by no means am I a -- a Webster expert, but supporting aspects would just show that -- I don't know.  I use it all the damn time.  It supports it, goes along with it.

We talked about -- what did we say the word was?  Review.  What are those two words we used earlier?  Help me out here.  We -- we talked about

Page 123

supporting aspects of social studies curriculum.  I would say that would go along with it was to be supporting; right?  To back up.  To -- yeah.  To back up aspects or to -- to go along with aspects would be supported.

Q   Did Mr. Tarazi have any evidence before him when he wrote this email that the teacher used the flag in actual instruction?

A   Without talking to Omar, I do not know.  When was this email written?  Was this before or after the teacher -- what date was this written?  February the 10th; right?  All right, scroll back up.  Now where is the standards we talked about, that email with the standards; right?  You mentioned the teacher referenced standards.  When was that done?  Hold on.  Go back up.  February 2nd.  So I would say yes; right?

Q   Yeah.  So the evidence -- do you know if he had any evidence besides this February 2nd email?

A   You -- you have the documents.  I -- I don't have them in front of me, Josh.  I -- I do not know.

Q   So it looks like the teacher then responds on February 9th.  And he says he's had a chance to review the emails.  And he says he tends to agree with Mr. Tarazi's overall characterization of the purpose behind the flag.  You're familiar with that; right?

Page 124

A   Yes.  Scroll back.  Was I -- was I included on this email?  Was I included on this?  I think I was, but I do not know.  Like I said, I --

Q   It does not appear that you were.

A   Okay.  Then maybe at this portion I do not know if I was included on this or not.  My guess is I probably was not given, like I mentioned, a lot of times I'm left off of items.

Q   And it's fair to say here in this email, he disagrees that the revised code section in the board policy is applicable to this thing; right?

A   Well, let's read it here.

Q   He says, "I'm not sure how either ORC 3313.473 House Bill 8 or policy 5780.01 are implicated."

A   Okay.  So he is unsure.

Q   Right.  And then he goes on the next paragraph, he says, "I would say the flag is at most an incidental reference," which would exclude it under the definition of sexuality content; right?

A   To what he's saying, yes.

Q   Okay.  And then he says clearly, "I do not explicitly provide instruction on the flag or incorporate it into my curricular materials."

A   Okay.

Page 125

Q   So he writes that.  That seems to contradict what your interpretation of his previous email; right?

A   Well, no.  Right?  He does not explicitly provide instruction, but he does provide instruction on the flag.  The question would be what does he mean by explicitly?  Right?  It's up there.  He mentioned that he -- he references it; right?  Or supports it.  Then Mrs. Morgan mentioned at the board meeting that she uses -- that he uses it by pointing to it and -- and referencing it; okay?

So by saying it's incidental, I question it because it's prominently displayed on the front of the classroom, which really -- incidental to me.  And I guess I would ask what your definition of an incidental means, but I do not believe incidental when he has it prominently displayed in the front of the classroom.

MR. TARAZI:  Can I pause for a quick second on a procedural matter?  You have the next deposition scheduled for one.  Should I text Regina that it's going to be delayed?  I mean, just so she's not sitting around or --

MR. ENGEL:  Yeah.  I think we've got probably about 10 or 15 more minutes here only.  And then -- but yeah, then people will need a break.  Our

32 (Pages 122 - 125)

Page 126

court reporter's going to need a break.

THE WITNESS: Yeah. I'm going to -- I'm going to ask right now, Josh, if I can just take a break and stretch my leg. My back is tightening up on me.

MR. ENGEL: Yeah. Let's do that. Let's go off the record.

THE WITNESS: All right.

THE REPORTER: Off the record at 12:50.

(Off the record.)

THE REPORTER: Okay. We are back on the record, 12:56.

BY MR. ENGEL:

Q   Okay. So we were talking about the February 9th email from the teacher. Anything else you want to add about that?

A   No. I -- I think we finished up on incidental what that meant; right? And he had that big flag on his wall, which I would not classify that as incidental.

Q   Okay. And then it looks like on February 10th, Mr. Tarazi then sends another email to Regina copying -- it looks like everyone on the board here; right?

A   Yes.

Page 127

Q   Who is Terry Gonda, by the way?

A   Treasurer, school treasurer.

Q   And he indicates that he spoke with you, and you asked that the matter be placed on the agenda for the next board Meeting. What do you recall about that conversation?

A   I -- I think it was a matter of whether voting -- whether this triggers House Bill 8's opt-out policy. The "Hate Has No Home Here" with the sexual content and the gender ideology and having the board make that decision on whether the teacher needs to send out -- to remove it or to send out an opt-out policy to allow it for his curriculum material.

Q   And again, he says he -- he makes a representation about what the display is intended for. Do you know if before making those conclusions, he spoke to either the teacher or the principal?

A   I do not know.

Q   Do you know if he spoke to any other board members?

A   I do not know.

Q   Do you know if he visited the classroom?

A   I do not know. Yeah. I -- I know he spoke to Mrs. Morgan.

Q   Do you know if he had any communications of

Page 128

any sort with the teacher to be sure that this summary accurately represented the teacher's position?

A   I -- I think -- well, he -- he worked through Mrs. Morgan to communicate with the teacher.

Q   Do you know if he had any direct communications with the teacher?

A   I do not know.

Q   Did you have any direct communications with the teacher?

A   No.

Q   So when this came before the board, what evidence did you gather to make your decision?

A   The -- the poster. I saw the poster in the classroom and -- and his email stating that he's -- he's referenced that as part of his curriculum. And then -- yeah, that was the information.

Q   Okay. Did you have in front of you this February 16th email from the teacher?

A   I -- I did see something about -- I guess this had to be it. I did see something that I was CC'd on where -- this might have been it, where he -- he referenced part of the curriculum.

Q   Doesn't look like he CC'd you on this.

A   Okay. That may not then. There -- there was one that he had that talked about the curriculum

Page 129

standards. I think you referenced, might be at the bottom of this one. I did see that part of it.

Q   All right. But do you recall seeing this particular email?

A   I -- I do not. Yeah. Like I said, I may have seen it as part of a -- a chain of another email, but I do not recall.

Q   Okay. And it's fair to say in this email he says he wants to provide some clarification further about what he said; right?

A   Yes.

Q   Okay. And then he says "The flag is not nor has ever been intended to engage students in sexual concepts or gender ideology."

A   Okay.

Q   And you had that statement in front of you when you made your decision?

A   I very well could have seen these. I -- I remember there was a couple emails where he tried to walk back his original statement. And then, like I said, when we were in that meeting, Mrs. Morgan referenced that he, you know, referenced it quite often, that poster.

Q   So he says, "I have never incorporated the flag into the curriculum or used it as an

33 (Pages 126 - 129)

Page 130

instructional item." Is it your testimony you believe that's inaccurate or accurate?

A Inaccurate.

Q Okay. And again, is the only evidence you have that original email and a later statement from the superintendent?

A Yes. His email stating that he uses it, references it as part of his curriculum, and he list listed a whole line-up of items that he references, and then what Mrs. Morgan stated in the meeting.

Q And this is your opportunity -- I want to be clear --

A Yeah, yeah, yeah. No.

Q Do you, as the representative of the Little Miami School Board as a -- both in your own personal capacity and as a 30(b)(6) deponent, have any other evidence to suggest that the statement "I have never incorporated the flag into the curriculum itself or used it as an instructional item" is untrue?

A I am saying that his other emails and Mrs. Morgan's testimony -- Mrs. Morgan at the school board Meeting referenced that he used it in previous lessons. If you scroll down to the bottom -- okay. We can see where he says he has referenced it. And in discussion with Mrs. Morgan at the January meeting,

Page 131

she mentioned that he references quite often in his -- in his teaching.

Q Okay. Anything else? I just want to make sure that I'm not surprised later if we have a hearing or something.

A Sure.

Q And you guys come in with some additional emails that we haven't talked about, or 17 students are coming in and saying something, or God knows what; right? The purpose of this conversation is so that I'm not surprised.

A Sure.

Q So I want to be clear that the entire universe of evidence that you have to suggest that his statement in this email is not true are the email that you talked about --

A From his own admission, yes.

Q And Ms. Morgan's statement?

A Right. The information I'm going off of is his admission in his email; right? And can we roll down to that one? Can we -- can you bring that down there, Josh? All right. So where does it say here?

Q I think it's --

A All right. "Below are the specific content standards for each where I feel the flag I have in my

Page 132

room, which says "Hate Has No Home Here" is especially applicable." Okay? And it's prominently displayed in the classroom.

So my -- my take when he says applicable, right, whether it applies or not, is this here. Then Mrs. Morgan in her board meeting mentioned that, "Yes. He references it quite a bit in his instruction."

Q Anything else?

A No.

Q Okay. Has anyone on the Little Miami School Board ever expressed animus or hostility towards LGBTQ students or staff?

A Other than what was that said at the school board meeting, I -- I have not personally talked with -- with anyone about it. I think we need to be very caring. I -- I can tell you that Dan Smith surprised me with what he said. But that's --

Q What are you referring to?

A His comment at the meeting where he mentioned about Jesus doesn't love sin.

Q Why did that surprise you?

A I -- I couldn't disagree more with him. I -- I don't know Dan that well. I -- I couldn't disagree more with that statement.

Q Unpack that a little for me, please.

Page 133

A I -- I -- well, he said, "Jesus doesn't love sin." And I disagree with him. I consider myself, I guess, a religious person and certainly my feelings do not align with his.

But the issue is not whether his -- it was whether this triggered House Bill 8. And I think we got sidetracked at that meeting. He did. Just like we're getting sidetracked right now.

Q Well, I mean, do you believe that he had some animus towards gay and lesbian students or teachers?

A I-- I do not know. I don't -- I don't believe so. I -- I think he's -- yeah. I -- I do not know what he thinks, but I never got that impression of him before. And even with that statement, I don't -- I don't know if how he feels. So I guess I shouldn't speculate.

Q All right. Jump around a little bit here just to clean up some stuff. Looking back at the interrogatory answers, looking at interrogatory number 5 on the third paragraph -- got this right. You wrote that "Sexual orientation and gender ideology are substantive curriculum topics in the courses plaintiff teaches." What do you mean by that?

A Well, that that's -- that's what he uses to

34 (Pages 130 - 133)

Page 134

justify putting up the poster; right?  That he -- that he is using it to demonstrate the sexual orientation and gender ideologies are curriculum topics.

Q  So is it your testimony that sexual orientation and gender ideology are substantive curriculum topics within the Ohio social studies model curriculum for American History?

A  Again, let's -- let's bring up the curriculum topics.

Q  Before I do that, let me -- I'm happy to do that.  But what do you mean by the word substantive?

A  That they're a part of.

Q  So is it your testimony that teaching on the continuing debate between the role the state and federal government and political and social issues includes disagreements over LGBTQ rights is the same as teaching sexual orientation and gender ideology as substantive curricular topics?

A  Well, let me ask you a question.  Is that -- without seeing that lesson plan; okay?  It could be part of that lesson plan.

Q  Did you review the lesson plans before you answered these interrogatories?

A  No.  I -- just I spoke in general.

Q  Does the school district have this -- make

Page 135

available teaching materials to parents through an online platform?

A  I would say if it is, it's very difficult to find.  I -- as a parent, I can tell you that I've never been able to find it.

Q  Are you familiar with this website called Schoology?

A  My children are.  I am not.  I mean, I -- I know of it.

Q  Do you know whether parents are through the Schoology website given access to all the instructional materials used by Mr. McIntyre?

A  In theory, yes.

Q  Have you received any complaints from parents not being able to inspect any of the instructional or educational materials used for Mr. McIntyre's class?

A  No.  I -- I think they have -- have taken things at face surface.

Q  What do you mean by that?

A  Well, I -- I-- without seeing the -- the actual lesson plan, whether it triggers House Bill 8 or not; right?  How in detail is it?  Is it going to be as generic as what you're showing me down here as a content standard?  Or are they going to break it down

Page 136

to where the -- as we go into this movement, we're going to then talk about the sexuality or the gender ideology are part of that curriculum as you -- as you start, you know, breaking it down more.

I mean, are we going to get the 50,000 view?  Or are we going to get the 10,000-foot view or the 50-meter view?  I don't know how far that breaks it down, but that's very much at the crux of what we're discussing with -- again, it goes back to everything, does -- is it discussed with House Bill 8?

And if he's referencing a poster, I would challenge to say that poster has transgender and pride flag on it.  And I would say based upon that and the fact that he references it, right, I would say then that yes, the sexual orientation and gender ideology he puts as part of the curriculum.  Now you're asking me on the -- the subject with his lesson, are you able -- I guess let me -- are -- are we able to bring up Schoology and see what he has?

Q  Well, I guess I want to bring this to a close here.  I've just asked the question of did you ever actually review the Schoology materials?

A  I did not, no.

Q  Have you ever received any complaints from parents that they were unable to access classroom

Page 137

materials for Mr. McIntyre?

A  No.  They would not go to me unless they were getting stonewalled from the school or superintendent.

Q  As the Little Miami School District Representative, do you have any reason to believe that parents were unable to inspect the instructional materials used by Mr. McIntyre?

A  As -- as a parent, I can tell you that it's challenging to get into Schoology and navigate it.  As a parent, I've never been able to get in there and look at the lesson plans.  Some -- some teachers I have been able to.  Others are not.  Some are more vanilla than others.

Q  I think my question was, are you aware of any complaints from parents that they were unable to inspect the instructional materials used by Mr. McIntyre?

A  No.  And -- and again, I -- I think that's one that would not be at my level unless they were unable to get the support from the superintendent or the principal.  I mean, it wouldn't work up to my level until they got nowhere --

Q  All right.  One other quick topic.  I'm going to show you what we've marking as Exhibit 19,

35 (Pages 134 - 137)

Page 138

which is the affidavit filed by Mr. McIntyre in this case. I assume you've reviewed this affidavit?

(Exhibit 19 was marked for identification.)

A  Yes.

Q  Okay. Is there anything in this affidavit that you believe is inaccurate?

A  I -- I would have to go through it again. I don't -- I do not recall all the details in this; right? He's the plaintiff. I would agree with that -- teach at Little Miami.

Q  Yeah. Let's go through each paragraph by paragraph.

A  All right.

Q  Paragraph 2, anything inaccurate in that?

MR. TARAZI: Josh? So I believe the superintendent has a hard stop at four o'clock, just so you know.

MR. ENGEL: Okay. I don't anticipate a problem there. Thank you for that.

THE WITNESS: Okay.

BY MR. ENGEL:

Q  So anything wrong with paragraph 2?

A  I -- like I said, I do not know Mr. McIntyre. But if he's saying that, then sure.

Page 139

Q  What about paragraph 3? Anything that you think is inaccurate in paragraph 3?

A  Yeah. We discussed this earlier as far as affecting the district's interest in providing services. The fact that we're discussing it right now. We had a school board meeting to discuss it. So there has been some disruption.

Q  Any other disruptions other than what we talked about before?

A  I will tell you, I -- I would say on the surface, no. But I'm -- I'm unaware if there's been any issues with -- any repercussions of any of the students that had him.

Q  Okay. What about paragraph 4? Anything inaccurate in paragraph 4?

A  No. That's what he believes.

Q  Let's go to paragraph 5. Anything that you believe is inaccurate in paragraph 5?

A  I disagree.

Q  Which part do you disagree with?

A  I believe that some members of the school board, right, and public statements -- through actions and public statements express hostility toward many marginalized students, particular LGBTQ students. I would like to know what those hostilities, actions, or

Page 140

public statements --

Q  Anything else you think in that paragraph is inaccurate?

A  "Hate Has No Home Here" flag was simply a reminder that students must treat all -- I disagree with that. I do not believe that was a reminder as he mentioned that he uses as part of his curriculum. And the superintendent also mentioned that he references quite a bit in his instruction. So I don't think it goes from a reminder, more as part of a curriculum.

Q  I think we've been through that plenty.

A  Yes.

Q  What about paragraph 6? Anything in 6 that you believe is inaccurate?

A  Yeah. "Hate Has No Home Here" flag was not used for any teaching purposes. Again, I disagree because in his own admission he uses that as part of his instruction. And the superintendent also validated that at -- at the board meeting in January.

Q  Anything else in --

A  I think it was January. It might've been -- whatever the -- it might've been February meeting. The board meeting that we voted.

Q  Anything else in paragraph 6?

A  Yeah. Well, he -- he says he's never used

Page 141

it as part of his methodology of instruction or never sought to instruct students on the impact of particular substantive knowledge on curriculum through the use of "Hate Has No Home Here" flag, when in fact he has referenced it. So I -- I disagree with quite a bit in number 6. Right?

And then it was incidental reference, but yet the posters very largely and predominantly displayed in the classroom. Hardly I would say incidental reference when net posters very -- taking up a lot of real estate.

Q  And anything in paragraph 7 you disagree with? Or no. That's a terrible question. Let me rephrase it.

Anything in paragraph 7 that you believe is not true and accurate?

A  I -- yeah. "My display of "Hate Has No Home Here" flag was private speech, not within the scope, the duties as a teacher or pursuant to any School board policy or part to convey." And the question is, he is -- he's supposed to be teaching the content standards that we referenced; right? So when he sent home a syllabus to the parents of this is what we're going to teach in Schoology as you referenced, nowhere on there did he say, "By the way, here's my private

36 (Pages 138 - 141)

Page 142

speech that I will be teaching the students that's not part of the curriculum."

So that's where I -- that's where I would disagree as far as his -- his private speech. 'Cause as a parent and as a former teacher, you -- you try to leave your personal private speech with yourself. You're -- you're hired just to teach the academic standard. And I would challenge any teacher at Little Miami to stick to the standards that Ohio wants you to teach.

Q After the school board made its decision, did you discuss with Mr. Tarazi statements that you had put out to the media?

A I believe we discussed a -- I guess a public statement from the school.

Q Did you have any conversations in person with Mr. Tarazi? Or was that all by email?

A I don't know. It might have been email or phone call. Probably email. Probably email. I'm guessing. I -- I don't know Josh. This was -- this was how many months ago? I don't remember. But the -- the fact is we -- there was communication to put together a statement. And I don't -- you know, I think -- yeah. So he did help craft that message.

Q Did he also help craft the statement that

Page 143

the board adopted at the March 3rd special meeting describing the decision?

A Yes. As a law director, we had him help with that. It was -- and then he worked with getting that sent to our communications director at the time.

Q Do teachers have first amendment free speech rights?

MR. TARAZI: Objection. You're calling for legal conclusion.

BY MR. ENGEL:

Q You can answer.

A I guess that that's -- that's a slippery slope there. Do the teachers have first amendment protection? I would say in cases is ye; right? A teacher has rights outside of the district; right? They -- they have first amendment rights on -- on their personal time; right? And then there's certain things within the -- the building, you know. You know, some things they -- they sacrifice when they go to the school, but I would imagine they have some rights as far as privacy, whether it be their possessions or their purses or their bags or whatever.

But if you're asking do they have first amendment rights in teaching a classroom? They -- they should be teaching the Ohio Academic standards.

Page 144

Like I said, when a syllabus gets sent home to a child and a parent, a parent should be aware of what is being taught. If it goes into sexuality or gender ideology, there is House Bill 8, which is Little Miami policy now that opts them out. But if an item is not covered in the curriculum, I do not believe they have the first amendment right to teach based on their first amendment speeches.

Now, we talked about the first amendment and -- and Little Miami. You mentioned they can put their Steelers poster up. They can put their Bengals poster up; right? So that they do have some latitude in -- in what they're teaching. But it comes back to age appropriate, their gender ideology or their sexual content that must -- parents must be notified about.

Q Are teachers allowed to wear, like, religious symbols on their clothing? Like a cross or something like that?

A Yes.

Q Or Jewish star?

A Yes.

Q Would they be allowed to wear one of those rainbow Safe Space pins on their clothes?

A Yes. Matter of fact, they do. My daughter has a French teacher that wears the gay pride pin.

Page 145

Q That's not sexuality content or gender ideology.

A She puts -- she -- she wears it. I'm not in favor of it, but I'll tell you right now, we've not had a chance to discuss it as we're -- we're going over this. I've asked my daughter. She does not reference it. She does not mention it. She has it on there. I -- I have not seen it. I'll be honest. I don't know how big it is, how prominent it is. I don't know if it's a -- a rainbow decoration or if the intent is to talk about sexuality.

And I'll be honest with you, Josh, I'm a little afraid to walk through the building to see what I find until we can get this thing ironed out.

MR. ENGEL: Well, on that note, I am going to end my questioning. I don't know if Mr. Tarazi has some questions for you. But thank you for your time and your candor. I very much appreciate it, and I apologize this was longer than we thought.

THE WITNESS: You too, Josh. No -- no worries. Good seeing you again.

MR. TARAZI: I think I don't have questions at this time. I do think, though, that we got to take a break. Otherwise, the court reporter is going to strike and blame both of us and all that.

37 (Pages 142 - 145)

Page 146

So for -- you know, so let's just pause here -- or end here, sorry, I should say. And then I would guess that we're talking about starting at two o'clock. I mean, I don't -- you know, I don't see the court reporter's name right now. Sorry. Sorry.

THE REPORTER: It's okay. I'm Marianne, and I also have a quick question.

Mr. Engel, would you like a copy of this transcript?

MR. ENGEL: Yes, please.

THE REPORTER: And Mr. Tarazi, would you like a copy?

MR. TARAZI: Yes. Yes, please.

THE REPORTER: Okay. We're going to go off the record, 1:26.

(Signature waived.)

(Whereupon, at 1:26 p.m., the proceeding was concluded.)

---

Page 147

CERTIFICATE OF DEPOSITION OFFICER

I, MARIANNE HISSONG, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Marianne C Hissong*

MARIANNE HISSONG
Notary Public in and for the
State of Ohio

---

Page 148

CERTIFICATE OF TRANSCRIBER

I, EMILY LEVY, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Emily Levy*

EMILY LEVY

---

38 (Pages 146 - 148)