**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| GEORGE MCINTYRE<br><br>Plaintiff<br><br>v.<br><br>LITTLE MIAMI SCHOOL DISTRICT, ET AL<br><br>Defendants | Case No. 1:26-cv-00351-MWM<br><br>Judge: Matthew W. McFarland<br><br>MOTION FOR SUMMARY JUDGMENT AND SUR-REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff respectfully submits this combined Motion for Summary Judgment and Sur-Reply in Support of Motion for Preliminary Injunction (Doc#3.)

This case remains governed by the test for government employee speech established by the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 140 (1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under this test, the Court must weigh the Plaintiff's free speech interest in displaying a Hate Has No Home Here Flag against the interest of the District, as an employer, in promoting the efficiency of the public services. *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), *citing Pickering*, 391 U.S. at 568.

Defendants in discovery have conceded the key facts under the *Pickering* test. Defendants admitted that, in displaying a Hate Has No Home Here Flag in his classroom, Plaintiff was speaking as a citizen about a matter of public concern. (Def. Response to Interrogatories; Doc.25-7, PageID#484 (admitting that the "imagery was perceived by community members as conveying positions on contested social issues."). Defendants have also conceded that the Hate Has No Home Here Flag did not impact the efficient delivery of public services. (Def. Response to Interrogatories; Doc.25-7, PageID#483 (admitting that the Board's decision to remove the flag "was not based on a finding of actual disruption to District operations or to Plaintiff's performance of his duties.").

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......... II

FACTS .......... 1

ARGUMENT .......... 1

A. Standard For Summary Judgment .......... 1

B. The *Pickering* Two Step Analysis .......... 1

1. *Pickering* Step One: There Is No Issue Of Fact That In Displaying The Flag Plaintiff Was Speaking As A Citizen Rather About A Matter Of Public Concern .......... 2

a. There Is No Issue Of Fact That The Flag Conveyed A Position On A Matter Of Political, Social, Or Other Concern Of Community .......... 2

b. The Flag Is Not Part Of The Curriculum .......... 3

c. The Mere Presence Of The Flag In The Classroom Does Not Mean It Is Government, And Not Individual, Speech .......... 6

2. *Pickering* Step Two: Defendants Do Have Any Evidence To Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is Outweighed By The District's Interests In Promoting The Efficient Delivery Of Public Services .......... 9

C. The Board's Action Is Not Immunized Simply By Asserting An Allegedly Viewpoint-Neutral Explanation .......... 11

1. There Is No Issue Of Fact That The Parents Right Policy Does Not Apply To The Flag .......... 12

2. The Board Does Not Have Unbridled Discretion To Define "Sexuality Content" However It Sees Fit .......... 14

3. The Board Engaged In Viewpoint Discrimination .......... 18

D. Plaintiff Relies On Prior Briefing Addressing The Remaining Preliminary Injunction Factors .......... 20

CONCLUSION .......... 20

**TABLE OF AUTHORITIES**

Cases

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) .......... 11

*Assn. of Christian Schools Internatl. v. Stearns*, 678 F.Supp.2d 980 (C.D.Cal. 2008) .......... 18

*Aubrey v. City of Cincinnati*, 815 F. Supp. 1100 (S.D. Ohio 1993) .......... 17

*Bailey v. Callaghan,* 715 F.3d 956 (6th Cir. 2013) .......... 11

*Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530 (6th Cir. 2020) .......... 1

*Boddy v. Grech*, 6th Cir. No. 25-3490, 2026 U.S. App. LEXIS 16832 (June 10, 2026) .......... 15

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891 (6th Cir. 2001) .......... 9

*Cajune v. Indep. School Dist. 194*, 105 F.4th 1070 (8th Cir. 2024) .......... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 1, 5

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .......... 15

*City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488 (1986) .......... 15

*Connick v. Myers*, 461 U.S. 138 (1983) .......... *passim*

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) .......... 1

*Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.,* 158 F.4th 732 (6th Cir. 2025) .......... 15

*Dept. of Commerce v. New York*, 588 U.S. 752 (2019) .......... 12

*Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332 (6th Cir. 2010) .......... 3

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) .......... 16

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .......... *passim*

*Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938 (Aug. 12, 2024). .......... 8

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988) .......... 3

*Int'l Soc'y for Krishna Consciousness Inc. v. Lee*, 505 U.S. 672 (1992) .......... 6

*Johnson v. City of Battle Creek,* W.D.Mich. No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300, (May 10, 2005) .......... 9

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) .......... 7

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000) .......... i

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 5331 (2001) .......... 7

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) .......... 15

*McCauley v. Univ. of the V.I.*, 618 F.3d 232 (1st Cir. 2010) .......... 17

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .......... 17

*Nielsen v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566 (E.D.Mich. 2025) .......... 15

*Pickering v. Board of Education*, 391 U.S. 563 (1968) .......... *passim*

*Pittsburgh League of Young Voters Edn. Fund v. Port Auth.*, 653 F.3d 290 (3d Cir. 2011) .......... 11

*Rhode Island Coalition Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180 (D.R.I. 2025) .......... 16

*Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65 1st Cir. 2004) .......... 11

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995) .......... 6

*Shelby Cty. Deputy Sheriff's Assn. v. Shelby Cty. Sheriff's Office*, W.D.Tenn. No. 07-2420-JPM, 2007 U.S. Dist. LEXIS 105712 (Nov. 14, 2007) .......... 9

*S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252 (D.Utah 2023) .......... 18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......... 9

*Trump v. Hawaii,* 585 U.S. 667 (2018) .......... 18

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998) .......... 16

*United States v. Stanchich*, 550 F. 2d 1294 (2nd Cir. 1977) .......... 12

*Vlaming v. W. Point School Bd.,* 302 Va. 504 (2023) .......... 9

*Washington v. United States HHS*, D.Or. No. 6:25-cv-01748, 2025 U.S. Dist. LEXIS 211013 (Oct. 27, 2025) .......... 16

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007) .......... 2

**FACTS**

Plaintiff incorporates the separate Statement of Proposed Undisputed Facts. This Statement is submitted separately pursuant to the Court's Standing Order.

**ARGUMENT**

The Expedited Discovery completed in this case in accordance with the Court's Order shows that Plaintiff is entitled to summary judgment because the basic facts relevant to the *Pickering* test are undisputed. With respect to the Motion for Preliminary Injunction, this Sur-Reply Memorandum primarily addresses the most highly contested factor: likelihood of success on the merits.

**A. Standard For Summary Judgment**

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B. The *Pickering* Two Step Analysis**

The Supreme Court's public employee jurisprudence described in *Connick, Pickering,* and *Garcetti*, establish a two-step analysis. *See Bennett v. Metro. Govt. of Nashville & Davidson Cty.*, 977 F.3d 530, 537 (6th Cir. 2020); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). The steps: (1) whether the employee was speaking as a citizen (rather than in a capacity as government employees) about a matter of public concern; and (2) whether the employee's interest in speaking outweighs the government's interests in promoting the efficient delivery of public services.

### 1. *Pickering* Step One: There Is No Issue Of Fact That In Displaying The Flag Plaintiff Was Speaking As A Citizen Rather About A Matter Of Public Concern

The message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community.[1] To determine whether employee speech is pursuant to ordinary job duties, courts "look to factors like the speech's 'impetus,' setting, audience, and general subject matter.'" *Id. quoting Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007). In this case, the relevant context is Plaintiff's desire to express "legal, ethical, and moral" support for Little Miami's a diverse student population among the myriad personal items he and other teachers displayed in their classrooms. (Verified Complaint, Doc.1, PageID#9; Pl. Aff., Doc.22-1, PageID#306; Deposition; Pl. Depo., Doc.25-1, PageID# at 382-383.)

#### a. There Is No Issue Of Fact That The Flag Conveyed A Position On A Matter Of Political, Social, Or Other Concern Of Community

Plaintiff's intent was to symbolize support for marginalized students who could be some of the most at-risk students. He explained:

> The Hate Has No Home Here Flag was part of my efforts to symbolize support for marginalized students who could be some of the most at-risk students. I believe that some members of the school board and the community at large have, through actions and public statements, expressed hostility towards many marginalized students, particularly LGBTQ students. The Hate Has No Home Here Flag was simply a reminder that students must treat all of their classmates with mutual respect, regardless of personal opinions or beliefs.

(Pl. Aff., Doc.22-1, PageID#306.) He further testified in his deposition:

> Q Why do you have the Hate Has No Home Here flag on your wall?
> A …while I was teaching -- or while I was earning my teaching degree, a couple of my classes, we had to read and learn more about the impacts to marginalized youth, including the LGBTQ community and the impacts to mental health and the differences that -- like, just knowing that they're -- like, nothing -- they talked about the safe space stickers and just something where

[1] The Supreme Court recently made clear that determining whether the government "intends to speak for itself or to regulate private expression" requires a "holistic inquiry" that is "not mechanical" but is instead "driven by a case's context rather than the rote application of rigid factors." Shurtleff, 142 S. Ct. at 1589.

> students know that they -- just something small like that, that they have support, it can increase their learning ability and it can go -- potentially go a long way in aiding their mental health.
>
> So given those factors, I wanted something in my classroom that kind of signified that, like, no matter what, like, we're not going to judge people or not -- like, all -- any of our coursework or course discussion is going to be grounded on fact, and we're, you know, going to respect differences of opinions.

(Pl. Depo., Doc.25-1, PageID#382-383.)

There is no issue of fact because Defendants acknowledge this in discovery. In response to Interrogatories, Defendants acknowledged that "the Flag's imagery was perceived by community members as conveying positions on contested social issues." (Def. Response to Interrogatories, Doc.25-7, PageID#484.) The District's 30(b)(6) witness testified in his deposition:

> Q …So in other words, you agree that [the Flag] conveyed a position on a matter of political, social, or other concern of community?
> A Yes.

(Wallace Depo., Doc.25-4, PageID#443.)

**b. The Flag Is Not Part Of The Curriculum**

In-classroom speech made by an educator as part of a curriculum is not speech on a matter of public concern for *Pickering* purposes. *See Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 340 (6th Cir. 2010) (teacher has no "free-speech right to dictate the school's curriculum").[2] The Supreme Court, in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988),

---

[2] In *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 340 (6th Cir. 2010), the Sixth Circuit did not explicitly define the term 'curricular,' but suggested that it included the selection of books and methods of instruction for use in the classroom.

In *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988), the Supreme Court defined the "curriculum" as having two components: (i) school-sponsored expression bearing the imprimatur of the school (ii) that is supervised by faculty members and designed to impart particular knowledge to the students. The Hate Has No Home Here Flag is not curricular under the *Hazelwood* definition in both ways. First, the Hate Has No Home Here Flag was not selected by the School Board and does not bear the imprimatur of the District. Second, Plaintiff never used the Hate Has No Home Here Flag as part of his methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag.

described curricular matters as matters related to the selection of books, method of instruction, or other activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences."

McIntyre states clearly and unequivocally the Flag is not curricular or used for teaching purposes and is not curricular under the *Hazelwood* definition:

> The Hate Has No Home Here Flag was not a school-sponsored expression bearing the imprimatur of the school or designed to impart particular knowledge to the students. I never used the Hate Has No Home Here Flag as part of my methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag. Similar to other items I have displayed in my classroom, The Hate Has No Home Here Flag was at most an incidental reference to topics discussed in class; I did not explicitly provide instruction on the Hate Has No Home Here Flag or incorporate it into my curricular materials.
>
> My display of the Hate Has No Home Here Flag was private speech not within the scope the duties as a teacher or pursuant to any school board policy or part of an effort to convey a government-created message. In displaying the Hate Has No Home Here Flag I was not instructing, discussing the curriculum, or encouraging better academic performance.

(Pl. Aff., Doc22-1, PageID#306-307.)

There is no issue of fact because Defendants' witnesses testified that McIntyre's Affidavit was basically accurate. The Principal testified:

> A …I believe the statement is true. Our -- our parents are pretty vocal around here. I think, if he was teaching it as a reference or explicitly using it as an instructional piece, I'd have probably gotten some emails or phone calls

(Harleman Depo., Doc25-3, PageID#425.) The Superintendent similarly affirmed in her deposition that she had no reason to doubt the veracity of McIntyre's Affidavit. (Morgan Depo., Doc.25-2, PageID#405.) She further testified:

> Q And as you sit here today, do you have any reason to believe that the flag was used for instructional purposes?
> A None.

> Q Was the flag any part of the curriculum for the school?
> A No.

(Morgan Depo., Doc.25-2, PageID#406.) The Superintendent explained that "if he was teaching it, he would have made it front and center. It was a poster that was hung on the wall to the side and not the focus of anything." (Morgan Depo., Doc.25-2, PageID#404.) To drive this point home: the Principal added that he was not aware of any contrary evidence:

> Q Is there any evidence that you know of that Mr. McIntyre used the "Hate Has No Home Here" flag as part of his methodology of instruction?
> A No.
> Q Is there any evidence that Mr. McIntyre sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the "Hate Has No Home Here" flag?
> A No

(Harleman Depo., Doc25-3, PageID#427.)

When asked at his deposition about whether the District was aware of any contrary evidence, the District's 30(b)(6) witness stated that the only evidence he had that the Flag was used for instruction was (i) part of an email from McIntyre and (ii) a statement from the Superintendent. (Wallace Depo., Doc.25-4, PageID#468.) Neither of these pieces of evidence is sufficiently credible to create an issue of fact, as production of a "mere scintilla of evidence" will not forestall summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. at 324-25. The email (i) refers to an email where Plaintiff merely said that the Hate Has No Home Here Flag was "applicable" to his teaching. (Depo. Exhibit 18.) He explained this email was in response to a question from the Principal meant just meant the flag was "relevant" topics he taught. (Pl. Depo., Doc.25-1, PageID#382.) The Superintendent confirmed this understanding. (Morgan Depo., Doc.25-2, PageID#403.) And, to alleviate any confusion, a few days later Plaintiff sent an additional email seeking to "provide some clarification"

and explaining that the Hate Has No Home Here Flag was not used as part of instruction.[3] (Email, Doc.25-22, PageID#644). The Statement from the Superintendent identified by Defendants (ii) similarly does not hold up to scrutiny. The Superintendent denied making such a statement to the Board. When asked about Wallace's claim, she testified:

> Q … Do you remember telling the school board that Mr. McIntyre used the "Hate Has No Home Here" flag during any lessons?
> A I actually believe I did just the opposite of that. I clarified to the school board that Mr. McIntyre had told me that he does not use it in any lessons.

(Morgan Depo., Doc.25-2, PageID#406.)

**c. The Mere Presence Of The Flag In The Classroom Does Not Mean It Is Government, And Not Individual, Speech**

While it is, of course, true that "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness Inc. v. Lee*, 505 U.S. 672, 678 (1992), and that the government can place varying kinds and levels of regulation on speech and expressive activity depending on the type of forum at issue, including in some cases by imposing content-based restrictions, once the government creates a forum for private speech on its property, regardless of the type of forum it has created, it cannot discriminate based on viewpoint. *See Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995) (observing that viewpoint discrimination is an "egregious form of content discrimination" and governments may not regulate speech when "the specific motivating ideology or the opinion or perspective of the speaker is the

[3] Defendants previously misrepresented the record on this issue to the Court. Defendants submitted a chain of emails as Doc.13-8, and represented that this was the "full written record" considered by the Little Miami School Board and later explicitly referred to these documents as "the full undisputed record." (Doc.13, PageID#97.) Deposition testimony and discovery revealed that this was not true; Defendants omitted the last email in the chain. Plaintiff confirmed in his deposition that this email was not included in the email chain filed with the Court and that, therefore, Defendants had not presented the Court with the "full record." (Pl. Depo., Doc.25-1, PageID#384.)

rationale for the restriction."); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) ("government may not "single out a particular idea for suppression because it [is] dangerous or disfavored").

In this case, it was common for teachers to display personal items on classroom walls, including movie posters, support for sports teams, and inspirational messages. (Harleman Depo., Doc25-3, PageID#420; Classroom Displays, Doc.25-20, PageID#578-642.) The School Board did not promulgate any criteria or guidelines, content-based or otherwise, that it applies in regulating teacher classroom displays. In response to an interrogatory, Defendants admitted: "The District's longstanding practice has been to afford teachers considerable latitude in personalizing their classroom environments, including displays of personal items, sports team flags, motivational posters, family photographs, and similar materials." (Def. Responses to Interrogatories, Doc.25-7, PageID#482.) The Distrct's 30(b)(6) witness acknowledged that teachers can "post things that aren't necessarily curriculum-related on their school walls." (Wallce Depo. at 94.) He testified:

> Q Nothing required teachers to only place curriculum related items on their walls?
> A Correct. You're right. Correct.
> Q And simply because it was on the wall doesn't mean it's related to the curriculum?
> A Correct.
> Q And simply because it's on the wall doesn't mean that the Little Miami Schools is endorsing that viewpoint?
> A Correct.

(Wallace Depo., Doc.25-4, PageID#459. *See also* Morgan Depo., Doc.25-2, PageID#401 (students "absolutely" understand that what's on the walls and these displays are the personal views of the teachers and not endorsed by the school).

The *Kennedy* Court made it clear that all speech occurs in school setting is not necessarily curricular or school sponsored. In holding that a football coach had a free speech right under *Pickering* to offer prayers on the field after games, the Court noted that "it dispositive that [the speech] took place 'within the office' environment." *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 530 (2022). The Court warned against "commit[ing] the error of positing an 'excessively broad job descriptio[n]' by

treating everything teachers… say in the workplace as government speech subject to government control." 597 U.S. at 530-531, *quoting Garcetti*, 547 U. S., at 424. The Superintendent and Principal's testimony is consistent with *Kennedy*. The Superintedent testified unequivocally:

> Q Is it understood that what teachers put on the wall represents in many times their own personal views?
> A Absolutely.

(Morgan Depo., Doc.25-2, PageID#401.) The Principal's testimony about classroom displays is similarly consistent with this understanding of *Kennedy*.

> Q Do students and everyone else in the district understand that what people put on their walls is their own personal views?
> A I believe so.
> Q In other words, everything that's on the wall isn't an endorsement by the district?...
> A Correct.
> Q Is everything that's put on the wall have to relate to the curriculum?
> A It does not.

(Harleman Depo., Doc25-3, PageID#419.) In this way, this case is like the post-*Kennedy* decision in *Geraghty v. Jackson Local School Dist. Bd. of Edn.*, N.D.Ohio No. 5:22-cv-02237, 2024 U.S. Dist. LEXIS 142938, at *35-36 (Aug. 12, 2024). In *Geraghty*, the court considered whether using preferred names and pronouns was part of a middle school teacher's ordinary job duties. The court concluded that the teacher's job was to teach English to state standards.[4] Notably, relying on *Kennedy*, the *Geraghty* court rejected the idea that the speech was not private merely because it took place in the classroom setting and during class time. 2024 U.S. Dist. LEXIS 142938, at *36. The court said, "Defendants make much of the fact that" the speech occurred in the classroom setting and during class time, but that, under *Kennedy*, was not "dispositive" because, the teacher "did not 'shed [her] constitutional rights' when she entered the classroom." 2024 U.S. Dist. LEXIS 142938, at *36, *quoting Tinker v. Des Moines Indep. Cmty.*

[4] In *Geraghty,* the court noted that the teacher was not addressing "LGBTQ issues" as part of the curriculum. In this case, some of the standards touch on LGBTQ history within the context of civil rights, but Defendants never suggest the Hate Has No Home Here Flag is inconsistent with these standards and is an independent concept.

*Sch. Dist.*, 393 U.S. 503, 506 (1969). *Cf. Vlaming v. W. Point School Bd.,* 302 Va. 504, 573 (2023) (holding that teacher's use of pronouns in classroom "does not involve a teacher demanding the right to teach a different curriculum from the one that he was hired to teach").

**2. *Pickering* Step Two: Defendants Do Have Any Evidence To Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is Outweighed By The District's Interests In Promoting The Efficient Delivery Of Public Services**

Once Plaintiff establishes that some of his speech is protected, the burden is shifted to the Defendants to show adequate justification for the action. *Connick*, 461 U.S. at 150. *See Johnson v. City of Battle Creek,* W.D.Mich. No. 4:04-cv-38, 2005 U.S. Dist. LEXIS 40300, at *32-33 (May 10, 2005) ("the entire *Pickering-Connick* line of cases establishes that employee speech, even if protected, may be the occasion of discipline if the public employer bears its burden of showing that its legitimate interests outweigh the employee's interest in speaking"); *Shelby Cty. Deputy Sheriff's Assn. v. Shelby Cty. Sheriff's Office*, W.D.Tenn. No. 07-2420, 2007 U.S. Dist. LEXIS 105712, at *13 (Nov. 14, 2007) ("Under *Connick* and *Pickering*, once Plaintiffs establish that some of their activity is protected, the burden is shifted to the government to show adequate justification for its acts").

Defendants will not be able to meet their burden of showing adequate justification for the removal of the flag and they are unable to provide any evidence of detrimental impacts on close working relationships, undermining of a legitimate goals of the District; or any impact on employee's performance. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 899 (6th Cir. 2001) (describing factors to be considered). In answering interrogatories, Defendants acknowledged that the decision to remove the flag was "not based on a finding of actual disruption to District operations or to Plaintiff's performance of his duties." (Def. Response to Interrogatories, Doc.25-7, PageID#483.)

That interrogatory answer is probably enough to find in favor of Plaintiff on Part 2 of the *Pickering* analysis. But there is more undisputed evidence. McIntyre states in his Affidavit that the

Hate Has No Home Here Flag did not negatively impact the District, mirroring the language of *Brandenburg*:

> I am not aware of any claims by school administrators, school board members, or parents that the Hate Has No Home Here Flag affected the District's interest in providing services efficiently. The presence of Hate Has No Home Here Flag has not had any detrimental impact on my working relationships with other teachers or administrators or undermined my ability to teach my classes in accordance with state standards.

(Pl. Aff., Doc22-1, PageID#302.) He also testified similarly in his deposition.

> Q … with respect to the Hate Has No Home Here flag, did anyone ever suggest to you that the presence of this flag affected the District's interest in providing services efficiently?
> A No.
> Q …Did you ever run into any problems in teaching because of the presence of the flag?
> A No, I did not.
> Q Has it had any detrimental impact on your working relationships with other teachers or administrators?
> A No.
> Q Has it undermined your ability to teach your classes in any way in accordance with state standards?
> A No.

(Pl. Depo, Doc.25-1, PageID#382.)[5]

The Superintendent and Principal confirmed in depositions that the Hate Has No Home Here Flag did not interfere with the efficient provision of government services. The Superintendent testified that the presence of the flag did not undermine any school interests or cause disruption.

> Q Did the flag undermine any of the curriculum for the school?
> A No.
> Q Did the flag cause any disruption at the school?...
> A Not prior to this, no.
> Q Prior to Mr. Wallace attempting to get the flag removed, had it caused any disruption at the school?

---

[5] The only response Defendants' 30(b)(6) witness could offer is the view that Board members becoming involved and this litigation was a "distractions." (Wallace Depo., Doc.25-4, PageID#441, 470.) This conclusory and non-specific claim is insufficient to show an impact on efficiency, particularly when the flag had been on the wall for years without comment or incident before Wallace decided to raise the issue.

A No.
Q Had it interfered with the ability of the school to efficiently provide services to students?
A No.

(Morgan Depo., Doc.25-2, PageID#406.) The Principal testified in the same way. (Harleman Depo., Doc25-3, PageID#421.)

### C. The Board's Action Is Not Immunized Simply By Asserting An Allegedly Viewpoint-Neutral Explanation

Defendants admit that "The Board's determination was grounded in the application of Board Policy 5780.01 and H.B. 8" and that and "operational impact" was "not the basis for the Board's decision." (Def. Response to Interrogatories, Doc.25-7, PageID#483.) Despite the presence numerous of other teacher displays, Defendants admitted that the "only classroom display removed" was the Hate Has No Home Here Flag. (Def. Response to Interrogatories, Doc.25-7, PageID#485.)

Defendant's assertion of a viewpoint-neutral explanation does not end the matter because "the government rarely flatly admits it is engaging in viewpoint discrimination" and "the recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive" *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), *citing Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 811 (1985) (cautioning that the "existence of reasonable grounds for limiting" speech "will not save a regulation that is in reality a facade for viewpoint-based discrimination"). *See also Bailey v. Callaghan,* 715 F.3d 956, 965 (6th Cir. 2013) (Stranch, J. dissenting) ("We have never been so naive as to expect the government to admit it is engaging in viewpoint discrimination."); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) ("the government rarely flatly admits it is engaging in viewpoint discrimination"); *Pittsburgh League of Young Voters Edn. Fund v.*

*Port Auth.*, 653 F.3d 290, 297 (3d Cir. 2011) ("the recitation of a nondiscriminatory rationale is not sufficient standing alone because it could be a cover-up for unlawful [viewpoint] discrimination").[6]

In this case, the apparent inapplicability of the policy, along with the hostility towards LGBTQ students previously demonstrated by the Board, permit a plausible inference that the Board was not applying a preexisting policy in a neutral way, but was instead using an evolving policy as pretext for targeting McIntyre's viewpoint. Courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dept. of Commerce v. New York*, 588 U.S. 752, 785 (2019), *quoting United States v. Stanchich*, 550 F. 2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.).

### 1. There Is No Issue Of Fact That The Parents Right Policy Does Not Apply To The Flag

There is no issue of fact the Hate Has No Home Here Flag does not meet the definition of "sexuality content" in Board Policy or Ohio law. "Sexuality content" is defined in the Policy and statute as "any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology…" The definition specifically excludes "Incidental references to sexual concepts or gender ideology occurring outside of formal instruction…" (Parents Bill of Rights Policy, Doc.25-9, PageID#493-494; Parents Bill of Rights Statute, Doc.25-8, PageID#490-491.)

---

[6] The *Ridley* court suggested three categories that may "lead a court to conclude that, despite the seemingly neutral justifications offered by the government, nonetheless the decision to exclude speech is a form of impermissible discrimination." To wit:

> First, statements by government officials on the reasons for an action can indicate an improper motive. Second, where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive. Third, suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent.

390 F.3d at 87 (citations omitted).

The Principal testified that the Hate Has No Home Here Flag was not sexuality content. (Harleman Depo., Doc25-3, PageID#425.) The Superintendent stated that the mere presence of a rainbow and other symbols does not automatically convert the Flag into "sexuality content."

> Q Does the fact that it contains symbols of identities mean that it was sexuality content as that term is defined in your policy?
> A No

(Morgan Depo., Doc.25-2, PageID#404.) The Superintendent explained that it is irrelevant that Plaintiff taught about LGBTQ rights within the context of the civil rights movement because there is a difference between "teaching sexuality content and referring to it while teaching something else." She testified:

> A I feel like if you're teaching movements and that -- and you're referring to a particular movement among other movements, I feel like you're teaching about movements, not about the references within the movements.

(Morgan Depo., Doc.25-2, PageID#399. *See also* Morgan Depo., Doc.25-2, PageID#410 ("And in social studies you would have references to all different groups including the LGBTQ community.") The Principal testified in a similar manner:

> Q …Is there a difference between instruction that addresses or acknowledges sexuality and instruction that teaches about sexual conduct or relationships?
> A I believe so.

(Harleman Depo., Doc25-3, PageID#417.) The Principal further explained that McIntyre teaches in accordance with the State model curriculum and AP European History standards and does not teach any sexuality content:

> Q Are you aware of Mr. McIntyre ever teaching sexuality content in his classroom?
> A I am not.
> Q Are you familiar with the materials that he uses in his class?
> A I am.

(Pl. Depo., Doc.25-1, PageID#353.)

This testimony was consistent with contemporaneous emails. The Superintendent stated in an email that while the poster "contains symbols of identities" she did not "believe a reasonable

observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." (Email, Doc.25-22, PageID#646-647.) She testified in her deposition that despite the Board's subsequent decision she *still* agrees that neither the Parental Rights Policy and law are not implicated by the Hate Has No Home Here Flag. (Morgan Depo., Doc.25-2, PageID#404.) She also agreed that *even if* the flag contained sexual concepts or gender ideology, it *still would not be sexuality content under the policy or Ohio law* because it would be "incidental." (*Id.*) She explained that simply because LGBTQ rights are controversial, this does not convert the Flag into sexuality content:

> Q In your experience as a superintendent, you've come across people who think that sexual orientation should not be protected; right?
> A Yes.
> Q Okay. So is expressing the idea that yes, people should be protected from harassment based on sexual orientation, would that be considered a gender ideology or a sexual concept?
> A I would not think so.

(Morgan Depo., Doc.25-2, PageID#396.)

### 2. The Board Does Not Have Unbridled Discretion To Define "Sexuality Content" However It Sees Fit

Defendants, notably, do not actually contest the Superintendent's opinion that the Hate Has No Home Here Flag was not "sexuality content." Defendants stated in response to an Interrogatory that "Defendants do not contend that the Superintendent was incorrect in her professional assessment." (Def. Response to Interrogatories, Doc.25-7, PageID#483-484.) Defendants, instead, suggest that there can be no First Amendment violation because the School Board has unreviewable discretion to declares that anything speech implicates the notification provisions Ohio Parent's Bill of Rights and the District's Parents Rights Policy. Defendants state that the Board has "final authority over policy implementation under Board Policy 5780.01 and H.B. 8" to "make the ultimate determination regarding whether the Flag constituted sexuality content under the totality of the circumstances." (Def. Response to Interrogatories, Doc.25-7, PageID#484.)

Defendants cannot be more incorrect as a matter of law.[7] A policy cannot abrogate the Free Speech rights described in the *Kennedy-Garcetti-Pickering* line of cases. If the School Board enjoys unlimited discretion to define "sexuality content," it can use that discretion whittle the scope of permitted speech so drastically as to render the *Kennedy-Garcetti-Pickering* line of cases meaningless. Under this view, there is no stopping point. This is why the Supreme Court has explained that when First Amendment concerns are involved, a reviewing court "may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, (1986), *quoting City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22, (1984). *Cf. Nielsen v. Ann Arbor Pub. Sch.*, 803 F. Supp. 3d 566, 602 (E.D.Mich. 2025) (students could survive summary judgment on free speech claim by showing that "purportedly viewpoint-neutral reason… was merely pretext for viewpoint discrimination"). The Sixth Circuit, in a recent decision, rejected the idea that school boards' had *carte blanche* to use the application of facially neutral policies to justify viewpoint discrimination. *Boddy v. Grech*, 6th Cir. No. 25-3490, 2026 U.S. App. LEXIS 16832, at *16 (June 10, 2026). In *Boddy*, a school

---

[7] *Mahmoud v. Taylor*, 606 U.S. 522 (2025), does not support this audacious claim. In *Mahmoud*, the Court considered a different issue: whether parents had a free exercise right to opt out of instruction using LGBTQ-friendly books that substantially interfered with the religious development of their children. Two key facts were present in *Mahmoud* that are not present here. First, the materials were part of the curriculum. Second, the materials were not presented in a neutral manner, but, rather, were presented as part of a curriculum that was hostile to certain religious viewpoints and designed to impose upon students a pressure to conform. In contrast, this case concerns the free speech rights of a teacher, not the free exercise rights of parents considered in *Mahmoud*. The curriculum in *Mahmoud* went far beyond books sitting silently on classroom shelves or posters on a wall. Those materials were deployed by teachers with lesson plans designed to subvert children's religiously grounded views on marriage and gender. This case is more like the free speech analysis in *Kennedy* because students and parents all understand that teachers control the messages conveyed by their classroom displays. (Morgan Depo., Doc.25-2, PageID#46; Harleman Depo., Doc25-3, PageID#32.). *Cf. Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.,* 158 F.4th 732, 753 (6th Cir. 2025) (school district's ban on the use of biological pronouns regulates personal expression and speech on a public concern in a way that discriminates based on viewpoint); *Cajune v. Indep. School Dist. 194*, 105 F.4th 1070, 1081 (8th Cir. 2024) ("we find that the public would perceive private persons, and not the District, as having spoken through… posters" at a school).

board cut off a speaker's public comments criticizing the board as 'failing' and the superintendent as showing 'cowardice.' The Sixth Circuit held that this Court had erred when it credited the school board's "proffered reasons for limiting the speech when [those] reasons were unconstitutional, inconsistent, or plainly unreasonable." 2026 U.S. App. LEXIS 16832, at *22.

Courts have been rightly skeptical of similar claims of "unbridled discretion" by governments to regulate free speech. In *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), the Court warned against the "the possibility of censorship through uncontrolled discretion." The Court held that the First Amendment prohibits the vesting of "unreviewable" and "unbridled discretion in a government official" because nothing would prevent "the official from encouraging some views and discouraging others…" 505 U.S. at 133. The "unbridled discretion" doctrine requires that a restraint on speech contain narrow, objective, and definite standards to guide the decisionmaker. For example, in *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998), the Sixth Circuit held that the defendant's advertising policy prohibiting "controversial" advertisements was unconstitutionally overbroad because its application presented a "very real and substantial" danger that the defendant would exclude a proposed advertisement solely because of its viewpoint. *Id.* 361-62.

In this case, terms like "sexual content" and "gender ideology" are undefined and could be interpreted so broadly as to encompass almost everything in a classroom. One court has noted that "because the term[, gender ideology,] lacks scientific or any other discernable basis, it is likely undefinable" and "too vague." *Washington v. United States HHS*, D.Or. No. 6:25-cv-01748, 2025 U.S. Dist. LEXIS 211013, at *73 (Oct. 27, 2025). Another court has found that phrases like "'promote gender ideology' … obscure meaning like Russian dolls stacked inside each other." *Rhode Island Coalition Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 197 (D.R.I. 2025). Wallace, as a 30(b)(6) deponent, struggled to provide a working definition of these terms, suggesting that it would

cover "identifying the different genders in a… sexual manner." He then unhelpfully suggested that almost *any* discussion of difference in genders, including differences in average heights of men and women, would be encompassed in the definition. (Wallace Depo., Doc.25-4, PageID#445.) Tarazi even tried to invent his own standard, suggesting that displays "intended to prompt student discussion or engagement on sexuality or gender topics" constituted sexuality content. (Depo. Ex. 13, 14) This led Wallace to make a stunning admission in his deposition, that the standard used by the Board was not based on any legal standards but, instead, mere politics and public sentiment:

> A … I believe it has to do with how the -- the election in our community went where the community overwhelmingly voted to remove -- well, to vote candidates in that would remove sexuality concepts and gender ideology from the classrooms and focus on academics.

(Wallace Depo., Doc.25-4, PageID#456.)[8]

Courts have held that the use of terms lacking specific limiting standards to restrict speech is an unconstitutional delegation of "unbridled discretion." *See McCauley v. Univ. of the V.I.*, 618 F.3d 232, 248-49 (1st Cir. 2010) ("use of 'offensive' is, 'on its face, sufficiently broad and subjective that [it] could conceivably be applied to cover any speech . . . th[at] offends someone.'"); *Aubrey v. City of Cincinnati*, 815 F. Supp. 1100, 1104 (S.D. Ohio 1993) (concluding that the Cincinnati Reds' banner policy allowing banners only if they were in "good taste" left "too much discretion in the decision maker without any standards for that decision maker to base his or her determination"). In this case, the School Board's training materials acknowledge that terms such as "gender ideology" are "Not defined in O.R.C., court decisions or Merriam Webster." (Morgan Depo., Doc.25-2, PageID#395; District To Do List, Doc.25-10, PageID#498 (Depo. Ex 6).) The Superintendent expressed a concern that the Board's interpretation was overbroad: "I will tell you that there are -- if – if we're talking

[8] Why is this a "stunning" admission? Because the purpose of the First Amendment is "to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).

about every concept that touches anything that has to do with -- with a sexual nature, that's very broad."[9] (Morgan Depo., Doc.25-2, PageID#407.) She then even proceeded to argue with an interpretation urged by the Board's attorney(!), suggesting that the definition used by the School Board could include almost everything:

> A …We're just talking about the word sexual and the word concepts. I think that that is broad. Could sexual concepts be talking about a woman or a man? I mean they're -- they have sex to them; right? They are either one sex or another. So are we talking about every time we talk about a woman or a -- or a man that we have to notify parents? I mean, is that what you're saying right now?

(Morgan Depo., Doc.25-2, PageID#408.)

**3. The Board Engaged In Viewpoint Discrimination**

In this case, there is evidence that the Board harbored animus towards :GBTQ students and was using the Parents Rights laws and policy as pretext for viewpoint discrimination. *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1289 (D.Utah 2023) (finding First Amendment violation where "the record evidence is replete with statements and conduct of the [officials]… which demonstrate severe animus towards [plaintiffs'] protected speech and viewpoint"); *Assn. of Christian Schools Internatl. v. Stearns*, 678 F.Supp.2d 980, 988 (C.D.Cal. 2008) ("evidence of animus demonstrated that the city used an ordinance… to punish a disfavored viewpoint"). *Cf. Trump v. Hawaii,* 585 U.S. 667, 699-700 (2018) (considering extrinsic evidence of anti-Muslim animus when determining the constitutionality of a presidential proclamation).

The Principal testified that LGBTQ students have been bullied and targeted in the school. (Harleman Depo., Doc25-3, PageID#425.) One former teacher who worked with LGBTQ students has submitted an Affidavit stating that "LMSD has a history of animus towards the message that

---

[9] The Superintendent provides undisputed testimony that contradicted Wallace's broad interpretation, explaining that acknowledging the existence of LGBTQ students or that they have an equal right to education would not be sexuality content. (Morgan Depo., Doc.25-2, PageID#26.)

LGTBQ individuals are entitled to equal rights." ([Redacted] Aff., Doc.25-31, PageID#1313.) He added:

> My impression was that the School Board was using the LGBTQLGBTQ+ students to score political points and create as hostile an environment for LGBTQLGBTQ+ students as possible. After the public objections from David Wallace and others, I became aware of an increase in harassment toward LGBTQ+ students…

([Redacted] Aff., Doc.25-31, PageID#1316.) Further, statements by Board Members made it clear that the motivation for the decision was not about curricular matters but whether the inclusion of LGBTQ symbols on the Hate Had No Home Here Flag was contrary to the viewpoints of the Board Members. One explained the vote to remove the Hate Has No Home Here Flag by stating, "I mean, you've got the colors that we all now associate with certain groups that not everyone agrees with in terms of their values…. And I feel like if you could just have the message without bringing in certain aspects and certain values that not everyone else has, that it would be more acceptable." (Transcript, Doc#13-4, PageID#119.) Another said, "So when you label all those different rainbow things there and the trans things you're identifying with that, and you expect us to love that and to even like it, but we don't…" (Transcript, Doc#13-4, PageID#121.)

The Principal, when asked whether Board Members had displayed animus towards LGBTQ students, testified that Wallace came in to the school to "go after a certain poster" because, "in [the principal's] opinion… he doesn't agree with that lifestyle." (Harleman Depo., Doc25-3, PageID#425-426.) Tellingly, the Superintendent declined to defend that School Board against charges of animus. She testified:

> A …As far as animus, I -- I can't answer that for them.
> Q Can you say the opposite? Can you say with any level of confidence that the board members do not have animus towards LGBTQ students?
> A I -- I don't know that I can say that either.

(Morgan Depo., Doc.25-2, PageID#394.) Evidence of animus, and thus of viewpoint discrimination, arises in the context of a District that does not include harassment based on sexual orientation as

prohibited conduct in its policies. (Policy, Doc.25-14; Policy, Doc.25-15; Policy, Doc25-16.) Evidence of animus is found from efforts to prevent training teachers on the challenges facing LGBTQ students, the removal of "safe space" stickers that teachers had placed on their classroom doors, and efforts to ban books with LGBTQ characters.[10] (*See* Verified Complaint, Doc.1, PageID#4-6; Pl. Aff, Doc.22-2, PageID#306; [Redacted] Aff., Doc.25-31, PageID#1314-1315.)

### D. Plaintiff Relies On Prior Briefing Addressing The Remaining Preliminary Injunction Factors

Plaintiff relies on prior briefing on the remainder of the Preliminary Injunction factors.

## CONCLUSION

Judgment should be entered in favor of Plaintiff. Plaintiff requests the following relief consistent with that Judgment:

- A declaration that the actions of the Little Miami School Board is removing the Hate Has No Home Here Flag is invalid under the First and Fourteenth Amendments to the United States Constitution.
- A Permanent Injunction permitting Plaintiff to Display the Hate Has No Home Here Flag as before, and prohibiting further acts in a manner that violates the First and Fourteenth Amendments to the United States Constitution.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

---

[10] A further inference of animus can be drawn from the fact that Defendants over-reached in ordering the removal of the Hate Has No Home Here flag. The Ohio Parent's Bill of Rights and the District's Parents Rights Policy does not even give the Board the ability to remove items from the classroom. Instead, the policy provides only that parents should be "notified." In the (unlikely) event a parent lodged an objection, the Policy describes a procedure for resolution of the concerns. R.C. 3313.473(B)(5).

Respectfully submitted,

/s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this June 30, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel