**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| GEORGE MCINTYRE, | Case No. 1:26-cv-00351-MWM |
| PLAINTIFF, | Judge:  Matthew W. McFarland |
| v. |  |
| LITTLE MIAMI SCHOOL DISTRICT, ET Al. | PROPOSED UNDISPUTED FACTS |
| DEFENDANTS |  |

1.  McIntyre is a history teacher for the Little Miami School District.  He has a bachelor's degree in journalism, a law degree, and a master' degree in teaching.  He was admitted to practice law in West Virginia but is not active.  (Pl. Depo., Doc.25.1, PageID#348; Pl. Aff., Doc.22-1, PageID#302.)

2.  Defendant Little Miami School District is a local school district in southern Warren County, Ohio. The district includes the villages of Morrow, Butlerville, and Maineville.  The Little Miami Local School District consists of Little Miami High School, Little Miami Middle School, Little Miami Primary School, Little Miami Elementary School, and the Little Miami Early Childhood Center. Defendant David Wallace is the President of the Little Miami School Board.  (Verified Complaint, Doc.1, PageID#2-3.)

3.  McIntyre taught U.S. History and AP European History in accordance with the State model curriculum and AP European History standards.  The model curriculum and standards are readily accessible online. (Pl. Depo., Doc.25.1, PageID#357, 369; Harlemen Depo. at 22-23; AP European History Standards, Doc.25-13; Model Standards, Doc.25-12.)

4.  The State model curriculum and AP standards do not contain sexuality content.

1

5. In American History, McIntyre taught students that the United States experienced a struggle for racial and gender equality and the extension of civil rights and that movements began to highlight the need to secure the same freedoms and opportunities for groups of marginalized Americans that other Americans enjoyed. In AP European History, McIntyre taught students how and why European culture changed from the period following World War II to the present, including that various movements worked for expanded civil rights, in some cases obtaining the goals they sought, and in others facing strong opposition. (Model Standards, Doc.25-12, PageID#518, 526-528; AP European Topic 9.14, Doc.25-13, PageID#533-534; Plaintiff Response to Interrogatories, Doc.25-23, PageID#657-658.)

6. McIntyre does not teach any sexuality content. (Harleman Depo., Doc.25-3, PageID#419; Pl. Depo., Doc.25.1, PageID#383.)

7. Parents have access to class materials prior to instruction in classes through the Department of Education website and 'schoology,' a web platform used by LMSD. McIntyre posted all of his teaching materials, syllabi, and assignments on Schoology. (Harleman Depo., Doc.25-3, PageID#428; Pl. Depo., Doc.25.1, PageID#357.)

8. McIntyre hung a flag bearing the message *Hate Has No Home Here* in his classroom. The Flag displayed five hands holding heart-shaped icons representing, among other things, the American flag, a peace sign, different skin tones,[1] and a rainbow Pride flag. The flag had hung in McIntyre's classroom for approximately four years without generating any complaints. (Verified Complaint, Doc.1, PageID#2; Flag, Doc.25-6; PageID#476; Pl. Depo., Doc.25.1, PageID#363.)

9. The Flag, along with its position in the classroom, is depicted here:

---

[1] Plaintiff originally intended this image to represent skin tones, but subsequently learned it may be a lesbian pride symbol. (Pl. Depo., Doc.25.1, PageID#363.) Others had the same impression. (Morgan Depo., Doc.25-2, PageID#403.)

2



(Verified Complaint, Doc.1, PageID#2; Flag, Doc.25-6, PageID#475-476.)

10. McIntyre displayed the Flag to express "legal, ethical, and moral" support for Little Miami's a diverse student population among the myriad personal items he and other teachers displayed in their classrooms. Plaintiff's intent was to symbolize support for marginalized students who could be some of the most at-risk students. The Hate Has No Home Here Flag was part of his efforts to symbolize support for marginalized students who could be some of the most at-risk students. McIntyre believed that some members of the school board and the community at large have, through actions and public statements, expressed hostility towards many marginalized students, particularly LGBTQ students. The Hate Has No Home Here Flag was simply a reminder that students must treat all of their classmates with mutual respect, regardless of personal opinions or beliefs. (Pl. Response to Interrogatories, Doc.25-23, PageID#661; Pl. Aff., Doc.22-1, PageID#306; Pl. Depo., Doc.25-1, PageID#382-383.)

11. The Flag's imagery was perceived by community members as conveying positions on contested social issues. The Flag conveyed a position on a matter of political, social, or other concern of community. (Def. Response to Interrogatories, Doc.25-7, PageID#484; Wallace Depo., Doc.25-4, PageID#443.)

12. LMSD did not receive any complaints from about the Hate Has No Home Here Flag before the events in this lawsuit.  The only complaint that was ever received was from Wallace.  (Harlemen Depo. at 34.)

13. The Hate Has No Home Here Flag is one of a number of displays in McIntyre's classroom, including an American Flag and a Bengals Flag.   The Hate Has No Home Here Flag is a displayed on a wall next to other flags/posters, including a Bengals Flag, an American Flag, and a flag with a quote from *A Christmas Story*.  McIntyre also has a "COEXIST" poster in another location of his classroom, that uses various religious symbols from around the world for letters, including the Star of David.  McIntyre has framed photographs of Presidents and civil rights leaders with quotes, a Rosie the Riveter poster, and some Uncle Sam "I Want You" recruitment posters.  He has some personal items, including West Virginia University flags, a batman poster, and pictures of his family.  (Pl. Aff., Doc.22-1, PageID#302-306; Pl. Depo., Doc.25.1, PageID#382.)

14. LMSD generally permits teachers to display personal items on the walls of their classrooms and teachers are given a lot of freedom to decorate classrooms.  Examples of posters or flags displayed by teachers include: flags for various sports teams, images of movie stars, and letters from colleges and universities that former students attend.  Some teachers have family photos.  (Harleman Depo., Doc.25-3, PageID#420; Classroom Displays, Doc.25-20;PageID#578-642.)

15. Teachers can post things that aren't necessarily curriculum-related on their school walls and wall displays are not considered to be endorsement by LMSD.  (Wallce Depo. at 94- 96; Morgan Depo., Doc.25.2, PageID#401.)

16. In December 2024 the school board introduced a policy that would limit classroom displays, generally allowing only U.S. and Ohio state flags and curriculum-related materials to be displayed. This policy was not adopted after significant public backlash. (Verified Complaint, Doc.1, PageID#5-6.)

17. In January 2025, the Ohio Assembly passed H.B. 8, known as the Ohio Parent's Bill of Rights. This Statute provides that school districts "provide parents the opportunity to review any instructional material that includes sexuality content." and "Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and be permitted to participate in an alternative assignment."  R.C. 3313.473(B)(1)(b).  The Statute, R.C. 3113.473(G)(5), defines "sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting.
>
> "Sexuality content" does not mean any of the following:
>
> > (a) Instruction or presentations in sexually transmitted infection education, child sexual abuse prevention, and sexual violence prevention education provided under division (A)(5) of section 3313.60 or section 3314.0310 or 3326.091 of the Revised Code;
> >
> > (b) Instruction or presentations in sexually transmitted infection education emphasizing abstinence provided under section 3313.6011 of the Revised Code;
> >
> > (c) Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Statute, Doc.25-8, PageID#487-492.)

18. In October 2025, following the adoption of HB5, the School Board adopted Board Policy 5780.01, entitled Parents' Bill of Rights.  This Policy provides:

> Prior to providing instruction that includes sexuality content or permitting a third party to provide such instruction on behalf of the District, the Board will provide parents the opportunity to review any instructional material that includes sexuality content. Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and shall be permitted to participate in an alternative assignment.

The Policy defines "Sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting. "Sexuality content" does not mean any of the following:
>
> A. Instruction or presentations in sexually transmitted infection education, child sexual abuse prevention, and sexual violence prevention education provided under division (A)(5) of section 3313.60 or section 3314.0310 or 3326.091 of the Revised Code;
>
> B. Instruction or presentations in sexually transmitted infection education emphasizing abstinence provided under section 3313.6011 of the Revised Code;
>
> C. Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Policy, Doc.25-9, PageID#493-495.)

19. In September 2025, Wallace come to McIntyre's classroom earlier one morning and took pictures of the Hate Has No Home Here Flag. (Wallace Depo., Doc.25-4, PageID#462; Harleman Depo., Doc.25-3, PageID#424.)

20. Wallace took pictures of a display or book in one other classroom in the Middle School. (Harleman Depo., Doc.25-3, PageID#422.)

21. Wallace later went through the media center searching for 'objectionable' books. When Wallace could not find any objectionable materials, he told the principal that his "intel" must have been incorrect. (Harleman Depo., Doc.25-3, PageID#422; Morgan Depo., Doc.25-2, PageID#401.)

22. Months later, Wallace contacted the Superintendent requested that McIntyre take down the Hate Has No Home Here Flag. (Wallace  Depo. at 108; Def. Response to Interrogatories, Doc.25-7, PageID#479; Morgan Depo., Doc.25-2, PageID#401.)

23. The Superintendent communicated Wallace's request to the principal.  The Principal indicated that he would not order McIntyre to remove the Hate Has No Home Here Flag.  McIntyre refused

6

to comply with Wallace's request.  (Def. Response to Interrogatories, Doc.25-7, PageID#479; Wallace Depo., Doc.25-4, PageID#462.)

24. McIntyre, at the Principal's request, drafted an email to defend the display of the Hate Has No Home Here Poster.  McIntyre provided specific American History and AP European History curriculum standards indicating that "the specific content standards … where I feel the flag I have in my room… is especially applicable."  This email was forwarded to the superintendent.  McIntyre explained this email was in response to a question from the Principal meant just meant the flag was "relevant" topics he taught.  The Superintendent confirmed this understanding.  (Pl. Depo., Doc.25.1, PageID#371; Morgan Depo., Doc.25-2, PageID#403; Email, Doc.13-8, PageID#147-148.)

25. On February 3, 2026 the Superintendent wrote an email indicating that she had "reviewed the poster in question and its association with the attached curricula standards."  She provided her opinion that while the poster "contains symbols of identities" she did not "believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." (Emails, Doc.13-8, PageID#146.)

26. On February 4, 2026 McIntyre met with the Principal and Superintendent.  The Superintendent explained she had relayed the Principal's refusal to order McIntyre to take down the Hate Has No Home Here Flag to Wallace, as well as McIntyre's refusal to comply with Wallace's request, to Wallace. (Verified Complaint, Doc.1, PageID#9.)

27. The Superintendent indicated that Wallace was now requesting that the Superintendent order McIntyre to remove the Hate Has No Home Here Flag.  McIntyre explained that the Hate Has No Home Here Flag was not some "meaningless display" but that he had put a lot of thought into purchasing and displaying the Flag.  McIntyre expressed his belief that Little Miami had a

7

diverse student population that the District had a legal, ethical, and moral obligation to support. McIntyre indicated that the Hate Has No Home Here Flag was intended to symbolize support for marginalized students who could be some of the most at-risk students. He further explained that he chose a flag with multiple skin tones because it was important for that all of his students saw themselves represented in the Flag. (Pl. Aff., Doc.22-1, PageID#306.)

28. The Superintendent told McIntyre that she would not order him to take down the Hate Has No Home Here Flag. The Superintendent further explained that if the School Board voted to remove the Hate Has No Home Here Flag, a refusal would be insubordination and subject McIntyre to discipline in accordance with union procedures. (Verified Complaint, Doc.1, PageID#10.)

29. On February 4, 2026, following McIntyre's meeting with the Superintendent and the High School Principal, the Board's outside counsel, Omar Tarazi, emailed the Superintendent and Wallace. Tarazi focused on the message conveyed by the rainbow image in the Hate Has No Home Here Flag. Tarazi stated that "Board Policy 5780.01 is not directed at general messages encouraging kindness, respect, or anti-bullying" and suggested further that the Board policy would not be implicated if the same message is "displayed over a neutral image, such as the American flag or a generic student image." (Emails, Doc.13-8, PageID#143.)

30. Tarazi claimed that "depending on context and interpretation, displays incorporating images that could reasonably be viewed as presenting or describing sexual concepts or gender ideology may implicate parental notification and opt-out requirements under HB 8 and District policy." Tarazi suggested that the teacher "utilize more neutral versions of the anti-hate and respect theme images…" (Emails, Doc.13-8, PageID#143.)

31. On February 9, 2026, McIntyre responded that "this flag is at most an incidental reference as I do not explicitly provide instruction on the flag or incorporate it into my curricular materials." McIntyre also noted the alternative display suggested by Tarazi was not acceptable. He wrote:

> My concern is that attempting to find a different, "neutral" image may inadvertently lead to the erasure of LGBTQ+ representation. My preference would be to discuss any additional representation that could potentially be added to the existing flag, rather than removing any of the represented groups.

(Emails, Doc.13-8, PageID#144; Pl. Depo., Doc.25.1, PageID#384.)

32. On February 10, 2026 Tarazi emailed the Superintendent to inform her that Wallace has asked for the matter to be placed on the agenda for the next Board meeting. (Emails, Doc.13-8, PageID#143.)

33. On February 16, 2026 McIntyre sent another email to the Superintendent to reiterate that the Hate Has No Home Here Flag's sole intent has always been a general message of inclusion and anti-bullying. He stated:

> The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology. My purpose and intent in purchasing that flag for my classroom four years ago was to convey a general message of inclusion. There is no subversive message or hidden intent underlying the flag. It is simply intended to convey that bullying and/or targeting will not be tolerated. I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class.
>
> Additionally, from what I can tell, it has not had the effect of engaging students on sexual concepts or gender ideology, as they have for the most part not mentioned the flag to me at all, either during in-class discussions, in submitted assignments, or during one-on-one discussions outside of class.

(Emails, Doc.25-22, PageID#644;  Pl. Depo., Doc.25.1, PageID#371; Morgan Depo., Doc.25-2, PageID#403, 406.)

34. On February 25, 2026, the Board of Education voted 4–1 to order the Hate Has No Home Here Flag's removal. The issue was framed as a determination of whether the poster constituted "sexuality content" HB 8 and Policy 5780.01. (Def. Response to Interrogatories; Doc.25-7, PageID#479.)

35. The Superintendent had told the School Board that McIntyre does not use the Hate Has No Home Here Flag in any lessons.  (Morgan Depo., Doc.25-2, PageID#406; Transcript, Doc.13-4, PageID#124.)

36. The Board's rationale was that the Hate Has No Home Here Flag engaged students on topics of sexual orientation or gender identity requiring prior parental notice and an opt-out opportunity. (Def. Response to Interrogatories; Doc.25-7, PageID#479.)

37. Comments from Board Members made it clear that the decision was not based on the words of the poster itself, but rather an effort to silence the pro-LGBTQ message associated with the rainbow imagery.  These School Board members made it clear that the opposition to the Hate Has No Home Here Flag was focused on the association of the rainbow symbol with a position on LGTBQ rights that the Board Members disagreed with and anti-LGTBQ animus.  One Board Member said:

> I mean, you've got the colors that we all now associate with certain groups that not everyone agrees with in terms of their values. But you also have the American flag, which involves everyone, and then you alluded to the pink and white and blue, which I'm not, as [unintelligible] with that transgender. So it is unfortunate that it's all kind of muddled together. And I feel like if you could just have the message without bringing in certain aspects and certain values that not everyone else has, that it would be more acceptable. And when you're in a public system, you've got lots of different people with lots of different values and backgrounds and religions, so you have a really challenging circumstance where you can all come together and focus and have shared a shared focus. And so everyone kind of has to veil certain parts of themselves in order for that to happen.

Another Board Member said:

> We love people. Jesus loved people. But I tell you what he didn't love he didn't love sin, and He let that be known. All you have to do is read the word. It's right there. It's not… me saying that's his… his words. He loved all people. He loved all people, but he told them to go and sin no more. He didn't condemn them. He loved them, but he didn't leave them as they were, because where their lifestyle, where it was going, was not going to be a good place. So when you label all those different rainbow things there and the trans things you're identifying with that, and

you expect us to love that and to even like it, but we don't, but we do love people. And so if you want to put a sign up, it says hate has no home here, yeah, but the rainbow colors puts it into another category.

(Transcript; Doc.13-4, PageID#119-121.)

38. On March 4, the Board issued a Statement that "The decision was not based on the phrase 'Hate Has No Home Here.'" The Board claimed that HB 8 and the Board Policy "require parental notification and the opportunity to review and opt out when classroom materials, under the totality of the circumstances, go beyond incidental references and engage students on sexual concepts or gender ideology." Wallace later explained the reasoning for the decision: "Depending on context and interpretation, displays incorporating images that could reasonably be viewed as presenting or describing sexual concepts or gender ideology implicate parental notification and opt-out requirements under House Bill 8 and district policy." (Statement, Doc.13-5, PageID#130.)

39. McIntyre risks disciplinary action, up to an including termination, if he does not comply with the Board decision to remove the Hate Has No Home Here Flag. (Verified Complaint, Doc.1, PageID#9.)

40. The message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community. (Def. Response to Interrogatories; Doc.25-7, PageID#484; Wallace Depo., Doc.25-4, PageID#443.)

41. The Hate Has No Home Here Flag caused no disruption or interference in his classroom or elsewhere in the school. (Pl. Depo., Doc.25.1, PageID#382; Morgan Depo., Doc.25-2, PageID#406; Harleman Depo., Doc.25-3, PageID#421.)

42. The Hate Has No Home Here Flag did not interfere with the basic educational mission of the school district. (Pl. Depo., Doc.25.1, PageID#382; Morgan Depo., Doc.25-2, PageID#406; Harleman Depo., Doc.25-3, PageID#421.)

11

43. There have not been any claims by school administrators, school board members, or parents that the Hate Has No Home Here Flag affected the District's interest in providing services efficiently. (Pl. Aff., Doc.22-1, PageID#302; Pl. Depo., Doc.25.1, PageID#382; Morgan Depo., Doc.25-2, PageID#406; Harleman Depo., Doc.25-3, PageID#421.)

44. The presence of Hate Has No Home Here Flag has not had any detrimental impact on his working relationships with other teachers or administrators or undermined his ability to teach classes in accordance with state standards. (Pl. Aff., Doc22-1, PageID#302; Pl. Depo., Doc.25.1, PageID#382; Morgan Depo., Doc.25-2, PageID#406; Harleman Depo., Doc.25-3, PageID#421.)

45. The Hate Has No Home Here Flag was not curricular, as it was not part of activities supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences. The Hate Has No Home Here Flag was not a school-sponsored expression bearing the imprimatur of the school or designed to impart particular knowledge to the students. McIntyre never used the Hate Has No Home Here Flag as part of his methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag. Similar to other items McIntyre displayed in his classroom, the Hate Has No Home Here Flag was at most an incidental reference to topics discussed in class; he did not explicitly provide instruction on the Hate Has No Home Here Flag or incorporate it into my curricular materials. (Pl. Aff., Doc.22-1, PageID#306-307; Morgan Depo., Doc.25-2, PageID#404, 406; Harleman Depo., Doc.25-3, PageID#425, 427.)

46. McIntyre's display of the Hate Has No Home Here Flag was private speech not within the scope the duties as a teacher or pursuant to any school board policy or part of an effort to convey a government-created message. In displaying the Hate Has No Home Here Flag he was not instructing, discussing the curriculum, or encouraging better academic performance. (Pl. Aff.,

12

Doc.22-1, PageID#306-307; Morgan Depo., Doc.25-2, PageID#404, 406; Harleman Depo., Doc.25-3, PageID#425, 427.)

47. The decision to remove the flag was not based on a finding of actual disruption to District operations or to McIntyre's performance of his duties. (Def. Response to Interrogatories; Doc.25-7, PageID#483.)

48. The Hate Has No Home Here Flag was not sexuality content as the term is used in LMSD's Policy or Ohio law. (Harleman Depo., Doc.25-3, PageID#425; Morgan Depo., Doc.25-2, PageID#404-405.)

49. Conveying the message that LGBTQ students are welcome and should be comfortable in a classroom does not constitute sexuality content as the term is used in LMSD's Policy or Ohio law. (Harleman Depo., Doc.25-3, PageID#426.)

50. Expressing the idea that people should be protected from harassment based on sexual orientation is not considered a gender ideology or a sexual concept. (Morgan Depo., Doc.25-2, PageID#396.)

51. Mentions of LGBTQ rights within the context of the civil rights movement in a history class is not sexuality content. There is a difference between instruction that addresses or acknowledges sexuality and instruction that teaches about sexual conduct or relationships. (Morgan Depo., Doc.25-2, PageID#399, 410; Harleman Depo., Doc.25-3, PageID#417.)

52. While Hate Has No Home Here Flag contains symbols of identities, a reasonable observer would not conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology. Even if the flag contained sexual concepts or gender ideology, it still would not be sexuality content under the policy or Ohio law because it would be "incidental." (Emails, Depo Ex 18; Morgan Depo., Doc.25-2, PageID#396, 405.)

53. LMSD has a history of animus towards the message that LGTBQ individuals are entitled to equal rights. LGBTQ students at LM High School were often subject to sexual harassment, taunts,

13

bullying and slurs. (Verified Complaint, Doc.1, PageID#4-5; [REDACTED] Affidavit, Doc.25-31, PageID#1313-1316; Harleman Depo., Doc.25-3, PageID#425-426.) .)

54. Evidence of animus is found from efforts to prevent training teachers on the challenges facing LGBTQ students. Many LGBTQ students report or fear bullying, harassment, and physical assault because of their gender identity. Studies have suggested that LGBTQ youth in Ohio are more likely to report poor mental health and suicide attempts compared to heterosexual teens. Training on these issues were blocked either because of direct instructions from school board members or a desire by the Superintendent's office to not upset school board members who held anti-LGBTQ views. For example, a few years ago GSA students did a series of recorded interviews (with the permission of the principal) about their experiences as LGBTQ students at Little Miami. The purpose of the project was to share information from LGBTQ students in order to raise awareness about the challenges these students face. One school board member called the principal and instructed the principal to not allow a teacher training based on this program. ([REDACTED] Affidavit, Doc.25-31, PageID#1313-1316; Pl. Answer to Interrogatories, Doc.25-23, PageID#662.)

55. Evidence of animus is found from the removal of "safe space" stickers that teachers had placed on their classroom doors. These teachers wanted students to know that they would be accepted for who they are in the classroom.



The safe space stickers never received any complaints until they became controversial around 2020 when some school board members who had expressed anti-LGBTQ views were elected. The prior Superintendent ordered that all of the stickers be removed over summer break. (Harleman Depo., Doc.25-3, PageID#422; Verified Complaint, Doc.1, PageID#4-5; [REDACTED] Doc.25-31, PageID#1313-1316.)

56. Evidence of animus is found from the treatment of LGBTQ themed books. In September 2023, the District decided to scale back and alter their Scholastic Book Fairs following complaints about the inclusion of certain graphic novels, including the graphic novel series Heartstopper by Alice Oseman, which centers on a gay boy. Wallace, then a candidate for school board, objected to the presence of any stories that included LGBTQ characters. (Morgan Depo., Doc.25-2, PageID#393, 409; [REDACTED] Affidavit, Doc.25-31, PageID#1313-1316.)

Respectfully submitted,

     /s/ Joshua A. Engel
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this June 30, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel

16