IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

GEORGE MCINTYRE,

     Plaintiff,

vs.                  Case No: 1:26-cv-00351-MWM

LITTLE MIAMI LOCAL SCHOOL

DISTRICT, et al.,

     Defendants.

_____

REMOTE STREAMING DEPOSITION OF

GEORGE MCINTYRE

TAKEN ON

TUESDAY, JUNE 9, 2026

12:06 P.M.

ENGEL AND MARTIN, LLC

4660 DUKE DRIVE, SUITE 101

MASON, OHIO 45040

Page 2

APPEARANCES

Appearing on behalf of the Plaintiff:

JOSHUA A. ENGEL, ESQUIRE

JIM HARDIN, ESQUIRE

Engel & Martin, LLC

4660 Duke Drive, Suite 101

Mason, Ohio 45040

(866) 590-6830

engel@engelandmartin.com

hardin@engelandmartin.com

Appearing on behalf of the Defendants:

OMAR TARAZI, ESQUIRE

Tarazi Law Offices

5635 Sandbrook Lane

Hilliard, Ohio 43026

(614) 226-2823

otarazi@tarazilaw.com

Also Present:

Ben Pitts, Naegeli Technician

---

Page 4

EXHIBIT INDEX

| EXHIBIT | | PAGE |
|---|---|---|
| F | PARENTS BILL OF RIGHTS | 117 |
| G_1 | EMAIL | 63 |
| G_2 | SYLLABUS | 58 |
| N | NOD | 99 |
| O | SYLLABUS | 70 |
| R | ASSIGNMENTS AND LESSONS | 75 |
| T | AP EUROPEAN HISTORY | 89 |
| U | TEXTS | 142 |
| V | EMAILS | 22 |
| W | AMERICAN HISTORY SYLLABUS I 25-26 | 109 |
| Y | AMERICAN HISTORY SYLLABUS II 24-25 | 112 |

---

Page 3

EXAMINATION INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MR. TARAZI | 6 |
| EXAMINATION BY MR. ENGEL | 144 |

---

Page 5

REMOTE STREAMING DEPOSITION OF

GEORGE MCINTYRE

TAKEN ON

TUESDAY, JUNE 9, 2026

12:06 P.M.

THE REPORTER: We are on the record at 12:06 p.m.

Mr. McIntyre, please raise your right hand.

Do you affirm under the penalty of perjury that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

THE REPORTER: Thank you.

Will each attorney please state their name and whom they represent, starting with Mr. Tarazi.

MR. TARAZI: Omar Tarazi, 84165, for the defendants in this case.

MR. ENGEL: And I'm Joshua Engel, and I am representing the plaintiff.

THE REPORTER: Thank you.

Counsel, you may proceed.

MR. TARAZI: All right. Thank you very much.

Page 6

GEORGE MCINTYRE, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. TARAZI:

Q.  Good afternoon, Mr. Engel -- sorry.  I -- Mr. George -- how do you say your last name?  I apologize.  How do you pronounce your last name?

A.  It's McIntyre.

Q.  McIntyre.

A.  Like Reba McEntire.

Q.  McIntyre.

Do you want me to refer to you as Mr. McIntyre throughout this or --

A.  It doesn't matter.

Q.  -- however way?  Doesn't matter to you? Okay. Okay.  So we'll proceed, and if I slip and start saying George or McIntyre back and forth, it's nothing personal.  And you can call me Omar as well. Just, I mean, you don't have to say Mr. Tarazi, or whatnot, but just so that we can keep this moving.

Have you ever done a deposition before?

A.  I have.

Q.  Okay.  So are you fairly -- I -- I'm going to repeat.  Are you fairly familiar with how

Page 7

depositions go?

A.  Yeah, somewhat.

Q.  Okay.  Have you been deposed yourself before?

A.  Yes.  I was deposed once in my prior company.

Q.  Okay.  Well, for the benefit of just memory, I'll just remind -- I mean, in addition to what the court reporter said about not talking over each other, obviously, testify to what you know. And if you're testifying to something that is an opinion or it's something you think you know or somebody told you, just be clear about that so we're clear about what is within your realm of knowledge and what you're maybe extrapolating or giving an opinion on from a clarity perspective.

And then the second thing is, if you don't understand the question, you know, obviously ask rephrase -- I can rephrase, clarify.  The purpose of today is to just get the facts from your perspective, get them on the record.  If you need to pause, take a break, anything like that, I would just simply ask that you answer the question that's pending, and then we'll take a break and -- and keep moving.  Fair?

Page 8

A.  Yeah.

Q.  Okay.  Any other questions before we start?

A.  No.

Q.  Okay.

A.  I have no questions.

Q.  I'm going to start with a little bit of background just for the record.

Can you tell me a little bit about your education?

A.  Yeah.  I have a bachelor's degree in journalism, my law degree, and then a master's in teaching.

Q.  Okay.  Tell me a little bit more about your law degree.  In other words, were you actually admitted to practice law somewhere?

A.  Yes.  I was admitted to practice in West Virginia in 2014.

Q.  And how long did you practice law in West Virginia?

A.  It was probably about four and a half, five years.

Q.  Okay.  Are you still admitted to practice law in West Virginia?

A.  I am -- like, my status is called, I'm a

Page 9

member, not practicing.  It's weird in West Virginia. I can't withdraw from the bar.  So it's just I don't have to do CLEs.  I still have to pay bar dues every year.

If I wanted to practice again, I would have to do 12 hours of continuing ed in ethics, and then I would be able to update my membership.  So at this point, no.  But yeah, with 12 hours, I could.

Q.  All right.  So they got you for the fees, basically, is what's going on?

A.  Yeah.

Q.  All right.  And -- but you -- were you ever disciplined in West Virginia?

A.  No.

Q.  Okay.  So this is not a question of some kind of discipline or some kind of inability to practice. You just simply are --

A.  I'm not practicing.

Q.  -- not practicing.  It's as simple as that; is that accurate?

A.  Yes.

Q.  Okay.  And you decided, it sounds then, and I don't want to put words in your mouth, that you sort of changed careers then because you didn't exactly apply -- did you apply to practice law in

Page 10

Ohio?

A. No, I did not.

Q. Okay. So tell me a little bit, just to have clarity, how did we go from lawyer in West Virginia to teacher in Little Miami School District?

A. I was working as an in-house attorney for an oil and gas company. The company wasn't doing well, and I was given about a year's notice that my job would likely be eliminated.

Q. Okay.

A. So I was going to have to start over somewhere anyway. By that point, my family was living in Ohio, so I had to decide if I wanted to apply for and sit for the Ohio Bar. I was about six months shy of being able to motion in.

And then in weighing options with my family, I started looking at Miami University's MAT program, Master of Arts in Teaching program. And decided instead of shifting focus in -- within the legal field, just to leave it altogether and go into education.

Q. Okay. Fair enough. So when -- and just from a timing perspective, so when did you actually start being a teacher?

A. I graduated from Miami in 2022, so my

Page 11

first year would have been the 2022-2023 school year.

Q. And that was where?

A. At Little Miami.

Q. Okay. So you've never taught anywhere other than Little Miami School District?

A. No. Not beyond student teaching.

Q. Okay. And in Little Miami, did you always have the same principal overseeing you?

A. No.

Q. Okay. So who was overseeing you as a principal during your -- well, since you've been at Little Miami?

A. Cathy Trevathan was my first building principal my first year, and then she left at the end of the '22-'23 school year.

Q. Okay. And then we got to Dr. Harleman, right? Or was there somebody else?

A. No. Dr. Harleman was an assistant principal my first year, and then he was elevated to building principal when Dr. Trevathan left.

Q. What would you say your relationship is with Dr. Harleman? In other words, is it just purely professional at the school or is there -- is there more than that in terms of hanging out, other

Page 12

things?

A. No. I've never hung out with Dr. Harleman outside of school. I think we have a positive relationship, but it's professional.

Q. Okay. What have you done -- other than talking to your attorney, which -- let's put that aside. What else have you done in terms of preparing for this deposition today?

A. Reviewed the email chain from February, reviewed some of the discovery requests and the interrogatories.

Q. Did you review the discovery production? I apologize for the cough. It's a lingering thing from -- that's in part why we're doing Zoom, so that you guys don't have any chance. Anyway, sorry. Did you review also the discovery -- the discovery production?

A. I did not review any of the documents produced by the district. I don't believe.

Q. Okay. Who did you talk to other than your attorney relating to preparing for this deposition or regarding this case?

A. For preparing for the deposition?

Q. Yeah.

A. Sorry, I'm trying to think. My wife. I

Page 13

mean, just kind of venting and talking with her.

Q. That's fine. We all vent with our wives, right? Other than your wife, though?

A. No. Nothing beyond. Yeah, I've got a deposition Tuesday.

Q. Okay. The -- tell, how are you -- let's go into this. Since the filing of this case, have you received any threats or has there been any sort of negative harm that has come to you, physically or otherwise?

A. I have not received any threats. I know there was a Facebook post by Darbi Boddy that I was made aware of, but that's probably the closest.

Q. Okay. Why -- what is it about that post that is -- was it threatening or, tell me why you were even mentioning it. I mean --

A. Oh, it wasn't threatening.

Q. I've not seen it. So I don't know what you're talking about.

A. Oh, no. It was -- she had my name and sirens, and it was a whole big write up about -- I don't remember if that was before or after. I think that may have actually been before litigation was filed. I could be wrong.

Q. Okay. So it's basically a post saying,

Page 14

hey, look what this teacher is doing.

A. Yeah.

Q. And that's pretty much the extent.

A. Yeah. As I said, that was the closest to what you're asking. Outside of that, nothing.

Q. Okay. Who is paying for the litigation costs for you on this?

A. There was a legal fund that was set up and donations from the community and outside the community.

Q. Okay. Have you paid anything out of your own pocket?

A. I have.

Q. How much?

A. I'd have to confirm with my wife. I believe it was about $250, $300.

Q. Do you have any idea how much total has been collected in this legal fund?

A. I honestly do not.

Q. Not even a guess? I mean, have you even seen the donations?

A. I haven't seen it in a while. I believe my wife said that they had shut it down and were not taking any more donations. I think she said it was around $7,500, if I'm recalling that correctly.

Page 15

Q. Okay. Who is managing that money? Is that your wife or somebody else? Who's actually tracking the money? Is it going, you know, to your personal account? I mean, where is it going?

A. It's not going to a personal account. I forget the parent that was taking care of that and kind of taking lead as far as -- and I'm assuming that they have made arrangements with Mr. Engel as far as payment, but I have not seen any of the money and have no access or control over the account.

Q. Okay. But you said it's a parent? Do you know the name of the person who's managing this money?

A. I believe it may be just -- I'm sorry.

MR. ENGEL: Obviously, we can either designate this portion of the deposition attorneys' eyes only or we can provide this to you as attorneys' eyes only separately and not put it in the record here.

MR. TARAZI: Well, I think what I'd prefer is that we keep the deposition clean, but we can specifically designate the name that he's providing and obviously, identifying information as a -- so we don't have to redact the whole transcript, but the specifics of the name and identifying. And then we

Page 16

can obviously address later whether -- what the Court wants to do with it.

MR. ENGEL: No. I -- well, no -- I mean, that -- so that's fine. So we'll designate this portion of the testimony that includes personal identifying information of the person as "Confidential, Attorneys' Eyes Only, cautioning everyone that that means it can't even be shared with -- with clients.

MR. TARAZI: Correct. So before anything gets shared with the -- the specific name and contact would be redacted until the Court decides what to do with it, if -- and -- and we go from there.

MR. ENGEL: Well, no, no, no. We're not going to play this until the Court decides what to do with it. I mean, you -- you entered into this protective order and we agreed to go this route with the understanding that the personal identifying information of these witnesses would be designated Attorneys' Eyes Only. I'm sure you weren't trying to play games with us, figuring you're going to, you know, then later try to challenge that designation after you accepted that as -- as a resolution for our discovery dispute, right?

Page 17

MR. TARAZI: The protection order speaks for itself. I'm simply --

MR. ENGEL: No. We entered into -- I mean, we -- we had a discovery dispute, and to resolve that discovery dispute, we agreed we would ask the Court to enter in a protection order and that the information that we were disputing over would be designated Attorneys' Eyes Only. I'm certain you did not enter into that agreement with the idea that you weren't having a good faith conversation about that, and you later intended to try to undermine what we accomplished through that, right?

So, this will be designated as "Attorneys' Eyes Only," and I would be shocked if you decided to try to challenge this designation after your previous representations. So that's our record. This is designated "Attorneys' Eyes Only."

Let's proceed with the deposition.

MR. TARAZI: Right. And I'm simply saying that the court order speaks for itself. It does call for, when it is time to actually use these materials in court, the Court -- there's an opportunity to present it to the Court itself in camera, or whatnot, and see if the Court agrees that

Page 18

it should stay attorney eyes only for purposes of -- later purposes.  That's the order.

Now let's move on.

MR. ENGEL:  Well, you can certainly challenge it.  But again, I think we entered into that agreement and to try to -- that would be a very underhanded practice if you were planning to do that.

MR. TARAZI:  Okay.

THE DEPONENT:  I'm sorry.  Could you repeat the question?

(WHEREUPON, the following portion has been deemed Confidential, Attorneys' Eyes Only:)

BY MR. TARAZI:

Q.  Who is the name of the person that we are talking about, just for clarity?

A.  It's -- I believe it is being -- the funds are being handled by a nonprofit.  I believe it's ██████████ that is the -- in control of that.

Q.  Do you know the name of the nonprofit?

A.  I can't recall.

Q.  Okay.  Do you know how much total has been -- has been charged in terms of attorney fees in this case up to now?

A.  I do not.

Page 19

Q.  Have you ever seen a bill or seen anything in terms of how much has been charged?

A.  I have not.

(WHEREUPON, the Confidential, Attorneys' Eyes Only portion concluded.)

MR. ENGEL:  And this portion of the transcript does not need to be confidential.

Go ahead.

MR. TARAZI:  Correct.  Yeah.

BY MR. TARAZI:

Q.  Okay.  And we are obviously here talking about -- there's a lot to do with this House Bill 8 and the Parents' Bill of Rights policy and so forth, right? Tell me a little bit about what training you -- and direction you have received on this policy.

A.  When we returned to school at the beginning of the '25-'26 school year, Dr. Harleman reviewed it with the staff, like, the legislative changes that had come because of the Parents' Bill of Rights.  After that meeting, I did go and ask him a couple of questions about lessons that I teach in the second semester.

And he told me at that time that he did not think that it would -- those would trigger the notification requirements.  So my understanding was

Page 20

that, as long as I was teaching the history of it, that none of the notifications would be required.

Q.  Okay.  Do you know what date or approximately what date that conversation occurred?

A.  Would have been early August of 2025 before students were back.  I'd have to -- I'm not -- I can't remember the exact date, but I believe it was the first or second day that teachers had to report back.

Q.  Okay.  So just so when is the training that happened?  So, I guess, what's the time difference between the training that everybody got and you coming back and saying, hey, I have some specific questions on these matters?

A.  It was a quick, like, five-minute conversation following that before -- when we were done.  I just went up to Kevin and said, hey, just a couple of questions and --

Q.  Okay.

A.  -- that's that.

Q.  Okay.  So it wasn't, like, a week later, two weeks.  It was the same training?  Okay.

A.  Yeah.

Q.  And the training --

THE REPORTER:  I'm so sorry.  Can I get a

Page 21

verbal answer for that last question?

THE DEPONENT:  I apologize.  Yes.

THE REPORTER:  Thank you.  And just a reminder to please speak one at a time for a clear record. Thank you.

MR. TARAZI:  Thank you.  We will do our best. We'll try our best.

BY MR. TARAZI:

Q.  So the training that was received, is that the Ennis Britton material -- or what was the training, I guess, is the question?

A.  It was fairly informal.  I believe Dr. Harleman had some slides about it.  My understanding is he received training in it last summer and that he was kind of explaining what he learned to us.

Q.  Okay.  Have you ever seen or was there an email that you ever saw that was written by me relating to the Parents' Bill of Rights and the steps, the process of -- you know, it goes principal, then superintendent, and then Board in terms of appeals and so forth.  Did you ever see any kind of document like that?

A.  Not that I recall.

MR. TARAZI:  Okay.  Let me go ahead and show you Exhibit -- I am marking as V.  And I know

Page 22

these are slightly out of order, but it's okay.

THE REPORTER: Exhibit V has been marked.

(WHEREUPON, Exhibit V was marked for identification.)

MR. TARAZI: Yes. Oh, I forgot you were going to say it verbally, so yes.

MR. ENGEL: Is it a B as in boy or V as in Victor?

MR. TARAZI: V as in Victor.

BY MR. TARAZI:

Q. So if I did this correctly, can you see the document?

A. I can see it. It's just a little hard to read.

Q. Are you able to make it larger on your end or I -- I don't know how that works. Can I make it larger on my end?

MR. ENGEL: You're going to have to make it larger on your end, Omar.

BY MR. TARAZI:

Q. How's that? Or maybe this. How's that?

A. That's a little bit better.

Q. All right. I'll do that again.

A. Yeah. Even better still.

Q. Even better still. All right. Does this

Page 23

refresh your memory at all in terms of an email like this?

A. I don't recall reading this email.

Q. Okay. Do you ever recall anything this guide -- this language specifically about the district applies a common sense, objective standard, you know, that language? Reasonable observer, primary purpose?

A. Not that I recall.

Q. Okay. The -- okay. So the bottom line is you don't remember this as an email, correct?

A. Correct.

Q. All right. I'm going to stop sharing. The language, reasonable observer and primary purpose and so forth, I believe -- well, let me -- I'll get back to that. So I -- scratch that. Let me -- I'll come back to that in a little bit.

All right. Now, I'm going to cover Exhibit U here. These are text messages that were shared in discovery. And just give me a second to share this.

THE REPORTER: Exhibit U has been marked.

(WHEREUPON, Exhibit U was marked for identification.)

BY MR. TARAZI:

Page 24

Q. All right. Are you able to see that?

A. Yes.

Q. Okay. So this is the first version in the order that it was provided, and there's a whole bunch of these text messages, and they have redactions throughout. Do you recall putting this together or being involved in putting this together at all?

A. I do.

Q. And for -- anticipating this, for purposes of the record, I'm going to ask you about some of the people you're texting with, and all of the names and identifiers are going to be attorneys' eyes only, I assume, is the request, correct?

MR. ENGEL: Yes. So we'll designate any portion of the transcript that has personal identifying information about the people who are being communicated with as confidential.

MR. TARAZI: And attorneys' eyes only, correct?

MR. ENGEL: And attorneys' eyes only, yes.

MR. TARAZI: Not just confidential.

MR. ENGEL: Redacted before it was provided to clients or filed with the Court.

MR. TARAZI: Correct.

Page 25

(WHEREUPON, the following portion has been deemed Confidential, Attorneys' Eyes Only:)

BY MR. TARAZI:

Q. Okay. So with that said, let's take a few minutes. Who are you texting with here? Do you recall?

MR. ENGEL: Don't guess. If you know, then --

THE DEPONENT: Okay. I don't -- I -- yeah, I would need to --

BY MR. TARAZI:

Q. What would you need to look at to be able to tell who you're texting with?

A. My files that I put together on my computer for --

MR. ENGEL: Well, you were provided with unredacted copies of all these, so why don't we -- you could use those. I mean, I'm not going to tell you how to do your deposition, but you got a copy of this document that was unredacted, so --

MR. TARAZI: Yeah. But it's completely in a different order, which makes it challenging.

MR. ENGEL: Again, you got a copy of the document that was unredacted. So if you don't want him to guess, you can show him that document. But

Page 26

otherwise, we're going to be here all day asking him to guess when you know the answers.

BY MR. TARAZI:

Q. Well, not entirely. So there -- give me a second here. In all of the texts that are being sent in this file, is the blue section always you?

A. In that one, yes. The blue section is me.

Q. Does -- is -- do you recall ever exporting any text message where you're not -- I would assume that if you're exporting all of these, that every time it's blue, it's you as the person sending. Is that an accurate way to think about it, or am I wrong about how the phone works?

A. I believe so if they're from -- like the iMessage app. And then if -- I'd have to double check because I think there were some -- I use Signal as well, and I don't know if Signal does the same, so I would have to verify that.

Q. Okay. Give me one quick second. Okay. There are -- I'm going to ask it in another way, just to kind of make this a little bit faster.

There are a number of names that are listed in the text messages. █████████████

A. ████████████

Q. Who is that?

Page 27

A. ██████████████████████ .

Q. So he's just a friend?

A. Yes.

Q. He doesn't work for the district. He has no involvement beyond just being a friend; is that right?

A. Correct.

Q. Okay. So it's just somebody you're venting, or whatever -- venting is maybe not the right word, but somebody -- you're sharing with a friend; is that fair?

A. Correct. Yes.

Q. Okay. █████████?

A. ████████████████

Q. Yeah. There's several texts that involve -- and it just -- all it shows is a little circle with a █████████. Any idea who that is? Do you need to look at your phone?

A. I was going to say if you -- do you have a copy there? If -- I might recognize it from the --

Q. Okay. Give me a second.

Are you able to see this?

A. Yes. Are you able to zoom in a little bit?

Q. Yeah. Let me see what I can do here. So

Page 28

it says ████████, and there's a bunch of ████

A. ████████████████████████████████████████████████████████████

Q. How do you spell ██████?

A. ████████████

Q. Okay. And neither of them work for the district, I assume?

A. No, they do not.

Q. Neither of them are related or married to a Board member. Like nothing -- there's nothing connecting them, I guess, is -- is the question?

A. No, there is not.

Q. Okay. So again, here is another example of just, I guess, a family member or personal friend that you're just talking to, correct?

A. Correct.

Q. All right. When you were, you know, sharing your text messages -- well, we'll come back to that. There is a █████ that's listed in the text messages. Who is that?

A. That is ██████████ .

Q. Okay. And there is a ███████?

A. That is █████████████ .

Q. Who is that?

Page 29

A. She is a friend who used to be ████████ ████████████ at Little Miami.

Q. Okay. And does she have any connection to the Board or to anything? She doesn't even work at the district anymore, correct?

A. ████████████ .

Q. Okay. Do you know when she's not -- doesn't -- when she stopped working at the District?

A. I believe it was ████████ ago.

Q. Okay. Who is ████?

A. And I'm not sure. If you have that somewhere else, I might be able to.

Q. For purposes of refreshing your memory.

A. I appreciate it.

Q. Let's see if I can find the ████ here.

A. Well, I believe that was probably ████ ████████ .

Q. Who's that?

A. She lives within the Little Miami School District. She had reached out to somebody else and asked to be put in touch with me.

Q. Okay. For what purpose?

A. To discuss possible litigation over the flag.

Q. What -- what involvement did she have with

Page 30

litigation after that?

A. Sorry. Excuse me. Just putting me in touch with Mr. Engel. Helping to put me in touch with Mr. Engel.

Q. Did she have any involvement beyond that?

A. Not that I'm aware of.

Q. Do you happen to know, like, how -- okay. Let's move on. ██████, who is that?

A. That's ████████████. She is another parent in the District.

Q. Okay. And she doesn't work for the District now. She's just a parent?

A. I believe so.

Q. Okay. Who's ██████████?

A. He is a friend and former coworker.

Q. Okay. Who is █████?

A. That would be █████████. He's another ████████████████████████████████████████████████.

Q. Okay. And then who's ████?

A. That would be █████████. He was another teacher █████████████████████████████. ███ █████████████████████████████.

Q. Stop sharing that. I'm sharing this. Do you see this document or this text message

Page 31

specifically?

A. It looks like it's still loading. I don't remember that one specifically.

Q. The --

MR. ENGEL: I'm going to -- I'm going to caution the attorney, this looks like it is the document, I believe, that was redacted for spousal privilege reasons, and so I'm going to --

MR. TARAZI: Correct. I just want to ask about this box.

MR. ENGEL: Can you -- Omar, let me finish, please. I'm going to instruct him not to answer to the content of any conversations between him and his spouse.

MR. TARAZI: I'm asking about this box in the middle, which is the box that covers who's part of the text message stream.

MR. ENGEL: I think you know the answer to that because you would have gotten the privilege log that indicated who was in there.

MR. TARAZI: Well, I would like to know who else was in here because there was an indication that it wasn't just his spouse.

MR. ENGEL: Yeah. The privilege log indicated that there was conversations between the

Page 32

plaintiff and his spouse and also the plaintiff and his spouse with their child.

MR. TARAZI: Okay.

MR. ENGEL: Yeah. We have all of this information in the privilege log. So, I mean, I don't know why we're doing this here.

BY MR. TARAZI:

Q. Okay. So just to confirm, do you recall that this is with your wife and your child?

A. I do not recall.

Q. Okay. How old are your kids?

A. She is 17.

Q. Okay. All right. Let's get to something here. All right. So now, I -- sorry. One second. All right. I'm going to ask -- let me share this. I'm sorry, I want to -- I'm just going to go ahead and print so it'll make it a little more efficient moving forward. So just give me one second.

A. Okay.

(WHEREUPON, the Confidential, Attorneys' Eyes Only portion concluded.)

BY MR. TARAZI:

Q. And then we are now back with Exhibit U, which is the redacted version of the text messages. And for purposes of the record, I'm not going to ask

Page 33

you any more questions about who you're texting with or identifying information. All the questions are just going to be about the content of your message, and we're just going to proceed from here; is that fair?

A. Yes.

Q. Okay. So 839, so it says you are messaging -- these are both of your text messages, correct? In blue?

A. Yes. Those would be my responses.

Q. Right. Do you believe that the Board was willfully, maliciously, and purposefully misinterpreting the policy?

A. I'm sorry. Could you repeat that?

Q. You state here, "That's the best I had come up with. Tying in willfully, maliciously, and purposefully misinterpreting Board policy and state law to -- in order to force me to remove a poster." Is that an accurate --

A. It's accurate in that I said it. It was -- I don't have -- like, I don't know that I believe it or have the -- the evidence to prove that. It could -- it would be speculation on my part.

Q. Okay. So it seems like you were going through possible legal theories to file a complaint.

Page 34

Is that fair to say?

A. Yes.

Q. Okay. So was this sort of some -- somewhat of a, like, brainstorming operation, essentially?

A. If I recall, it was more frustration and venting.

Q. Okay. I'm going to jump ahead to -- it's labeled Bates number 841. And there's some more conversation here about, "Right. That's what I mean, that purposefully misinterpreting the law. Their reading isn't even logical, in my opinion.".

Was that just more venting frustration, or is that something you truly believe is true?

A. I truly believe the law was misinterpreted. I don't know how purposeful.

Q. Okay. So sitting here today -- I mean, you obviously have a difference of opinion about the definitions, which we'll get into, "sexual concept." I would assume you do. But you're not trying to say that there was a malicious intentional attempt to misinterpret or, you know, the language?

MR. ENGEL: Object to the form of that to the extent it's calling for a legal conclusion about malicious.

Page 35

But you can answer it to the best of your ability, and whatever your opinion is, it is.

THE DEPONENT: Okay. Yeah. I -- based on the evidence that's been fleshed out that I'm aware of, no, I don't believe that.

BY MR. TARAZI:

Q. Okay. You also mentioned, "This attorney is apparently chomping at the bit to file, so I'm curious what he come up with." Who are you referring to there?

A. Mr. Engel.

Q. Okay. And then you go on to say, "He hates David Wallace and finds it fun to kick his ass in court." Is that true, to your knowledge at the time?

A. At the time that I wrote that, that was roughly my understanding. It may be a bit overstated there, but -- yes.

Q. Okay. Do you personally have any kind of animosity towards David Wallace?

A. I don't know him personally. I disagree with some of the actions he's taken as a Board member, and I'm --

Q. Okay.

A. -- frustrated with some of that.

Page 36

Q. That's fair. But, I mean, there's a big difference between, I'm frustrated, I disagree, and I have personal animosity, I hate him, and I want to kick his ass. I mean, you know, like, what's -- and, you know, and I'm looking for somebody to do that for me. You know what I'm saying? Like, there's some kind of range there. So where are you on that spectrum?

A. I mean, I'm not -- I have no desire to and don't wish him any ill, harm. And with that, it is in court. So that's, like, legal -- I disagree with his -- in some of the legal interpretations. So yeah, there's -- I'm not insinuating I want anybody to cause him physical harm.

Q. I'm going to skip ahead here. Okay. So this -- so this is another text message that you sent. Can you read that?

A. I can.

Q. Okay. "This is from a Board adopted Parents' Bill of Rights adopted in October that the new dipshit attorney referenced in his email to Regina arguing it may fall -- be implicated depending on, 'interpretation.' My thought is, my flag falls under Exception C. Do you agree? No worries if you don't have time, et cetera." So do

Page 37

you recall writing this?

A. I do.

Q. Okay. Why did you think that your flag fell under Exception C at the time?

A. Because in my mind, it is nothing more than an incidental reference. It's not something that I use as a curricular item or to provide instruction. So that was my understanding of what was meant by that policy with incidental references.

Q. Okay. Prior to today's deposition, have you and I ever spoken?

A. No.

Q. Is -- have we ever met anywhere?

A. No.

Q. Not so I wouldn't have -- I mean, would you have been able to -- well, scratch that.

Is the sum total of communication that had any connection between you and me is the couple of emails that went back and forth that are part of the record relating to -- to the flag; is that accurate?

A. Yes.

Q. Okay. So when you're saying "dipshit attorney," what is that based on?

A. It's based on our disagreement on the -- and differences of opinions on how the law works,

Page 38

what's intended, and hearsay that I'd heard from other people.

Q. Okay. So is that -- you do not believe that there's a possible interpretation difference involved? Is that basically the issue?

MR. ENGEL: Object to the form.

THE DEPONENT: I'm sorry. Could you repeat that?

BY MR. TARAZI:

Q. Well, you say -- you criticize that I'm arguing it may fall depending on an "interpretation." So is that -- you don't believe that there's an interpretational difference, potentially, in what is or isn't falling under Exception C?

MR. ENGEL: Object to the form.

You can answer if you can. I mean, I don't know what some of those words mean.

THE DEPONENT: Yeah. I mean, I think that we wouldn't be here if there wasn't a difference in interpretation.

BY MR. TARAZI:

Q. Okay. I'm jumping now to page -- or to Bates 925, Page 88. So in here, you have a message that reads, "This is the end of an email I sent to

Page 39

Kevin (at his request) with the standard for American History and AP Euro attached, as well as which standards I think the flag is relevant. Had Kevin approve before sending over school email -- he said it was perfect." Do you recall sending that message?

A. I do.

Q. Okay. Is that accurate? In other words, did you have Kevin review that email before you sent it?

A. Yes.

Q. Okay. How were you communicating with ▮▮▮, the principal?

A. ▮▮▮▮▮.

Q. Okay. Did you ever communicate with him through personal email?

A. Not that I recall.

Q. Okay. So -- okay. Did you also have a conversation with him, or you sent him the whole thing via text, and he just simply replied?

A. We had a conversation earlier in that day before school started, where he requested that I go through the standards and prepare that email.

Q. Okay. What standards were you going through to prepare this?

Page 40

A. The Ohio model curriculum for American History, and then the course and exam description for AP European History.

Q. Why didn't you attach your syllabus for the class?

A. It wasn't requested and Kevin just asked me to attach the standards.

Q. Okay. So do you teach the model curriculum as the standard or do you teach what's in the syllabus?

A. I teach to the model curriculum.

Q. Okay.

A. The -- yeah.

Q. So if the syllabus is different than the model curriculum, which one do you actually teach in the classroom?

A. To my knowledge, they are consistent.

Q. Okay. Who prepared the syllabus for American History?

A. I did.

Q. Okay. Was this after you were hired? Like, when was it prepared?

A. Yeah. I prepared it before the school year started my first year, and then I've kind of tweaked it as I've gone.

Page 41

Q. Okay. And is that -- is that syllabus what you provide to parents?

A. Yes.

Q. I believe somewhere I've seen a form where you have parents sign saying they've received the syllabus. Are you still using that form?

A. I do, yes.

Q. Okay. So that's an every year thing. They get the syllabus and they get a -- some kind of parent sign-off saying they got the syllabus; is that accurate?

A. Yes.

Q. Okay. In terms of putting together the syllabus, was it ever approved by anybody other than yourself?

A. Not that I recall. I know we have to send them to -- I know it was Kevin one year. I forget, like, to administrators, like, with our course maps and our discipline policy.

Q. So you sort of forward it to somebody, but there's not, like -- or is there some kind of formal approval process, or is it just simply, hey, this is it and this is what I'm doing?

A. Yeah. All I've done is forward it. What happens from there, what they do with it, I'm not

Page 42

aware, but --

Q. Okay.

A. I, like, don't recall receiving any specific, like, approved.

Q. Okay. So nobody's ever come back to you and said your syllabus is approved or not approved or anything. They just -- you're just simply letting them know this is what I'm doing, correct?

A. Correct.

Q. Okay. Do you also post your syllabus on Schoology?

A. Yes, I believe so. I know I have -- I know I have. We have to redo Schoology every semester. I'm not going to say that there were never any semesters where I did not post the semester syllabus to Schoology, but --

Q. Okay.

A. I tried to.

Q. Okay. Did you ever post the model social studies curriculum to Schoology?

A. I believe I did my first year, maybe my first couple of years. I don't know if I have the last couple.

Q. Okay. But if we have testimony from that, you know, they've gone through it and they haven't

Page 43

found it in the last couple of years, you have no reason to think that that's inaccurate? Whatever is there is there. Is that fair to say?

A. Yeah. I mean, I could double-check the archives on my end as well, but -- yeah.

Q. So -- but to the best of -- feel free to double-check the archives. And obviously, if something -- I mean, it is what it is, right? The data is what it is. So if you discover that -- that there's something. Let's say we're going to focus on the last two years just for simplicity -- for this record.

If you discover, in fact, that you did post the model curriculum standard, then let us know. But my knowledge, it sounds like your knowledge as of right now, you don't believe that you did for the last two school years, correct?

A. Correct.

Q. Okay. And if that changes, let us know.

A. Okay.

Q. Did you ever receive any guidance or direction in terms of any Board policy or -- as to what you need to post in Schoology?

A. Not that I recall. I know that we had a -- it was the '24-'25 school year, that our tech

Page 44

coach said that we needed contact information on there. I forget what else, but gave us a rundown of some things.

I know one on there was frequently used online tools. I'm trying to -- but yeah, that was -- it was from our tech coach, not the -- not an administrator, to my --

Q. Okay.

A. -- recollection.

Q. So there's never been any -- well, there's not a Board policy that, for example, says all material has to be on Schoology. Like, there's nothing like that, to your knowledge, correct?

A. Not to my knowledge.

Q. Okay. And you've never received direction that basically says, post everything on Schoology that you're covering in the classroom?

A. They want us to post, like, our materials and assignments so that in particular, if a student is absent, they can check Schoology to see what they've missed and what they need to make up.

Q. Okay. Is that, like, a suggestion or is that some kind of a, you know, like, an order or, you know, something you have to do?

A. No, my understanding is that that's

Page 45

absolutely what we need to do. I know we've gotten stuff, like if a student is suspended, the teachers will get a notification and a reminder, like, everything needs to be updated, uploaded to Schoology. So yeah, that's always been my understanding is that materials and assignments, particularly for absent students, need to be posted.

Q. Okay. Is that tied specifically to absent students?

A. Not necessarily specific to them, but it's largely to -- for their benefit, so that they know what they missed.

MR. TARAZI: Okay. I'm going to need to pause for two minutes to go off the record. I think the mailman is ringing the doorbell. So if you can give me, like, three minutes, I'll be back.

THE DEPONENT: Okay.

MR. TARAZI: We can go off the record.

THE REPORTER: We are off the record at 1 o'clock p.m.

(WHEREUPON, a recess was taken.)

THE REPORTER: We are back on the record at 1:05 p.m.

Counsel, you may proceed.

MR. TARAZI: Yes. Thank you, everybody,

Page 46

for indulging that. That was actually important. So -- okay. Continuing on. And -- oh, by the way, before I forget, if any -- if any the court reporter or if anybody needs a break at any point for, you know, bathroom, anything like that, just obviously say so, and we can pause because we're going, you know, going on here. But I'm going to keep going.

BY MR. TARAZI:

Q. All right. So I'm showing you another text message. This one is Bates 939, and this is in Exhibit U as well. Do you see that message that you sent?

A. I do.

Q. Yeah. And you agree, obviously, that you sent it?

A. Yes.

Q. Okay. So this is in response to a prior -- from somebody who we're going to not address who it is at the moment, but where they say, "Question is, is a flag 'incidental'? It'll come down to Board attorney's interpretation of it."

And then you respond to that message and you say, "I can articulate an argument that it is. I may quote the dictionary definition. I agree this policy should not exist and hope it will go away

Page 47

sooner than later. Dare to dream. I know. I appreciate your concern, and trust me, I'm still stalking the job boards, et cetera."

Okay. So can you explain a little bit about the policy shouldn't exist? Can you explain why you were saying that, what you meant by that?

A. Yeah. I don't agree with the Ohio Parents' Bill of Rights, or especially with regard to how it's being interpreted, and my understanding is that the Board policy was adopted to sort of mirror that.

Q. Okay. And what is your understanding of the purpose of the Parents' Bill of Rights?

A. My understanding of the purpose is to -- like, there's a number of things in there. A lot of it has to do with mental health and alerting parents to mental health concerns. My bigger issue with it -- like, for instance, the provision that if a student requests to go by a different name, that the school has to notify home. I don't personally agree with that.

I don't personally agree with the portion that says that if a student requests to meet with a mental health counselor, that that needs to be subject to parent approval. And then with the --

Page 48

just the way that it didn't really define what was meant by gender ideology or sexual content.

MR. ENGEL: And I'm going to jump in here, and because my client answered before I got a chance to note an objection because the question, I think, was his understanding of the purpose, and I think the question was vague, and you might want to reword it, is, are you asking him what his understanding of the legislator's stated purpose was or what he thinks their real underlying motivations were, to the extent they might be the same or different?

BY MR. TARAZI:

Q. I'll just continue. I'll ask a follow-up question or address it slightly different. Do you agree that the policy requires parental notice and opt-out for before instruction in "sexuality content," and -- which defined as "sexual concepts" and "gender ideology"?

MR. ENGEL: Object to the form. I think the policy speaks for itself, but you can answer if you can.

THE DEPONENT: Yes. That is my understanding.

BY MR. TARAZI:

Q. Okay. Is that something you do not

Page 49

believe should exist? In other words, parents shouldn't be able to know when "sexual concepts" are being taught in a classroom and have an opportunity to opt out?

MR. ENGEL: Objection. Argumentative. You can answer if you can.

THE DEPONENT: Okay. That -- like, on the face, I don't necessarily have an objection to it. It's the way that it seems to be -- being applied and how broadly those are -- terms are being read. It's more of an application.

BY MR. TARAZI:

Q. Okay. Do you think that parents should have the right to opt their children out of the LGBTQ content that you -- that you're teaching in the classroom?

MR. ENGEL: Object to the form. Argumentative. Assumes facts not in evidence.

You can answer if you can, but I don't think you can because I think it assumes that you teach LGBTQ content, which hasn't been established in the record.

BY MR. TARAZI:

Q. I am referring to your Interrogatory responses, which we can pull up here in a second.

Page 50

So if you want, we can come revisit this question, but if you want to address it now, feel free.

MR. ENGEL: Why don't you pull up what you're referring to? Because I think -- I think you're -- I -- I hope unintentionally kind of misrepresenting what was there.

MR. TARAZI: Well, we'll come -- I'm not -- I'm not going to go out of order here, so let me -- I'll come back to it then.

MR. ENGEL: Well, I'm not going to let him answer. You said that he teaches LGBT content. That is not a fact that is part of the record. That is an irrelevant fact. It's argumentative. So let's move on. The objection to the form of the question because it would lead to a misleading record.

MR. TARAZI: Okay. I am sharing with you Exhibit marked N.

THE REPORTER: Exhibit N has been marked.

(WHEREUPON, Exhibit N was marked for identification.)

BY MR. TARAZI:

Q. Exhibit N is your response to Defendant's first set of discovery requests and Interrogatory answers. Do you recall this?

Page 51

A. I do.

Q. Okay. And is that your signature at the end, that all the answers are under oath?

A. Yes.

Q. Okay. And you read over this document, correct?

A. I did.

Q. Okay. And all of the answers remain true today?

A. Yes.

Q. In terms of the Interrogatory responses?

A. Yes.

Q. Okay. So you -- so for example, in Interrogatory Request number 5, you detail out what you are teaching. In other words, and I'm not going to read it all here, but essentially, this is all still accurate, correct? In American history, you teach this and that and the other thing, including LGBTQ rights. The document speaks for itself.

But the question I'm basically asking is, has anything changed about this that you want to correct or is it all still true and accurate?

A. Could you make it a little larger? Zoom in a little bit.

Q. Yeah. No problem. If you want to read it

Page 52

over again or, you know --

A. No. I believe that's all still correct.

Q. Okay. Do you teach all of these things every single year?

A. No.

Q. Okay. How do you decide when you are teaching these topics and when you are not?

A. Largely, it depends on time. Particularly, these are all covered in the second semester. It -- a lot of times comes down to how many snow days we've had. This particular school year, I did not teach the Stonewall Riots, and I didn't teach about the Lavender Scare. I cut those in part because of how much time we missed and were out of school for snow days.

Q. Okay. Did you teach those the year before?

A. I believe so.

Q. Okay. So then basically, it's fair to say you do teach these topics on a regular basis unless snow days or something prevents. And it sounds like, at least this year, those couple of areas were not covered; is that fair?

A. Yes.

Q. Okay. Let's go back. All right. So

Page 53

going back to this text message, referring specifically to the things that you admit that you are teaching in your Interrogatory and nothing beyond that, do you believe that the parents' rights policy applies to those -- to that material in terms of providing a parents a notice and an opportunity to opt out?

MR. ENGEL: Object to the form. Are you referring to the Interrogatory answer?

MR. TARAZI: The material that he said he teaches in his Interrogatory response.

MR. ENGEL: So is -- I'm sorry, and you can rephrase it if I -- is the -- I just need to make sure I understand it. Is the question, does the parents' rights policy apply to the materials described in the Interrogatory answer?

MR. TARAZI: That's correct.

THE DEPONENT: My interpretation and understanding is that it would not, that I keep it strictly to a historical treatment of the LGBTQ community. I don't get into teaching about, like, sexual content or gender ideology, just that these people exist, and this is how they've been treated in these different periods of time.

BY MR. TARAZI:

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 54

Q.   Okay.  Here's another text message describing some conversation that you had with ███.  Do you recall this text message?

A.   I'm sorry.  Just take a minute to read it?

Q.   Yeah.  Go ahead and refresh your memory.

A.   I don't recall sending this particular text, but I do recall the conversation with Kevin and the situation that it's describing.

Q.   Okay.  What was the conversation with Kevin? Because this is not very clear what is being talked about.

A.   When I was first asked to take down the flag, and we -- I believe it was after we started the email exchange.  I would talk to Kevin after school and asked him if he thought that the Parents' Bill of Rights would -- or if my flag would be implicated by the Parents' Bill of Rights.

He -- if I'm remembering the conversation correctly, he told me that he did not think that.  And I point out, like, that they were -- that it was seemed to be boiling down to that and the Board policy.  And so he agreed that he would look at the Parents' Bill of Rights, and then I would look over the Board -- relevant Board policy, and that we would reconvene and kind of compare notes.

Page 55

Q.   Okay.  So that's the same conversation I think you mentioned previously; is that right?

A.   Yeah.  Well, so there were -- there was one before -- like, before I sent that initial email.  And then I believe it was the following week, I spoke to Kevin after school.

Q.   Okay.  And so what -- what does this Warren County GOP have to do with anything?  How did that kind of become part of the conversation?

A.   Kevin, like, was mentioning that in our conversation, that he felt that David Wallace was -- had lost some of the support that he once had.

Q.   Okay.

A.   Over the frustration with him.

Q.   What does that have to do?  I guess I'm just not -- I'm just not understanding what does that have to do with this flag issue?

A.   I don't know that it has anything to do with it.  It was part of that --

Q.   Okay.  And maybe that's the answer.  All right.  In Page 934, you describe another conversation with Kevin, or I don't know if it's another conversation or the same conversation.  Do you recall this conversation with Kevin that's being described here?

Page 56

A.   I genuinely don't.  I know that I -- there was -- I talked to Kevin once before school.  I spoke with Regina and Kevin once after school, and then it was the following week that I spoke with just Kevin after school.  I'm not sure which of those after school discussion -- it would have been one of the two after school.  I don't know if it was the one where Regina was there or not.

Q.   Okay.  And when it says here, "After talking and comparing notes, we both think this chode of an attorney is full of shit and may be misrepresenting both state law and Board policy, expecting no pushback." Is that your belief at the time?  Do you and what -- what was the misrepresentation that you felt was occurring?

A.   Again, having the flag on my wall where I don't use it in the curriculum.  I don't use it in instruction in any way.  It's just there as anything more than an incidental reference or would be anything that would implicate the Parents' Bill of Rights.

Q.   Okay.  What's the misrepresentation that you're referring to specifically?

A.   That -- that equates, like, having that flag on the wall is the -- equates sexual content or

Page 57

-- or -- yeah, sexual content or gender ideology.

Q.   Okay.  Did you ever see an email from me that stated that that was, in fact, covered by Parents' Bill of Rights?

A.   I believe I know we exchanged -- I've seen a couple of emails from you.  I understood that that was your understanding and interpretation.  Again, I believe that that was a misinterpretation.

Q.   Okay.  Well, we'll cover those emails here in a second.  And I just also want to be clear for the record.  There was several communications from your counsel stating that there's no further documents relating or materials relating to what you were teaching then beyond what was actually provided in discovery.  Is that still accurate today?

A.   I'm sorry, could you repeat that?

Q.   I'm just asking that there's no additional materials relating to what you were teaching in the classroom that's responsive to our request.  That -- that you've produced everything that exists; is that accurate?

A.   Yeah, to the best of my knowledge.

MR. ENGEL:  Well, we produced everything that is relevant and responsive and not an undue burden.  As you know, materials, for example, on

Page 58

Schoology are equally available to you.

In fact, easier available to your client than to ours, and I think you've already accessed those for example. And I think your question seems to imply an overbroad request, but I think he's produced everything that he's got that's relevant to this case.

BY MR. TARAZI:

Q. Okay. So there's not some additional documents off to the side that you were using in class, for example, that wasn't on Schoology, that hasn't been produced up to this point?

A. Not to my knowledge.

MR. TARAZI: Okay. I'm sharing with you the model curriculum, social studies, and it's marked on our end as Exhibit G_2.

THE DEPONENT: Uh-huh.

THE REPORTER: Exhibit G_2 has been marked.

(WHEREUPON, Exhibit G_2 was marked for identification.)

BY MR. TARAZI:

Q. Okay. And this was the model curriculum, of course, that you copied on your email; is that correct?

Page 59

A. Yes.

Q. Okay. And noting for the record, in Content Standard 32, it says it has -- includes LGBTQ+ rights, correct?

A. Yes.

Q. And Content Standard 32 is, "Focusing on domestic policy, the United States faces ongoing social, political, national, security, and economic challenges in the post-Cold War era and following the attacks on September 11, 2001." Correct?

A. Yes.

Q. Okay. Is the poster -- and I think you used the term "especially applicable," and we'll get into what you meant by that. But is the poster especially applicable to LGBTQ+ rights?

A. I believe so.

Q. Okay. Did you teach LGBTQ+ rights as part of this content standard in the classroom?

A. I'm sorry. Could you zoom in on the content standard a little bit more? I just want to make --

Q. sure.

A. -- so I know which one we're looking at.

MR. ENGEL: Yeah. I think you've misread the document there. It says -- go ahead.

Page 60

THE DEPONENT: I was going to say, so with Content Statement 32, that is towards the end of the year and after the students have done the state test. So normally at that -- because we're on a time crunch, in wrapping up the school year, I tend to focus on the 9/11 attacks, the build up to that.

And then we watched the movie American Sniper, and kind of talk about the war on terror through that. As far as I think it's an earlier content statement where I will typically teach LGBTQ rights, possibly 27.

BY MR. TARAZI:

Q. Okay. So we'll get to that in a second. But are you saying that you don't cover 32 or you do cover it, you just often don't cover LGBT rights here because of time?

A. Correct. Yeah, I cover it quickly. And since we have talked about -- or typically and within the school year, we've talked about the LGBTQ rights as part of the Civil Rights Movement. I more stick to the war on terror and the, like, build up to the 9/11 attacks and then the immediacy after that.

MR. ENGEL: And I'm going to put an objection to the form of the question there because

Page 61

I think it misrepresents the record. The question was, does he teach LGBTQ rights, but that's not what the content standard says.

The content standard says that there's a continuing debate between the role of the state and federal government in political and social issues, including disagreements over LGBTQ+ rights. And so I'm going to object to the form because it misrepresents the record here, and I think might lead to a misleading record.

So I think the question you want to ask him is, do you teach about the continuing debate between the role of the state and federal government in political and social issues, including disagreements over LGBTQ+ rights?

MR. TARAZI: Are you done?

MR. ENGEL: Yeah.

MR. TARAZI: Okay.

MR. ENGEL: You can correct your question if you want.

MR. TARAZI: I believe the question was asked and answered. So we're going to now go to content.

MR. ENGEL: It was answered -- I'm sorry. It was answered subject to an objection that I'm

Page 62

putting on there because it --

MR. TARAZI:  And your objection is noted, and we're moving on.

MR. ENGEL:  Please don't interrupt me. It's improper form and led to a misleading record, I think.  And so I -- I really wish you would ask questions that accurately represented the -- the documents that you're talking about and aren't trying to intentionally create a misrepresentation. So go ahead.

MR. TARAZI:  Okay.  Thank you.

BY MR. TARAZI:

Q.   Now we're talking about Content Standard 27. Do you see that?

A.   Yes.

Q.   Okay.  And can you go ahead and read the content standard?

A.   "Following World War I, the United States experienced a struggle for racial and gender equality and the extension of civil rights."

Q.   Okay.  And in Content Standard 27, there is the Gay Liberation movement, among other things, relating to civil rights; is that accurate?

A.   Yes.

Q.   It "began with Stonewall Riots, which

Page 63

organized efforts for full inclusion in public life and institutions." Correct?

A.   Yes.

Q.   And when you stated earlier, this content, the section relating -- this part right here in Content Standard 32, that addresses the social roles and disagreements relating to LGBTQ+ rights, is it your testimony that you covered that in Content Standard 27? If I understand you.

A.   I do not.  I don't teach anything beyond Stonewall.  So as far as, like, in the post-World War II -- or I'm sorry, in the post-9/11 era, I don't get into any of that.  It's simply a matter of time.

Q.   Okay.  Okay.  So in terms of the Civil Rights Movement relating to LGBTQ+, you're -- you're focusing on it here in this section, 27; is that correct then?

A.   Yes.

MR. TARAZI:  Okay.  And then I'm putting in front of you Exhibit G_1.

THE REPORTER:  Exhibit G_1 has been marked.

(WHEREUPON, Exhibit G_1 was marked for identification.)

Page 64

BY MR. TARAZI:

Q.   Do you recall this email?

A.   Yes, I do.

Q.   Okay.  And in this email, you specifically listed that the "Hate has no home here" is especially applicable.  And then you list a whole bunch of curriculum standards for both American History and AP Euro, correct?

A.   Correct.

Q.   Okay.  Now, you don't reference 32 -- Content Standard 32.  What was the reason for that?

A.   Because when I cover Content Statement 32, I pretty much keep it to the conflict with Middle Eastern countries and the build up to 9/11, and then the war on terror.

Q.   And that's not applicable to "Hate has no home here"?

A.   I would say it's applicable.  I don't -- I pointed these out because it's where we cover some of, like, the -- like, the -- with the 27, with the LGBTQ community in particular, it's where I have that.  And that -- where they were represented -- those groups are represented in the flag.

Q.   Okay.  So why did you -- I guess I'm just confused.  I'm not trying to do a trick question

Page 65

here, but I'm confused as to why, like, 11 is included, but 32 is not included.  Like, what -- what is the difference?  Can you help me understand why?

A.   Because of how I teach the curriculum and teach and that's just a piece of it that I don't get to within 32, the continuing fight over, like, gay marriage and those sorts of things, we don't really touch on.

Q.   Okay.

A.   Beyond, like, in that when we're covering 32.

Q.   So the Plain Wars in some way has something to do with LGBTQ+?

A.   No, it doesn't.  It has to do with Native Americans and their treatment.  That's another group that we cover -- like, cover again with the Civil Rights Movement.  We talk about how they were -- like, the displacement of Native American tribes and then the Plain Wars and the conflict between the American settlers.

Q.   Okay.  So help me understand.  Again, I -- I'm not, you know, trying to -- dumb question here, but in what way does, like, when you look at the icons on the -- or the flags on the flag, what did

Page 66

each one represent? Do you recall?

A. There's an American flag in the center. There is a peace flag. I'm trying to go through those.

Q. Yeah. I can pull it up if you don't recall.

MR. ENGEL: If there is something to look at that would help you.

BY MR. TARAZI:

Q. Give me a second.

A. Okay. So yeah, there's the pride flag, the peace sign, the American flag. I believe the one to the left of the American flag is the transgender rights flag. When I bought the flag, my interpretation of the one on the far left was that that represented different skin tones.

Q. Do you have a different interpretation today?

A. Through discovery, I understand that some people understand that that is a lesbian pride flag.

Q. Is that -- I -- I personally have no knowledge on this. Do you believe that this is a lesbian pride flag, or do you believe that it somehow represents skin tones?

A. I've never seen that used personally, I've

Page 67

never seen that used for lesbian pride and was not aware of that. I've -- while it was in my room, I always understood it to represent multiple different skin tones and meant to be the range of skin tones.

Q. Okay. Sorry. Give me a second to kind of get back to where I was. All right. Going back to this email. So -- okay. So then why -- so you said that the Plain Wars, this is -- you said that the flag is applicable to the Plain Wars because of the Native American component; is that accurate?

A. Yeah.

Q. Okay. What part of the flag related to the Native American component? Was it the words or was it one of the symbols?

A. The words for sure were applicable. I would also, like, if in my opinion, my understanding of the skin tones would have covered different, like, darker complected Native Americans and then also the American flag, since Native Americans were given citizenship in the 1920s.

Q. Okay. And then what about reconstruction and institutionalized racism? Is that the same -- the same skin tone one? Is that what you're referring to?

A. And the American flag, yes.

Page 68

Q. Okay. Racial intolerance in post-World War I?

A. That would also be the skin tone and the American flag.

Q. Okay. Harlem Renaissance?

A. Skin tone and American flag.

Q. All right. Marginalized groups in World War I.

A. That would be skin tone and American flag.

Q. Okay. Second Red Scare?

A. That would -- when I talk about the Lavender Scare as a corollary to that, that would be the pride flag and the trans pride flag.

Q. Okay. And then the Civil Rights Movement?

A. Arguably all of them. The -- the skin tones, the American flag, and then the pride flag and the trans pride flag.

Q. Okay. And then what about 29, "white flight, immigration reform, urban riots of 1960s?

A. The skin tones and the American flag.

Q. Okay. So for some reason, then, you don't -- what was it that you covered for Content Standard 32? Can you remind me again?

A. Conflict with Middle East and the war on terror.

Page 69

Q. Okay. And you do not feel that the war on terror or conflict in the Middle East has anything to do with any of the symbols on the flag?

A. I think it does. I think that -- and I think that it applies to most of the curriculum, if not all of it. It's more of where I tend to see issues and where historically, I've seen some issues and where students are or at least -- yeah, heard reports where, like, students tend to maybe exhibit more of what would be hate is from those. I've never had any issues with in teaching the 32 when I do. I've never had any issues with students doing anything that would have crossed the line.

Q. So does what -- I mean, again, forgive me. If -- for post-9/11, wasn't there a significant amount of issues in society relating to Muslims and Arabs, you know, immigrant -- like, there's, you know, all of that. Do they not qualify from a skin tone perspective? Is that or is it because it's religion in your mind? Like, what -- I guess I'm not seeing the distinction.

A. I'm -- like, when I put that together, when I was asked to do this, Dr. Harleman wanted to know, like, exactly where each of this was, especially, like, and where it was -- sorry. Where

Page 70

it would be especially applicable.

Again, that's based off of where -- and I do cover Islamophobia, the rise of Islamophobia, following 9/11. It's not that it's any less worthy. It's just when I was going through this quickly before class started, those were the ones that jumped out at me.

Q. Okay. So Islamophobia, does that -- and I guess, anti-religion, you know, sentiment, is that reflected in some way on your flag?

A. Not in the flag, but I do have a coexist poster elsewhere in the classroom, and it does include Islam representation.

MR. TARAZI: I'm sharing with you now Exhibit marked O. And this is -- hold on. Let her -- do you have to label the --

THE REPORTER: Exhibit O has been marked. Thank you.

(WHEREUPON, Exhibit O was marked for identification.)

BY MR. TARAZI:

Q. Okay. This was provided to me by the district as being the syllabus information relating to your class; is that accurate? If you want, I can make it bigger. Let's see here.

Page 71

A. Yeah. If you could, that would be great.

Q. So there's this, and then course map.

A. Okay. So the map and pacing guide, that document or that page that's pulled up now, I -- I did not -- to my recollection, I don't think that that's mine.

Q. You don't teach --

A. Not my units.

Q. You don't teach at United States History, too?

A. I do, but I didn't create that document.

Q. Okay. What about this portion?

A. No, I didn't create that.

Q. So then what -- so this isn't the syllabus that you're handing out to parents?

A. No.

Q. Okay. Where is the syllabus that you're handing out to parents?

A. I've got a copy on my computer, and that's on my hard drive that I've used in prior years, and I can check to see if it's on my archive Schoology page.

Q. Okay. Are you able to supplement that? So you don't recognize this at all, this syllabus?

A. I don't. That page I recognize, but

Page 72

that's at the end of mine. And my -- if you scroll back up to the acknowledgment page.

Q. Uh-huh.

A. The Little Miami logo there, I have that on the front page of my syllabus as well. It's styled similarly to that.

Q. Okay. Are you able to -- how -- this was the syllabus that -- that was got sent to me as the syllabus that the district had. So if there's a different syllabus, great. And this is what was found looking through the records or whatnot. So how quickly do you think you can get the correct syllabus or the one you're actually teaching?

MR. ENGEL: Well, we -- we'll work through counsel on that. I'm not going to have to commit to a time here.

BY MR. TARAZI:

Q. Well, the issue is, is that -- that is part of something that I need to be able to ask him questions on. So is that something you can get relatively quickly, or is that something that takes, you know, takes a day or two?

A. I could see if I can get it pulled up and help get to --

MR. ENGEL: We -- we'll work through

Page 73

counsel. Obviously, we'll have to review it and -- and do what we need to do on our end, and we'll do that between our other commitments as well. So we'll get it to you as soon as we can, but I'm not going to promise anything.

BY MR. TARAZI:

Q. Does the syllabus that -- that -- now, the syllabus that you're handing out, is that something that's on Schoology?

A. I believe so.

Q. Do you know for sure or no?

A. Do I know -- I'd have to go look at my archived pages to see if I had the syllabus posted.

Q. And does the -- where do you keep the syllabus?

A. When I post it, it's on the front page of the Schoology page.

Q. Okay. But is it, you know -- like, do you have, like, a shared drive or something on your -- on your school computer?

A. I have an American History file on my desktop.

Q. Okay. Is the -- is it in there?

A. Yes.

Q. Okay. Which subfolder would it be in?

Page 74

A. It would -- so I tweak it for the different years. It would be there in the American History folder on my desktop, the one I used my first year would be in the main folder, and then I've got -- got it separated out by each of the school years.

And then what's there is kind of my base. And then what I've taught in each school year is in those separate folders. So the syllabus would be in one of those or in those for each year.

Q. Okay. So if they find it in -- so it's that subfolder for the year. Like, this year, you would have whatever syllabus you used in that subfolder on your desktop; is that correct?

A. Correct.

Q. Okay. And then there was a -- okay. And then, but as far as this one right here, you have no idea where this came from?

A. Correct.

MR. TARAZI: All right. We've been going for a while. Do you mind if we take a couple of minutes break?

THE DEPONENT: No.

MR. TARAZI: Just go to the bathroom and so forth.

Page 75

THE REPORTER: Please stand by. We are off the record at 1:48 p.m.

(WHEREUPON, a recess was taken.)

(WHEREUPON, Mr. Hardin joined the deposition.)

THE REPORTER: The time is 2:04 p.m., and we are back on the record.

Attorney Tarazi, you may proceed.

MR. TARAZI: Thank you.

I am going to share -- so this is the exhibit that was shared by Plaintiff in discovery of responsive documents relating to material taught in classroom. So I just wanted to go through this, and it's marked Exhibit R.

THE REPORTER: Exhibit R has been marked.

(WHEREUPON, Exhibit R was marked for identification.)

BY MR. TARAZI:

Q. Okay. Do you recall this document?

A. Yes, I do. That was a homework assignment I gave to -- homework reading I gave to my AP European History class.

Q. Okay. When did you give that -- did you give this every year?

A. This past school year was the first year

Page 76

that I've taught AP European History.

Q. Okay. So this document is an AP Euro document, and by -- by referring to it as the first page of the 140-page -- 7-page Exhibit R, correct?

A. I'm sorry?

Q. This is part of AP Euro.

A. Oh, yes, it is.

Q. Okay.

A. It looks like part of it -- it's the -- and I just to be clear, the homework reading was the first two pages of this.

Q. Okay. So that's the first two pages, correct?

A. Yes. That's the homework reading, or was the homework reading.

Q. Okay. And it obviously includes something to do with sexuality here on Page 2, correct?

A. Yes.

Q. Okay. Was there a reading beyond this little paragraph or is this the reading in its entirety?

A. That was the reading in its entirety.

Q. Okay. Was this assignment posted on Schoology in advance of it being shared with students?

Page 77

A. I believe I posted it the same day I assigned it and gave them -- I gave a printout copy so they could take a hard copy home or posted it in -- in AP Euro, I had a separate homework folder and would have posted it in the homework folder.

Q. Okay. So that would have been the same day it's assigned, though, correct?

A. Correct. For -- well, the same day I assigned it for reading for the next class.

Q. Okay. And then now, let's just be clear about one thing. Does AP Euro follow Schoology as well, or is that another -- or is there another system for -- for that?

A. No. I use Schoology for AP European History as well.

Q. Okay. And then you provided some -- on Page 3, something about The Who and then The Rolling Stones?

A. Yes. So what I did on the content on counterculture, again, it's later in the year. We -- the kids were -- like, we're coming up on AP testing. They were kind of over the dense topics. So when I was looking into it, a lot of it came up with, like, different British Pop rock songs that were relevant.

Page 78

So we -- I covered a lot of the different events through these songs. And we -- I think it was a Friday. We listened to the songs and kind of analyzed the lyrics.

Q. Okay. So then it goes The Sex Pistols, The Clash, The Rolling Stones. So you get to Page 8 of this document. Is all of that related to AP Euro?

A. Yes.

Q. Okay. And all of this, like, was it handed out directly to students or -- or was it all posted --

A. Yes, it would have been posted on Schoology.

THE REPORTER: I'm so sorry. For a clear record, could you please restate your question?

BY MR. TARAZI:

Q. Yes. Was this handed out in person or was it -- okay. Let me rephrase. Was this posted on Schoology?

A. Yes, I believe it was. I think so.

Q. Okay. And would it have been the same day that it was discussed and assigned or would it have been at the beginning of the year?

A. It would have been the same day it was

Page 79

discussed and assigned.

Q. Okay. And -- all right. And now we -- it looks like we're now doing something related to Civil Rights Group wrap-up questions on Page 9. Is that still AP Euro, or is that switching to American History?

A. That's American History.

Q. Okay. There is -- which groups were you -- were -- okay. So when did you teach this lesson? Was that this year, last year? When was it?

A. I didn't teach it this year. This was one of the assignments that was cut due to snow days. I know I taught it in '22 to '23 because that's when I created it. I can't -- I think there was one other year I was able to do it. I can't remember if it was last year or the prior year.

Q. Okay. What about this Civil Rights mural?

A. I know I did it in the '22 to '23 school year. I don't know that I've had time to do it beyond that year. I'd have to go back and check my folders.

Q. Okay. But this is an assignment that you would do if there wasn't enough school days, basically, or -- and in this prior one as well. Like, in other words, it's scheduled --

Page 80

A. Correct. Yes. If I had time, I would have included that.

THE REPORTER: Okay. Just a reminder to speak one at a time for a clear record. Thank you.

THE DEPONENT: Sorry.

BY MR. TARAZI:

Q. Yeah. You have this document here regarding the gay Liberation Movement on Page 11?

A. Yes.

Q. And then they go through the Disabled Rights Movement, the Native American Movement, the United Farm Workers, et cetera, Asian American Movement, and Women's Movement. So that's six of them, correct?

A. Correct.

Q. Where is -- when -- you didn't teach this material this year; is that correct?

A. No, I did not.

Q. Okay. When you did teach this material, you said, like, the last -- you believe the last time was '22-'23?

A. That is the last year I know for certain that I taught it. If I'm -- I believe I've taught it at least once since then. I don't know if it was last year or the year prior. And it may have been

Page 81

both. I honestly don't recall.

Q. Would this have been posted on Schoology?

A. Yes. I would have posted that to Schoology for, again, students who were out. That one, I teach as a -- call it a gallery walk, where I think I have six of each of those laminated. And then there's a worksheet so the kids go around and read these things and answer questions about each of the groups.

Q. Okay.

A. So I would have posted that to Schoology so that they would have had their makeup assignment, would have had everything that they needed to read without coming to see me.

Q. Okay. And then the mural assignment is you have to pick one of the six; is that correct?

A. Correct.

Q. All right. And make a mural to honor them?

A. Correct.

Q. Okay. And then the Cold -- you start off here with Cold War slides, and then you -- a lot of these are -- are, in fact, on Schoology this last year. But there was this -- how do you teach all of this material? Is it, like, given one -- I mean,

Page 82

like, how do you cover all these various slides?

A. Typically -- like, if you stop there, like, the title slide, like, the Cold War, that one. Typically, every time you see one of those, that would be a new day's material, if that makes sense.

So then we would go into -- I start each class, like, when if I'm lecturing, would have, like, that Cold War, the Second Red Scare and McCarthyism. We'd cover the content statement and expectations for learning, why it's important, and then get into, like, discussing the slides on days that I'm lecturing.

Q. Okay. And then this Second Red Scare and -- and this material specifically -- sorry, the Lavender Scare, and all of these slides relating to that, you didn't cover that this year; is that accurate?

A. Correct. I did not cover the Lavender Scare this year.

Q. Okay. And then the -- but you -- but this is part of your material such that you would cover it if there was no snow days, essentially?

A. Correct.

Q. Okay. And if you would cover it, is this material in the syllabus that you hand out, like,

Page 83

how -- is the syllabus covered -- you know, included or not included?

A. It is. With the syllabus for second semester, because all of this is from second semester. I -- yes, I believe I've got the course guideline.

It's not going to be that far broken down. It's going to be more broad of, like, the Cold War, Civil Rights Movement, World War II. Like, it's those broad topics that's in the syllabus.

Q. If -- when we get the copy of the syllabus, is it going to -- is it going to have -- is it going to say "lavender scare"?

A. No, I don't believe so.

Q. Is it going to say "Gay Liberation Movement"?

A. I don't believe so.

Q. Is it going to say "Stonewall" anywhere?

A. I don't believe so.

Q. Is it -- is it going to say "LGBTQ+ rights" anywhere?

A. I don't think so.

Q. Okay. Scrolling through here. You provided quite a lot of slides here. Now, you're saying that you just sort of break these up and, you

Page 84

know, depending on the day, you might cover 10 slides or 5 slides or -- like, how does that work?

A. Honestly, it depends on the class. And that's it. I learned that when I was student teaching. My cooperating teacher said that and recommended that I make all of my unit slides into one because you never know how far you can get. If you can get ahead based off of the class, go for it. So that's what I've done.

If it really depends on the individual class, how many I can get through. And it varies from one year to the next, so it is somewhat fluid. Sometimes I'll have to reorder the slides, like this year with the -- having to cut the Stonewall and Lavender Scare. Like, I just kind of skip through those or skip past those. So it -- honestly, it varies.

Q. Okay. And then you have a slide here on LGBTQ+ Liberation on Pages 146 and 147, as well as the Women's Liberation. These slides are -- when are they covered?

A. That would have been the second half of the Civil Rights Movement or to -- actually, the last day is after they've done the assignment that we just reviewed, then I kind of recap with notes

Page 85

for them to and kind of lecture and discussion. And then -- yes. That's the end of the Civil Rights Unit.

Q. Okay. So did you not cover the Civil Rights Unit at all this year?

A. No. I did cover the Civil Rights Unit, but I did not cover those extension groups. And did not -- like, I'm trying actually, I'm trying to remember what we went through. I know I didn't do the assignment, the mural assignment, and the gallery walk with the different stations.

Q. Okay. But you might have done those the year before?

A. I believe so, yes.

Q. And before, you don't -- you just simply don't remember?

A. Correct. I'd have to go back and review.

Q. Okay. So when you don't cover something, is it not included then in your testing?

A. Correct. It won't be included in the -- my unit test.

Q. Okay. Did you cover anything at all relating to LGBTQ+ rights or history this school year?

A. Not that I recall. I don't think so. Not

Page 86

in American History. AP European would have hit on, like, what we reviewed, that was this year. I don't believe so in American History.

Q. Okay. And -- but all of this material was covered in the year prior or, like, potentially in the years prior, you just don't remember exactly?

A. Correct. I've taught it all at some point in the last four years. It's probably going to be a mix and match for which year -- which material is covered in which year.

Q. Okay. Why -- I guess I'm still struggling to find -- to understand, but -- I understand you have to cut back when you have snow days, but why did you choose to cut all LGBTQ+ material this year due to snow days relative to any other material you could have cut?

A. In part, because we are gearing up -- part of the problem with second semester, in addition to the snow days, is we -- the state testing schedule, and we don't get the full semester to teach everything. So it's kind of on a time crunch as it is.

So I try to focus on the core things that I believe will come up in their state test. And to my knowledge, like, in the released item, I've not

Page 87

seen anything with those materials that come -- has come up in the state test, like, in the released items the last couple of years. So I tried to focus more on the material that they have covered so that the students would be better prepared for their state test.

Q. Okay. And when -- you didn't teach it this year, but if you were to teach it, say, next year or whatnot, do you believe that the House Bill 8 Parents' Bill of Rights applies to any of this material?

A. Based off of my interpretation and understanding, no, I don't think that it does because I'm teaching about how these groups are impacted. I'm not teaching about their beliefs. I'm not teaching -- going into the details on sexual health, reproductive health, not getting into the mechanics of it.

It's simply these groups exist, which the kids come in with a -- I've never had to explain to any student what LGBTQ+ means. So they come in with that basic understanding before I ever see them. And it's -- this is how this is how these groups were treated at this point in time. It's focused on the history, not the individuals, not their

Page 88

lifestyles.

Q. Okay. But wouldn't you have to cover lifestyle to talk about it? I mean, isn't it even -- I mean, like this document, for example, Gay Liberation Movement, like, don't you have to talk about the topic to some degree?

MR. ENGEL: Object to the form. You can answer if you understand the question.

THE DEPONENT: Again, it doesn't get into their lifestyles. It's, again, just that these groups of people exist, and this is how they were treated. Again, I've never had a student not understand that. And usually by it's tenth grade, that's 15, 16, they understand that gay and trans people exist in our society.

So I don't get into the lifestyles at all. It's this is how these groups have been treated over history. And I teach it -- like, with that, I teach it in the context of not just focusing on the LGBTQ+ community, but I teach it in conjunction with other groups.

BY MR. TARAZI:

Q. Okay.

A. So it's looking and comparing and contrasting how these different groups were treated.

Page 89

So I'm not, like -- and marginalized at that period of time.

Q. Okay. So the sum total of everything in this document that you have shared is the first eight pages that are AP Euro content. I'm sorry, let me rephrase the question. For AP Euro specifically, you only shared eight pages in this document; is that accurate?

A. I believe that's correct.

Q. Let me just double check that it's, in fact, eight pages. Yeah. So Page 1 through 8 is the sum total of what you have shared relating to AP Euro, correct?

A. I believe so.

MR. TARAZI: Okay. Okay. I'm sharing with you now the AP Euro document that you shared from the College Board in discovery, and it's marked Exhibit T.

THE REPORTER: Exhibit T has been marked.

(WHEREUPON, Exhibit T was marked for identification.)

BY MR. TARAZI:

Q. The -- let's see here. One second. So what exactly have you -- this is, of course, the -- or what is this document? Help me understand this

Page 90

document. Is this what you're supposed to teach exactly, or is this sort of a sample model, and then you, as a teacher, are supposed to customize it or -- or adjust it for your purposes?

A. Okay. So that is the course and exam description from College Board. The first part, like -- I'm sorry, you're kind of scrolling through it, so I'm not sure which part you want me to talk to. This is explaining -- like, here, this part, it gives -- it starts with an overview of the course, like, the skills that are being taught.

If you want to scroll down. Okay. Again, that's historical reasoning and processing skills, critical thought. Those are things that the test is designed to assess. So then this is where it's going to get into content.

So scroll down there -- that page, scroll up. Right there. That is a broad description of each of the nine units within the AP European curriculum. And then you can kind of see there to the side, like, what percentage of the course -- the exam that the kids take at the end of the year, what percentage we can expect to come from each unit.

So if you continue scrolling down, This is getting into different themes that cut across the

Page 91

course and where they hit. All right. So this -- and I'm sorry, can you scroll in a little bit to make sure I'm looking at the right thing.

Q. Okay. What do you mean scroll in?

A. Stay on this page and, like, zoom in. Okay. So then this -- like, if you see Unit 1 there, Renaissance and Exploration, it's got each of the subtopics from College Board within each unit. So then if you look to the key to the side, it hits on the themes and historical thinking skills that AP recommends, like, that you could tie in with those.

So it has that quick glance for all of the units. And then if you continue scrolling down, Keep going. Keep going. All right. Now, then you get into the unit guides. You'll get an introduction. Keep scrolling. Again, just explanation.

All right. And then this gets into, like, these are the bigger unit guides. And then this is going to give you again, like, this is just that unit at a glance. My understanding from again, this is the first year I've taught AP, but that it kind of just reiterates what that last one, the quick one at a glance that we just looked at.

And then if you scroll down, to give you

Page 92

some sample, like -- okay. Here's what I was going for. So there, that is the, like, Topic 1.1. So that's the first if you see that blue box, it says, required content. Those are things that we need to make sure that the kids know.

And if you scroll down, the first one is always context, it's not -- keep going. See what 1.2 has got. Okay. There. So again, you see the blue box there has got the required content. And then off to the left are illustrative examples.

Those are -- that's where, like, content that College Board recommends could tie in with that and kind of give you a jumping off point if you want to figure out how to do those things and -- or you want to tie those in to kind of teach this stuff. Now, within the blue box, we just have to make the material available to the students.

So whether that's part of a lesson, part of a group work, it can be reading in the textbook that they do independently on their own. But we just have to make sure that they have some basis of understanding or at least had been given something with that information.

Q. Okay. So do you have -- I guess the core question though is, is this sort of a -- may be the

Page 93

wrong term, but a generic outline essentially, that you as a teacher, then customize to cover how you're going to actually teach it, or is this exactly the syllabus, essentially, that you're supposed to be teaching?

A. It's not the syllabus. It's kind of like the Ohio Model Curriculum for -- like, for the -- just for the AP course put out by College Board. And then, yes, like, we have some leeway and freedom into how we incorporate this stuff and how we present it to those students.

Q. Okay. So then what is the material -- because you only provided the eight pages specifically. What is the material that you're actually teaching or that you're actually, you know, covering relating to this?

A. To -- I'm sorry, I don't understand the question.

Q. Well, give me a second. So here you have listed, and you say, it is especially -- the flag -- this is back to Exhibit G_1. "The flag is especially applicable." And then now you have listed a whole bunch of content statements in AP Euro, correct?

A. Correct.

Page 94

Q. Okay. So you've got, for example, now, 1.8, 1.9 -- or let's go through these one by one. Why did you -- can you go through them one by one and explain why you decided to include it on this list versus not something else?

A. Yes. Again, it goes back to where there tends to be tension in the classroom or where there can be like, differences of opinion that can become a little more heated. There again, that's what the flag was meant for, is to just a reminder to students that we need to be respectful of each other, regardless of differences of opinions or thought.

So that's why, you know, it was at 8:45 in the morning, I felt that, like, hey, this is where that's really going to particular or potentially come up. It's not necessarily going to be restricted to just any content that relates to the LGBTQ+ community in general.

Q. Well, it's okay. Let's focus for the -- it's the -- the -- the flag, though, you said, is not purely limited to the LGBTQ community, correct?

A. Correct.

Q. All right. And -- and the policy itself is not limited to the LGBTQ community either,

Page 95

correct?

A. Correct.

Q. All right. It's about sexuality content. So let's try to intersect those two concepts together. Explain to me what is the material in 1.8, Colonial Expansionism and Colombian Exchange. How does that -- how does relate to the flag?

A. I would say the skin tones.

Q. Due to treatment of people?

A. Yes. The Colombian -- and I'm sorry. If you can scroll in. I'm just having trouble reading it.

Q. No problem.

A. So Colonial Expansionism refers to European Colonialism that included Native people in the Americas as well as in Africa. So -- yeah, like, you're going to have differences in race there. The Slave Trade, again, is going to be based off of the skin tones because of racial differences. Wars of Religion is -- like, there was a bunch of tension over religious differences. I would argue that the peace sign on the flag would cover that. The Balance of Power, again, refers to the rise in Nationalism. That was often rooted in religious differences post-Martin Luther and post --

Page 96

yes, post-Luther.

So that would -- I would say the peace sign. Absolutist Approaches to Power. That's overreach by government and the government trying to oppress the people. I would say in that course, the peace sign. Napoleon's Rise, Dominance, and Defeat. Again, him trying to conquer other nations. I would say the peace sign.

Congress of Vienna is how Europe was trying to figure out what to do post-Napoleon. So again, I would say the peace sign. Social Effects of Industrialism dealt with, we started to see more of the differences in class emerging. So again, I would say the peace sign.

Ideologies of Change and Reform Movements. Again, it's going to be to people being marginalized based off of class and status. So I would say the peace sign. Institutional Responses and Reform is how government was trying to react to that. So again, I would say the peace sign.

Nationalism refers to people thinking that because of where they are from, they are inherently better than other people or more than. So I would say, again, the peace sign. National Unification and Diplomatic Tensions. Again, we're hitting on

Page 97

conflict between the European countries, so I would say the peace sign.

Darwinism and Social Darwinism. With that one, we talked about social scientists trying to apply Darwinism to social settings and setting up the context that may be in -- like, that certain races are inferior and deserve to be treated differently. So that I would say the skin tones and the peace sign.

Imperialism's Global Effects. There we talk about, like, the impact in the African countries that European Colonialism and Imperialism had on those countries. So I would say, again, the peace sign because especially with Decolonization, they really didn't take into account the local -- like, the local opinions, like, people who -- tribes that historically saw themselves as allies with one versus enemies of another, so it's led to a lot of conflict in Africa.

Fascism -- well, I'm sorry, Fascism and Totalitarianism and the Holocaust, I would say that goes to the peace sign, as well as with the Holocaust, the -- I think, the skin tone portion to the extent that it wrapped up the Roma and Sinti people, and then also the LGBTQ pride stuff with the

Page 98

implication of the LGBTQ victims of the Holocaust, Postwar Nationalism, Ethnic Conflict --

Q. Pause for a second. Can I pause just for a quick second. Just finishing on the Holocaust for a second. So you're saying that the flag is applicable due to the LGBT portion related to that. But I guess my question is: Is -- the flag also does not have anything to represent the Jewish community, or does it?

A. That flag does not. I do have, like I said earlier, the coexist sign elsewhere in the classroom that does include Jewish symbols.

MR. ENGEL: Did you have a chance to answer your previous question before you were interrupted?

THE DEPONENT: I did not.

MR. ENGEL: Go ahead.

BY MR. TARAZI:

Q. Okay. So go ahead and continue.

A. Postwar Nationalism, Ethnic Conflict, and Atrocities, that's going to be the skin tone and the peace sign. 20th Century Feminism, I would say the peace sign. Decolonization and Migration and Immigration would be the skin tone and the peace sign.

Page 99

Q. Okay. So if I heard you correctly, the only one of this whole list that has anything to do with the -- the transgender or the LGBTQ+ would be the Holocaust?

A. Yes, I believe so.

Q. What material did you teach as it relates to 20th Century Feminism?

A. I don't recall. I'd have to go back through my Schoology page.

Q. Do you have any idea at all? Like, what was it -- what were you even -- what is the topics you were trying to teach or you don't remember?

A. I know that we talked about the differences between first wave and second wave Feminism, and then a little bit with third wave and some of the key figures in the Feminism movement.

MR. TARAZI: Okay. Let me do something here. I'm showing you your Interrogatory response, and this is Exhibit N.

THE REPORTER: Exhibit --

MR. TARAZI: And this is the --

THE REPORTER: Sorry. Exhibit N has been marked. Thank you.

BY MR. TARAZI:

Q. And this is Interrogatory number 5. I'll

Page 100

just draw your attention to, "I taught AP European History," and then this specific paragraph right here. Can you see that paragraph, or do I need to make it bigger?

A. No, I can see it. I just need to -- got to get close to it. Thank you.

Q. So can we -- do you want to just go ahead and read that out loud just for the record, and then we'll have a couple of questions about it?

A. Yeah. "In AP European History, I taught students how and why European culture changed from the period following World War II to the present. One of the topics addressed was the various movements, including Women's Movements, political and social movements, Gay and Lesbian Movements and others worked for expanded civil rights, in some cases obtaining the goals they sought and in others facing strong opposition."

Q. Okay. Where --

A. And "see 9.14."

Q. Okay. So first note, 9.14 isn't in this list for some reason. Do you recall?

A. Again, this was a quick e-mail that I put together. This was not a comprehensive, like, thought. They wanted or Kevin asked for some brief

Page 101

explanation as to how the flag tied to my curriculum or was relevant to my curriculum based off of our understanding that Mr. Wallace's complaint with Mr. Derrig was that his love win sign was completely irrelevant to his content in the social studies curriculum.

So that's what was asked of me, was where -- like, go through it, look at it, see if you can, like, where it would be relevant to the curriculum that you taught. So again, like, it's -- it's an overview. It's not meant to be comprehensive. It's an e-mail --

Q. I understand.

A. -- sent at 8:45.

Q. Yeah, I understand. So then going back, would you agree that -- that -- or do you think that the poster has any relevance to Topic 9.14?

A. Yeah. I think the poster is relevant to everything within there. Again, like, especially dealing with conflict. And especially European History, AP Euro covers a lot of wars and conflict based off of these differences of identity. Again, particularly post-Martin Luther in the Catholic Reformation, people really -- where people in Europe really began bickering and having a lot of conflict

Page 102

over these religious differences.

So, yeah, and I have different students of different religions in my class, and it's -- it can get a little hairy sometimes with the student debate in there.  So again, we need -- I want them to center it on factual information, not making attacks personal, and being respectful of other people's beliefs, whether they agree with them or approve of them or not.

Q.   Okay.  What material did you -- reading material or homework or assignments, did you provide relating to 9.14 Gay and Lesbian Movements?

A.   I'd have to -- I'd have to go check my Schoology page and my files to know for certain.  I don't recall off the top of my head.

Q.   And can you -- so it's not anything we've looked at up to this point?

A.   I don't know.  Can you scroll back up?  Was 9.14 in that, or was that the counterculture one that we looked at?  I genuinely don't know.

Q.   I -- I'm not sure what you're asking me to look -- to look at.

A.   Oh, that -- scroll down.  I think.  I know you scroll it.  Oh.

Q.   This is your --

Page 103

A.   The email.  The email.

Q.   Oh, the email?

A.   Yeah.  Okay.  So 9.14 wasn't on there.  I guess we could go to the Course and Exam Description and if you want to -- I don't remember what topic 9.14 was off the top of my head.

Q.   I'm not sure what direction I should be looking at here.  So that unit --

A.   The Unit Guides go in order.  So there's 9.15.

Q.   Here, 9.14.

A.   Yeah.  That was the Counterculture Movement, the stuff that we looked at, the homework reading, and then the -- the British Pop Rock songs.

Q.   Okay.  I guess I'm -- okay.  So there's -- help me see what it is that -- so we're right now looking at Exhibit T, and this is Page 217, and this is 9.14, right?  Now, if I go back to your Interrogatory and you're telling me, "See Topic 9.14," and you're saying, "Gay and Lesbian Movements, women's movement, political and social movements, and others work for expanded civil rights." Okay.  So I'm over here.  Show me where that is, where any of that is.

A.   Okay.  Can you scroll, like, zoom in a

Page 104

little bit more because I'm having trouble reading the blue box.

Q.   No problem.

A.   Okay.  So at the top there, "The creation and transmission of knowledge, including the relationship between traditional sources of authority and the development of differing world views, had significant political, intellectual, economic, cultural, and social effects upon European and world societies."

So again, it's getting into the -- not the American Civil Rights Movement, but those similar type of things that were occurring in other countries, including Europe.  And then if you scroll -- can you scroll down a little bit?  Sorry.  Let me just stop right there.

Okay.  "Organized religion continued to play a role in European social and cultural life despite the challenge, military and ideological conflict, modern secularism, and rapid social change." So that's going to that rising secularism in Europe post-World War I, that's going to bring in and include the LGBTQ community pushing for expanded rights.

Q.   Okay.  Do you see on the right that they

Page 105

-- they do list a number of movements?

A.   Uh-huh.

Q.   Illustrated examples, New Movements in Visual Arts, New Architectural Movements, Movements in Music, et cetera.

A.   I do.

Q.   The ones you specifically mentioned, the Women's movement and Gay and lesbian movement, are not listed?

A.   Correct.  So I got the assignment that I gave, I actually got that from when I -- I went to a training last summer since I had not taught AP European History before.  My instructor for that class, she has been teaching AP Euro for about 20 years.  She is -- trains the graders and she helps write the questions for the exam.

She told us in the training that the AP test is evolving to where -- like, that for students to basically to earn maximum points, they need to talk about these different and talk about these different groups and how they're treated differently in different points in time and to make sure that we emphasize that with everything.

She also gave us all of her curricular materials.  I did not use them all, but that one I

Page 106

pulled from the file that she gave us and what she uses with her classes.

Q. Okay. Would you mind supplementing --

MR. ENGEL: Wait. Wait. Can you hold on one second because I think I have to object to that question because it was misleading because you didn't look at the next page of the document where it's quoted.

MR. TARAZI: What is quoted?

MR. ENGEL: The language in the Interrogatory that you asked him, it's not in there and it's in there on the next page.

MR. TARAZI: I'm not -- I'm not sure what you're talking about.

THE DEPONENT: I think you need to go back to the Course and Exam Description.

MR. ENGEL: You -- you asked about document Page 439, and you said, hey, none of this stuff is in there. And you asked him to talk about the Interrogatory answer and said it's not in there, but it is in there. It's right the next page.

THE DEPONENT: It says at the bottom, continued on next page.

MR. TARAZI: Okay. Well, then, I mean, I'm not super familiar. This is your content. So

Page 107

tell me if it's on the next page. Well, tell me --

MR. ENGEL: You're asking the question, man. And I'm sorry. This appears to be -- and I'm objecting because it appears to be misleading questions by selectively picking out things that don't represent the record.

MR. TARAZI: Well, I'm simply asking --

MR. ENGEL: So now --

MR. TARAZI: -- where is this?

MR. ENGEL: Do you want to change your answer now, having looked at the next page of the document that he was showing you?

THE DEPONENT: I'm trying to see where it is. I'm still having trouble reading this.

MR. ENGEL: Can you make it a little bigger?

THE DEPONENT: Oh, okay. Yeah. So let's see. Right there, it's the second from the bottom, "Various movements, including Women's Movements, political and social movements, Gay and Lesbian Movements, and others worked for expanded civil rights, in some cases, obtaining the goals they sought, and in other -- and in others, facing strong opposition." That is in the blue box that AP says that we have to provide those materials to the

Page 108

students.

BY MR. TARAZI:

Q. Okay. Can you tell me what materials you provided relating to this? Is it materials you've already covered or something else?

A. Yes. It was the material that we covered. And then it -- I'm not sure to what extent it may be covered in the textbook that's assigned, but the textbook is also aligned to the curriculum. So I imagine that is probably in that chapter reading as well within the textbook.

Q. And just to be clear for the record, we're talking about these -- these handouts, right? Or something else?

A. No, that's for American History.

Q. Okay. So there's something different than this, that is a handout?

A. Scroll, yeah, scroll up. It's those first eight pages, I believe. That's for this portion of it. Then that homework reading covering those different groups, and then the textbook reading.

Q. So this is the extent of the material that when you're saying that you're covering, this is -- these first eight pages is what you're talking about; is that -- is that accurate, or are you

Page 109

talking about?

A. That and the textbook reading.

Q. Okay.

A. That they would have been assigned from the textbook.

Q. Okay. So the only thing that we might be missing here is whatever is in the textbook?

A. Correct.

Q. Okay. That helps.

MR. ENGEL: Give us one second. We're -- we're still on the record. Thank you.

BY MR. TARAZI:

Q. One second. I am labeling. All right. I am introducing -- so during the break, I called Marla and asked if she could look up and see if she could find the files you were referencing in the OneDrive under American History in the two folders. And she emailed me two documents. This one, which was labeled '25-'26, and then another one. So I'm labeling this one Exhibit W, and I'm asking if you -- if this looks familiar to you.

A. That does look familiar.

THE REPORTER: Exhibit W has been marked.

(WHEREUPON, Exhibit W was marked for identification.)

Page 110

BY MR. TARAZI:

Q. Okay. Is this what the syllabus that you used for '25-'26? And if you need time to review it, just tell me if you need it scrolled a little.

A. If you -- can you scroll down one page? Okay. This would have been -- and I'm sorry, and then scroll back up. Okay. So it says American History I Syllabus, so this would have been for the first semester for '25-'26.

Q. Okay. And so you're saying there's a second file that -- that would have been History II or Syllabus Number 2?

A. Yeah, it would have been American History II. I don't know if there was one for this year. There should be prior. I know, like -- again, yeah, it should be prior. There was one year I switched up how I taught it. I think that was this year was 20 -- I forget which year. I think it was my second year.

Q. Okay. Then let me now mark Exhibit W. And it looks to me that this is the same thing, but it's also American History I Syllabus.

A. Let me see. Can you scroll down a page? Okay. This would have probably been from a separate or -- can you keep going? A different year because

Page 111

it doesn't have the updated school policy on Personal Communication Devices, and that was new last year. So this would have been prior to this previous school year.

Q. Okay.

A. Actually, this -- I'm sorry. This looks like this is the one when I switched it up a little bit. So this was the first semester of -- okay. So that would have been August -- that must have been '24-'25.

Q. Right. Which is what the file name was labeled.

A. Yeah. So that would have been from the first semester of that school year.

Q. Okay. So where would we find the second semester syllabus?

A. It would either be in the same folder or it would be if there's a -- I think in some years I've done second semester, like a second semester folder. So if it's not in the main '24-'25 folder, it would be in that one. In the second semester and under the '24-'25. It's not in the main one.

Q. Okay. So you think that if she looks for second semester folder and then looks for syllabus there, that's where this will be found?

Page 112

A. Unless there's another one labeled American History, it would -- I think it would either -- I think it'd be American History II using, like, Roman II capitalized for two. It's either going to be in the main '24-'25 folder, or if it's not in there, if there is a second semester folder, it may be in there.

MR. TARAZI: Okay. Can I take just one quick minute? I got to take this call, so give me -- like, let's do a five-minute break.

MR. ENGEL: Okay.

THE REPORTER: Thank you. We are off the record at 2:55 p.m.

(WHEREUPON, a recess was taken.)

THE REPORTER: The time is 3:05 p.m. And we are back on the record.

Attorney Tarazi, you may proceed.

MR. TARAZI: Okay. So in the break, I got one more. And this is what you described in terms of syllabus and -- okay. Let me start with this is marked Exhibit Y.

THE REPORTER: Exhibit Y has been marked.

(WHEREUPON, Exhibit Y was marked for identification.)

BY MR. TARAZI:

Page 113

Q. Okay. Do you recognize this document?

A. Yes. But I -- if you can zoom in, I can't really read it, but I do recognize it. Okay. I can see it. Thank you.

Q. Okay. Is this was labeled '24 -- this is the only one that Marla was able to find, looking -- and it -- and it was for American History II. So is it possible that you used the '24-'25 in '25-'26? Like, in other words, it was the same file?

A. I honestly don't recall.

Q. Okay. Well, the -- if there is and something else is found, if you can supplement, that would be great.

A. Okay.

Q. On the record. Okay. So now going through this, is this the American History II syllabus for that year?

A. I -- can you scroll down a little bit because they all kind of look the same. So keep going. Yeah. It wouldn't have been for the '25-'26 school year. Keep going. Okay. Keep going. Keep going. Sorry, I just need to see. So then yes, this would have been for '24-'25, Semester 2.

Q. Okay. How do you recall if you changed it much from that year to prior -- or to following

Page 114

years?

A. '24-'25 is different from the first two years and then this past school year. I was trying to implement more of a project-based curriculum. I talked to Dr. Harleman about that, kind of experimenting with it.

So I ended -- with doing that, sort of switched up, like, not -- you can kind of see, like, the -- you can see it more with the first semester, but the content statements -- the units are a little bit different, and then the content statements are switched up a little bit from the order that I usually teach them. But I went back to the way I previously taught it this past year.

Q. Okay. So if we do get a hand on the -- the subsequent years, in other words, '25-'26, since this was '24-'25, then '25-'26, the order might have been slightly different, but it's not -- the content standards themselves wouldn't be different?

A. Correct.

Q. Okay. So -- and then slight order change --

A. Correct.

Q. But when we're talking about, for example Content Statement 27, there wouldn't be

Page 115

significantly more detail than what -- than what you posted here. Is that accurate?

A. There would not.

Q. And the same for 32 -- actually, same for all of these. They -- they're just literally the content statement, and that's all you put in the syllabus, correct?

A. Correct.

Q. Okay. Have you ever given parents any kind of notice at all? Like, has there been any kind of issue in terms of, hey, we're covering this and you can opt out on any topic?

A. The -- only with when I've shown movies in class. I mentioned earlier that I show American Sniper at the end. And then with that, because the movie is rated R, I do get -- like, the parents have to give permission for that. I kind of explain what we're covering. And then I do have an alternative assignment, kind of within the textbook for that.

Q. Is there anything else that you've taught or teach that you specifically tell parents, hey, we're teaching this, here's what it is. You have an opportunity to opt out?

A. The only other thing is in the law class I teach, at the end, we watch My Cousin Vinny. It's

Page 116

the same thing. It's rated R. So we have to have parental permission slips, and if the parents don't sign or don't want them to, then they -- there's an alternative assignment while we're watching the movie.

Q. Okay. And the -- help me understand why the R-rated movies or, like, what is the -- what policy creates that obligation under for -- for R-rated movies?

A. I don't know that there's a specific policy. When I wanted to show those, I went and talked to Dr. Harleman, and he said, get permission slips, and as long as you have an alternative assignment, if they don't have the permission slip, then you're fine.

Q. Okay. So to your knowledge, it's a practice. It's not something that's Board required or you don't know?

A. I don't know.

Q. Okay. And do you know if it has anything to do with House Bill 8 policy, the Parents' Bill of Rights policy?

A. No. I was doing that before House Bill 8.

Q. Okay. But to -- not based on a Board policy that you can recall?

Page 117

A. No.

MR. TARAZI: Okay. Okay. I'm showing you Exhibit F.

THE REPORTER: Exhibit F has been marked.

(WHEREUPON, Exhibit F was marked for identification.)

BY MR. TARAZI:

Q. So this is the Parents' Bill of Rights policy.

A. Okay.

Q. What is your understanding if something does -- is -- if this policy does apply to something in the classroom or some instruction in the classroom, what is the -- excuse me, the obligation that this policy -- what -- what are the steps that this policy creates under those circumstances?

A. Can you increase it, please?

Q. Yes.

MR. ENGEL: Could you rephrase the question? I -- I think I lost part of it there, maybe because of the internet.

MR. TARAZI: No problem.

BY MR. TARAZI:

Q. So this -- this policy calls out a number of obligations, correct?

Page 118

A. I believe so.

Q. All right. So one of them is, the Board will ensure that any sexuality content is age appropriate and developmentally appropriate for the age; is that correct?

A. That's what it says.

Q. The Board will promptly notify for a substantial change of student services. So there's quite a few things in this policy, correct?

A. Correct.

Q. Okay. So -- okay. So now what we are talking about is this definition here. The sexuality content means any oral or written instruction. This -- this definition. Correct? Like, this is the main section that we're that -- that is the point of difference; is that correct?

A. I'm sorry. What was the question?

Q. Is the understanding of sexuality content and specifically what is or isn't an incidental reference, those are the points of difference of opinion. Do you agree?

MR. ENGEL: I'm going to object to that. I don't think it accurately describes the issues in the litigation.

MR. TARAZI: Okay. No problem.

Page 119

BY MR. TARAZI:

Q. What is your interpretation of sexuality content?

A. My interpretation of sexuality content is discussing, like, more of the mechanics necessarily. Like, I'm not getting into disease transmission. I'm not getting into what private lives look like with people in this, not getting into their particular lifestyles. Those are things that I would understand to be more of sexuality content, like, getting more past their identity and more into their daily lives.

Q. Okay. So the definition specifically says sexuality content is defined as -- "means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology"; is that right?

A. That's what it says.

Q. Okay. So now, you're saying that sexual concepts -- you're defining sexual concepts. Can you give me an exact definition of what you -- how you're understanding that?

MR. ENGEL: Wait, can I just ask a clarifying question? Are you asking for what his definition is or what he understands the policy to

Page 120

be, if it's even defined in the policy? I mean, what because his own personal opinion doesn't matter, right? It's what the policy is.

MR. TARAZI: Okay. Well --

MR. ENGEL: You can ask him, I guess. I mean, it's your deposition, but --

BY MR. TARAZI:

Q. My question is --

MR. ENGEL: I object to form to the extent it's ambiguous.

BY MR. TARAZI:

Q. My question is, from a -- as a, you know -- what do you believe the policy is talking about when it says sexual concepts?

MR. ENGEL: You can answer if you know.

THE DEPONENT: I honestly don't know what it means. It's not defined.

BY MR. TARAZI:

Q. Okay. Do -- do you understand the word "concepts"?

A. I do understand the word "concepts."

Q. Okay. And if concepts is applied to sexual, would sexual reproduction be a sexual concept?

MR. ENGEL: Object to the form. Are you

Page 121

-- the same thing. Are you asking in context of this policy? Are you asking in life? I mean, what --

BY MR. TARAZI:

Q. I'm talking linguistically. Do you understand the words "sexual concepts" to be inclusive of sexual reproduction in that sexual reproduction is a concept that is sexual?

A. In my opinion or under the Board policy?

Q. Under the language. The language that we are reading here, the words "sexual concepts."

A. So under the Board policy, I don't know if --

Q. Okay.

A. -- it would be included there or not.

Q. Okay. From a language perspective, what does the words -- would it be inclusive or not?

MR. ENGEL: Object to the form. You can answer if you know.

THE DEPONENT: I mean, I -- yeah, I really don't know. I think that this is a concept that a lot of people have trouble figuring out. I think everybody probably has different definitions that are individual. I've seen it referred to as a Russian nesting doll, where it's, like, you get into

Page 122

different -- like, we're trying to define this, and then we use some other term that's not defined and is open to interpretation.

BY MR. TARAZI:

Q. Yeah. Okay. Well, from -- like, just asking the one question. From a language perspective, pure plain language, just simple reading words. If you say, you understand the word "concepts" as any abstract idea or, you know, related to and sexual as a modifier means any abstract idea relating to sexual -- sexual. Something that's sexual.

So within that understanding, that framework, in other words, a linguistic framework, is sexual reproduction a sexual concept?

MR. ENGEL: Object to the form. You can answer.

THE DEPONENT: I believe so.

BY MR. TARAZI:

Q. Okay. What about sexual health? Is that a concept relating to sexuality?

A. I believe so.

Q. What about sexual rights?

A. I don't think so.

Q. Okay. So what's the difference between

Page 123

sexual rights as a concept relating to sexuality versus health relating to sexuality?

A. I think with the -- like, when you're talking about health, reproduction, you're talking about actual physical sexual acts that people, consenting adults perform with one another. I think when you're getting into rights, it's more -- then we are talking about human rights and civil rights and liberties that people have, and how they are treated differently based off of these different groups that they fall within.

So within the sexual rights, there, you're not focusing on the individual and what they do in their private lives. It's how society is treating them based off of that.

Q. What about sexual expression? Is that a concept relating to sexual -- something sexual?

MR. ENGEL: Object to form. You can answer if you know.

THE DEPONENT: Me personally, I don't think so. Again, it's getting into expression, and there's multiple different types of forms of expression, and it can vary from one individual to the next. There's a bunch of different factors that go into it. Sexuality is just one of many factors.

Page 124

And with that, like, it's more of the expression and people's right to express themselves.

BY MR. TARAZI:

Q. Okay. What about sexual identity? Is that a concept relating to something sexual?

MR. ENGEL: Object to the form. You can answer if you can.

THE DEPONENT: Just sexual identity?

BY MR. TARAZI:

Q. Yes.

A. I don't think so. I think it's how people define themselves. And everybody has some sort of identity, whether they're part of the LGBTQ community or not, that's going to be personal to them. I don't think that that would -- in my opinion, no.

Q. Okay. So in your understanding or opinion, somebody could teach sexual identities and not be teaching sexual concepts under this policy?

A. It depends on the context in which they're teaching it and what materials they're providing and what instructions they're providing.

Q. Okay. Can you explain?

A. Yeah. It depends on if you -- they're looking at, like, transgender rights or how people

Page 125

-- like, again, how they've been treated over time, how they've been marginalized, how courts have treated that, versus if you're getting into the mechanics and the biology and what goes into how people form these identities, and, like, in getting more into the nuts and bolts of their personal lives. In my opinion, and in my mind, that's kind of where the distinction lies.

Q. Okay. Can the Board have a broader interpretation of the Board policy?

MR. ENGEL: Object to the form. Are you asking metaphysically, legally? What -- what, like --

MR. TARAZI: He can answer a question.

THE DEPONENT: Can they? Sure. I mean --

BY MR. TARAZI:

Q. Okay. So -- and if the Board takes a vote to say that something is or isn't a sexual concept under the policy and define it -- add definition, does the Board have the authority to do that, in your understanding?

MR. ENGEL: Object to the form. Calls for a legal conclusion.

MR. TARAZI: Counsel, hold on a second.

THE DEPONENT: I mean --

Page 126

MR. TARAZI: Okay.

MR. ENGEL: Yeah. I mean, I -- go -- go ahead. I mean, it's -- it's a nonsense question. I mean, it's -- it's a non sequitur. It's, like, can the Board decide that the earth is -- vote that the earth is flat?

THE DEPONENT: Yeah. No. Like, the Board is still confined to the U.S. Constitution and has -- like, they have to work -- they don't have carte blanche authority to do whatever they want when they want, for whatever reason they want. I don't believe that.

BY MR. TARAZI:

Q. Okay.

A. And I do think that they are bound by certain limits.

Q. So you're saying they could interpret sexual concepts broadly, they could interpret incidental references differently than you or broader than you, but the outer bounds of that is some kind of a constitutional limitation in your mind?

A. Well, I think that you're misreading what I said when can they, which is what we were asking for the clarification on. Can they? Sure. Can

Page 127

they legally do it? And without repercussion or without a court intervening, no, they can't.

Q. Okay. And --

MR. ENGEL: I'm going to add, I'm going to caution the witness that sarcasm often doesn't appear in the transcript. And so with -- with that caution, do you want to clarify your answer?

THE DEPONENT: Yeah. Just that again, like, can they do so with -- like, they're still bound by certain legal restrictions and legal frameworks that exist. So it's not going to give them -- like, to the extent that they do interpret those, it doesn't mean that -- it doesn't mean that they can use it to create some sort of pretext to eliminate speech that they don't agree with.

BY MR. TARAZI:

Q. So if they -- if the Board interpreted sexual concepts to include sexual rights, civil rights, and required parent opportunity to opt out, do you believe that that would be something they couldn't do or prohibited somehow from doing so legally?

MR. ENGEL: Object to the form. Calls for a legal conclusion, but go ahead.

THE DEPONENT: So with sexual rights, if

Page 128

they required that -- yeah. I think if they did that, that it would potentially run afoul of the, like, different legal frameworks, like, in the Constitution, and that there -- a Court may tell the Board that they'd overstepped.

BY MR. TARAZI:

Q. Okay. So your -- your perception is that they are prohibited from requiring parent right an opportunity to opt out when discussing sexual civil rights?

MR. ENGEL: Object to the form. What what his view is doesn't matter, what my view is, doesn't matter. It's the judge's view ultimately.

But you can answer if you can.

THE DEPONENT: I was going to say it's -- honestly, and I'm not trying to be difficult, but it is difficult to answer. Can you repeat the question?

BY MR. TARAZI:

Q. The -- there are two words here. There are sexual concepts and incidental references, okay? And sexual concepts, if the Board chooses to interpret broadly, that it includes sexual rights in terms of civil rights perspective, LGBTQ, women's rights, whatnot -- if they want to interpret it

Page 129

broadly, is it your understanding that they can't do that from a constitutional perspective?

A. I think it depends. I think if they're doing it to create a pretext to eliminate speech that they don't necessarily personally agree with, I think that that is potentially constitutionally problematic.

Q. Okay. Now, the -- the consequence of being under this policy, does it actually prohibit anything or does it simply require parent notification and opportunity to opt out?

A. So it provides -- my understanding is it provides notice and opportunity for an opt out, but that's where it becomes problematic when you apply it to something that's just a classroom display, that's not an instructional item. Opt out of what, my class? Like, that's where I guess I'm confused with where it's, like, with the Board's application of it.

Q. And when it comes to incidental references, because even in your text messages and in multiple places, you addressed that, that -- that, you know, at best or whatnot, it's incidental reference, right? If the Board took a different view, it's not an incidental reference, is that, in

Page 130

your mind, within the Board's discretion, or is that somehow stepping out of bounds into some kind of constitutional problem?

MR. ENGEL: Object to the form. Calls for a legal conclusion.

THE DEPONENT: Again, based on my personal understanding, I think an incidental reference is something that I'm not using in part of, like -- well, I should say, something that I'm not using in the curriculum, that I don't incorporate into my classroom, that I don't incorporate into my lessons, and it is simply hanging there on the wall. I think that that would fall within the definition of incidental reference.

And I think the Board, disagreeing with that without further explanation, just this is why we think this or this is why we -- or this is what we -- you know, without really any type of explanation or what -- more -- like, a better definition of what does and does not constitute an incidental reference. If they're again using that to create this pretext to single out displays that they don't personally agree with, I do think that that's problematic and is a constitutional problem.

BY MR. TARAZI:

Page 131

Q. Just out a matter of curiosity, you chose to replace the poster instead of going down the path of parent notice opportunity to opt out. In other words, you could have just simply taken a picture of it, put it on Schoology, and -- and sent a note to parents, hey, you know, this is my poster. You can opt out of my class or what you can opt out of the kid -- your child being able to view it. Could you have gone down that path?

A. I discussed it with Dr. Harleman. The problem is with where we were at in the school year, where I am one of multiple teachers who teaches American History. We are coming up on the state test. We all teach it a little bit differently. So switching them into another history class at that point in the year would not have been practical.

Setting them in, like, an area to do independent study for a big chunk of the curriculum and some that's really heavily state tested, that's not going to be setting the kids up for success. So it didn't seem in our end to be in the best interest of kids to go down that path.

Q. But you didn't know that any parent was going to go down that path?

A. No, I didn't. But then we've got the --

Page 132

we're opening it up to where a parent, like a parent could do that. And then dealing with that, even if it's one student, we didn't want to put a student in that situation.

Q. Okay. But you didn't know. You didn't have any parent saying, I want to opt out if this is, you know. Or you didn't know that that was going to happen. You could have tried it, I suppose, and no parent could have opted out?

A. Correct.

Q. You just didn't know. Okay. You said something about it because it was the time that point of the year. So how much was the part of the year a factor? In other words, let's say that that was -- let's say, for the sake of argument, the new rule is that poster, there's an opportunity to opt out.

Could you have logistically made it work at, say, the beginning of the next school year in a sense of, like, if a parent truly doesn't want their kid to be involved in a classroom with that up on the wall, they think it somehow, you know, infringes or -- or -- with their parents' rights, can it logistically be made to work? Is it just simply -- can it be made to work logistically on a new school

Page 133

year more easily than when you were discussing it just before state testing?

A. The honest answer is, I don't know. Logistically, from my end, I don't think that it would be that big of a deal. It could potentially for the counselor. So there's a much bigger moving parts than just -- it is a bigger deal than just simply moving a kid into another class.

I honestly don't know. I don't know if logistically it would be possible. It's something I would have to talk to Dr. Harleman and the counselors on.

Q. Those syllabuses, did -- I -- I have this vague recollection. I know we've been talking all day, so I apologize. But there was something at one point in time about submitting a syllabus somewhere to somebody. Who do you submit a syllabus to, and when was the last time that that happened?

A. I believe it was -- I remember, like -- I know at one point it was Dr. Harleman and we copied Ms. Morgan. I don't recall. I feel like it changed. Well, I don't know if it changes or not. I'd have to go back and check my email to see the last time I did that.

Q. I mean, do you have any idea if it was in

Page 134

the last couple of years?

A. Oh, yeah.

Q. Was it last --

A. I mean, I started -- it would have been -- it would have been at the beginning of each school year. I'd have to go back and to confirm that I did it for each school year, but I think they email us if we don't. And I don't recall getting any emails about any of my mapping.

Q. Okay. So this would have been the syllabus we had just discussed. You -- every single year, you're sent -- you're emailing an updated copy to -- to what, your principal and who else?

A. It would have been -- I know at one point it was Ms. Morgan. I don't know if it's been replaced with Marla Timmerman or not. I can't remember if that was when she was assistant superintendent or superintendent that we copied her on those. And I don't know if that changed when she was moved up to being superintendent.

Q. Okay. Excuse me. All right. We're almost done, but I want to go through just very briefly the rest of that email chain just to confirm a couple of quick things. All right. So we're back to this email chain.

Page 135

So we -- we already discussed extensively this first email and then how the applicability of the poster to -- to these. We -- we've already covered that. So then what happened next? You got an email from -- did you see this email from Regina, from the superintendent?

A. Yes, I believe I did see this.

Q. Okay. But you -- were you blind copied or did you see it? Okay. Now, there's my email that comes after that, back to her.

A. I don't know the one that she forwarded to me. I remember -- I remember reading the email towards the -- I don't remember -- actually, if you can scroll back to that one. That's a different email.

Q. I'm sorry, the one before that?

A. Yeah, this one. So what I was -- like, I don't know. I -- I think that she was -- I know that she was forwarding me emails. I don't remember the first top of that, like, where she mentioned, like, the after the meeting, talking about the middle school and high school posters, like, talking about the one at the middle school.

I do remember seeing an email where she said, I do not see -- or "I do see the poster

Page 136

contains symbols of identities. I do not believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."

So I believe I saw that phrasing in an email from her. I don't know if it was this one that may have been forwarded or if there was another email.

Q. Okay. And then there was my email where I was talking about -- there's this mention about more practical to approach it in a -- in a -- and there was some -- some additional. Did you see this email? Because I feel like you responded to this email at some point later, like, up the chain.

A. Let me see. Yes, I do believe I received this email forwarded to me as well.

Q. And then is this your email in reaction to my email?

A. Yes.

Q. Okay. So that is your email. And -- and it was in reaction to the emails that came before, correct?

A. Correct.

Q. All right. And then you are -- let's see

Page 137

here. So in here, again, you're sort of saying, arguing that this the flag is at most an incidental reference, right?

A. Correct.

Q. Now, do you agree that something has to be the -- the -- like, you have -- you have to basically be a sexual concept or sexuality content first, and then it's -- the exception is if it's an incidental reference to that. Do you agree with that concept or that -- that it's an exception to?

MR. ENGEL: Object to the form. Are you asking just in general or are you asking in reference to this particular flag?

MR. TARAZI: I'm saying in terms of from -- from the application of the policy, you have to have something that's sexual content first and then decide if it's an incidental reference to. Because if it's not sexual content in the first place, then it's not an incidental reference.

MR. ENGEL: I'm going to object to the form that it misrepresents the record because I think he writes at most an incidental reference.

MR. TARAZI: Okay.

MR. ENGEL: You said -- you have to read -- the you have to read all the words, man.

Page 138

BY MR. TARAZI:

Q. I understand. And I'm saying at most an incidental reference still implies that you're accepting that it is sexuality content, but then you're saying, but it's at most an incidental reference of it.

MR. ENGEL: Object to the form. You can answer if you can.

THE DEPONENT: I was going to say, that's an interpretation. That's not necessarily how I read it. I more read it as the policy was wanting to be very clear, like, to the extent that anything -- any of these may -- or there may be a question, like, incidental references aren't even going to be considered in the same ballpark or field as this.

Like, if it's an -- I see, when I saw the exception, I read it as, like, anything that falls within those exceptions, like, that's kind of end of story. Doing that analysis first versus is it sexuality content or ideology.

BY MR. TARAZI:

Q. Well, I guess I'm not understanding the reverse that you're talking about. Because if you are saying an incidental reference of what?

A. Incidental reference to the LGBTQ

Page 139

community, like, incidental reference to the Cincinnati Bengals, incidental reference to a Christmas story. Like, I have incidental -- all of those as incidental references. So no, I don't agree with the like, that an incidental reference first has to pass or jump over the hurdle of being sexuality content. I don't agree with that.

Q. Well, if it's an incidental reference to a football, that has nothing to do with the policy at all, right?

A. Okay.

Q. Okay. Well, let's -- we're going to get into sort of an argumentative area. So let's just finish up with these emails. You went in to -- then Regina replied or the Board President -- I'm sorry, the Superintendent, sorry.

I -- it's been a long day, and I'm getting -- I'm not even reading things correctly at this point. So the -- we then have the email from me to the Board. Did you ever see this particular email?

A. Yes, I believe I did.

Q. Okay. Was it, like, forwarded to you or something, or did you see it in discovery?

A. I believe it was forwarded to me.

Q. Okay. And by who?

Page 140

A. I'm guessing it would have been Regina.

Q. Okay. And do you agree that the email does show five attachments in the -- in the description at the top, correct?

A. I see that there are five attachments on there. I don't know that the attachments came through on my end.

Q. Okay. So you don't know if you got the attachments?

A. Correct.

Q. But this email appears at least to have sent the attachments to the Board?

A. Correct.

MR. TARAZI: Okay. Okay. Can I have five minutes? I think I'm pretty much done, but I just want to review and just make sure I didn't miss something.

MR. ENGEL: Yeah. I'll have a couple of questions. Do I have the ability to share screens, Lindsay?

THE REPORTER: You should have the ability to share screens in Zoom. Yes.

MR. ENGEL: Okay. Take us off the record.

THE VIDEOGRAPHER: I'll take us off the record. The time is 3:43 p.m. And we are off the

Page 141

record.

(WHEREUPON, a recess was taken.)

THE REPORTER: We are back on the record at 3:50 p.m.

Counsel, you may proceed.

BY MR. TARAZI:

Q. Okay. I'm sharing -- I just want to make sure the record is 100 percent clear on this point, so we're not confusing things. So can you go ahead and read C in the policy in Exhibit F?

MR. ENGEL: I think you've got something over the --

THE DEPONENT: Yeah.

BY MR. TARAZI:

Q. How do I do that? Okay. Sorry.

A. Okay.

Q. Can you just read it out loud just for the record, since it's --

A. Sure.

Q. -- typed.

A. "Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork."

Page 142

Q. Okay. And then going back to Exhibit U on -- these are the text messages. So you have -- it looks to me like on February 5th, from a timing perspective, Page 101, Exhibit U. Do you see this, first of all?

A. I do.

Q. Okay. And on February 5th, you say, "My thought is my flag falls under Exception C"; is that correct?

A. Correct.

Q. Okay. And then it looks like the following day, we have you saying, "I can articulate an argument that it is." So this is in response to the question -- you know, to the prior text saying, question is, "Is a flag incidental?" And then your response is, "I can articulate an argument that it is. I may quote the dictionary definition." Do you see that?

A. I do.

Q. Okay. What dictionary definition are you referring to specifically? To which word? I mean, you mean incidental or something else?

A. Correct. Incidental. The dictionary definition of incidental.

Q. All right. So on the 5th and the 6th,

Page 143

you're saying it is, it does. It is -- my flag -- my -- my thought is my flag falls under Exception C. And then when you get to the email that you write on the 9th, that's when you say, "I would say the flag is at most an incidental reference," correct?

A. Correct.

Q. Okay. What changed between it is and at most?

A. I don't know that anything necessarily changed. I think it's looking at an email put together for my bosses versus me texting with friends and personal acquaintances after hours and while I'm juggling a bunch of stuff at home. So I don't know that the language in the -- I don't -- like, I can't say that I chose my words all that carefully in my text messages.

Q. Okay. You were -- at what point along the way were you starting to think that you were going to take this in a legal direction and -- and litigate it?

A. After the Board vote to make me take down the flag, once people from the community started trying to reach out to me through people that they knew, that was when I decided to hear them out rather than just looking for another job somewhere

Page 144

else.

MR. TARAZI: Okay. No further questions at this time.

THE REPORTER: Attorney Engel, do you have some follow-up questions?

MR. ENGEL: I do. Thank you.

EXAMINATION

BY MR. ENGEL:

Q. Let's just clarify a couple of things here. First, with respect to the Hate Has No Home Here flag, did anyone ever suggest to you that the presence of this flag affected the District's interest in providing services efficiently?

A. No.

Q. Okay. Did you ever run into any problems in teaching because of the presence of the flag?

A. No, I did not.

Q. Has it had any detrimental impact on your working relationships with other teachers or administrators?

A. No.

Q. Has it undermined your ability to teach your classes in any way in accordance with state standards?

A. No.

Page 145

Q. Okay. What sort of images do you have in your classroom besides the flag?

A. I have a Cincinnati Bengals flag. I have a flag for The Christmas Story, which is my favorite movie. I've got a couple of WVU flags where I went for my undergrad and law school.

I have the West Virginia State Flag, since I'm a proud native of West Virginia. I've got a Coca-Cola sign. I've got the Coexist sign that we've talked about. I've got an FC Cincinnati plaque. Multiple, different.

Q. Why do you have the Hate Has No Home Here flag on your wall?

A. When I was student teaching and told my cooperating teacher that I was applying at Little Miami, he told me, Google them and look at the news on Little Miami. And I came across the articles with the football team, who I think they had worn a thin blue line flag or carried a thin blue line flag out onto the field against Dr. Trevathan and our former principals. Warning not to, and then she suspended them, and just the articles made it seem like there was this whole big blowup following that.

Also, while I was teaching -- or while I was earning my teaching degree, a couple of my

Page 146

classes, we had to read and learn more about the impacts to marginalized youth, including the LGBTQ community and the impacts to mental health and the differences that -- like, just knowing that they're -- like, nothing -- they talked about the safe space stickers and just something where students know that they -- just something small like that, that they have support, it can increase their learning ability and it can go -- potentially go a long way in aiding their mental health.

So given those factors, I wanted something in my classroom that kind of signified that, like, no matter what, like, we're not going to judge people or not -- like, all -- any of our coursework or course discussion is going to be grounded on fact, and we're, you know, going to respect differences of opinions.

Q. Okay. Did you use the flag for any teaching purposes?

A. No.

Q. Was it a school-sponsored expression during the imprimatur of the school?

A. No.

Q. Was it designed to impart any particular knowledge to the students?

Page 147

A. No.

Q. Did you ever use it as part of your methodology of instruction?

A. No.

Q. Did you ever seek to instruct students or impart particular substantive knowledge on curricular matters through the use of the flag?

A. No.

Q. Do you consider the flag to be your private speech?

A. I do.

Q. Okay. And it's speech on a controversial topic?

A. Yes.

Q. Okay. A topic that's controversial in particular within that district?

A. Yes.

Q. Okay. And what particularly is that topic?

A. The LGBTQ community and students. And yeah, their visibility in the school and inclusion in classroom, like, content.

Q. Okay. So I'm going to share a document with you that we previously marked. Get the right document up. One second. What I'm showing you was

Page 148

previously marked Exhibit 5. Do you recognize that document?

A. Yes.

Q. Okay. And that's the Parents' Bill of Rights that we've been talking about?

A. I believe this is the school district's version, yes, the Board policy.

Q. Okay. So just so we're clear, does any of your classes include sexuality content as is defined in the policy?

A. Not based on my understanding.

Q. And in particular, does the Hate Has No Home Here flag constitute sexuality content as that is defined in the policy?

A. Not to my understanding.

Q. Drilling down, does the Hate Have No Home flag -- I'm sorry, Hate Has No Home Here flag include any description of sexual concepts?

A. No.

Q. Does it include any description of gender ideology?

A. No.

Q. If it did, is it your belief that even if it did, it would be an incidental reference?

A. If it just had language just, again,

Page 149

making reference to these groups with nothing more, then yes.

Q. Okay. So when you referred to that in the emails that you were questioned at length about by Mr. Tarazi, were you using a lawyer term like "arguendo"? What --

MR. TARAZI: Objection as to leading. I would I would object to this whole line in terms of leading relating to, you know -- and that's it. Just for the record.

BY MR. ENGEL:

Q. For objection. I'll reword it. What did you mean when you used the phrase "at most"?

A. At most, it was that if it does fall within -- like, would be considered sexuality content or that -- then this Exception C would apply. But again, like, I -- I think that's it -- was at the most.

MR. ENGEL: Okay. And then I want to show you this email chain that you were asked about that was filed with the Court. Yes. So I'm showing you what was filed with the Court as document number 13-8. It was marked as Exhibit G_1.

And I'll ask Counsel, was this also marked Exhibit G_1 in this deposition?

Page 150

MR. TARAZI: Yes. I've been consistent so that we don't have overlapping situations.

MR. ENGEL: We appreciate that.

BY MR. ENGEL:

Q. So a couple of things about this email chain. First, it includes a couple of times what Mr. Tarazi said was his understanding. Did he ever speak to you before he made that understanding?

A. No.

Q. Did you ever have any other communications with him?

A. No.

Q. Okay. Was there some information that you believe Mr. Tarazi did not have when he initially described what was his understanding on February 4th?

A. I'm sorry. Could you restate or -- yeah. Repeat the question?

Q. Yeah. Let me rephrase. So on February 4th, he describes what he said as his understanding of the teacher's message.

A. Yes.

Q. Did he have all of the available information at that time?

A. Did he have it?

Page 151

Q. Yeah.

A. I'm not sure what he had or didn't have it.

Q. Okay. In particular, did he have a picture showing how the flag was displayed in the classroom?

A. I'm not sure if he did or not. I know at one point I sent a -- because I -- the picture that was going around was zoomed in, like cropped in pretty closely. I know at one point I provide or attached a zoomed-out photo to show for scale.

Q. Okay. And it looks like you sent that in an email on February 9th?

A. Yes.

Q. Okay. February 9th being, I assume, after February 4th?

A. Yes.

Q. Okay. Now, you said in your February 9th email that you would tend to agree with Mr. Tarazi's overall characterization. Did you mean to accept his complete understanding?

A. No, I did not. Just that, like, trying to keep the conversation moving rather than, like, trying to get hung up on semantics, just I -- kind of, okay, I can follow his understanding.

Page 152

Q. Okay. Now, here's what's really important. You -- you've read some of the pleadings in this case, too, right?

A. Yes.

Q. Okay. So, for example, you read the reply -- the opposition to the motion for preliminary injunction that Mr. Tarazi filed with the Court on it looks like April 13th, Document number 13. You saw that?

A. I saw it. I don't know that I've read it in detail.

Q. Okay. One of the things he says is that the full written record was forwarded to the Superintendent with a copy to the Board with procedural guidance as to next steps based on Board policy as is documented in Exhibit G_1. Is Exhibit G_1 the full record or was there something else that he didn't include?

A. There was an additional email that I had sent to Regina and Kevin Harleman. I believe Wayne Lyke may have been copied on that one as well. I don't know if that was sent on to Mr. Tarazi.

Q. Okay. Is that the email on February 16th --

A. Yes.

Page 153

Q. -- that you sent?

And that's included in Exhibit 18?

A. Correct.

Q. But it's not included in the other exhibit?

A. Correct.

Q. The -- the exhibit that was filed with the Court?

A. Correct.

Q. Okay. Why did you send this additional email?

A. I sent this additional email in response to one of Mr. Tarazi's, where he had said that it was -- like, my recollection -- I think it's quoted here, -- was whether or not the -- what the purpose of the flag was and whether or not it was primarily intended to engage students on sexual concepts or gender ideology, and then I said, perhaps I can provide some clarification, and then tried to clarify and explain my position on that.

Q. Okay. And Regina -- or Ms. Morgan responded that she's going to share it with Mr. Tarazi and the Board?

A. Yes, she did.

MR. ENGEL: One moment. That's all the

Page 154

questions I have. Thank you.

THE REPORTER: Attorney Tarazi, do you have any follow-up questions?

MR. TARAZI: No. Thank you.

THE REPORTER: All right. Thank you.

Attorney Tarazi, would you like to order the original transcript?

MR. TARAZI: Yes.

THE REPORTER: Attorney Engel, would you like to order a copy of the transcript?

MR. ENGEL: I would like -- yes, I would like a copy, and we will read and sign.

THE REPORTER: Your read and sign has been noted.

And with that, we are off the record at 4:06 p.m.

(WHEREUPON, the deposition of GEORGE MCINTYRE was concluded at 4:06 p.m.)

Page 156

Date: June 9, 2026                Assignment #: 97747

Deponent: George McIntyre

Case:      McIntyre vs Little Miami

ATTORNEY - TRANSCRIPT ENCLOSED:

signature of your client is required. Please have your client make any corrections necessary. Sign the Correction Sheet where indicated. Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below. (The Address(es) can be found on the Appearance page of the deposition.)

Also, send a COPY of the executed Correction Sheet to our corporation.

CC:  Naegeli Deposition and Trial
     Omar Tarazi, Esquire

Page 155

CERTIFICATE

I, Lindsay Vineyard, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 18th day of June, 2026.

*Lindsay Vineyard*

Lindsay Vineyard, CER No. 4287

Page 157

CORRECTION SHEET

Deposition of: George McIntyre    Date: 06/09/2026

Regarding: McIntyre vs Little Miami

Reporter: Vineyard/Seaman

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number. If there are no changes, write "none" across the page. Sign this sheet on the line provided.

Page  Line  Reason for Change

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

Signature: _____

George McIntyre

Email to: Production@NaegeliUSA.com

NAEGELI DEPOSITION & TRIAL | (800) 528-3335 NAEGELIUSA.COM

Page 158

DECLARATION

Deposition of: George McIntyre    Date: 06/09/2026

Regarding: GEORGE MCINTYRE vs LITTLE MIAMI LOCAL SCHOOL

Reporter:  Lindsay Vineyard

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20_____.

                    Signature: _____

                         George McIntyre

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

```
                        CORRECTION SHEET
Deposition of: George McIntyre      Date: 06/09/2026
Regarding: McIntyre vs Little Miami
Reporter: Vineyard/Seaman
_____
Please make all corrections, changes or
clarifications to your testimony on this sheet,
showing page and line number.  If there are no
changes, write "none" across the page.  Sign this
sheet on the line provided.
Page   Line   Reason for Change
8      18     I passed the WV bar in 2014 but was not admitted until 2015
125    15     Should indicate that response was sarcastic
```

Signature: /s/ George McIntyre

George McIntyre

Email to: Production@NaegeliUSA.com

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

DECLARATION

Deposition of: George McIntyre    Date: 06/09/2026

Regarding: GEORGE MCINTYRE vs LITTLE MIAMI LOCAL SCHOOL

Reporter:  Lindsay Vineyard

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at __Warren County_____, __Ohio_____

on the __23rd_____ day of __June_____, 20__26___.

Signature: __/s/ George McIntyre_____

George McIntyre

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM