Case: 1:26-cv-00351-MWM Doc #: 29-2 Filed: 07/01/26 Page: 1 of 23  PAGEID #: 1408

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

_____

GEORGE MCINTYRE,

     Plaintiff,

   v.                            Case No.

LITTLE MIAMI SCHOOL DISTRICT, ET    1:26-cv-00351-MWM

AL.,

     Defendant.

_____

DEPOSITION OF REGINA MORGAN

DATE:          Monday, June 8, 2026

TIME:          2:02 p.m.

LOCATION:      Remote Proceeding

                Engel & Martin LLC

                4660 Duke Drive

                Mason, OH 45040

REPORTED BY:  Marianne Hissong

JOB NO.:      8223145

Page 2

APPEARANCES

ON BEHALF OF PLAINTIFF GEORGE MCINTYRE:

JOSHUA ENGEL, ESQUIRE

Engel & Martin LLC

4660 Duke Drive

Mason, OH 45040

engel@engelandmartin.com

(513) 445-9600

ON BEHALF OF DEFENDANT LITTLE MIAMI SCHOOL DISTRICT:

OMAR TARAZI, ESQUIRE

Omar Tarazi Law Office

5635 Sandbrook Lane

Hillard, OH 43026

otarazi@tarazilaw.com

(614) 226-2823

ALSO PRESENT:

Jim Hardin, Partner of Engel & Martin LLC

Page 3

I N D E X

| EXAMINATION: | PAGE |
| --- | --- |
| By Mr. Engel | 5 |
| By Mr. Tarazi | 70 |
| By Mr. Engel | 85 |
| By Mr. Tarazi | 86 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 2 | Photo of Flag | 19 |
| Exhibit 4 | Ohio Revised Code Section 3313.473 | 20 |
| Exhibit 5 | Parents' Bill of Rights | 20 |
| Exhibit 6 | Bricker Graydon Presentation | 22 |
| Exhibit 7 | Little Miami Local Schools - Guidance Document | 24 |
| Exhibit 8 | American History Model Curriculum | 45 |
| Exhibit 13 | Tarazi Memorandum | 27 |
| Exhibit 14 | Email from Mr. Tarazi, 1/18/26 | 29 |
| Exhibit 15 | Email to Ms. Morgan, 1/29/26 | 32 |
| Exhibit 16 | Building Pictures | 51 |
| Exhibit 18 | Email Chain, 2/2/26 - 2/16/26 | 55 |

Page 4

P R O C E E D I N G S

THE REPORTER: And good afternoon. My name is Marianne Hissong. I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 2:02 p.m.

This begins the deposition of Regina -- Regina Morgan, excuse me, taken in the matter of George McIntyre vs. Little Miami School District, et al. on June 8, 2026, taken remote via Zoom.

I am a notary authorized to take acknowledgments and administer oaths in Ohio. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn in, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time, will everyone in

Page 5

attendance please identify yourself for the record, beginning with the taking attorney.

MR. ENGEL: Hi. This is Joshua Engel, attorney for the plaintiff.

MR. TARAZI: Omar Tarazi, 84165, for the defendant.

MS. MORGAN: Regina Morgan, superintendent, Little Miami Local School District.

THE REPORTER: Thank you.

Hearing no objection, I will now swear in the witness.

Mrs. Morgan, can you please raise your right hand?

WHEREUPON,

REGINA MORGAN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: On the record.

MR. ENGEL: Terrific. Thank you very much.

EXAMINATION

BY MR. ENGEL:

Q And thank you for taking the time this afternoon. Would you please -- I think you spelled

2 (Pages 2 - 5)

Page 6

your name, but let's put it on the record.

A   Sure.  Regina, R-E-G-I-N-A, Morgan, M-O-R-G-A-N.

Q   Mrs. Morgan, where are you employed?

A   Little Miami Local School District.

Q   What do you do there?

A   I am the superintendent.

Q   What does a superintendent do?

A   Well, I tell our students that I can call snow days.  But overarching, I work with all departments, all employees, facilities, every aspect of the school district, including curriculum instruction.  But I do have an assistant superintendent who oversees curriculum instruction directly.

Q   How long have you had that job?

A   This is my third year.

Q   How did you get selected for it?

A   So I've been in the district since 2000.  I have -- I started as a teacher.  I became an assistant -- or I'm sorry, an assistant principal, which I was asked to do that job.  I became a principal, which I was asked to do that job.  I became a curriculum director that I was asked to do.  I became the assistant superintendent where I was asked,

Page 7

and then I was asked to be the superintendent.

Q   What is your educational background?

A   I have a undergraduate in business along with an education -- business education degree.  I have vocationally trained.  I was in business for 12 years prior to becoming an -- in -- in an education role.  I have a master's in educational leadership and then -- which is my administration license, and then my superintendent certificate as well.

Q   Where did you get those degrees?

A   My undergraduate was Eastern Kentucky University.  My vocational license was from Wright State.  My administrative license was from UC and my superintendent certificate from Xavier.

Q   Where do you currently reside?

A   In Lebanon, Ohio.

Q   How long have you lived there?

A   Thirty some years.

Q   Do you have any other residences?

A   At this time, no.

Q   Okay.  Any other property that you own?  I should have asked a better question.

A   Yeah.  At this time, no.

Q   Have you ever been in a deposition before?

A   I have not.  Well, I was in an arbitration.

Page 8

Q   Okay.  Well, we'll try to make this as painless as possible.  A couple rules I have for depositions that I like to go over with everyone at the beginning.  The first is that all of your answers need to be out loud, and you've done a really good job of that so far.  But those normal human interactions that we have where we nod our heads like you're doing now or point or anything like that, our intrepid court reporter cannot take any of that down.  So we have to make sure everything is in words; okay?

A   Yes.

Q   Great.  If you need to take a break, let us know.  You are not a hostage in this situation.  So if for whatever reason, whether it's -- if you need to talk to someone, if you need to just get some water or anything like that, just let us know, and we'll take a break.  The only thing I will ask is as a courtesy that if there's a question pending, we just answer that question, and then we'll go off the record.  So just let us know; okay?

A   Yes.

Q   I'd ask if there's a question that I state and you don't understand it, please ask me to clarify.

A   Okay.

Q   So if you answer a question, I'm going to

Page 9

assume you understand it, and that includes if there are terms in there, just give them their plain and usual meaning with one exception, which is that if there are certain terms that have special meaning within your field or that are what we call terms of arts, please let us know and we'll make sure we get a good definition on them.  The idea is that someone who picks up and reads this transcript who doesn't know anything about the case will be able to understand what we're talking about; okay?

A   Yes.

Q   All right.  We are talking about school issues.  I don't think it's likely to come up, but in the event that if a student gets mentioned, I ask that you just use student initials and not full names so that we protect all their FERPA rights.

A   Perfect.

Q   And then finally, I am going to use my computer to share documents.  That means I have to control where they move.  So please let me know if you need to read any part of the document, if you can't read a part of the document.  If for some reason you can't read it on share screens, we could always send it to you and find a way to get it for you.  Thank you.  But it's on you to please let me know, and I'll

3 (Pages 6 - 9)

Page 10

do my best to work with that; okay?

A   Perfect.  Yes.

Q   All right.  Have you ever been named in any other lawsuits?

A   I have.

Q   What are those?

A   I have been in two lawsuits that were named.  Two by Mr. Wallace suing me, and one a lawsuit by Mr. Silas Shelton, where he was suing me.

Q   Who was Silas Shelton?

A   Silas Shelton was a resident of Little Miami.  His children went to school here.

Q   And why did he sue you?

A   His daughter was involved in an incident with students, and in the lawsuit against me, it said that I had hired inept people.

Q   What were Mr. Wallace's lawsuits against you?

A   There was a posting on Facebook where a person specified that he was taking pictures of -- of students.  And -- and he specified that I knew that that was not true, but yet I did not defend him on Facebook.

Q   And I thought you said he sued you twice?

A   Exactly.  So the second one was -- that was

Page 11

dismissed without prejudice.  So then there was an incident where Mr. Wallace came to our high school.  He was not background checked.  He -- he refused to wait in the office.  He said he wanted to wait in an octagon area, which is an area right outside of our office.

The staff called me and -- well, he went out to the octagon, but he did not stay in the octagon.  He went out into the building itself.  At that point, the staff called me, asked me to come.  I came.  I found him in the building, and we had some back and forth.  He did finally leave the building.

And then after that incident, I had the -- the same lawsuit as before, but then that was added to it where I did not permit him access to the high school.

Q   So based on what you're telling me, and based on some of the things Mr. Wallace said in his deposition, I take it you and he don't see eye-to-eye on a number of issues?

A   He is a -- a board member, and I am a -- a superintendent, so he is my boss.  I don't know that eye-to-eye is what is needed.  He gives me direction and -- and, if possible, I follow that direction.  But I'm not going to put anybody at risk at the same time.

Page 12

Q   So what did you do to prepare for this deposition?

A   What did I to do?  Well, I spoke with Mr. Tarazi.  I went back and looked at some dates, some timelines, went through some questions that were possibly going to be asked of me just to prepare, almost like any interview.

MR. ENGEL:  Okay.  And I'll note on the record that my partner, Mr. Hardin, has come into the room for a little bit here.

THE WITNESS:  Okay.

BY MR. ENGEL:

Q   Did you talk to anyone else about your testimony in this case?

A   I talked to Dr. Harleman a little bit, not much.  He was in the same meeting with Mr. Tarazi and I, as we were talking through some of the questions that could possibly be asked.

Q   Okay.  Did anyone else participate in that conversation?

A   I don't believe so.  I think it was just the three of us.

Q   Okay.  Was anyone, like, called during the conversation or anything like that?

A   Not that I'm aware of.

Page 13

Q   Okay.  Has anyone done anything to attempt to influence your testimony in any way in this case?

A   I don't believe so.

Q   Has anyone done anything to try to intimidate you or coerce you to answer questions a certain way or not answer questions of certain way?

A   No.  I've been given guidance on -- on, you know, some of the same guidance that you just gave me.  You know, clarify --

MR. TARAZI:  Well, hold on.  Hold on a second.  If you're giving attorney-client communication on guidance, don't go in in that direction.  But if you've had something outside of attorney client communication, feel free.

BY MR. ENGEL:

Q   Let me ask a better question that may help.  The guidance or anything you talked about.  Have you received that from anyone other than Mr. Tarazi?

A   I did reach out to another attorney friend of mine who gave me general advice, and that's what I was just getting -- he gave me clarify the question.  If I don't know the answer, just say, "I don't know."  Don't guess.  Don't imagine.  Don't think.  Don't extrapolate.  Only answer the questions that are asked.  So it's really the same thing that you just

4 (Pages 10 - 13)

Page 14

said that -- that I was given that advice as well. If I don't know it to personally be true, then don't say it.

Q Okay. And so that was sort of general advice about what to expect?

A General advice, yes.

Q Did you speak to Mr. Wallace or anyone else on the board about your testimony?

A No. I'm sorry. So I have had conversations with coworkers in the -- in the building, general conversations about the deposition, about, you know, I've looked up timelines. I've not had any advice from them. They are just sounding board more than anything, if that's what you're asking.

Q Yeah. So nothing substantive then?

A Nothing substantive then.

Q Okay. How long have you worked with Mr. Tarazi?

A Since January 6, 2026.

Q Okay. And what is his role with Little Miami?

A He is our district attorney.

Q And what does that mean?

A If we have any legal questions, need legal guidance, have any due processes, have any lawsuits,

Page 15

he would guide us on all of matters legal. Actually, it goes further than that. If we have a parent concern that we don't know how to handle and it could go into a legal environment, we will reach out to -- to our board attorney and ask those questions.

Q How was he selected for that role?

A At our January 6th board meeting, we had two new board members that were elected. That was our organizational meeting. It -- it appeared that -- that those two board members and a third board member had had communications prior to the board meeting, and they brought it up. They fired our previous law firm, and Mr. Tarazi was our new attorney. I do not believe -- well --

Q Go ahead. What were you going to say?

A Well, the -- the whole don't extrapolate just came to mind as I was saying that I don't believe that that was Mr. Tarazi's thought. I think he thought he was going to be our law director, not our sole attorney.

Q Did you have any dissatisfaction with your previous attorney?

A No.

Q How much is Mr. Tarazi paid each month by the board, if you know?

Page 16

A I -- I don't think we've had a bill to know that.

Q Do you know what his hourly rate is?

A In the -- in the proposal that was submitted, there were two different ways that he could be paid. The board never approved one of those ways. I'm assuming that it is $300 an hour.

Q Have you ever heard of something called the National School Boards Leadership Council?

A I have.

Q What is that?

A That is a organization that a -- a person by the name of Kelly Kohls is associated with. And she has spoken at our board meetings prior.

Q And what is the goal of that organization?

A I cannot answer that.

Q Okay. Does that organization have a particular ideological bent to it?

A I would -- from my perspective, yes.

Q And what is that perspective?

A They -- I believe that -- that they are not for public schools. That they are for privatizing schools. They are -- they have notes on their website about special needs students, about -- I do believe that LGBTQ students are not something that they --

Page 17

well, I don't -- I'm not sure.

Q Yeah. So what do you know -- I'm going to push on that a moment. What do you know about their views on LGBTQ students?

A I don't know them personally. They seem to -- to not have high values of them.

Q Do you believe that view is shared by any of the board members now?

A I -- I don't know that for sure. That's -- that's a hard question because I don't -- you know, they're -- they're bosses. I don't speak to them on a daily basis.

Q Have they given you any reason to believe that they may have animus towards LGBTQ students?

A I think animus is a strong word. I do believe that -- that we have had a -- a book in a book fair that was a boy meets boy book that was -- had concern. We had vending machines that had a concern, but that was not due to any LGBTQ books. We've had a couple of posters on walls.

So out of day-to-day, those are kind of the -- the pieces that have come up that have had -- you know, in the -- in the realm of books or posters, that sort of thing. There was a display flags and display policy that was noted a while ago that they

5 (Pages 14 - 17)

Page 18

wanted to -- to adopt. But it was really found that with House Bill 8 and policy 5780.01, that we didn't really need it.

Q Do you believe that any of the actions that you just described by board members were motivated by a desire to not protect LGBTQ students?

MR. TARAZI: I would object insofar as it calls for speculation.

But if you can answer, go ahead to share your opinion.

THE WITNESS: I would -- I -- I believe that the thought is that all people can be supported without any extra posters, books, that sort of thing. I think --

BY MR. ENGEL:

Q I'm not sure what that means. What does that mean?

A So -- so I don't need a poster on the wall to support any one group. Just "be kind" would support everybody, and that would be the better message is what I believe that the board thinks. As far as animus, I -- I can't answer that for them.

Q Can you say the opposite? Can you say with any level of confidence that the board members do not have animus towards LGBTQ students?

Page 19

A I -- I don't know that I can say that either.

Q So let's level set here. I'm going to share with you some documents and items that we marked in a previous deposition.

A Okay.

Q So first we're going to show you what we marked as Exhibit 8 [sic] which is actually a two-page document. I'm showing you page 2 now first. Are you familiar with that?

(Exhibit 2 was marked for identification.)

A I am.

Q Okay. And what is that?

A That is a poster that was hanging on Mr. McIntyre's wall. We've always called it a poster. I believe he calls it a flag. I think it must be of nylon material, but it hangs on his wall. It was a poster that was under question that was not taken down until the board asked to take it down.

Q And then the first page of Exhibit 2, are you familiar with that?

A I am.

Q What is that?

A That is the wall area behind Mr. McIntyre's

Page 20

desk.

Q Okay. And you can see the -- well, we'll call it the flag there in the upper right corner?

A Correct.

Q Okay. And does this fairly and accurately depict where the flag was located in his classroom?

A Yes.

Q Okay. So now I'm going to ask you about what we marked as Exhibit 4, which is a copy of revised code section 3313.473 and Exhibit 5, which is the Parents' Bill of Rights policy for Little Miami School District.

(Exhibit 4 and Exhibit 5 were marked for identification.)

A Yes.

Q I assume you're familiar with these two things?

A I am.

Q Okay. And what I want to drill down on is the definition of sexuality content. Would you agree with me that they're the same in both documents?

A I would.

Q Okay. So for sake of ease, I'm just going to refer to the school policy, but if for some reason we need to talk about the statute, we can do that;

Page 21

okay?

A Yes.

Q All right. So if I'm looking at the definition here of sexuality content, it says, "Means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in the classroom setting." I read that correctly?

A Correct.

Q Okay. So I'm trying to figure out what that means. Can you tell me what the term "sexual concepts" means?

A From my understanding, sexuality content could mean sex. It can mean sexual-related items. It could mean -- I -- I believe there's another place that it talks about gender -- it does right there, gender ideology. So that would be ideology of transgender, something of that nature. It could be sexual preference. It could be abstinence, the lack of sex, I would suppose.

Q So I'm going to be very lawyerly here. And in your answer, you use the term sexuality content. I'm asking a separate question, perhaps, which is, can you tell me, is there a definition of the term "sexual concepts"?

6 (Pages 18 - 21)

Page 22

A   I don't have a clear term -- a clear definition.

Q   Do you know anywhere where we could look to find what that term sexual concepts means?

A   I think it -- it -- the law talks about -- or the policy talks about what isn't included.  But I don't know that it talks about what all is included.

Q   And then we'll talk about the term gender ideology.  Do you have a definition for that term?

A   Not a formal definition.  I know in my mind that I think it has to do with a person changing or thinking of changing or going through the process of changing, going through therapy for changing from one sexuality to another.

Q   So I'm going to show you now some guidance that you've received on this.  So the first is going to be Exhibit 6, which is a document produced by Bricker Graydon, which is a law firm; right?

(Exhibit 6 was marked for identification.)

A   Correct.

Q   Okay.  And it looks like that came out looking like they're from the Ohio Superintendent Association?

A   Yes.

Page 23

Q   Okay.  You're a member of that group?

A   I am.

Q   Okay.  And do you remember receiving this update from the Bricker Law Firm?

A   We -- we received quite a few updates on House Bill 8, but I don't remember that exactly.  But I do remember that I received them.  So yes.

Q   Okay.  And in particular, I'm looking at page 3.  Well, page 2, it's got a definition of sexuality content, which seems to just mirror what's said in the revised code there; right?

A   Correct.

Q   And then it has a section on page 3, what's not defined.  And the first thing it says is gender ideology.  Is that consistent with what your understanding is, that the term is never defined anywhere?

A   Well, I agree that it is -- the -- the law is vague in many areas, yes.

Q   So when they say it's not defined in the Ohio Revised Code court decisions or Merriam-Webster dictionary, you agree with that; right?

A   I can agree with that.

Q   And then if we look at what we've marked as Exhibit 7, it's a guidance doc that it looks like your

Page 24

school put together.

(Exhibit 7 was marked for identification.)

A   This was something that we put together but has not been shared out to everybody as of yet.  It will be shared out this year.  I don't know that you have the exact version that will be shared, but --

Q   How was this put together?

A   We received guidance -- actually it was through Superintendents again.  We had a neighboring school that put together something of this nature, and we liked it.  And we thought that we would -- we would put something together in the same manner.

Q   Okay.  And then again, this just at the beginning, it looks like reprints the policy; right?

A   Sure.

Q   And do you know, does this document contain any definition of the terms sexual concepts or gender ideology?

A   I -- I do know that I was involved with this document.  I have not looked at this document in some time.  So I would not be able to tell you everything that's in it.  I'm sure that it mirrors the -- the -- what we've received from -- from guidance from others.

Page 25

Q   Okay.  So I'm looking at page 6, for example.  It says, on the definition of sexuality content, it's got a bullet point that says sexual concepts and gender ideology; right?

A   Yes.  Right.

Q   It doesn't define either of those terms?

A   It does not.

Q   Okay.  Are there any other documents that you're aware of that might define these terms, sexual concepts or gender ideology?

A   No.  We're all looking for that information.

Q   So let me ask you some questions here.  Is acknowledging the existence of LGBTQ students a sexual concept or gender ideology?

A   I -- I think that's why we're here.

Q   What do you mean by that?

A   Well, if we -- if we knew that, then there wouldn't be a question; correct?  I mean -- so I stated when -- you know, when this poster was asked to be taken down, I said that I -- I did not think the poster was used in instruction, and I thought it was innocent incidental.  But -- but vague laws don't help us.

Q   So I'm asking you just your opinion as superintendent is acknowledging the existence of LGBTQ

7 (Pages 22 - 25)

Page 26

students a sexual concept or a gender ideology?

A   I do not believe so.

Q   Is acknowledging that LGBTQ students have the right to an education without harassment a sexual concept or a gender ideology?

A   No.

Q   Is the idea that bullying and harassment based on sexual orientation is prohibited a gender ideology or sexual concept?

A   Say that one more time. I'm sorry.

Q   Sure. I probably worded it badly. I apologize. Is the idea that bullying and harassment based on sexual orientation is prohibited a gender ideology or a sexual concept?

A   It is not. So let me -- let me clarify. I -- what I'm saying is that bullying and harassing students who identify as LGBTQ plus is not a violation of -- of House Bill 8. Is that what you were asking?

Q   Sure.

A   So -- so they should not be harassed, and that is not a violation.

Q   I get that. It's fair to say not everyone might agree with that though; right?

A   Well, again, I'm not speaking for other people today, but --

Page 27

Q   In your experience as a superintendent, you've come across people who think that sexual orientation should not be protected; right?

A   Yes.

Q   Okay. So is expressing the idea that yes, people should be protected from harassment based on sexual orientation, would that be considered a gender ideology or a sexual concept?

A   I would not think so.

Q   So let me ask you about some emails you've got on this then. So I'll show you what we marked Exhibit 13, which is an administrative memo written by Mr. Tarazi. Do you remember receiving this document?

        (Exhibit 13 was marked for
        identification.)

A   I do.

Q   Okay. How did this document come to exist?

A   Can you scroll down just a little bit? Does it have -- I just want to make sure it's the same one I'm thinking of. Does it have some -- okay. It is not what I was thinking of. Okay. Okay. So I believe -- yeah.

        MR. TARAZI: If you don't remember, as I said --

        THE WITNESS: Yeah. I don't -- it's to

Page 28

Little Miami --

        MR. TARAZI: -- don't try to guess.

        THE WITNESS: -- school staff. I don't know where that came from. I thought it was the one that had the directions at -- at the bottom of it.

BY MR. ENGEL:

Q   Well, there's some other emails I want. We'll go through them all here, but so this particular document, which is undated, did you ask Mr. Tarazi to prepare this?

A   I don't recall asking to -- for him to prepare it.

Q   Do you know if anyone asked him to prepare it?

A   I am not aware.

Q   Or do you know if he just sort of sent it out on his own saying, "Hey, this is what I want you guys to do"?

A   I -- I do not know.

Q   Do you know if this document contained any definition of sexual concepts or gender ideology?

A   I do not know.

Q   And then -- and this may help. I'll show you what we marked previously Exhibit 14, which is a set of emails. Let's start with the one at the bottom

Page 29

here, January 18th on a Sunday afternoon looks like Mr. Tarazi sends you a document. I assume that is attaching this memo that we just looked at

        (Exhibit 14 was marked for
        identification.)

A   Could very well be.

Q   Okay. Again, do you remember, did you ask him to send you this memo or anything?

A   It appears that we're in the middle of a conversation, so I would say yes. I would not think somebody would start a conversation on one side, but I do not recall this conversation.

Q   Okay. Do you recall any conversations before this that would have led to him drafting this memo?

A   I do not. Well, yeah, I do not any specific conversations. I know that -- that we had plenty of conversations through the display and flags policies and -- and Mr. Tarazi, you know, guiding the board with -- that we already had 5780.01, and we didn't need an -- an additional policy. There is a Big Walnut policy that was discussed quite a bit on our previous board and -- and some on the current board.

Q   But I've heard that phrase, Big Walnut,

8 (Pages 26 - 29)

Page 30

that's another school district?

A   It is another school district, Northern Columbus.

Q   Okay.  And they had a rather, I think, people thought draconian display policy?

A   It was very rigid.

Q   And that was considered by the board, your board of being adopted?

A   It was.

Q   And was it actually adopted?

A   It was not.

Q   So coming back to this email on the 18th, did you provide any comments to Mr. Tarazi on his memo?

A   I do not recall.  I'm sorry.  I don't --

Q   That's okay.  And it looks like a few hours later he copied Mr. Wallace.  Do you know why he got Mr. Wallace involved in this conversation?

A   I do not know.

Q   Do you know why he didn't copy any of the other board members?

A   Mr. Wallace is the board president.

Q   Okay.  And it says that he wants to address certain specific concerns.  Do you know what those concerns were?

Page 31

A   I do not.

Q   Okay.  We probably have to ask Mr. Tarazi what those concerns were; right?  It's his email?  Yes?  No?

A   Yes.

Q   Okay.  You don't know; right?

A   I thought that was rhetorical, but yes.

Q   In other words, you can't tell us what they're talking about.

A   I cannot tell you, no.

Q   It's possible you might; right?  I mean, you maybe had a conversation with him, but --

A   Yes.  Right.

Q   -- in this case, you don't know.

A   Well, and -- and we -- I could have been in the conversation, and I don't recall it.  But I do not recall that conversation.

Q   So just so we're clear, you don't know what specific concerns Mr. Wallace was raising with Mr. Tarazi?

A   I do not, not at this time.

Q   Okay.  And then what we've marked as 15, it looks like a little bit later, there's a couple of emails versus January 23rd of 2026 from Mr. Tarazi to you and other board members.  Do you remember

Page 32

receiving this email?

(Exhibit 15 was marked for identification.)

A   I remember the conversation, not the exact email.  But this is the conversation that I'm referencing about the flags in display.  I would assume that it says that we already have 5780.01, and we don't need to have another policy on top of it.

Q   Okay.  So what exactly do you remember about that conversation?

A   The board was wanting to -- to re-look at the Big Walnut policy for Little Miami.  We had had previous guidance that was very similar to Mr. Tarazi's guidance, that if it was -- if it was just to get particular posters off the walls, then we have a policy that can already -- we can already -- they can use that policy to do that.

Q   Were there particular posters that seemed to be motivating people to pursue this new policy?

A   There was a poster that was in question prior to this.  And it was in question again at the same time as this.  It was a poster that was on a middle school teacher's wall.  It was a poster of a heart.  It had multiple light shades of color within it.  And at the bottom of it, it said "Love Wins."

Page 33

Q   And what was the objection to that?

A   I am -- I am not sure.

Q   Are you aware of anyone ever objecting to a poster or displaying a school that didn't involve gay kids?

A   Not during my tenure.

Q   Do you know why they seemed so focused on that particular group of people?

A   I do not know.

Q   Were you around when the Safe Space images were removed?

A   I was the assistant superintendent when those were removed.  They removed the summer before I became superintendent.

Q   Okay.  And probably we should describe.  What were the Safe Space stickers?

A   I believe they were stickers that had been up for years on a few classrooms.  I'm -- I'm not sure whether teachers knew they were there or not.  It was something that -- there was some concern around them.  And the previous superintendent asked them to be removed.

Q   Do you know why they were asked to be removed?

A   I actually was not involved with that at

9 (Pages 30 - 33)

Page 34

all. So I did not -- I did not know they had been asked to be removed until the following year when I became superintendent.

Q Okay. Did you eventually learn what some of the objections were?

A I did not.

Q Do you know today what some of the objections?

A I do not.

Q Have you ever spoken to anyone about that issue?

A I did. The -- our -- our Gay-Straight Alliance or GSA club invited me to -- to come and -- to one of their meetings and to speak to them. They asked if they could put the stickers back up. And I said at this particular time, I -- I did not think that was a good idea because of the concerns in our district with flags and displays.

Q What specifically was the concern that you had with putting up Safe Space stickers?

A I -- I did not necessarily have a concern myself, but the Heartstopper book was a problem at that particular time. And -- and there were concerns at our -- that were being brought. We were in the news. We were -- and so I just felt like at that time

Page 35

that would perpetuate negativity toward a group of people that I didn't feel like was warranting.

Q What do you mean by perpetuate negativity?

A I felt like that that negativity against a group of people because of signs or spaces or -- or something. And I had conversation with -- with multiple folks, and it was -- it was felt that at that point in time we -- we talked about something other than the -- the Safe Space sticker that would provide a -- noting that it's a teacher that would not mind having conversations or -- but something that our community would back a little bit better.

Q Are you aware of instances of harassment or bullying of LGBTQ students at Little Miami Schools?

A I see the bullying reports that come in. I am not directly -- they don't -- so I see a bullying report that comes in off of a Safe Schools tip line or -- or our anonymous reporting tool. I've not had one in a while or maybe ever that had -- concerning from -- from an LGBTQ community.

Q Do you think that's because it's not happening? Or do you think that's because students feel like their reports will not be taken seriously?

A Yeah. It's a really good question; right? You know, I would -- I would love to hope that it is

Page 36

not -- not happening. And -- and I feel like that, that we need to always do a better job to make sure that all of our students feel safe at all times in our buildings. And it really doesn't matter who they are. That everybody should be provided a safe place to -- to learn. And so if -- if there's a group that feels marginalized or feels bullied, it needs to be addressed.

Q Based on your meetings you've had with students, do you believe that some members of the LGBTQ community feel like they are marginalized?

A I do feel like that they have been -- I'll give you an example. We have a day where we bring students over from -- from the middle school. It's called Bump Up Day. They come up to the high school.

And we had to put an administrator at the GSA booth to make sure that kids were polite at that booth. We -- we know -- I know that posters are taken -- flyers, you know, club flyers are -- are taken down. We now have -- we put all of our club flyers behind glass so that all the club flyers will be left on the walls. Not some of them will take taken down.

I'm not saying that -- that GSA flyers are the only ones that are taken down by any means. It

Page 37

might be that you don't care for the drama club, and so you take those flyers down. But I do know that GSA flyers have been taken down, have been put all of them on one person's locker, have been -- things of that nature that are -- I believe are unkind acts.

Q So getting back now to this January 23, 2026 email, do you know who asked Mr. Tarazi to generate this email?

A I do not.

Q Did you ask him to?

A Again, I don't -- I do not know that for sure. I'm not saying that I didn't, but I do not recall asking him to -- to create this email.

Q Okay. And then it looks like in the --

A I'm sorry. This is a different one. This is the one that I was talking about just a minute ago. If you scroll down, it starts having the steps.

Q Yes.

A Yeah. Okay. So well, I still don't know exactly who asked him to write that, but I know that it was shared with me, and -- and I was asked to comment on it.

Q Okay. Did you provide comments on it?

A I said based upon the -- I believe I said based upon the -- the Big Walnut policy that this was

10 (Pages 34 - 37)

Page 38

better than that.

Q   And I think -- let me find that email here. I don't have it.  Anyway, on page number 425 at the bottom, Mr. Tarazi provides a standard to apply about whether a lesson is considered sexuality content.  Are you familiar with that?

A   It is in that document, yes.

Q   Okay.  Do you know where he came up with this standard from?

A   I do not.

Q   Okay.  Do you know if he relied on any cases, statutes, laws, anything like that?

A   I do not know.

Q   You know, and he applies what he calls a reasonable observer standard, it looks like.  Do you know where that came from?

A   I do not.

Q   And he talks about primary purpose.  Do you know where the term primary purpose came from?

A   I do not.

Q   Okay.  So we probably have to ask him where this came from then; right?

A   Yes.

Q   And do you -- one of the things I noticed about this definition -- I want to know if you agree

Page 39

with me, is it doesn't really matter what the teacher's intent is, it just looks at what a reasonable observer would think; right?

A   It does.

Q   okay.  And then there's the exception for incidental references, and your understanding is that's taken from the statute and the policy?

A   I would assume.

Q   Yeah.  So if we look at, for example, Exhibit 5, sexuality content does not include -- incidental reference to sexual concepts or gender ideology occurring outside of formal instruction or presentations?

A   Correct.

Q   Okay.  So what is your understanding of that exception?

A   My understanding of that would be if it's not actually in -- in the lesson being taught, but it is -- maybe a student mentions it -- something, that would be an incidental reference.  Or a student shows something that is on their computer or on their phone or -- that would be incidental as well.  Things that are not within the lesson plans that are being taught. I would say those are incidental things that are not focused on.

Page 40

Q   And when we think about this term sexuality content, is there a difference between instruction that addresses sexuality or gender ideology directly and instruction that mentions it as a fact in passing?

A   I feel like there is a difference with that. And that is where perhaps further clarification needs to be -- needs to be given.  I do believe there's a difference in teaching sexuality content and referring to it while teaching something else.

Q   Okay.  So let me give you some examples for example.  There's a famous Supreme Court decision called Griswold -- and I'm not familiar with it, dealing with birth control and whether there is a constitutional right to access birth control.  Would teaching that the Supreme Court decided this decision and explaining its reasoning be considered teaching on sexual concepts?

A   I believe that's where it needs to be defined.  I would say no, because it's not teaching -- it is not teaching the detail of the -- of sexuality content.  It's teaching the case that that detail was in, if that makes sense.

Q   Yeah.  So one of the ways this comes up is in the Civil Rights movement.  Is teaching about the participants and the struggles and milestones of the

Page 41

Civil Rights movement with respect to LGBTQ people sexual concepts or gender ideology?

A   Again, that's where I feel like if you're teaching movements and that -- and you're referring to a particular movement among other movements, I feel like you're teaching about movements, not about the references within the movements.

Q   So if I taught, for example, a lesson about the assassination of Harvey Milk, that wouldn't be a sexual concept or gender ideology; would it?

A   I do not think so.

Q   Same with teaching about Stonewall.  Would that be necessarily teaching about sexual concepts or gender ideology?

A   I don't believe -- on the surface, no.  Now, could it turn into that?  Absolutely; right?  But -- but on the surface, if I'm teaching a social studies lesson on -- on Stonewall, and you're -- and you're teaching about the events of the -- of the -- that occurred, and it occurred to this group of people. I'm not going into teaching about the people.  I'm teaching about the event.  I don't believe that that would qualify.

Q   Would the same apply in an English class? For example, if a teacher were teaching The Merchant

11 (Pages 38 - 41)

Page 42

of Venice, and there's a big scene in there where women dress up as men. Is that a sexual concept or gender ideology that requires notice under the Parental Rights policy?

A I have not read that book, so I don't know where all it goes. But based upon that single description, I would say no. It does not violate House Bill 8.

Q Okay. I could ask about other Shakespeare plays have you -- but that's okay. Okay. Mr. Hardin's had enough.

Now the policy we're looking at says simply that you -- it doesn't prohibit teaching on that topic. It just says you have to provide notice ahead of time; right?

A Correct.

Q What would be involved in providing notice?

A Well, it could be a syllabus given out to parents. It could be content on Schoology that parents have access to. It could be a notice sent home. It could be -- it could go in -- in lots of different ways. We have -- parents opt out of -- of really any controversial subject that they want to. We have many parents that opt out of -- of content that we -- whether it's a book that they don't want

Page 43

their child to read. We have some that -- that don't love some of the classics and, and they opt their children out. And we provide an alternative.

Q You mentioned Schoology. What is that?

A Schoology is a -- just a platform that teachers will use on their side to publish their -- their contact information. They can publish their syllabus. They can publish assignments for students. Some -- some will publish videos of their classes, of them teaching. So if a student is missing for the day, for whatever reason, they can get caught up.

Some will post any slideshows that they have or any pertinent readings or worksheets that they've done in the class. So it really depends on the teacher, how much they put on there. But it has the ability to put almost everything on there. They can do Quizlets on there. They can -- pretty much everything can be put on there.

Q Do parents have access to all these materials?

A Parents have access to -- to what's put on it, yes. Not the tests ahead of time, but --

Q So if a teacher puts all of their classroom materials and handouts on -- how's it pronounced? Schoology?

Page 44

A Schoology, but that's fine. Yes.

Q On Schoology, every parent would then be able to see what's going on in the classroom every day?

A Correct.

Q Do you consider that to be notice under the Parents' Rights policy?

A I would.

Q So let's go back to this. In Exhibit 15, looks like that was sent out -- the memo from Mr. Tarazi on the 23rd. On the 29th, you got an email from David Wallace asking you to work with Mr. Tarazi to have a letter sent out. Do you remember receiving this email?

A I remember the conversation. I don't remember the exact email, but yes.

Q What do you remember about the conversation?

A Just that Mr. Wallace wanted -- wanted information to go out to the staff, and he felt like it would be better coming from -- from me. And I was to work with Mr. Tarazi to put that together, have it approved by the board, and then send it out to the staff.

Q Did you do that?

A I believe that that is the same email if you

Page 45

scroll down. Is this the same one that had the directions at the bottom of it? Yeah. So yes, I did send that out to principals for them to communicate to staff.

Q So let me ask you about some of these curriculums here. Let me mark as Exhibit 8, the model curriculum for American History.

(Exhibit 8 was marked for identification.)

A Sure.

Q And in a couple places on this -- let's look at, for example, content statement number 27. Number 27, there's a mention about the struggle for racial and gender equality and the extension of Civil Rights.

A Yes.

Q And part of that mentions Civil Rights movement for African Americans, Mexican Americans, women, and gay liberation movement. Do you believe any of this constitutes sexual concepts or gender ideology?

A Again, I believe that this is talking about movements in the United States. We're not teaching the act of -- I don't know that there is an act, the lifestyle of LGBTQ. We're referencing it in -- in social transformations in the United States. I would

12 (Pages 42 - 45)

Page 46

say no.

Q   So what is the current policy at Little Miami on teacher displays on their walls?

A   Little Miami, it's really -- we -- we've not had any concerning with items on the wall.  If a principal or a administrator sees something that's on the wall that is concerning to them, they would ask them to take it down.  We are a pretty conservative district, and -- and we've never had a concern with teachers posting anything that -- that we felt like was concerning.  And if we did, we would ask them, like I said, to take it down.

Q   Is it understood that what teachers put on the wall represents in many times their own personal views?

A   Absolutely.

Q   Okay.  So for example, we saw in Exhibit 2, Mr. McIntyre had a Bengals poster.

A   Sure.

Q   I assume the district does not have an official position on the Bengals?

A   We do not.  And I -- and correct.  I would assume he is a Bengals fan.

Q   Okay.  And it looks like there's something about -- is that the Christmas Story movie, too, down

Page 47

here?

A   I would assume that he is a fan of the Christmas Story, yes.

Q   Okay.  So do students understand that what's on the walls and these displays, at least at the high school level, they're the personal views of the teachers and not endorsed by the school?

A   I would say absolutely.

Q   And it is also fair to say that not everything that's posted on the walls related to the curriculum?

A   That is fair.

Q   Again, Bengals has nothing to do with the curriculum, we hope; right?

A   It has nothing to do with the -- well, we could teach the history of it.  But I don't know that we do.

Q   Okay.  So let's talk about then the flag in Exhibit 2.

A   Okay.

Q   When Mr. McIntyre had this flag on the wall displayed, as you see here, was he seeking to convey a message that the Little Miami School District had created?

A   No.  That the Little Miami School District

Page 48

created?  Is that what you said?

Q   Yeah.

A   No.

Q   Was he instructing students by displaying the flag?

A   I think he's sending a message that he would like people to be kind.  I don't know that he's instructing them, but --

Q   So when did you first become aware of this flag?

A   When Mr. Wallace pointed it out to me.

Q   Okay.  And I was going to ask you another lawyerly question.  I apologize.  Was he engaged in any speech that the district paid him to produce as a teacher when he displayed that flag?

A   No.

Q   When did Mr. Wallace bring this to your attention?

A   This particular flag?  It was -- it was right after the email that you had up last.  So whatever the date on that email was, it was -- yeah.  So -- so January, February timeframe.

Q   Okay.  So just so we're clear on the record here, I'm showing you Exhibit 15, which is the January 29th email.  So it was sometime after that?

Page 49

A   -- correct.

Q   Had he talked to you at all about this flag before that?

A   There was an incident where he came into the building prior to the start of school and went into a few classrooms and to check out his intel on what he was given that was in classrooms.

Q   Tell me about that.  What's that?

A   That is about what I know.

Q   What do you mean "intel"?

A   Somebody told him and teachers that were in the classrooms reported that he said that he was checking out his intel.

Q   In about what?

A   I'm assuming -- well, I don't -- I don't know.

Q   What's your best guess?

A   What's on the walls, yes.

Q   And, in particular, stuff on the walls that referenced LGBTQ issues?

A   That -- those were the references that were brought to my attention.

Q   I mean, he's not, like, a Browns fan and he's got intel that people were hiding Bengals things; right?

13 (Pages 46 - 49)

Page 50

A   We do have some Browns fans, and I don't care for -- no. I'm just teasing. No. It was not about the Browns or the Bengals or the Steelers.

Q   Yeah. In other words, we're all adults here; right? We know what's going on. And what's going on it sounds like his intel is he was looking for any indications of support for LGBTQ students. Is that a fair characterization?

MR. TARAZI:  Objection insofar as it calls for speculation.

BY MR. ENGEL:

Q   Is that your best guess of what was going on?

A   Those are the only posters that came to my attention.

Q   And what inference do you draw from that?

A   That the other posters on the walls were okay from his perspective.

Q   So this occurred around the start of the school year. Did you hear anything from him between -- let's say September 2025 and the end of January of '26 about this issue?

A   Somewhere in there, yes. And I don't know the timeframe. There was the "Love Wins" poster on the middle school wall. That -- that was discussed

Page 51

earlier in the year, and I don't know -- I don't know the timeframe of that. That is the -- the heart with the pastel colors in the middle of it that said, "Love Wins" at the bottom.

Q   So let me show you what we marked as Exhibit 16, which is a set of pictures I believe you helped take?

(Exhibit 16 was marked for identification.)

A   I took all of these, yes.

Q   Okay. And so are these pictures fair and accurate depictions of some images or posters in teacher classrooms?

A   It -- that -- that particular one is, yes.

Q   Okay. And we can scroll through all 65, but I believe I captured everything that was sent to me. So you and Mr. McIntyre went around the classroom or the building and took some pictures?

A   We did.

Q   Okay. And so for example, this Garfield poster on page 768 was there. Is that a school message or anything?

A   It is not.

Q   Okay. So that's something that everyone would understand would be teacher's personal views?

Page 52

A   I hope it's not even a teacher's personal view; right? I hope that they give more than whoop-de-do, but I know it's supposed to be funny, yes.

Q   And so for example, we see a dreaded Steelers poster on page 769.

A   Dreaded, yes.

Q   Certainly not the view of Little Miami Schools?

A   Certainly not.

Q   Okay. On page 770, it looks like we've got some -- is that some rainbow imagery on there? Has that raised any objections?

A   No.

Q   771 Gilmore Girls. Anyone object to the sexual content in the Gilmore Girls shows?

A   Not that I'm aware of.

Q   Going to scroll ahead. It's fair to say a lot of these images are not curricular again; right?

A   Correct. But I will tell you, I've taken a picture of that one and put it on -- I have it on my phone to share just so you -- just so you know. I -- I am particularly fond of that particular poster.

Q   Okay. And you're referring to the poster that we find on page 777?

Page 53

A   "I want to hire employees who don't finish their work, said no boss ever."

Q   Okay. And it's fair to say some of these other images have rainbow imagery within them; right?

A   Correct.

Q   And similar messages that are expressed with the flag that brings us here today?

A   Correct.

Q   And for example, on --

A   With that being said, the board did say that it is not the words that they were worried about in that flag and putting words in their mouth, but that it was the imagery.

Q   Okay. And in particular it was the rainbow flag imagery; right?

A   I believe so.

Q   So but in 786 we see some rainbow imagery here, too, as well; right?

A   We do.

Q   And on 801 we have the rainbow dolphin. Has that gotten any concerns?

A   No.

Q   People may not understand what that means perhaps, but you know --

A   Maybe I don't understand what it means.

14 (Pages 50 - 53)

Page 54

Q   Yeah.  We'll do that off the record.  There's another rainbow elephant on 803 that hasn't garnered any concerns?

A   No.

Q   And I'm just going to scroll through the rest of these and make sure I -- these are all pictures that you took.  Number 815, that's now hanging in Mr. McIntyre's room?

A   Correct.

Q   Okay.  And it has the same message, "Hate Has No Home Here"?

A   Correct.

Q   And it has rainbow imagery in the center?

A   Correct.

Q   Do you believe that flag 815 contains sexuality content?

A   I do not.

Q   Do you believe it represents sexual concepts or gender ideology?

A   I do not.

Q   And in the same way, like 822 is a representation of a Buddha.  Little Miami School is not endorsing Buddhism I take it; right?

A   We are not.

Q   Okay.  And everyone would understand that?

Page 55

A   I believe so, yes.

Q   All right.  That's all.  So let me show you then, so we can sort of get our dates in order, what we marked as Exhibit 18, which is the email exchange involving the flag for Mr. McIntyre.  And so I'm going to scroll down to the end and start at the end.

(Exhibit 18 was marked for identification.)

A   Okay.

Q   There's an email on February 2nd sent by Mr. McIntyre to Mr. Harleman, the principal.

A   Correct.

Q   Do you know why this email was sent?

A   Yes.

Q   Why?

A   Prior to this email, Mr. Wallace reached out to me and specified that he had a concern with two posters on our walls.  One was a middle school poster.  It was the shape of a heart.  It had pastel colors within it.  It had "Love Wins" at the bottom of it.

And there was a poster at the high school that had "Hate Has No Home Here."  It had four or five arms with hearts on the top of them.  One in the shape -- or one in the -- with an American flag, a rainbow flag, a pink and blue flag that is, I believe

Page 56

the transgender flag, a peace symbol, and multiple colors from my perspective that represent skin tones.

Those were the two flags that -- that had a concern.  I reached out to the high school principal and the middle school principal.  I shared Mr. Wallace's concern.  The middle school teacher -- principal went to the teacher, and the teacher took the -- the poster down.  Mr. -- or Dr. Harleman went to Mr. McIntyre, and Mr. McIntyre did not want to take the poster down right away.  So he came back with why he felt that the poster was okay to be left up.

He sent that to -- to Dr. Harleman.  Dr. Harleman, in turn, forwarded it to me.  And then the conversation kind of went back and forth between me, from -- to the board and back to Dr. Harleman, Mr. McIntyre and Mr. Like [ph], which is our LMTA president.

Q   So let me ask you a couple things about what Mr. McIntyre said.  He writes in the last paragraph, "The flag is a reminder that they must treat their classmates with mutual respect regardless of personal opinions or belief."  Do you have any reason to doubt that he's sincere when he writes that?

A   I have no reason to doubt that.

Q   And at the beginning of the email, he says,

Page 57

"Below are the specific content standards for each where I feel the flag I have in my room, which says, "Hate Has No Home Here" is especially applicable."  What was your impression when you read that sentence?

A   I will tell you, not only is my impression, but I asked about it to make sure that -- that I was clarified in my impression.  That when -- when Mr. McIntyre teaches content that -- where hatred was involved, that he wanted to remind people that hate has no home here.  It doesn't matter who you are, that -- that you should be respectful to one another.

Q   Did he at any point say that he used the flag in his lessons or curriculum?

A   He specifically said he did not.

Q   So when he said it's applicable, did you understand that to mean that he used it for teaching purposes?

A   Say that one more time.

Q   Yeah.  When he used the term applicable, did he mean he was using it for teaching purposes?  Or did you understand that to mean he thought it was just relevant?

A   Just relevant.

Q   And so you then responded it looks like a few days later or the next day, February 3rd; right?

15 (Pages 54 - 57)

Page 58

A    Yes.

Q    And you indicated that you've reviewed the poster in question and its association with the attached curricular standards. What exactly did you do to do that?

A    When I reviewed it?

Q    Yeah.

A    Well, I reviewed the -- well, I looked at the poster, I mean. And -- and then I looked at his content standards and saw that what George was pulling out were content standards where hate was involved in the -- in what he was teaching. And -- and then through my own reflection of what the content standards were in the poster, I concluded that -- that he was indicating to his classmates that when he is teaching content that involves hate, that that hate should not be brought into the classroom.

Q    And you said, "I do see that the poster contains symbols of identities." What do you mean by that?

A    Identities of a rainbow flag, which represents identities of the LGBTQ community, the -- the pink and blue flag, which I've been told and have looked up that it indicates the transgender community. So that is the identities that I was talking -- the

Page 59

American flag. It indicates, you know, an American identity. I -- I believe that all of the -- the tones of tans are -- are trying to be inclusive of all people in -- in America or in the world, wherever you want to put it. I -- you know.

Q    Does the fact that it contains symbols of identities mean that it was sexuality content as that term is defined in your policy?

A    No. It -- it -- from my perspective, it -- what identities meant was people who are identifying with different groups. I identified with multiple of those groups on that flag. I identify with the American flag, identifying the skin tones. I think I identify with the peace symbol, unless it means something else. But --

Q    You then wrote next, "I do not believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." First, am I correct that's the standard that Mr. Tarazi had set out for you?

A    That is the standard Mr. Tarazi had in his email.

Q    Okay. And do you still believe that?

A    I do.

Page 60

Q    Why do you believe that?

A    Because I believe that if he was teaching it, he would have made it front and center. It was a poster that was hung on the wall to the side and not the focus of anything. If I'm -- you know, if I'm teaching something, I don't want students to have to -- to turn around and see a small poster on the side of the wall. I want it to be right in front of them where they can see it clearly. It would be in his lessons.

Q    Okay. So looks like the next email here is the next day from Mr. Tarazi. Did you decide to get Mr. Tarazi involved? It looks like you copied him on your February 3rd email. Or did someone else?

A    Mr. Tarazi has been involved in much of the board conversation that has happened in general since -- since he was hired on January 6th.

Q    Okay. Is that why you decided to CC him on the email?

A    Yes.

Q    Okay. So that was your decision?

A    I figured he would be involved anyway, yes.

Q    What do you mean by that?

A    Well, because he is the board attorney and was collaborating on this issue with the board.

Page 61

Q    And he included in there a statement about his "understanding of the teacher's message." Do you know how he gained that understanding?

A    I do not. I would assume from George's email.

Q    Okay. Do you know if he ever spoke to Mr. McIntyre?

A    I do not know.

Q    Do you know if he ever spoke to Dr. Harleman?

A    I do not.

Q    Do you know if he actually reviewed the image of the flag in the classroom?

A    It was in some of the email exchanges, an image of just the poster and then an image of the poster hanging on the wall. I can't guarantee that he -- he viewed it, but he was on some email that had the images of the posters on it.

Q    Okay. So what happened after you got this email?

A    The one from Mr. Tarazi?

Q    Yeah.

A    I -- I would have forwarded that back to Dr. Harleman, Mr. Like [ph], and Mr. McIntyre.

Q    Okay. And, in fact, I think Mr. Tarazi says

16 (Pages 58 - 61)

Page 62

quite nicely, "I think it may be helpful to have some additional dialogue."  And so it sounds like that dialogue took place.

A   I -- I don't know that that dialogue took place with Mr. McIntyre.

Q   So and then few days later, Mr. McIntyre sends an email back.  And do you remember receiving this email?

A   I do.

Q   And he says, "I'm not sure how either ORC 3113.473 or board policy 5780.01 are implicated."  Did you agree with him on that?

A   I -- I can, from my perspective, yes.

Q   And in particular, he says, "I would say the flag is at most an incidental reference."  Do you agree with that?

A   I do.

Q   He says, "I do not explicitly provide instruction on the flag or incorporate it into my curricular materials."  Is that an accurate statement?

A   That is what he shared with me as well.  I'm not in his classroom every day, but -- but Dr. Harleman and other administrators are in and out often.

Q   So I'm going to ask a very lawyerly question

Page 63

here.  Do you have any reason to think that what he said here is not true?

A   I have no reason to believe other than what he has said.

Q   What happened after this email was sent?

A   The emails went back and forth for a little while.

Q   Okay.  Yeah.  It looks like the next day Mr. Tarazi sent an email?

A   Yes.

Q   And he said he spoke with President Wallace.  Were you part of that conversation?

A   I was not part of the conversation, no.

Q   Okay.  So do you have any idea what was said during that conversation?

A   I do not, except what Mr. Tarazi has stated here.

Q   And then he says he's representing the teacher's position in these two bullet points; right?

A   That's what is stated, yes.

Q   Do you know if he had any conversations with the teacher in order to form that conclusion?

A   I do not.

Q   Do you know if he spoke to Dr. Harleman before he formed that conclusion?

Page 64

A   I do not.

Q   Do you know if he reviewed any additional materials before he formed that conclusion?

A   I do not.

Q   Okay.  And then it looks like it was placed on the board's agenda; right?

A   Correct.

Q   Did you -- and at that time, it looks like Mr. McIntyre sent another email on the 16th?

A   Yes.

Q   Okay.  And you read that email?

A   I have read it, yes.

Q   Okay.  And he says, again, he wants to provide some clarification.  Do you know what he was clarifying?

A   I believe that he did not use it to teach with.

Q   And so he writes, "The flag is not, nor has it ever been intended to engage students on sexual concepts or gender ideology."  Do you have any reason to believe that that is a false statement?

A   I do not.

Q   He says, "here is no subversive message or hidden intent underlying the flag."  Do you have any reason to believe that's not true?

Page 65

A   I do not.

Q   He says, "I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class."  Do you have any reason to believe that's not true?

A   I do not.

Q   Is there anything else in that second paragraph that he writes that you believe is untrue?

A   I believe that statement is true from my perspective.

Q   And probably true is not the best word.  Is there anything in this email that he sent on February 16th that you believe does not accurately describe the state of affairs?

A   I do not.  I believe it is accurate.

Q   Were you present at the board meeting where this was discussed?

A   I was.

Q   Did the board obtain any additional evidence that it relied upon in making this decision?

A   I am not aware of that, if any.

Q   Were you involved in drafting any of the statements that the board put out after the decision was made?

17 (Pages 62 - 65)

Page 66

A I was not.

Q Do you know if the board considered sending out notice to parents instead of ordering the removal of the flag?

A I believe that was stated at the following board meeting, but I would have to review that statement.

Q What do you remember about that?

A About the board meeting?

Q Yeah. About the question of -- because here's why I'm asking. Let me cut to the chase. The policy, as I understand it, doesn't prohibit sexuality content. It just says that notice has to be provided; right?

A Correct.

Q So it would seem that the comply with its policy, the board could have just said, "We're going to send out -- we want notice sent out to every parent about this flag." And that it didn't have to be taken down?

A Correct.

Q Do you know why they chose to order it taken down rather than send out notice?

A I do not know why.

Q Were you involved in any conversations about

Page 67

that?

A Just the board conversation that happened during the board meeting.

MR. ENGEL: Okay. Let's go off the record here for a moment.

THE WITNESS: Sure.

THE REPORTER: Off the record at 3:27.

(Off the record.)

THE REPORTER: Okay. We are back on the record, 3:33.

BY MR. ENGEL:

Q Okay. Referring you back to this -- let me share the screen, sorry. Referring you back to this email chain at other times, again, Mr. McIntyre stated, "I have never incorporated the flag into the curriculum itself or used it as an instructional item." When I asked Mr. Wallace about this, he said that he didn't believe that was accurate. And he said it wasn't accurate.

First, he referenced the original email written by Mr. McIntyre. But then he also said Mrs. Morgan at the school board meeting referenced that he used it in previous lessons. Do you remember telling the school board that Mr. McIntyre used the "Hate Has No Home Here" flag during any lessons?

Page 68

A I actually believe I did just the opposite of that. I clarified to the school board that Mr. McIntyre had told me that he does not use it in any lessons. There was conversation at that school board meeting that indicated that -- it's all on video, from my perspective, indicated that -- that he was teaching with the flag or using the -- the flag as an instructional tool.

And -- and at the very end of that meeting, I clarified that I had spoken to Mr. McIntyre or the teacher I probably said, and -- and he indicated that he does not use it in -- for instructional purposes.

Q And as you sit here today, do you have any reason to believe that the flag was used for instructional purposes?

A None.

Q Was the flag any part of the curriculum for the school?

A No.

Q Did the flag undermine any of the curriculum for the school?

A No.

Q Did the flag cause any disruption at the school? Other than what we're here today; right?

A Not prior to this, no.

Page 69

Q Prior to Mr. Wallace attempting to get the flag removed, had it caused any disruption at the school?

A No.

Q Had it interfered with the ability of the school to efficiently provide services to students?

A No.

Q Do teachers at Little Miami have constitutional free speech rights?

A You're going to have to clarify that for me.

Q Yeah. It's a terrible question. It's a legal question. Do people have a right to their own personal opinions on things?

A Sure.

Q And you've heard the objection, "The constitution doesn't stop at the schoolhouse doors." Do you agree with that?

A I agree with that.

MR. ENGEL: All right. I have no other questions. I thank you very much for your time. I think Mr. Tarazi may have a couple questions for you, but I'm done. So thank you very much.

THE WITNESS: Okay. Thank you, sir.

MR. TARAZI: Thank you. I will be very brief, but I just wanted to go back over a couple of

18 (Pages 66 - 69)

Page 70

things just to make sure the record is clean in terms of a couple of factual matters.

EXAMINATION

BY MR. TARAZI:

Q So the first one is -- let's start with definitions. There was a lot of talk about definitions and the definition of sexual concepts; right? So if you go through the -- my first question is, when you go through board policy, it's very rare that there's an -- there's not a whole section in board policy on definitions; correct?

A Not necessarily. There -- there are some definitions in some policies.

Q There are a few definitions in some policies, but in general, there's not a lot of definition. There's not a definition section, and there's not like a call out for every single thing.

A Correct.

Q So since most things don't have a specific definition in board policy, how do you interpret it then? How do you understand any particular policy? What is it based on at that point?

A If it's vague --

MR. ENGEL: We'll just note an objection to the form of that question. I think

Page 71

that's a -- well, I can elaborate if you need to.

If not, you can answer.

BY MR. TARAZI:

Q You can go ahead and answer. Like, how do you understand what a board policy means since most of it doesn't have definitions?

A If it's not common sense, then we -- we ask an attorney or a legal advisor.

Q Okay. And then ultimately, if there's confusion or that lack of clarity, who's the final decider on what board policy means?

A I would say depending, it would be the principal or the superintendent or the board.

Q Right. And if ultimately, it's the board that makes the policies; correct?

A Correct.

Q Okay. So ultimately, it's their call in terms of interpreting their own policies; correct?

A Correct.

Q Okay. Obviously, unless there's a legal -- because some policies mirror a legal obligation. And in that case the legal obligation trumps. So just to make sure that's clear.

A Sure. Yes.

Q Okay. So regarding sexual concepts that's

Page 72

in the board policy, it's unclear to me what exactly you think that actually -- and that's where it triggers parents' rights. What exactly does that actually cover? Like, what would I be teaching in a classroom for an hour where I would, in fact, have to tell parents about that would fit under the definition of sexual concept?

A Yeah. So when -- if -- from my perspective, and again -- well, anyway. From my perspective, if I'm actually teaching content on the subject. So I'm not referencing it through a movement, but I'm actually teaching content on that particular subject.

So let's use abortion for an example. I'm not teaching the procedure to have an abortion, but I am saying that there are laws that have abortion rights in them. I think that -- that is a clarifying difference.

Q So if somebody spent an hour talking about Roe v. Wade and all the legal things about abortion, that does not trigger parents' rights. But if somebody was specifically describing the procedure of an abortion for an hour, that would. Is that how you differentiate?

A In that particular situation, yes.

Q Okay. In terms when we say the words sexual

Page 73

and concepts, what would be your interpretation of the word concepts? What's the definition of the word concepts?

A The Merriam's definition?

Q Well, let me just make it easy. Do you agree that the word concept means any abstract or generalized idea?

A Yes. I can agree with that.

Q Okay. And so when you pair that with the word sexual, wouldn't it mean any abstract or generalized idea relating to sexual matters?

MR. ENGEL: I'm going to object to the form here.

You can go ahead and answer, even though I objected.

THE WITNESS: I -- I hear where you're going. I will tell you that there are -- if -- if we're talking about every concept that touches anything that has to do with -- with a sexual nature, that's very broad. That's in our standards. That is -- that would -- that would be very broad.

BY MR. TARAZI:

Q Well, would you agree -- again, let's stick on the linguistic side of the world; right? From a linguistic perspective, sexual health is teaching

19 (Pages 70 - 73)

Page 74

concepts relating to health that relate to sexuality, and therefore it's a sexual concept. Would you agree with that from a linguistic perspective?

MR. ENGEL: I'm going to object to the form. And I think you're arguing with your own witness, which I'm not sure is appropriate.

MR. TARAZI: I'm not arguing with anybody. I'm just asking her to tell, you know, like, her understanding and how she understands these words.

THE WITNESS: If we're taking the words outside of the law. We're not talking about the law at all. We're just talking about the word sexual and the word concepts. I think that that is broad. Could sexual concepts be talking about a woman or a man? I mean they're -- they have sex to them; right? They are either one sex or another. So are we talking about every time we talk about a woman or a -- or a man that we have to notify parents? I mean, is that what you're saying right now?

BY MR. TARAZI:

Q   I'm saying if -- you were limiting it to sexual reproduction. And I'm just asking, do you agree that there are other conceptual aspects that relate to sexuality somebody could teach in a classroom that would also fit the definition of sexual

Page 75

concept? So for example, sexual abuse prevention. Is that a sexual concept?

A   Yeah. It can be. If -- if you go into the sexual abuse portion of that. If you're just talking about prevention measures, then -- then I think that you're talking about prevention measures of something else that -- that is not instructed --

Q   Okay. And so would you agree that legal rights is also a concept. And so sexual legal rights would be a sexual concept?

MR. ENGEL: I'm going to object to the form again. And just so you know what I'm talking about, this is a lot of leading questions. And it's your own witness, so I don't think you can do that. But you can go ahead and do whatever you want here.

MR. TARAZI: Well, we have very -- 15 minutes. So it's easier to just cut to the chase.

So do you see --

MR. ENGEL: I mean, it's got to be admissible evidence. And if it's leading questions, it may not be admissible. That's why I object to the form to give you a chance to ask non-leading questions that you may want to --

MR. TARAZI: Well, let me ask it this way so we can --

Page 76

MR. ENGEL: And I know your -- let me finish. I know your time is short, so I'll just note a continuing objection to the leading questions so I don't have to say it every time. And you can do what you need to do.

MR. TARAZI: I appreciate that because I just want to get -- I got 15 minutes. Okay.

BY MR. TARAZI:

Q   So in your mind, do you see any kind of linguistic difference between sexual legal rights and sexual reproduction in terms of the bubble that is sexual concepts?

A   It depends on where you take them. Just as a general statement between the two -- it -- it would depend on where you took each -- each conversation.

Q   Okay. So do you see a difference or you don't? Or it depends on how it's in presented?

A   No. It would depend on how you're using it. How -- what you're -- you're not giving me enough information.

Q   Okay. And then I wanted to touch on this other topic about what is required to be in the syllabus and Schoology. Are you -- you know, what is it required to be there?

A   Yeah. So in Schoology we have our teachers

Page 77

put in their contact information so parents can reach them. We ask them to put their syllabus on that has the topics or the general concepts that will be taught in the course. And then we ask them to put assignments for students so that parents can see assignments. And if students miss class, they can see what their assignments are. Some -- some go well over that, and some just do the minimum.

Q   Okay. So to make it super crystal clear in your mind, if somebody had a full, let's say, day classroom lesson on the gay liberation movement, for example, a historical incident relating to the Civil Rights and gay liberation movement. In your mind, that doesn't trigger House Bill 8, but that does require -- it has to be put on Schoology and potentially the syllabus, and parents can still opt out. Does that summarize your understanding?

A   So under Schoology, if we're -- if I'm talking about movements, then I would probably put movements. I wouldn't maybe list every movement, but maybe I would. And -- and parents could opt out, absolutely.

Q   Okay. So are teachers required to put every lesson or every -- you know, the main lesson materials on Schoology?

Veritext Legal Solutions

www.veritext.com                                                                 888-391-3376

Page 78

A   Yeah.  Their -- their syllabus which would have their -- their overarching topics on them, yes.

Q   Okay.  So basically, what it all boils down, just to make it simple, in your mind, House Bill 8 is actually quite narrow.  But at the same time, everything gets put on Schoology and syllabus, and everybody can opt out anyway.  So that side of it, you end up within the same place and as a practical matter.  Is that fair to say?

A   Fair to say, yes.

Q   Okay.  Let's touch a moment about -- it was the number of things that -- I mean, let me try to phrase it this way.

Parents complain about a lot of topics; right?  Books, materials, different things.  There was a mention in the last deposition about something to do with Megan's law.  There has been some mention, I think -- I don't remember if it was mentioned, but I think there was something about 13 Reasons Why.  You mentioned something about a vending machine that didn't have to do with LGBT.

Would you agree that there's just a lot of things that have come up over time -- let's say over the last -- during your tenure as superintendent?

A   Actually, our -- our families do not

Page 79

complain about a lot.  There have been some things, yes.  And there are families who opt -- you know, that have thoughts that they don't want their children to opt out of things.  But overall, our families are -- are actually fantastic.

Q   Yeah.  I wasn't trying to -- but the point -- not everybody's complaining about everything.  But the point is, is that there has been a few things that have popped up over time.  You know, you mentioned that there was two posters, one book, but there was some other things.  What was the vending machine issue?  Because you said that that didn't have to do with LGBTQ, I think, is what you said.

A   Yeah.  That was -- that was a -- Mr. Wallace was concerned that we were putting inappropriate books in our vending machine.  And so we -- we put criteria -- our PTOs run our vending machines.  And so perhaps on a student's birthday or as a student reward, they get to go.  And they get to pick a book out of a vending machine.

And so now our criteria from the vending machine is the content level is kind of a plus or minus one year of the grades that are in the building to make sure that the content in the vending machine is appropriate for all of the students in the -- in

Page 80

the school.

What happened was, while we were introducing that new kind of criteria for vending machines, a vending machine was emptied so that they could re-put information in it.  Somebody took a picture of it, elated to that -- or relayed that that was part of censoring books, and it became a whole issue.  But it really was just specifying criteria that goes into a vending machine.

Q   Okay.  But those criteria, what was the criteria in the end?  Or what was the criteria that was being debated?

A   Really there was a thought that there was inappropriate books, like, the same considered books that were inappropriate in our book fair.

Q   Okay.  And so that had to -- and those were, like, what type of topics?

A   In the book fair, that would be LGBTQ topics.  But also, topics that were just inappropriate for students at the age level.

Q   Okay.  So it was concerns related to that this is not the right age level for whatever is in the book?  Is that fair to say?

A   Yeah.  What the PTO was trying to do, because we have multiple reading levels in our

Page 81

district, you know, in a building of -- of second and third graders, let's say, you might have reading level of kindergarten.  You might have a reading level of sixth grade.  So we allowed, you know, a higher reader to pick something that was at their reading level.

We've now taken all of those books out, and we only have books that are of those second and third grade reading levels.  That's just the building I'm picking.  We also have vending machines in other buildings, but -- and then the PTO will put those books in a back room someplace, and parents are asked if they want to pick out of these other books to get a reading level that is at their child's reading level.

Q   Okay.  And then last couple of set of questions, and I'm trying to hurry this through.  So forgive me for, like, the form of this exactly.

But you agree that teachers do put things up on their walls; right?

A   Correct.

Q   And so, like, for example, a Spanish class, they might have things that relate to Spanish sort of scattered around the room.

A   Yes.

Q   Is that -- that's accurate?  Same thing for English or whatever; right?  Now when you say you

21 (Pages 78 - 81)

Page 82

teach a specific poster or a specific thing -- you know, and, like, going back to that Spanish class example, the Spanish teacher doesn't necessarily point to every single poster that they have up; correct? In other words, those are sort of related to what's being taught, but they're not, like, physically pointing to every single poster necessarily? And that that's different than say a football flag or something that's completely unrelated. Would you agree that there's a difference there?

A I didn't review every poster on every wall, but most of them -- like, if it was a Spanish, it might be a Garfield poster that's in Spanish. So yes, the student would have to read it in Spanish to understand the Garfield poster. But it would not be my perspective that -- that the Spanish teacher teaches from posters on our wall. I believe that that is what the -- what they put in their lesson plans and in their -- the content that they give to their teachers -- or to their students.

Q So is it fair to say that in this particular case it's really a question of there is this thing on the wall. There is a claim that it was never -- you know, that it wasn't directly used. But it's sort of a perception of is this reinforcing or connected to

Page 83

the LGBTQ lessons that are being taught and whether that falls on one side of the line or the other side of the line as from a board policy perspective. Is that -- as compared to --

A I think there's like five hearts and only one of them was a rainbow heart. So I -- I think the -- the purpose of the flag was exactly what Mr. McIntyre said it was, which is to state that hate has no home here. And these are all different types of people that -- that are included in that message hate has no home here.

Q Have you seen now through discovery all of the slides that relate to -- that he was actually teaching in the classroom or relating to the various subject matters?

A I'm not sure.

Q Okay. Well, no further --

A I've seen some, but I've not -- I don't know if I've seen them all or not.

Q You've not? So of the ones that you have seen, have you seen anything to do -- I mean, have you seen the slides that relate to LGBTQ history and civil rights? Have you seen those slides?

A I've seen some, yes.

Q Okay. Do you think that that poster relates

Page 84

to that by the fact that it has the various flags on it?

A Does that poster relate to his lesson of -- of LGBTQ?

Q Civil rights relating to that he's teaching in the classroom?

A Well, it -- it has similar content on it, yes, because there was a -- a rainbow flag and -- and if we're talking about gay rights, then I think that -- that they are as symbols. But I would not say that a Bengals flag in a math classroom, and I'm teaching statistics. I'm not using that Bengals flag to -- to bring along statistics. I don't know that he's bringing -- he's using that flag to bring it along.

But he did put the flag in his room, I believe, to share the message that he wants people to be kind in his classroom.

Q But I guess the question really boils down to, do you see it as fundamentally different than the Garfield poster speaking Spanish in a Spanish class that a teacher never points to but happens to be there that sort of reinforces what's being taught as compared to just a Bengals banner? Do you see the --

A Does it reinforce that he's teaching

Page 85

kindness in his classroom? I think it does.

Q Okay. And the civil rights elements that he's teaching in his classroom?

A Well, just that kindness. I mean, I think that we all try to teach kindness in our classrooms, but he does have LGBTQ content as well. And it did have an LGBTQ heart on that flag.

MR. TARAZI: Okay. No further questions.

MR. ENGEL: One quick follow up, and I'll note here I gave Mr. Tarazi lots of leeway on leading because I know he was trying to get through stuff.

EXAMINATION
BY MR. ENGEL:

Q One of the questions he asked was whether the flag was connected to "LGBTQ lessons". Is that a fair characterization? Did Mr. McIntyre have LGBTQ lessons? Or did he have history lessons that happened to mention LGBTQ issues among others?

A I believe that that more accurately represents what he teaches. He teaches social studies. And in social studies you would have references to all different groups including the LGBTQ community.

22 (Pages 82 - 85)

Page 86

Q So when you say that, you meant the latter description I gave?

A Yes.

Q Okay. So just so we're clear, he did not have LGBTQ lessons to the best of your knowledge?

A I do not believe he did. Again, I'm not in his classroom every day, but there would be no reason for him to be just having LGBTQ lessons.

Q No reason to think he did?

A Pardon me? No reason to think he did; right.

Q In other words, you have no evidence to think he did?

A Yes.

MR. ENGEL: Okay. I have nothing else. Thank you.

THE REPORTER: Go ahead.

MR. TARAZI: Can I just clarify?

EXAMINATION

BY MR. TARAZI:

Q If I said -- I was speaking fast, and I apologize. But I think I was trying to say it was LGBTQ civil rights lessons, and maybe I crunched it. I know I said it once. Maybe I crunched it on the second time. So I was trying to say --

Page 87

A I believe he teaches civil rights lessons.

Q Right. But you don't believe that he's focused specifically on LGBTQ civil rights in his classroom?

A I -- I do not know that.

MR. TARAZI: Okay. No further questions.

THE REPORTER: Mr. Engel, would you like a copy of this transcript?

MR. ENGEL: We would, please. Thank you.

THE REPORTER: And, Mr. Tarazi, would you like a copy of this transcript?

MR. TARAZI: We would. And thank you very much, by the way, for doing the depositions for us today and being patient with all of the talking over and stuff.

MR. ENGEL: All right. We'll let Ms. Morgan --

THE REPORTER: We can go off the record at 3:57. Thank you.

(Signature waived.)

(Whereupon, at 3:57 p.m., the proceeding was concluded.)

Page 88

CERTIFICATE OF DEPOSITION OFFICER

I, MARIANNE HISSONG, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Marianne C Hissong*

MARIANNE HISSONG
Notary Public in and for the
State of Ohio

Page 89

CERTIFICATE OF TRANSCRIBER

I, EMILY LEVY, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Emily Levy*

EMILY LEVY

23 (Pages 86 - 89)