Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

_____

GEORGE MCINTYRE,

      Plaintiff,

   v.                           Case No.

LITTLE MIAMI SCHOOL DISTRICT,      1:26-cv-00351-MWM

ET AL.,

      Defendants.

_____

DEPOSITION OF DR. KEVIN HARLEMAN

DATE:          Tuesday, June 9, 2026

TIME:          9:02 a.m.

LOCATION:      Remote Proceeding

                Little Miami Schools

                Morrow, OH 45152

REPORTED BY:  Marianne Hissong

JOB NO.:      8223137

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF GEORGE MCINTYRE:

JOSHUA ENGEL, ESQUIRE (by videoconference)

Engel & Martin LLC

4660 Duke Drive

Mason, OH 45040

engel@engelandmartin.com

(513) 445-9600

ON BEHALF OF DEFENDANTS LITTLE MIAMI SCHOOL DISTRICT

AND DR. KEVIN HARLEMAN:

OMAR TARAZI, ESQUIRE (by videoconference)

Omar Tarazi Law Office

5635 Sandbrook Lane

Hillard, OH 43026

otarazti@tarazilaw.com

(614) 226-2823

Page 3

I N D E X

EXAMINATION:                          PAGE
  By Mr. Engel                   5
  By Mr. Tarazi                  60

         E X H I B I T S
NO.         DESCRIPTION                 PAGE
Exhibit 2     "Hate Has No Home Here" Flag     30
Exhibit 4     Ohio Revised Code 3313.473      13
Exhibit 5     Parents' Bill of Rights       12
Exhibit 8     American History Model Curriculum  22
Exhibit 9     AP European History Part 9-14     26
Exhibit 13    Tarazi Memorandum          18
Exhibit 15    Tarazi Memo Email II         19
Exhibit 16    Building Pictures          32
Exhibit 18    Email Chain             44

NO.         DESCRIPTION                 PAGE
Defendant:
Exhibit G_1    Email from George McIntyre      72
Exhibit O     Syllabus Relating to Course Math
         and Pacing Guides           73
Exhibit U     Plaintiff Text Messages        77
Exhibit V     Superintendent's Email Guidance
         Forwarded to Principals        76

Page 4

P R O C E E D I N G S

THE REPORTER:  Good morning.  My name is Marianne Hissong.  I am the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 9:02 a.m.

This begins the deposition of Kevin Harleman taken the matter of George McIntyre vs. Little Miami School District, et al., on June 9, 2026, taken remote via Zoom.

I am a notary authorized to take acknowledgments and administer oaths in Ohio.  Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time, will everyone in

Page 5

attendance please identify yourself for the record, beginning with the taking attorney?

MR. ENGEL:  Hi.  I am Joshua Engel, counsel for the plaintiff.

MR. TARAZI:  Omar Tarazi, 84165, counsel for the defendants.

DR. HARLEMAN:  Kevin Harleman, the principal of Little Miami High School.

THE REPORTER:  Thank you.  Hearing no objection, I will now swear in our witness.

Dr. Harleman, can you please raise your right hand?

WHEREUPON,

KEVIN HARLEMAN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  On the record.

EXAMINATION

BY MR. ENGEL:

Q   Good morning.  Would do you please spell your name?

A   First name is Kevin, K-E-V-I-N.  Last name Harleman, H-A-R-L-E-M-A-N.

Q   Okay.  And where are you currently employed?

2 (Pages 2 - 5)

Page 6

A Little Miami School District.

Q How long have you been there?

A Five years.

Q What is your position?

A Principal.

Q Okay. Have you been principal all five years?

A I was an assistant principal my first two. I've been the head principal of the last three.

Q What did you do before joining or taking this position? Or let me back up. What did you do before you became assistant principal?

A I was the principal of the John Lazarus, which is the Warren County alternative school. I was there for six years.

Q How long have you been working in education?

A Twenty-four years.

Q Okay. What are some of the positions you've held?

A I was a special education teacher for 13 years. I dealt with students with behavioral and emotional disorders.

Q Okay. And what's your educational background?

A I have a bachelor's in social science

Page 7

education from Wright State, a master's in educational leadership from Regis University, and a doctorate in exceptional student education from North Central University.

Q Have you ever been in a deposition before?

A I have not.

Q All right. Well, it's always good when it's new for somebody. So a couple rules I have on these depositions, and I'm sure you've sort of been briefed and asked about what's involved. My job is to ask questions, and your job is to answer them to the best of your ability. We write these all down. So those normal human interactions, like where you point or nod your head or anything like that, those don't get taken down by our loyal and intrepid court reporter. So you need to make sure all your answers are out loud. Okay?

A Okay.

Q I warn everyone that they are not a hostage here. So if at any point you need to take a break, just let me know, and we'll take a break. And that could be for whatever reason you want. The only thing I ask is as a courtesy, that if there's a question pending, we'll answer that question first, and then we'll take whatever breaks we need to take. Fair

Page 8

enough?

A Fair enough.

Q I will do my best to ask questions that are understandable, but I don't always succeed in that task.

A Okay.

Q So if anything I ask is not understandable or you need clarification, please let me know. Otherwise, I'll just assume you understood it. Fair enough?

A Okay. Yep. Fair enough.

Q An important caveat to that is that the words I'll use, you should just give their plain and natural meaning. Sometimes, however, words have special meaning in your field, something we call "terms of art." If they do, please let us know, and we'll make sure we get a good definition of the words you're using in answering the questions. Or if I use a word imprecisely, let me know, and we'll make sure we are on the same page. Okay?

A Yep.

Q We are on Zoom here. And one of the disadvantages of Zoom is that sometimes it's hard to hear people. And sometimes we, because of a computer lag, might talk over each other. I will try my best

Page 9

not to do that, but it will happen. So I apologize in advance. And if you need more time to answer a question, just say, "Hey. I wasn't done. Let me finish that question." Okay?

A Yep.

Q Our court reporter might yell at us, too, sometimes, and say, "Hey. You guys need to slow down or not talk over each other." She's doing that because she's doing her job and not because she's mad at us, we hope.

Finally, and I don't think this will come up, but I always want to be cautious in school cases. We want to make sure we protect everyone's FERPA rights. So if a question requires you to give the name of a student or any personal identifying information for a student, please don't do that. We'll use initials, or we will use something else to make sure that we protect the privacy rights of students. But just alert us if that issue comes up, before we put a name in the record.

A Okay. Sure.

Q Because everything we say does get written down. All right. Any reason we can't go forward? You ready to go?

A Yep.

3 (Pages 6 - 9)

Page 10

Q Great. Have you ever been named in a lawsuit before?

A A divorce.

Q Okay. Any other civil matters or criminal matters or anything like that?

A No.

Q Okay. Never been charged with or convicted of a crime?

A No.

Q Okay. Where do you currently live?

A I live in Jamestown, Ohio.

Q Okay. How long have you lived there?

A Just about seven years.

Q Okay. Do you own property anywhere else?

A I do not.

Q Do you have any children in the Little Miami Schools?

A I do not.

Q Any who graduated from there?

A No.

Q What did you do to prepare for this deposition?

A Last week, I met with my superintendent and Omar.

Q Was anyone else present for that meeting?

Page 11

A Marla Timmerman, the assistant superintendent.

Q Okay. She works for the department?

A Yes.

Q Okay. And why was she present?

A I believe she was compiling like some documents -- some educational documents.

Q So did you speak to any other people about your testimony in this case?

A No.

Q Let me ask specifically. Have you spoken to any board members about your testimony here?

A I have not.

Q Okay. Other than in the meeting you had with Mr. Tarazi, have you spoken with Ms. Morgan about your testimony?

A Not besides the meeting with her -- or with him.

Q Has anyone made any effort to try to influence your testimony or intimidate you to testify in any certain way?

A Not that I'm aware of.

Q Has anyone done that to anyone else?

A Not that I'm aware of.

Q Is Mr. Tarazi, he's representing you here

Page 12

today, I assume, in your role as an employee of the district?

A Yes.

Q Okay. Are you paying him directly or is the district paying him?

A I'm -- I'm unsure. I -- I am not paying him directly. No.

Q Okay. You haven't received the bill, then?

A I have not. I have not.

Q All right. So because you're last, this might go a little quicker than some other people. I am going to show you on a screen some documents here.

A Okay.

Q And we are going to start with a document we marked as Exhibit 5, which is the school's Parents' Bill of Rights policy. And are you familiar with this policy?

(Exhibit 5 was marked for identification.)

A I am.

Q Okay. Were you involved in the drafting of this policy at all?

A I was not.

Q Have you received any training on this policy?

Page 13

A We received training from Ennis Britton on that policy.

Q Who is that?

A It's a law firm that our -- our old law firm that used to represent the school district.

Q And what sort of training did they provide to you?

A They do a legal update every year at the beginning of the school year with all the administration. So they went over the Parents' Bill of Rights.

Q Okay. And were they focused on the state statute or the district policy or both?

A It was more of like the state statute.

Q Okay. And so let me show you. We marked that previously as Exhibit 4 -- 3317. I'm sorry, 3313.473. This is the state law you're talking about?

(Exhibit 4 was marked for identification.)

A Correct.

Q Okay. And really, what I'm going to focus in on is this definition of sexuality content in the state statute. Are you able to see it there?

A Yes. I am.

Q Okay.

4 (Pages 10 - 13)

Page 14

A I have to grab my glasses. Hold on.

Q Yeah. Take your time.

A Okay.

Q And I believe the language in the statute is the exact same language that's in the Parents' Bill of Rights. Is that your understanding? The Parents' Bill of Rights policy?

A Correct.

Q Okay. So I'm going to refer to, I think, for our conversations, the district's policy. But if you understand there's any sort of difference with what's required by the state and what's required by the policy, please let me know, and we'll make sure we draw that distinction.

A Okay.

Q Fair enough?

A Fair enough.

Q Okay. So as part of your familiarity with the policy, I assume you're familiar with this definition of sexuality content?

A I am.

Q Okay. And did you receive any training on that?

A Just -- just the training that I had mentioned before from the lawyers.

Page 15

Q Okay. So did the training discuss how you define sexuality content?

A To be honest, I don't recall, if there were specifics.

Q All right. Well, let me ask you about this definition because it reads, "Sexuality content means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting." Do you know what this term "sexual concepts" means?

A I mean, not -- not in particular.

Q Has anyone defined that term for you?

A No. Not that I'm aware of.

Q Is there a working definition in Little Miami Schools of what that means?

A Not that I'm aware of.

Q Okay. Same question about the term "gender ideology." Are you familiar with the definition of that term?

A I wouldn't say the definition. I'm familiar with the term.

Q What's your familiarity with the term? What do you mean by that?

A When -- when the House Bill 8 presentation was given to us, we were notified that if a student

Page 16

wanted to be called by a different name, that would be a gender change. Or wanted to be called different pronouns, then we had to report that to their parents.

Q Okay. And that's what you understood to be gender ideology?

A Yes.

Q So would you say any description in the classroom of people behaving in a way inconsistent with their gender assigned at birth is gender ideology?

A Could you -- could you repeat that?

Q Sure. Does gender ideology include any depictions of someone acting in a way inconsistent with their gender assigned at birth?

A It depends on, I guess, what -- what you mean by acting.

Q Well, okay. So let me give you an example we've used some other depositions. I assume you're familiar with the play of The Merchant of Venice? Okay. And in The Merchant of Venice, the climactic courtroom scene, a woman dresses up as a man in order to play a lawyer there. Is that gender ideology?

A I would say "yes."

Q Okay. Why would you say that?

A Because someone's portraying to be a

Page 17

different -- a different gender.

Q So if a teacher were going to teach Merchant of Venice in your high school, would that require parents to be notified ahead of time?

A Depends on -- I guess it depends on how they're teaching it. What's the --

Q What do you mean by that?

A I mean, I -- if they're, I mean, if the instruction is geared towards that or if it -- the instructions are geared towards something more whole.

Q Can you give me an example?

A I think a lot of times in education, things come up. Students ask questions that, you know, aren't something planned. You know, a -- a student could ask a question based off some topic that could maybe pertain to something else that the teacher wasn't, you know, going to touch on in the first place.

Q Now, the definition in the policy has an exception. It talks about "incidental references to sexual concepts or gender ideology." What does that mean?

A That's kind of what I was trying to say. Like if a question comes up or -- or something different comes up, the teacher wasn't purposefully

5 (Pages 14 - 17)

Page 18

trying to teach that concept. It just came up in discussion.

Q Okay. So let me ask some broader questions, then. Thinking about this definition of sexuality content, is acknowledging the existence of LGBTQ individuals sexuality content?

A Could you repeat that question?

Q Yeah. Is acknowledging the existence of LGBTQ individuals sexuality content?

A I do not believe so.

Q Is acknowledging that LGBTQ students have the right to an education without harassment a sexual concept or gender ideology?

A I do not believe so.

Q Is the idea that bullying and harassment based on sexual orientation is prohibited considered to be sexuality content?

A I don't believe so.

Q I'll show you what we marked Exhibit 13, which is a administrative memo from Mr. Tarazi. I just want to clear. Have you ever seen this document?

(Exhibit 13 was marked for identification.)

A I have not.

Q Okay. I'll show you, now, what's been

Page 19

marked Exhibit 15, which at the bottom contains a January 23, 2026, email from Mr. Tarazi to Ms. Morgan.

(Exhibit 15 was marked for identification.)

And I'll scroll down as slowly as you need. There's a discussion about classroom displays and then a question about application of sexuality content or some information about that. Have you ever seen the substance of this email?

A I have not.

Q So was this ever shared to you?

A This was not.

Q Okay. So just let me ask specifically. Was the idea that in determining whether a classroom display is considered sexuality content, you apply the test in bold from Mr. Tarazi here? Was that ever shared with you in any form?

A Not to my knowledge.

Q Okay. And just because I've done a bad job here of asking questions, I'm referring to the document on page 425 here. And there's two bullet points that says "The district provides a common-sense and objective standard to determine whether something is sexuality content." So same question. Was that information ever shared with you in any form?

Page 20

A Not -- not in this form, no. You know, it was -- the only thing that was shared was after -- and I don't recall the date. But the process, if someone had an issue with or thought -- believed something to be of sexual content.

Q And that's the process found later in this email, you mean? Okay. So let me ask, then, two separate questions.

A Okay.

Q Just because I think I've done a bad job of asking questions here. So I apologize. So if I'm understanding you right, on page 425, there's a three- step process outlined by Mr. Tarazi. You're familiar with that process?

A Yes. I am.

Q Okay. There's also right above that a test for determining whether a classroom display is considered sexuality content that he developed. If I understood you right, you said you are not familiar with that test?

A I am not familiar with that.

Q Let me ask you just a little bit more about sexuality content in general. Is there a difference between instruction that addresses sexuality and instruction that teaches about sexual conduct or

Page 21

relationships?

A Can you repeat that?

Q Sure. Is there a difference between instruction that addresses or acknowledges sexuality and instruction that teaches about sexual conduct or relationships?

A I believe so.

Q And why do you say that?

A You know, there's historical relevance to certain -- certain things that happened as far as harassment and different movements that, you know, include, you know, some sexuality. But it's not -- it doesn't mean it's -- it's taught in a biased way, just a historical way.

Q So specifically, is teaching about, for example, the history of the Civil Rights Movement as it involves gay and lesbian individuals considered to be sexuality content?

A As -- as long, in my opinion, as long as it's straight down the middle and not pushing one side or the other, I -- I think it's material that the students should learn.

Q In other words, is it sexuality content if a teacher has a lesson on Harvey Milk? And then, as part of that lesson says, "Harvey Milk was a gay mayor

6 (Pages 18 - 21)

Page 22

who was assassinated." Would that be sexuality content?

A In my opinion, no.

Q Same for if you taught about the Stonewall riots as part of the Civil Rights Movement? Would that be considered sexuality content?

A In my opinion, no.

Q So one of the things that we discussed earlier was the model curriculum from the State of Ohio. We marked this as, first page, Exhibit 8. Are you familiar with that?

(Exhibit 8 was marked for identification.)

A Yes.

Q Okay. And as a principal, you're probably the best person to ask this. I mean, what are these model curriculum that the State developed?

A I don't know if I'm the best person to ask. But, you know, it -- it, you know, guidelines and -- and expectations. And a lot of it, you know, has to do with, like, you know, ideas to elaborate on the content.

Q And so do the classes at Little Miami, say in American History, try to follow this model curriculum?

Page 23

A Absolutely.

Q Okay. And is this model curriculum made available to parents?

A It is.

Q Okay. How is it made available to parents?

A Well, I mean, it's on the state website. Some -- some teachers might post it to their Schoology account, which is accessible by parent.

Q What is Schoology? I've heard a couple things about it.

A Yeah, it's -- it's an online platform that we use here. Teachers post assignments, their PowerPoints. They communicate with students through it. There's a messaging system on it. But the parents have access to all materials that are on Schoology.

Q So if a parent posts all of their class presentation materials and everything on Schoology, a parent would have access to it?

A Yes.

Q And parents are told how to access this?

A I don't know if there's a specific training for the parents, but there are access codes for the parents to -- to log into it.

Q Okay. And do parents actually do this?

Page 24

A Yes, very often.

Q Okay. Do you ever get complaints about content from parents because of things they've seen on Schoology?

A In my five years, I've only had one parent complain about any content.

Q And how do you spell Schoology to help our court reporter out here?

A It's S-C-H-O-O-L-O-G-Y.

Q So let me refer you to some sections of the model, American History thing, in particular. We'll look at Content Statement number 27. And I hope you're able to read it. I can make it a little bigger. Does that help?

A That helps a lot.

Q I'll ask you to review that. Then I'll ask you a question about it.

A Okay.

Q Does anything in Content Statement 27 constitute sexuality content?

A In my opinion, no.

Q And you say that even though it specifically mentions teaching about the gay liberation movement beginning with the Stonewall riots?

A Correct. That's history.

Page 25

Q And then, let's look at Content Statement number 32. I'll ask you to review that, and then I'll ask you the same question.

A Okay.

Q Anything in Content Statement number 32 constitute sexuality content as that term is defined in the board policy?

A In my opinion, no.

Q And you say that even though it specifically mentions the continuing debate between the role, the state, and federal government and political and social issues, including disagreements over LGBTQ rights?

A Correct.

Q And just so we're clear, I think there was a mention earlier in the case about Content Standard 24. Anything in Content Standard 24 that constitutes sexuality content?

A In my opinion, no.

Q And does your answer change if part of the teaching about Content Standard 24 involves something called the Lavender Scare?

A No. I mean, that's -- that's part of history.

Q You're familiar with what I mean by the Lavender? Is it the Lavender Scare?

7 (Pages 22 - 25)

Page 26

A   Yeah.  Lavender Scare.  Yes.

Q   Yeah.  And just so someone who picks up the record and doesn't know what it means, what is your understanding of that?

A   I don't have a huge understanding about it. I mean, I -- it's been brought up in conversations through other things I've just read with other school districts.  But it has to do with -- with LGBTQ+.

Q   Does it refresh your recollection, the targeting of gay and lesbians?

A   Yeah.

Q   In a manner similar to McCarthyism around that time?

A   Yes.  Yeah.  Harassment, intimidation, yes.

Q   And teaching about that would not constitute sexuality content?  Would it?

A   In my opinion, no.

Q   We also have had some discussion of the AP European History curriculum, which we previously marked as Exhibit 9, and we pulled out topic number 9.14, and I think the discussion was on some of the material on the second page.

        (Exhibit 9 was marked for
        identification.)

        So I should ask first.  What is AP European

Page 27

History, and how is that different than other things taught in school?

A   AP courses are advanced placement courses. They're -- they're given by College Board.  And then, students can take that course, take a assessment at the end and earn college credit.

Q   And so is that curriculum set by the State, or is it set by someone else?

A   It's set by College Board.

Q   And so what we have here on the thing is one of the documents produced by the College Board for the curriculum.  And you see at the bottom, there's some of the topics to be discussed, including the one.  It looks like 4.4.III.B.  I can make it a little bigger, which begins various movements.  Anything about that constitute sexuality content?

A   In my opinion, no.

Q   Okay.  And you say that, even though it includes teaching about gay and lesbian movements?

A   Correct.

Q   So are you familiar with Mr. McIntyre?

A   I am.

Q   Okay.  How do you know him?

A   He's been a teacher here at the -- at the high school.

Page 28

Q   Are you responsible for supervising him?

A   I am.

Q   How long have you known him?

A   Four or five years.

Q   In the course of your supervision, are you familiar with what he teaches in his classroom?

A   Yeah.  And overall, I mean, I have 90 teachers here.  So, I mean, overall, I'm not in his classroom every day, but I'm very visible in my teacher's classrooms.

Q   What do you mean by that?  Like, how do you supervise all these teachers?

A   Well, we split them up.  So it's myself and I have two assistant principals.  We evaluate certain teachers.  George is one of the teachers that I evaluate.  But with that said, we, you know, I -- myself and my admin team, we pop into classrooms constantly throughout the day just to -- just to listen and check on things and be visible.

Q   Are you aware of Mr. McIntyre ever teaching sexuality content in his classroom?

A   I am not.

Q   Are you familiar with the materials that he uses in his class?

A   I am.

Page 29

Q   Those are all available on Schoology?

A   Correct.

Q   Okay.  Did teachers in your school do lesson plans?

A   They do.  I -- I do not require them to turn them in, though.

Q   So I assume, then, some do, some don't?

A   Yeah.  But I -- I'd venture to say they all do.  I mean, they all have -- they all plan.  They just do it in different ways.  It's not like the old-fashioned lesson plan.  You know, it's more of a sequence of events that they post on Schoology.

Q   So you're able to look at the Schoology materials?

A   I am.  Yes.

Q   And in particular, have you looked at the Schoology materials that Mr. McIntyre used for American History and European History?

A   I mean, some of them, I -- I glance over. Like I said, I have 90 teachers.  So I don't go in depth on every single teacher, but I glance over the teacher's Schoology accounts.

Q   Did you pull or look at any of the documents for his classes in preparation for this deposition?

A   I did not.

8 (Pages 26 - 29)

Page 30

Q Now, we're here because of a classroom display. And just so we're clear on the same page, previously marked that as Exhibit 2, which is the "Hate Has No Home Here" flag. Your understanding is this is what we're talking about today?

(Exhibit 2 was marked for identification.)

A Correct.

Q Okay. And what you see there is a true and accurate depiction of the flag that was in his classroom?

A Yes.

Q Okay. And on the first page of Exhibit 2, is that a fair and accurate depiction of where it was in his classroom?

A Yes.

Q Right next to a Bengals flag and right above an American Flag it looks like; right?

A Yes.

Q Does your school have any policy about classroom displays?

A No.

Q So what is your understanding of what teachers are permitted to put on their classroom walls?

Page 31

A I -- I think teachers need to use discretion over what they -- what they put on their walls. You know, I -- the policy is pretty much does it -- does it cause a disruption to the educational environment? If a poster or display of any kind causes a disruption to the educational environment, then it shouldn't be on the walls.

Q So what kind of posters might cause a disruption to the educational environment?

A I mean, for instance, like if it had cuss words on it. Obviously, that would cause a disruption. I mean, specifically, I guess, I don't know, but --

Q For example, if I'm a Browns fan and I see a Bengals poster, is that going to cause disruption?

A No. It does not.

Q I mean, it's a serious question; right?

A No. I know. I'm a Browns fan and I don't like the Bengals. So that's kind of a funny question.

Q Okay. Well, fair enough; right? But when Mr. McIntyre has this Bengals poster on his wall, for example.

A Yeah.

Q You understand that to mean his personal view of the Bengals; right?

Page 32

A Absolutely. It personalizes his classroom.

Q Okay. And is that a good thing for people to personalize their classroom?

A I believe so.

Q Why? Why?

A Well, 'cause it -- it generates conversations between students and -- and teachers, and it develops relationships.

Q Do students and everyone else in the district understand that what people put on their walls is their own personal views?

A I believe so.

Q In other words, everything that's on the wall isn't an endorsement by the district? Is it?

A Correct.

Q Is everything that's put on the wall have to relate to the curriculum?

A It does not.

Q So, for example, some people went around the school and took some pictures that we marked as Exhibit 16.

(Exhibit 16 was marked for identification.)

These are all pictures that I assume you might have seen around the building as well?

Page 33

A Yes.

Q So, for example, a picture about Quidditch and Harry Potter, that's not an endorsement by the school of Harry Potter? Is it?

A No.

Q Not an endorsement of witchcraft, for example?

A No.

Q When we see someone has, for example, a poster of Garfield on page 768, is that curricular material?

A No.

Q What about document that we have on page 770? Anything problematic about that poster?

A No. I believe -- I believe a former student created that.

Q Is the rainbow imagery on that poster problematic?

A In my opinion, no.

Q Okay. You understand some people associate rainbow imagery with gay and lesbian movements; right?

A Yes.

Q Is simply having rainbow imagery problematic or going to cause disruption in the school?

A In my opinion, no.

9 (Pages 30 - 33)

Page 34

Q   And let me ask you specifically, before I forget, about the posters that Mr. McIntyre had on the wall.  Did his poster cause any disruption in the school?

A   It did not.

Q   Did his flag interfere with the ability of the school to efficiently provide educational services to students?

A   It did not.

Q   Did you ever get any complaints about that flag?

A   I -- I did not.  The only complaint I received was the one from a board member.

Q   And that's Mr. Wallace?

A   Yeah.  I didn't receive the complaint.  Ms. Morgan received the complaint.

Q   That's the only complaint you're aware of; right?

A   Correct.

Q   So going back to stuff that's around the school, a poster involving the Gilmore Girls, that wouldn't be sexuality content?  Would it?

A   No.

Q   Okay.  Even though I understand that show from talking to my kids, that show itself has a lot of

Page 35

sexuality content in it.  But you wouldn't consider this poster to be that?  Would you?

A   Yeah.  I'm not aware of the -- the show.  I've never watched it, but no.

Q   No problem with Darth Vader on there; right?

A   No.

Q   Let's give specific ones.  There's a picture for the Tottenham football team.  That's not an endorsement, again, by the school of a Premier League team; right?

A   No.

Q   On page 786, there's a poster that says, "Everyone is welcome here," with some rainbow imagery.  Would that be considered sexuality content?

A   In my opinion, no.

Q   Poster on page 792 of Justice Ginsburg, is that sexuality content?

A   In my opinion, no.

Q   Okay.  Is the depiction of Justice Ginsburg gender ideology?

A   In my opinion, no.

Q   What about page 801, this rainbow dolphin?  Any problems with that?

A   No.

Q   Would that be considered -- that's a

Page 36

terrible question.  Would that be considered sexuality content?

A   In my opinion, no.

Q   Same answer on page 803 for the rainbow elephant?

A   Yeah.  In my opinion, no.

Q   Okay.  So when did you first become aware that Mr. Wallace had complaints about the flag in Exhibit 2?

A   When Ms. Morgan called me to let me know that he had an issue with the flag.  And prior to that, he came to the school to take a picture of that flag.

Q   When had he come to the school?

A   I don't recall the date.  But he had come to the school and -- and wanted to go to George's classroom, and while in there, took a photo of that poster.

Q   Is this the first time he'd been in the school?

A   He was there a couple times.

Q   And I should say, I assume he had some kids who went there.  I assume he had to go there as a parent; right?

A   I don't believe that those visits were as a

Page 37

parent.

Q   Yeah.  That's what I'm trying to get at; right?  Sometimes, like, you go to parent teacher conferences, for example; right?

A   Correct.

Q   So these were outside of those visits that were outside of those types of usual parent visitations?

A   Yes.  They were.

Q   Okay.  And do you know why he was coming to the school?

A   I -- I don't know specifically.  But he, I mean, when he arrived, he did want to go to that room.  And he also wanted to go to the library.

Q   And I think you said that's not the first time he'd been in the school; right?

A   Yeah.  There was another -- there was another time he came to the school as well.

Q   When was that?

A   I don't recall the date, but there was an email going back and forth that day between myself, Ms. Morgan and Mr. Wallace.  She had -- she had asked him to schedule a time with me so he would have an escort around the building 'cause it was a time where students were present.  He said he didn't need an

10 (Pages 34 - 37)

Page 38

escort. When he arrived here at school, I was actually in another meeting. And so he -- he did not wait on me and went ahead and started walking around the schools to when, then, Ms. Morgan was notified.

Q   Why is that a problem if someone's walking around the school?

A   Well, it's -- it's unfamiliar for the students. I want the students to be here at the school. And I -- I want the students to feel safe. I want, you know, they -- they recognize the staff here. And so I don't want people that they don't recognize walking -- walking the halls. 'Cause then it becomes commonplace. And -- and I think it -- it takes down the safety of the school.

Q   What was he doing when he walked around the school?

A   The one time, he was video recording stuff. I don't know if he was taking pictures, too, but I know that he was recording on his phone.

Q   Is that a problem?

A   In my opinion, yes. Because there's students around.

Q   I've been told, also, there's some safety concerns, if people were to go around and start taking pictures around the school.

Page 39

A   There could be there. There are students that are on a non-published list. Their parents sign a document that they do not want their student's picture taken or videotaped.

Q   Okay. I'm asking because, specifically, Mr. Tarazi told me that, you know, we couldn't go around and take pictures, for example, without the superintendent there because of some security concerns. Does that sound accurate?

A   Yeah. I mean, 'cause even after hours, we still have students in the building with different clubs and sports and things like that.

Q   So Mr. Wallace doing that, did that create a security risk, then?

A   In my opinion, it did.

Q   Was that around the time there was an issue with Safe Space stickers at the school?

A   No. That was -- the Safe Space stickers was a few years ago.

Q   Okay. What was the issue with that?

A   I -- I don't know if it was Mr. Wallace or someone else, but someone else pointed them out, that they did not like them. Or a previous superintendent had them taken down.

Q   And when I say Safe Space stickers, can you

Page 40

describe them? What are we talking about?

A   Yeah. It was just a small -- small little rectangular sticker that -- that people had on their -- the window -- the little window of their door. It was a really small sticker.

Q   And it had rainbow imagery on it?

A   It did.

Q   Okay. And why did people, or why, if you know, did teachers put those on their door?

A   I think just so students could -- would feel comfortable coming to them.

Q   And particularly, students who were LGBTQ students?

A   Yeah, but not just that. I think it was more of a welcoming -- like, they welcome everyone.

Q   So what was the objection to the stickers?

A   To be honest, I -- I don't know all the specifics behind that.

Q   Okay. Do you know if the objection, specifically, had to do with the rainbow imagery?

A   I know that that was part of it.

Q   Tell me what you know about that, if anything.

A   I -- I really don't know much. I just know that that was part of what was being brought up was

Page 41

the rainbow on -- on those stickers. I was just taking over as principal when those stickers came down and Ms. Morgan was just transitioning into the superintendent role at that time.

Q   Would those rainbow stickers constitute sexuality content?

A   In my opinion, no.

Q   So, all right. So we're talking about, when you said Mr. Wallace, I think, came to the building and he just went to Mr. McIntyre's room? Was that your testimony?

A   He went to Mr. McIntyre's room. Then he went to the library -- to the -- our media center.

Q   What did he do?

A   In George's -- Mr. McIntyre's room, he -- he took a couple pictures. In the media center, he did not take any pictures, to my knowledge.

Q   Did you speak to him?

A   Very short conversations.

Q   What do you remember about those conversations?

A   I remember that when we walked into the media center that he said that his intel was incorrect.

Q   What did he mean by "intel?"

11 (Pages 38 - 41)

Page 42

A   I don't know. I didn't ask for clarification.

Q   So what happened next?

A   I walked him out towards the front of the building, and he walked out the doors.

Q   And do you recall? Was this in about September timeframe?

A   Possibly, yeah. It was in the fall.

Q   Okay. Fall of 2025?

A   I'm sorry. Could you repeat?

Q   2025?

A   Correct.

Q   So what happened next? That's a terrible question. What happened next with respect to the flag in Mr. McIntyre's room?

A   Nothing was brought -- nothing was brought up to me immediately about it. I informed Ms. Morgan what took place. And, I mean, nothing at that -- at that particular time was relayed to me.

Q   So when was the next time you heard anything about the flag in Mr. McIntyre's room?

A   When Ms. Morgan called me.

Q   When was that?

A   I -- I forget the dates. I don't -- I don't know.

Page 43

Q   Approximately, was it January, 2026?

A   Around that time. Yeah.

Q   Okay. So a few months after when Mr. Wallace was there?

A   Correct.

Q   Okay. And what do you remember about your initial conversation with Ms. Morgan?

A   So my question to her was, "Is," because I -- I knew the events that would take place, you know, if -- if someone had an issue with something, they'd come to me. And then they would go to her, and then go to the school board. I asked her if Mr. Wallace was reporting this as a parent, or was he reporting this as a school board member, to see what my involvement would be in this.

Q   Why was that difference important?

A   Why was that what?

Q   Why was it different, which hat he was wearing?

A   Well, if he did it as a parent, then -- then I would investigate it as the principal of this high school. As a school board member, he knocks out the chain of command of that. It's already a school board -- it's already to the school board, so.

Q   Do you know if he had any students in Mr.

Page 44

McIntyre's class?

A   Could you clarify more?

Q   If he had any kids? I know he had kids that went to school. Do you know if his kids took Mr. McIntyre's class?

A   Yeah. I believe his one daughter had Mr. McIntyre. Or if -- if she didn't have him, she -- she did go to his Mock Trial a few times. He -- he runs Mock Trial after school.

Q   Do you know if she had him at the time that Mr. Wallace was complaining about the flag?

A   I -- I don't recall. All -- all I remember, I -- I know that she went to Mock Trial a few times.

Q   So what happened next?

A   I was pretty much out of it then. I mean, it -- once she -- she stated that he was reporting as a board member, then I was out of it, and then it went to the board.

Q   Well, let me show you a couple of emails that came through here. Sort of tell me how that happened. So these are in Exhibit 18.

        (Exhibit 18 was marked for
        identification.)

    It's an email chain. And I'm going to start at the first email, which is dated Monday,

Page 45

February 2nd. It's from Mr. McIntyre to you. And first of all, even though his name is, it looks like, redacted on this document, you understood this was an email from Mr. McIntyre; right?

A   Correct.

Q   I think he's identified as social studies teacher at the end. That's who you knew it to be; right?

A   Correct.

Q   Okay. How did this email come to be?

A   George and I talked about the -- the poster. And I -- I don't recall if -- if I asked him for information about it or if -- or if Ms. Morgan asked for information about it. But he sent me information about his curriculum.

Q   Well, first of all, tell me about the conversation you had with him.

A   It was basically, you know, I -- I, you know, it is more of like a, you know, what's -- why is it up there; what's your justification kind of thing. And I wanted to see like his -- his curriculum -- his stance.

Q   Yeah. Why did you want to see his curriculum?

A   Well, I just wanted -- I just wanted see,

12 (Pages 42 - 45)

Page 46

like, if he -- does he tie it in? Does he talk about it in class? You know, what -- what was the significance? If it -- if the two of them intertwined or was it just -- just a poster on his wall?

Q Did he indicate at that time that he used the poster in any of his teaching?

A No. He -- he said he did not.

Q Okay. And so he provided you an email. He said that it's applicable to certain topics that he teaches?

A Correct.

Q What is your understanding of what he meant when it says "is especially applicable?"

A Because some of the, you know, I think the -- the posters in question, because of the rainbow flag and the trans flag, just that they -- they talk about similar issues. But he's not referencing the poster in his room. He is just -- they are talking about certain issues in American History.

Q In other words, it's consistent with what he was teaching?

A Correct.

Q Okay. I don't want to put words in your mouth, but is that good?

A No, you're good.

Page 47

Q Good was a good word?

A Yes. Yes.

Q Okay. And is that important because you don't want teachers to have things on the wall that, I guess, undermine what they're teaching in the class; right?

A Yeah. I -- I don't want teachers promoting their belief system. I want teachers to teach neutral.

Q And you believe this poster did not undermine his teaching in any way?

A I -- I don't believe so.

Q So what did you do after you received this email?

A I don't know if I forwarded on to Ms. Morgan or if I asked him to forward it on to Ms. Morgan. I don't recall.

Q Okay. It looks like you forwarded it to Ms. Morgan.

A Okay. Yeah.

Q That's consistent with your memory?

A Sure. Yeah.

Q And then it looks like Ms. Morgan, it looks like she copied herself and sent to Terry Gonda. Who is Terry Gonda?

Page 48

A He's the treasurer of Little Miami Schools.

Q Do you know why he would be involved in this issue?

A I -- I don't.

Q Okay. And then, also, to Mr. Tarazi. Did you ever speak with Mr. Tarazi about this issue?

A No. I did not.

Q Do you know if Mr. Tarazi ever spoke to Mr. McIntyre about this issue?

A No. Not that I'm aware of.

Q Okay. So did he ever receive your input about what the purpose of the flag might be?

A No. I -- I never had a conversation about that.

Q And to the best of your knowledge, did he ever have a conversation with Mr. McIntyre about what the purpose of the flag is?

A To my knowledge, no.

Q Did he ever ask you for any curricular information or anything like that about the classes taught by Mr. McIntyre?

A No.

Q Did anyone ever ask you for any materials that were used in Mr. McIntyre's teaching?

A No.

Page 49

Q And by anyone, I include Mr. Tarazi in that.

A Yeah. Nobody asked me.

Q Okay. And so it looks like there's a February 4th email from Mr. Tarazi to Ms. Morgan and Mr. Wallace. Do you know why Mr. Wallace was brought into this conversation?

A I -- I don't know. Possibly because he made the initial complaint. I don't -- I don't know. Or that he is board president.

Q Okay. Did you ever receive a copy of this email?

A To my knowledge, no.

Q And in this email, he writes about his understanding of the teacher's message, what it's intended for. Do you know what he did to determine what his understanding was?

A I do not.

Q Okay. And then it looks like on February 9th, you got an email from Mr. McIntyre, again, following up on that. Do you remember receiving that email?

A I do.

Q What was your reaction when you got that email?

A What was it -- what was your question again?

13 (Pages 46 - 49)

Page 50

I apologize. I was just looking over it again.

Q Yeah. I asked a bad question. So let me ask a more specific question. In the email, first Mr. McIntyre writes, "I am not sure how either ORC 3313.473 or Board Policy 5780.01 are implicated. Did you agree with him on that?

A I do.

Q Did you believe that the poster was sexuality content as those terms are defined in either the revised code or the board policy?

A I do not.

Q And in particular, then, he indicates that "I would say this flag is at most an incidental reference." Do you agree with that?

A I do.

Q And then he says, "I do not explicitly provide instruction on the flag or incorporate it in my curricular materials." Do you have any reason to believe that statement is not true?

A No. I believe the statement is true. Our -- our parents are pretty vocal around here. I think, if he was teaching it as a reference or explicitly using it as an instructional piece, I'd have probably gotten some emails or phone calls.

Q Okay. And by the way, it looks like on

Page 51

February 9th that Mr. Tarazi attached a -- I'm sorry, Mr. McIntyre attached a second photo to show the relative location in the classroom. Do you know if, when Mr. Tarazi wrote his email on February 4th, he was aware of the actual location of the flag in the classroom?

A I -- I don't know.

Q Did you ever provide him with that information?

A I did not.

Q All right. And it looks like Mr. Tarazi again responded on February 10th. You weren't copied on that email; right?

A Correct.

Q Do you ever receive a copy of this email?

A No. To my knowledge, no.

Q And then, it looks like you received an email February 10th from Ms. Morgan indicating she'd be putting it on the board agenda. And then, is that correct? You remember receiving that; right?

A I -- yeah. I -- I don't recall. I -- I get so many emails a day. I don't recall, like.

Q Okay. Did anyone on the board ever ask you your views on this matter?

A No.

Page 52

Q Did anyone ever ask you for some context or anything like that?

A No.

Q Did anyone ever ask you whether Mr. McIntyre taught any sexuality content in his classroom?

A No.

Q And then, it looks like on February 16th, Mr. McIntyre wrote another email to you guys. Do you remember receiving that email?

A I do.

Q And it looks like first thing it says is he wanted to provide some clarification. Did you think some clarification might be necessary at that point?

A I mean, to myself, no, but -- but maybe to others.

Q So then, he writes first, "The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology." Any reason to believe that statement is not accurate?

A No.

Q He writes, "My purpose and intent in purchasing the flag for my classroom four years ago was to convey a general message of inclusion." Any reason to believe that's not accurate?

A No.

Page 53

Q He then writes, "There is no subversive message or hidden intent underlying the flag." Do you have any reason to believe that's not accurate?

A No.

Q He writes, "It is simply intended to convey that bullying and/or targeting will not be tolerated." Any reason to believe that's not accurate?

A No.

Q Is bullying and targeting of LGBTQ students a problem at Little Miami Schools?

A I wouldn't say it's a problem. It has happened. I wouldn't say it's an overall huge problem. But yeah. It has happened, like in any other school.

Q Do you believe that you have support from the board in taking action against people who harass LGBTQ students?

A I don't interact much with the board. I -- I know that I have support from my superintendent.

Q Are you aware of anything that board members have done to indicate animus towards LGBTQ students?

A Could you rephrase the question, maybe?

Q Have any board members done anything to indicate to you that they may have animus towards

14 (Pages 50 - 53)

Page 54

LGBTQ students?

A   I mean, in my opinion, I think the -- the one visit by Mr. Wallace was to go after a certain poster, whether that was due to a certain -- certain group of people or not.  That's -- I don't know the -- his intention, but I know the purpose was to go after that poster.

Q   I mean, is there an inference you can draw from the fact that he just focused on that one poster?

A   I mean, I could draw an inference.  I mean, it would -- it's completely my opinion.

Q   Go ahead.

A   No.  I just -- I obviously, in my opinion, that he doesn't agree with that lifestyle.  And -- and I'll -- I'll preface that with like, I'm -- I'm a very conservative person.  I -- I have always -- I was raised very conservative.  I'm still very conservative.  But I know that when I walk through the doors of that high school, I've got 1,600 kids that, no matter what my personal beliefs are, I have to treat them with respect and -- and that's my job.  So, you know, whether my own beliefs align with some of the students' beliefs or lifestyles, it -- it doesn't matter inside of a school.

Q   And is that an appropriate message to convey

Page 55

in a classroom display?

A   Yeah.  I mean, like, I -- I think that, you know, as a former teacher, you want -- you want your students to feel comfortable in your class.  You want your students to feel welcome in your class.  And I -- I believe that students feel -- feel comfortable around George.  And I think they feel comfortable in his class and feel welcome in his class.

Q   And is conveying the message that, in particular, LGBTQ students are welcome and should be comfortable in his class, does that constitute sexuality content?

A   In my opinion, no.

Q   So getting back to Mr. McIntyre's email, he writes, "I have never incorporated the flag in the curriculum itself or used it as an instructional item when covering any sensitive topics in class."  Any reason to believe that's not accurate?

A   No.

Q   He writes, "From what I can tell, it has not had the effect of engaging students on sexual concepts or gender ideology as they have, for the most part, not mentioned the flag to me at all, either during in-class discussions and submitted assignments or during one-on-one discussion outside of class."  Any

Page 56

reason to believe that statement is inaccurate?

A   No.

Q   All right.  So what's the next thing that happened after this?

A   The -- the board voted to have him remove it.  And Mr. -- Mr. McIntyre removed the poster.

Q   Okay.  Did he replace it with something else?

A   He did.

Q   Did he believe that what he replaced it with was an adequate substitute?

A   I -- I don't know for sure.  It was a similar -- similar, you know, statement.  The "Hate Has No Home Here", but it did not have the flags, the -- the pride flag or the transgender flag on it.

Q   Do you have any concern that the flag exposed students to material that was inappropriate for their level of maturity?

A   No.

Q   Did you have any concerns that by displaying the flag, Mr. McIntyre's views on this issue might be erroneously attributed to the school?

A   No.

Q   Is there anything on this flag that's inconsistent with what you believe is the board's

Page 57

policies on harassment and belief?

A   No.

MR. ENGEL:  All right.  Just let's go off the record.

THE REPORTER:  Off the record at 10:11.

(Off the record.)

THE REPORTER:  Okay.  We are back on the record, 10:23.

BY MR. ENGEL:

Q   Just a couple more questions here to ask you.  Going back to Exhibit 18, just the email chain, there's a February 3rd email from Ms. Morgan.  And in it she writes, "Well, I have reviewed the poster in question and its association with the attached curricular standards.  I do see the poster contains symbols of identity.  I do not believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology."  Do you agree with her conclusion there?

A   I do.

Q   Anything about that that you disagree with?

A   No.

Q   Is it fair to say that the "Hate Has No Home Here" flag was not selected by the school board and

Veritext Legal Solutions
www.veritext.com                                      888-391-3376

Page 58

does not bear the imprimatur of the district?

MR. TARAZI:  Objection, calling for a legal conclusion.  And probably incomprehensible, too, by the way.

BY MR. ENGEL:

Q   You can answer, sir.

A   Could you -- could you repeat the question?

Q   Yeah.  Is it fair to say that the "Hate Has No Home Here" flag was not selected by the school board?

A   To my, I -- I don't know.  I mean, to my knowledge, I don't know.

Q   I mean, you're not aware that anyone from the school board wanted that flag up on the wall; right?

A   Correct.

Q   Okay.  Would anyone think that the "Hate Has No Home Here" flag was a message that the school board was trying to convey as opposed to Mr. McIntyre trying to convey?

A   No.

Q   Teachers have free speech rights; right?

A   Correct.

Q   Is there any evidence that you know of that Mr. McIntyre used the "Hate Has No Home Here" flag as

Page 59

part of his methodology of instruction?

A   No.

Q   Is there any evidence that Mr. McIntyre sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the "Hate Has No Home Here" flag?

A   No.

Q   All right.

MR. ENGEL:  I have no other questions.  I thank you very much for your time.  I know Mr. Tarazi may have a couple questions for you, but I think I'm done.

So thank you very much to everybody.

MR. TARAZI:  Would we mind stop recording, going off the record for just a minute?  I want to test my ability to screen share without accidentally sharing something I don't intend to share.  So I just, because I've not done this technology in the past, I want to make sure it's correct.

THE REPORTER:  Sure.  Going off the record, 10:27.

(Off the record.)

THE REPORTER:  We are back on the record, 10:28.

Page 60

EXAMINATION

BY MR. TARAZI:

Q   All right.  I was just going to have a few questions for you as just follow-up and clarification.  First clarification, have you spoken with Plaintiff's attorney prior to today?

A   No.

Q   Okay.  And were you involved in any communication with Plaintiff, with George, that was in writing outside of like the district email system on this topic?

A   We -- we will text here and there.

Q   Okay.  So did you ever use a private email account with messaging with him?

A   Absolutely not.

Q   Okay.  So any communication with him other than what's in writing?  Obviously, there was some verbal, but everything beyond verbal would have been either a text message or on the district email system?  Is that fair?

A   Yeah.  Correct.

Q   Okay.  Did you review that first email that he said where -- I don't remember the number of it, but where it goes through the content standards, and it attaches the model curriculum standards?  Did you

Page 61

review that before it was sent on the district email system?

A   No.  Not to my knowledge, no.

Q   All right.  And then, you mentioned.  There was a number of examples that was testified to that you said that you did not believe, in your opinion, that those examples were sexuality content.  Is that correct?

A   Correct.

Q   In fact, I don't recall that there was anything that you testified, actually, was sexuality content.  Can you give me an example of what exactly is sexuality content in your opinion?

A   I mean, in -- in my opinion, something with nudity would be sexuality content.

Q   Even if it's history?  Because you also said that if it's a historical matter, then it's not sexuality content.

A   Yeah.  If it's, I mean, I -- I believe nudity is sexuality content, even if it's historical, 'cause it's not appropriate for schools.

Q   Okay.  So other than nudity, what else?  So I guess, in your mind, there's sort of this history exception.  And then, you also made a statement about biased versus unbiased.  So is it sexuality content if

16 (Pages 58 - 61)

Page 62

it's being presented in a biased manner, but it's not if it's in an unbiased manner?

A I mean, if information, the -- I mean, history has all kinds of controversy. So if it's -- if it's given at a neutral level, the historical, you know, value of it, what the textbook is -- what our approved textbooks are, then -- then I think it's okay. If -- if our school board approved the textbooks and it's being taught directly from the textbooks with no sway of opinions, then I think it's okay.

Q Then, by "it's okay," you mean it's not sexuality content per the board policy?

A Correct.

Q Okay. And what that means, then, is that parents don't have a right to know that that lesson is being taught, and don't have a right to opt out? Is that accurate?

MR. ENGEL: I'm going to object to the form of that. I don't think it characterizes what's going on. I think his testimony was that parents have access to all the materials.

MR. TARAZI: Now, it's a speaking objection. So let him testify that he says that it doesn't apply. Let me rephrase it. Let me rephrase

Page 63

the question.

BY MR. TARAZI:

Q When you say that "it's not sexuality content per of the board policy," that means the board policy doesn't apply? Correct?

A Yeah. I'm not understanding the question.

Q You testified to many things saying that they are not sexuality content. And if it's not sexuality content, that means the board policy requiring parent notification and an opportunity to opt out does not apply. Correct?

A Correct.

Q Okay. So in your understanding, then teachers can teach a whole lesson on abortion in history in terms of all the cases and the controversies and the opinions and all that kind of stuff. And at no point, this policy wouldn't cover that in terms of parents being informed and have an opportunity to opt out. Correct?

A Parent -- parents have the ability to get on Schoology. They -- parents have the ability to get on the Ohio Department of Education's website to see what's -- what's being taught to their students.

Q Correct. But this policy says they have both an opportunity to inspect before it's taught and

Page 64

an opportunity to opt out. And are you saying that these procedures don't apply in that context?

A Parents -- parents have a right to opt out. And I -- and I don't know the dates that -- that George posted things. But, I mean, typically, the teachers, by a standard of practice, things are put up on Schoology prior to them teaching the content.

Q Is that practice in board policy anywhere?

A It's not. It's just what teachers do. They prepare in advance.

Q So in your understanding, then, there's no board policy obligation to post your entire lesson on abortion case law to parents? And there's no board policy that says parents have a right to opt out? Because, in your mind, that's history? Correct?

MR. ENGEL: I object to the form. I think it's a compound question.

BY MR. TARAZI:

Q Well, answer, please.

A Can you -- can you restate the question? Say the question again?

Q Okay. We're talking about board policy. Board policy, and this is the Parents' Bill of Rights policy; correct?

A Yeah.

Page 65

Q That we're talking about, 5780.01 is the Parents' Bill of Rights. That's what the parents' rights are; correct?

A Yes. Yes.

Q Is there any other board policy that talks about parents having a right to inspect and an opportunity to opt out, to your knowledge, other than this board policy?

A Not that I'm aware of.

Q Okay. And there's no board policy that says that parents or the teachers have to post everything that they're teaching in the class on Schoology? Is that correct?

A Yeah. That's correct. I don't believe there's a policy.

Q Okay. So you put those two together plus your definition of sexuality content, that means that teachers could not post on Schoology and be compliant with board policy and teach full lesson, multiple lessons on abortion, on, you know, sexual issues in history, polygamy in history, all of these sorts of things. And parents don't have an inherent board policy right to know or opt out based on your understanding?

MR. ENGEL: I'm going to object to the

17 (Pages 62 - 65)

Page 66

form. That's a compound question with numerous hypotheticals that are not based in the evidence of the record.

BY MR. TARAZI:

Q   Can you please answer the question?

A   I -- the practice of our teachers is to post things online. I mean, that's their practice. I -- I don't think any teacher in this building is trying to slide something by parents.

Q   Okay. I'm not sharing anything right now. Okay. Yeah. I'm sorry.

MR. ENGEL: While you're waiting, I'm going to just, so I don't have to put it on every time unless you need me to, just note a continuing objection to the form of the question. And in particular, to the fact that leading questions are being used for the defendant's own witnesses, which would make all of this evidence, I believe, inadmissible. But you're free to ask questions how you wish, noting my objection.

MR. TARAZI: I note your objection, and these are not leading questions. And, anyway, we're not debating this issue right now.

BY MR. TARAZI:

Q   Are you aware of everything that is on

Page 67

Schoology that the plaintiff posted? Have you like reviewed everything there, and you know what's there and what's not there?

A   I have not.

Q   Okay. And so if there is some material, or if, let's say for the sake of argument that this LGBT slides, LGBT material, or whatnot, isn't in Schoology, that would not be a violation of board policy in your understanding; correct?

A   I -- I think teachers should post what they're going to teach on Schoology.

Q   Okay. But that's not a board policy? Is it?

A   It's not a board policy. It's just -- it's a good practice.

Q   Okay. And if they choose not to, they're not violating anything; correct?

A   They could be.

Q   What would they be violating as a board policy if they don't post their content curriculum on Schoology?

A   It depends on what content they're teaching.

Q   Okay. Give me an example.

A   I mean, if they're -- if they're teaching their opinions on things and -- and being biased in

Page 68

things, then, yeah. That's a -- that's a problem.

Q   I'm talking about the content itself. Let's say that a teacher wants to teach all about the Roe v. Wade decision and spend a day talking about that. If they don't post it on Schoology, they're not violating a board policy; correct?

A   To my knowledge, no.

Q   Okay. And same for LGBTQ Civil Rights Movement, all of these other things, in your understanding, because you are -- okay. Let me rephrase the question. Is your current understanding, this understanding that you presented of your opinion of the board policy, is that what's currently in practice in your school?

A   The -- the board policy is in practice in the school.

Q   Is it being implemented according to your understanding of sexual concepts?

A   Yes.

Q   Okay. Do you agree that the board's interpretation of its policy would trump your interpretation of the board policy?

MR. ENGEL: Object to the form.

BY MR. TARAZI:

Q   Please answer.

Page 69

A   Could you restate the question?

Q   How does your opinion versus the board's opinion or the board's interpretation of its policy, how do those two interact in terms of what should actually be implemented in the school?

A   I mean, my -- my supervisor's the superintendent. So I -- I go to her. I know that the -- the school board is her -- her boss. So any questions that I would have, I would give it to my superintendent.

Q   Okay. Are you familiar with the syllabus in the American History course that the plaintiff teaches?

A   His particular syllabus? No. I don't -- I don't just go through every teacher's syllabus.

Q   Okay. Is there any particular reason why a syllabus would be different than a model curriculum standard that was shared?

A   I mean, each teacher's syllabus is -- is slightly different.

Q   So if a parent wants to know what's actually being taught, do they go to the model curriculum? Or do they go with what is actually in the syllabus the teacher gives them?

A   I would go, I mean, I would assume they'd go

18 (Pages 66 - 69)

Page 70

to the syllabus with an understanding.

Q Okay.

A With an understanding of the standards that are taught.

Q Okay. So the syllabus trumps any model standard out there; correct?

A Well, the syllabus should go off the standards.

Q It should. But if it's different, then which one is the one that's actually being taught, the syllabus or the model standard?

A I can't -- I can't say what -- what's being taught. But what -- the standard should be taught.

Q Okay. And so who approves syllabus? You said that syllabus can be different than the model standard. Who approves them?

A Department chairs. Department chairs go through all the curricular stuff.

Q Okay. So you have no role in that?

A No. I mean, I'll -- I'll go through teachers' Schoology accounts to -- to look at their materials. But, like I said, I've got 90 teachers. I would -- I don't know. I have department chairs for each department that are responsible for the curriculum.

Page 71

Q And, sorry. Just to clarify, excuse me. I don't remember if you answered this or not. So I apologize if you're repeating. But did you review his email before he sent it? The one where he mentions that this applies to the model curriculum standard? That email? You said you didn't review or you did review it?

A I -- I don't recall.

Q Okay. All right. Well, let's start going through some of these things. Do you recall the exhibit that covered the model curriculum, standard Content Statement 32, which mentioned LGBTQ+ Civil Right? Do you recall that in the model curriculum? It was discussed earlier in the deposition. Do you recall that, or do I need to bring it up to remind you?

A Yeah. Could you bring it up?

Q Okay, no problem. All right. Let me see if I do this correctly. All right. Is that working? All right. Are you able to see that?

A Yeah.

Q Okay. Are you able to see that it says, "Curriculum Standard 32, focusing on domestic policy. The United States faces ongoing social, political, national security, and economic challenges in the

Page 72

post-Cold War era, and following the attacks on September 11, 2001?" Do you see that?

A Yes.

Q And then do you see where it says "LGBTQ+ Rights"; correct?

A Yes.

Q Okay. And that's under Content Standard 32; correct?

A Yes.

Q Okay. And this was shared in that first email as an attachment; correct? Do you recall that, the Model Curriculum Standard?

A I don't recall.

Q Okay. All right. Let me stop sharing for a sec. I'm sharing with you that email. And just to be clear, this is our Exhibit G_1, and it's actually 13-8 in the docket, but it's been referred to as another exhibit on Plaintiff's side. Regardless, it's the same document. Do you see this original email from George?

(Defendant Exhibit G_1 was marked for identification.)

A I do.

Q Okay. And he says that the "Hate Has No Home Here" is especially applicable, and he lists

Page 73

several American History content standards; correct?

A Correct.

Q Okay. Did you review this before he sent this?

A I -- I don't recall.

Q Or you just don't recall?

A I don't recall.

Q Do you have any idea why Content Standard 32 isn't listed?

A No idea.

Q Okay. Sharing with you the syllabus. This is our Exhibit O. These are the syllabus documents that were shared with us from the district. Have you ever seen these documents before relating to --

A Course math and pacing guides?

(Defendant Exhibit O was marked for identification.)

Yeah.

Q Okay. So you've seen this syllabus here?

A I've probably scanned it along with many others. Yeah.

Q Okay. Is there a particular reason why Content Standard 32 isn't listed at all in this syllabus?

A No idea.

19 (Pages 70 - 73)

Page 74

Q Okay. Now, I'm sharing with you, back to the model standard. This is Content Standard 27. Do you see that?

A I do.

Q Okay. And it says, "Following World War II, the United States experienced a struggle for racial and gender equality and the extension of Civil Rights." That's Content Statement 27; correct?

A Correct.

Q Okay. And under Content Statement 27, there's a bunch of things. But what we've been discussing a little bit is "The Gay Liberation Movement began with the Stonewall riots, which led to the organized efforts for full inclusion in public life and institutions." Correct?

A Correct.

Q Okay. And in your understanding of the policy, parents don't have a board policy right to know what's being taught here because this is not sexual concepts in your interpretation; correct?

A Correct.

Q Okay. I'm now sharing back with you the syllabus. And the syllabus says, "Content Statement 27 improved global communications, international trade, international business organizations, overseas

Page 75

competition, and the shift from manufacturing to service industries have impacted the American economy." Do you see that?

A Yes.

Q Why is the content statement in the syllabus different than the content statement in the Model Curriculum Standard, if you know?

A I don't know.

Q Okay. Do you see anything in Content 27 here in the syllabus relating to the Gay Liberation Movement or Stonewall or anything like that?

A I do not.

Q Okay. Would you agree that if the model curriculum is being taught, but this is what's actually being presented to parents, that it would at least be a little bit misleading or a little bit confusing to parents?

A It -- it could be. I -- I've never had a complaint about it, so I don't, you know, I don't know.

Q Okay. And the only way parents would know is if the model curriculum was actually shared with them as this is what's being taught in the classroom; correct?

A Yeah. Either that or on -- if they post it

Page 76

on Schoology.

Q Okay. And if it's not on Schoology, then a parent would just assume that the syllabus is what's being followed; correct?

A Yes.

Q Okay. Give me one second. So a couple minutes ago while we were talking, I got the email. So the superintendent testified yesterday that she had forwarded the email guidance to principals. And so we asked her if she could forward that, and she did. And I just got it, you know, earlier while the deposition was ongoing. So I'm going to share this just with you here, and just see if you recognize it, if it, you know, refreshes any memory. This is what I'm labeling Exhibit V.

(Defendant Exhibit V was marked for identification.)

And it starts off here, at the bottom is, "This is the Little Miami Board of Education email that I had sent to the board. And it has this material relating to objective standard," et cetera, and then step one, two, and three. Are you able to see all that?

A I can see that. Yeah.

Q Okay. And then up here, there's an email

Page 77

where it's forwarding. And it says, "Regina Morgan to principals and assistant principals." Do you see that?

A I do.

Q Okay. And then she says, "At Wednesday's Board Meeting, Mr. Wallace read the following concerning flags and displays in our classrooms. This guidance will be used moving forward." Do you see that?

A I do.

Q Okay. Did you receive it as part of being, like, are you part of the principal's email list?

A I am.

Q Okay. So do you believe that you received this email then?

A I'm sure I did.

Q Okay. Did you act on it in any way?

A To my knowledge, no.

Q Okay. I'm sorry. Give me one second. Okay. All right. I am now sharing this. This is a set of emails that are marked as, what did I mark these, Exhibit U. And what these are are text messages that Plaintiff shared with us in discovery.

(Defendant Exhibit U was marked for identification.)

20 (Pages 74 - 77)

Page 78

And I'm just going to ask you a couple questions about a couple of them. Okay? So in this page, he, presumably, the Plaintiff says, "This is the end of an email I sent to Kevin at his request with the standard for American History and AP Euro attached, as well as which standards I think the flag is relevant. Had Kevin approved before sending over school email, he said it was perfect." Do you recall that conversation at all?

A   I don't.

Q   Okay. Do you have any reason to doubt that that's accurate?

A   No. I -- I believe it's accurate. I get thousands of emails and texts a day, so I -- I don't remember every text, every email that I get.

Q   That's fine. Totally fine. In this text message, Plaintiff shares that he doesn't believe the board policy in question should even exist. "I agree that the policy should not exist." Do you agree with his opinion that the board policy on parent rights should not exist?

A   The board policy needs to exist 'cause it's the law.

Q   Right. But do you, I mean, he says, "Do you think that this policy on law is bad and should be

Page 79

removed altogether?" Do you agree with, you know, that this shouldn't exist?

A   I believe the law should exist. I believe the policy should exist.

Q   Okay.

MR. ENGEL: Let me ask. Are you using for these exhibits, the documents we redacted or these documents that were marked "attorney's eyes only"?

MR. TARAZI: No. These are all the ones you redacted. I'm using that file.

MR. ENGEL: Okay.

MR. TARAZI: Yeah. I'm not risking anything. And we're going to get to that with the Plaintiff. So yeah. No, this is just all the redacted version of what you sent.

BY MR. TARAZI:

Q   Okay. So just a couple of quick questions. He's describing how he's having some more conversations with you. And then he says, "I did not realize how well-connected Kevin was with the Warren County GOP. But he said the people that endorsed Wallace, new lackeys, are already distancing themselves. And the irony is not lost on anybody, that fiscally-responsible candidates seem to be trying to cost the district an obscene amount of money." Do

Page 80

you recall any conversation with him regarding this matter?

A   I -- I don't recall. No.

Q   Do you have any idea what he's even talking about?

A   I -- I mean, there's -- there's a public disdain for Mr. Wallace amongst the district, amongst the teachers, amongst community members. It's -- it's talked about frequently around the schools and community, about his behavior at school board meetings and -- and the way he represents the school district. Yeah. So, I mean, there's conversations that happen all the time.

Q   Okay. If you can help me understand, who is having conversations?

A   All -- my staff constantly have conversations.

Q   Okay. And the circle of the conversation, it sounds like, is disdain for Wallace?

A   I mean, yeah. The majority, yeah. The majority of the teachers have disdain for him. Yeah.

Q   Okay. Do you think that disdain in some way colors the situation? In other words, if it was anybody but him raising the issue, that things might have played out differently?

Page 81

A   I don't believe so.

Q   Okay. I understand your teachers. What's the Warren County GOP got to do with anything with this topic?

A   Nothing to my knowledge.

Q   Okay. It's just odd and it was in reference to you.

A   I -- I am, I mean, I am acquaintances with some people that are in the Warren County GOP.

Q   Okay. But what does that have to do with this flag issue?

A   I have no idea.

Q   Okay. Here's a text message where he says, "I talked to Kevin today after school. And told him I would be pointing out that, to me, it sounds like "neutral" is code for the erosion of LGBT representation, which he smiled and seemed to like. After talking and comparing notes, we both think this shod of an attorney is full of shit and may be misrepresenting both state law and board policy, expecting no pushback." Okay. Did you have any conversation with the plaintiff on these matters?

A   Mr. McIntyre and I had had conversations regarding whether I believe that it -- that poster was a violation of House Bill 8. We did have that

21 (Pages 78 - 81)

Page 82

conversation.

Q Okay. Was there any conversation about, I assume, the attorneys, he's talking about me, was misrepresenting both state law and board policy? And was there any conversation about me misrepresenting?

A I mean, there's really no conversation, I guess, in particular about you. I mean, I don't -- I don't, like I said, I hadn't ever talked to you until like last week or something. But no. I -- I thought the school board is misrepresenting the way the -- the law. I mean, my interpretation of House Bill 8, I -- I think the -- I thought the school board was acting -- was misrepresenting the way the law -- the way I read the law and the way that I was taught the law.

Q Okay. Can you tell me how exactly were you taught the law that was different than what the school board was interpreting it?

A I mean, the -- the way we were taught the law is that you have to give parent notification of gender -- gender changes, significant changes in behavior. If a kid wanted a pronoun change and anything above the content standards, you just had to get parental, you know, send it out to the parents so they knew what was going on.

Page 83

Q Okay. So exactly what is the misrepresentation? First of all, is there a misrepresentation? Because he says, "There's a misrepresentation." You know, do you agree there is a misrepresentation?

A I -- I don't believe that, in my opinion, I don't believe that the poster violated House Bill 8. I mean, that's my opinion of it -- of the way I read House Bill 8. And in my interpretation of House Bill 8, I don't think the poster was a -- a factor in House Bill 8.

Q Okay. So basically, the bone of contention is not misrepresentation. It's difference in interpretation. Is that accurate? Or is it misinterpretation? Because misinterpretation implies, like, you're doing something that is on purpose wrong versus two people looking at the same thing and interpreting it in different ways. So which is it that is your testimony relating to what the board was doing?

A I guess interpreting it different than I do.

Q Okay. So, in your mind, it's not a bad-faith interpretation. It's just a different interpretation. Is that accurate?

A I would say that's accurate.

Page 84

MR. TARAZI: If I can have a moment and like take a minute to just kind of review my notes. Give me a second.

BY MR. TARAZI:

Q Regarding the materials that are on walls, if a board decided that they don't want any decoration on walls at all, does the board have the authority to do so?

A Yeah. They would.

Q Okay. And if they did, I would assume, based on your testimony, you would not agree that that's a wise thing to do or maybe a good thing. I don't want to put words in your mouth. All right. Sorry, strike that.

What would be your interpretation? Would you vote for such a policy to say nothing goes up on walls at all?

A Absolutely not.

Q Okay. But a board can be elected that chooses to adopt that policy; correct?

A Correct.

Q Okay. And if it's so done, and they are the elected board and they make that policy, what would be your role at that point?

A Well, I would have to enforce it.

Page 85

Q Okay. And so if, in relating to the sexuality concepts, if the board interprets it different than you in a broader sense, you're, you know, you obviously have a narrow view of it. If they have a broader interpretation, would you have to enforce that?

A Yeah. I have to enforce what the board tells me I have to enforce.

Q Okay.

MR. TARAZI: I believe I have no further questions.

MR. ENGEL: Nothing further. So I think we're done. We'll take a copy.

THE REPORTER: Thank you, Mr. Engel. And, Mr. Tarazi, would you like a copy of this transcript?

MR. TARAZI: Yes.

THE REPORTER: With that, we're going to go off the record at 11:05.

(Whereupon, at 11:05 a.m., the proceeding was concluded.)

22 (Pages 82 - 85)

Page 86

CERTIFICATE OF DEPOSITION OFFICER

I, MARIANNE HISSONG, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this acti

*Marianne C Hissong*

MARIANNE HISSONG
Notary Public in and for the
State of Ohio

Page 87

CERTIFICATE OF TRANSCRIBER

I, ROSE RIGGLE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ROSE RIGGLE

23 (Pages 86 - 87)