IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
~~~~~~~~~~~~~~~~~~~~

GEORGE MCINTYRE,

Plaintiff,

vs. Case No. 1:26-cv-00351

LITTLE MIAMI SCHOOL DISTRICT, et al.,

Defendants.
~~~~~~~~~~~~~~~~~~~~
Remote Deposition of
[redacted]

AUGUST 14, 2026
1:01 p.m.
Transcribed By:
Veritext Legal Solutions
1100 Superior Avenue, Suite 1820
Cleveland, Ohio

Jillian Adamovicz, Notary Public

THIS TRANSCRIPT IS ATTORNEYS' EYES ONLY AND IS SUBJECT TO A PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiff:
Engel & Martin LLC, by
JOSHUA A. ENGEL, ESQ.
4660 Duke Drive, Suite 101
Mason OH 45040
(513) 445-9600
Engel@engelandmartin.com

On behalf of the Defendants:
Omar Tarazi Law Office, by
OMAR TARAZI, ESQ.
5635 Sandbrook Lane
Hilliard OH 43026
(614) 226-2823
Otarazi@tarazilaw.com

~ ~ ~ ~ ~

~ ~ ~ ~ ~



TRANSCRIPT INDEX


APPEARANCES............................... 2

INDEX OF EXHIBITS ........................ 4

EXAMINATION OF [redacted]
By Mr. Tarazi:............................ 5
By Mr. Engel:............................. 87
By Mr. Tarazi:............................ 106
By Mr. Engel:............................. 113
By Mr. Tarazi:............................ 114

REPORTER'S CERTIFICATE.................... 120


EXHIBIT CUSTODY
EXHIBITS RETAINED BY THE COURT REPORTER



INDEX OF EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit AA-1 | Affidavit..................... | 8 |
| Exhibit AA-3 | Resignation Letter............ | 70 |
| Exhibit 101 | Set of Articles............... | 104 |




[redacted] of lawful age, called for examination, as provided by the Ohio Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

MR. TARAZI: So before we began I had a conversation with opposing counsel. I just want to make sure it's clear for the record with Joshua that everything in this deposition will be treated as attorneys' eyes only for now until he has a chance later to deal with redactions and get back to me with what they are asking to be redacted for purposes of the record. Is that accurate in terms of our understanding, Josh?

MR. ENGEL: That is correct. We understand that you are under a time crunch probably on a response so we will get those back to you as quick as possible.

Jillian, you should mark this as subject to protective order at the beginning.

EXAMINATION OF [redacted]

BY MR. TARAZI:

Q. With that I think we're ready to start. [redacted], do you want me to call

you [redacted] or how do you want me to refer to you for this?

A. [redacted] or [redacted]. Either one. Doesn't matter.

MR. ENGEL: Omar, before we get into it, I know we discussed before we went on the record, but let's put on the record that we are designating this deposition as confidential attorneys' eyes only. Initially, once we get the transcript we will provide redactions of the information that should be maintained protected.

MR. TARAZI: Yes. So can we -- we're good now? Any other -- anything else that needs on the record? Okay. We're good.

Q. So have you ever done a deposition before?

A. This is my first time.

Q. Okay. So I'm going to go over a few of the rules and how this works. We have a nice court reporter who is typing what you say. She can't type what we normally do, which is like uh-hum, huh-uh, any kind of nonverbal. It has to be yes or no kind of responses.

The second thing is that we can't



talk over each other because then it's difficult for her to type both sides. So basically I ask a question, pause, you can answer and then we just move on from there. Is that cool?

A. I understand.

Q. All right. Second thing is is you can take a break any time. Just answer whatever question happens to be pending. If you want to take a break, drink of water, whatever, you know, all of that can be done without any issue. Just say so and we'll pause.

A. All right.

Q. The other important thing is basically my purpose from today is to get basically what you actually know. There is a difference between opinion and facts and what we're trying to get at is what are the facts that you personally observed. You might believe a lot of different things, but we're trying to get a testimony of the basis of what you actually personally witnessed, personally read, personally saw, et cetera. And that's kind of going to be what we're going to cover



here in the various questions.

A. Looking forward to it.

Q. Make sense?

A. Yep.

Q. Let's go ahead. I'm going to be going over what I'm labeling for purposes of this deposition Exhibit AA-1, and let me go ahead and share this.

- - - - -

(Thereupon, Deposition Exhibit AA-1 Affidavit, was marked for purposes of identification.)

- - - - -

Q. So this is your affidavit that was filed in this case. I assume you're familiar with this document?

A. I am.

Q. And you signed the document; is that correct?

A. I did.

Q. So what we're going to do is we're just going to take it paragraph by paragraph and just try to ask you some follow-up questions on each line in terms of, as I said before, what was the basis of what it is or



some additional clarification.

A. Sounds good.

Q. Starting with line one. You received a BLA from Xavier and have a master's in history from American Military University and am a licensed teacher in Ohio.

MR. ENGEL: Can you make this a little bigger? It's kind of hard to read on our screen.

MR. TARAZI: One second.

MR. ENGEL: Zoom in a little bit maybe.

Q. So first question is: When did you become a licensed teacher in Ohio? When did you start teaching?

A. [redacted]

Q. And did you immediately start at Little Miami School District or did you have another school prior to that?

A. Nope. [redacted] years at Little Miami.

Q. Okay. So then the next paragraph, paragraph two, from what date to what date? So [redacted] until when?

A. Until [redacted]

Q. Okay. And in -- in both the junior

Page 10

high and the high school, can you help us like breakdown when did you teach what over those, you know --

A. My first two years were at the junior high. Then I transferred buildings to the high school for the other [redacted] years.

Q. Okay. [redacted] years at the high school?

A. Yes.

Q. And then you say here, "I taught social studies, which includes world history, AP Euro history and AP world history."

Were you teaching all of that the full [redacted] years or some portion of the [redacted] years?

A. No. Our course assignments vary from year to year depending on the courses as well, but those were the three that I have most experience with.

Q. Okay. So what courses were you teaching, say, in the five years before you resigned?

A. World history, AP European history, AP world history.

MR. ENGEL: You might want to slow down a little bit in your answers because the court reporter has to write down everything.

Page 11

A. World history, AP European history and AP world history.

Q. Okay. And that -- and that was, I apologize, that was the five years leading up to right before you resigned you were teaching those three courses?

A. Yeah. Over the course of [redacted] years I don't have every single years' course assignments memorized, but.

Q. Okay.

A. Those are the three I taught most frequently.

Q. Okay. What about -- did I hear you say social studies or no?

A. My license is in integrated social studies 7th through 12th.

Q. Correct. But was there a separate social studies course that you taught during the --

A. We offer other courses, too. I had taught early on in my career a course called World & USA, which no longer exists. I taught an elective called modern world history. I taught an elective called world cultures.

Q. Okay. But in the five years

Page 12

leading up to when you resigned, you didn't teach a social studies course. You taught the other three courses because I -- unless some of these were maybe -- are these interchangeably referred to as like social studies is AP something or is it -- or are they distinct courses?

A. Are you done?

Q. Yes. Sorry.

A. That's okay. History is one of the social studies. So social studies is a larger umbrella and within the social studies history is considered one of those subfields.

Q. Okay. And so you taught history, AP world history and AP euro history and that is what you were teaching for the five years before you resigned?

A. Correct.

Q. Okay. So next let's go to the next paragraph. You state you were one of the people texting with George McIntyre. You say here, "I am aware that other teachers who have spoken out about LGBTQ issues have received unwarranted online exposure."

Can you explain what specifically

Page 13

you're referring to with that statement?

A. Yeah. First of all, I want to make sure we're clear on his name. His name is George McIntyre.

Q. Oh, I'm sorry.

A. That's okay. That's okay. Yeah. No, I am aware of the unwanted attention and harassment that people have received both at a local level as well as, you know, national figures as well.

Q. Okay. When you were -- can you tell me what it is exactly that you're aware of -- who specifically you're talking about?

A. Well, George for one has received unwanted harassment here. Other colleagues that have been at Little Miami for a while have been through similar issues and they received unwanted online harassments. And I read the news daily and there are almost daily occurrences of teachers around the country who are receiving harassment from outside forces.

Q. Okay. Let's focus on Little Miami specifically. Other than George, who else are you specifically referring to?

A. Counselors and administrators.

Page 14

Q. Okay. Do you have any names?
A. Yes.
MR. ENGEL: Yes. This is designated attorneys' eyes only so you can --
A. I know for sure Dr. Cathy Trevathan, my former principal, and counselors as well, but I don't recall all of their names.
Q. Okay. So when exactly this Dr. Cathy matter online, what year are we talking?
A. She's no longer employed at Little Miami. So I don't know her exact years of employment, but this would have been several years ago.
Q. Okay. Well, you're talking about unwarranted online harassment or whatnot. When did that happen? Do you remember?
A. 2020.
Q. Okay. Can you share anything further about details as to what -- you know, if somebody wanted to go back and look and find it, what would they be looking for?
A. Sure. I know about her e-mail inboxes being flooded. I know about voicemails being left as well. My guess is you're more privy to -- or you have better access to this

Page 15

information than I do. I don't -- I'm not exactly in tune with Miami's IT department, but you would be able to go back and see the stresses that were placed upon her as a result of, you know, what she was trying to do with the -- what she was trying to do with the school.
Q. Okay. Well, can you give me something specific in terms of as it relates to LGBTQ, relating to that in 2020 like what --
A. What we're seeing happening here is any time a teacher or administrator shows the slightest amount of support for our LGBTQ+ students, that actually puts them -- puts them on other's radar, whether we're talking about local Facebook groups, media outlets, et cetera.
Q. So what is the subject of the e-mails that I should be looking for? Was there a specific event, a specific issue?
A. You'll have to talk to the IT department, Omar. I don't know. I don't have -- this is from years ago and I don't remember the exact words that were used for her, but I do remember her confiding in me over this and I

Page 16

do remember as well testimonies from counselors in time who were receiving harassment in their e-mail inboxes as well as on their voicemail as well.
Q. But you don't remember the subject of the harassment? Like in other words, was there a specific thing happening that everybody was talking about or you don't remember?
A. Yeah. No, I remember this part fairly well. We had made national news back in 2020 and that had put a radar on our school and some of the faces of our school and of course the principal and the counselors are faces of the school so they became the targets of this. You're asking for like specific words that you would need to search. I can't give you those.
Q. Okay. What was the subject of becoming national attention in 2020? What was the topic?
A. We had an experience where, after being told no, students were -- students put out a thin blue line flag at a football game when they were originally told that the only flag that was going to be displayed, this was around 9/11. So it was meant to commemorate

Page 17

9/11. That the only flag that was permissible was the U.S. flag.
Q. Okay. So that was the subject of the controversy that you're talking about that people were calling as you say harassing --
A. Well, it snowballed from that because, you know, we do have -- you know, this was also a time when people were becoming more aware of social injustice and, you know, we obviously have a GSA at Little Miami. We now have a diversity club as well. So just the mere existence of those things were also under increased scrutiny.
Q. By the general public?
A. By the general -- well, I don't know about the general public, but outside agitators as well as some people who were, as we called, inside agitators.
Q. Okay. Do you have any specific knowledge as to who you're referring to when you mean by inside agitators?
A. I don't have names of the perpetrators, no.
Q. Okay. Let's move on to the next paragraph here. You say, "I'm aware Dave

Page 18

Wallace sued people who have spoken out against him politically."

Have you read -- I mean, besides general generic awareness, have you read anything to do with the actual lawsuits involved?

A. I have not read anything on the docket if that's what you're asking.

Q. Okay. So this is just sort of general, very general awareness at this stage, correct?

A. I have awareness from some of the parties involved.

Q. Meaning what? One of the parties involved talked to you about it? Is that what you're basing your --

A. I knew -- I knew somebody was being sued, yes.

Q. Okay. And they talked to you about the lawsuit and that's your basis of your knowledge; is that correct?

A. Not about the lawsuit. Just that she was being sued.

Q. So just the fact of a lawsuit occurring?

Page 19

A. Yes.

Q. Okay. Let's move on to paragraph five here.

A. Yep.

Q. From what year to what year were you serving on the Gay-Straight Alliance?

A. My first year was [redacted] as the faculty advisor and my final year was [redacted].

Q. Is the Gay-Straight Alliance group still active in the school?

A. To my knowledge, yes.

Q. And it's a student-driven club that met on a regular basis to discuss current events and topical issues. And that, to your knowledge -- like nobody stopped the group; is that correct?

MR. ENGEL: Don't speculate. If you know, you know.

A. I know that people were trying to stop the group, but ultimately we were allowed to remain intact.

Q. Okay. And by "people" do you have any specific names or is it just generic somebody, you know, people are unhappy?

A. I was made aware that central

Page 20

office and administration had received phone calls complaining about our group.

Q. But do you know who made the calls or is it just aware that a call occurred?

A. No. I don't know who made the calls. Not from the public anyway.

Q. I'm sorry, you're going to have to speak up slightly.

A. No, I don't know who made the phone calls.

Q. Okay. Unless I misheard you, is there also a diversity group as well?

A. There is, yeah.

Q. Tell me about that. What is the purpose of that?

A. The official name is diversity & inclusion. It is also a student-driven club. We do much of the same thing. We discuss topical issues. We provide support to students who might be feeling isolated at Little Miami, but we also celebrate cultural differences as well.

Q. Okay. When did that group form?

A. About [redacted].

Q. And were you involved in that

Page 21

group?

A. I was.

Q. Okay. What was your involvement in that group?

A. I was the faculty advisor.

Q. Okay. And that's from [redacted] through when?

A. Through my resignation, so [redacted].

Q. Okay. So to make sure I have this correct, you were faculty advisor from [redacted] to [redacted] for the GSA club, but for the diversity & inclusion club from [redacted] through [redacted]; is that accurate?

A. Yes.

Q. Okay. Is there any particular reason why you resigned from the GSA club but not the other one?

A. Yeah, there is. Time. Time was the reason.

Q. Yeah. Okay, time. And the rest of what you say here is accurate. In other words, "At Little Miami High School, the GSA also worked on skills to deflect harassment in the schools. GSA provided a place for LGBTQ+ at Little Miami High School could express their

Page 22

authentic identity without fear of judgment."
Is that all accurate?
A. It is.
Q. Okay. So now you have this -- the next paragraph, paragraph six. You claim that -- or you state that, "LGBTQ+ students at the high school were often subject to sexual harassment, bullying, taunts and slurs."
Can you give me the basis of that statement?
A. The types, are you talking about the types of harassment that they suffered?
Q. No. I mean, like when you make this statement, are you thinking of specific students or are you thinking of specific incidents or is this just sort of a generic, general?
A. Well, I haven't made it up. This is under oath and I take that seriously, Omar. Students would often come to me and vent about whatever they had experienced that day. And then of course I make judgment as to what intervention I would then pursue.
Q. Okay. And what intervention did you pursue when there was sexual harassment,

Page 23

bullying and so forth?
A. A couple of things. Most frequently I would document it in our behavior management system. That system is Public School Works, but sometimes I would also investigate a little bit further with maybe some of the other parties involved. Like if it happened in another teacher's classroom I might even ask the teacher about it or I would report it directly to administration.
Q. Okay. Did you do this for any other students that would be complaining about sexual harassment, bullying or were you only doing it for -- or was this only occurring for LGBTQ+ students with you?
MR. ENGEL: I'm going to object to the form of that question. It's a compound question, but if you understand.
A. No, I understand where he's getting at. I think what you're asking, Omar, is did I only care when LGBTQ students were harassed versus saying --
Q. No. That's not exactly what I was asking.
MR. ENGEL: Hold on. Let him

Page 24

answer the question, please.
A. All right. Well, that's certainly the inference that I made, whether you intended that or not. The answer is any type of bullying and harassment is unacceptable and I would have reported it.
Q. Okay. So -- and basically you were following the procedure, whether it's LGBTQ+ students or any other students, but if I'm understanding you correctly, perhaps there was more of the LGBTQ+ students coming to you because of your position with the GSA club. Is that a fair summary or unfair?
A. That would be fair, that they saw me as somebody safe to come to.
Q. Okay. Was the -- and then you mentioned GSA posters were often torn down.
Can you -- like what are you referring to? When did this happen?
MR. ENGEL: Object to the form. It's a compound question. Did you want to rephrase? I think there were only two questions there.
Q. Do you recall when this occurred?
A. Do I recall exact dates, Omar? Is

Page 25

that what you're asking?
Q. For starting, yes.
A. No. I don't know exact dates.
Q. Do you have any idea who was doing so? Who may have done it?
A. The exact names of students, no.
Q. Okay. Is it true or is -- are GSA posters uniquely targeted to be torn down by students or are other posters also torn down occasionally or whatnot?
A. I only heard about GSA posters and diversity club posters.
Q. My understanding is that the District has moved all posters behind a glass display cabinet in the buildings. Am I accurate in my memory of that or?
A. That is not the case when I was there. So if that's true, it's a new development.
Q. Okay. Now, you claim that or you're stating here that the support from the District central office and school board was limited. What exactly are you referring to?
A. First of all, I want to be clear that we received support from my school

Page 26

principals. So I'm talking Dr. Harleman as well as Dr. Trevathan who proceeded him, but from central office was another story.

So I had pushed for a more traditional addressing of these issues. Something that was more comprehensive involved training for staff as well as maybe eventually training for students.

Q. So by support you're referring to is that you believe that central office could have done more from a training perspective; is that accurate?

A. I would say much, much more.

Q. Much more training or much more something else?

A. Much more training, and I'm trying to think of the right word here. We'll stick with training for now.

Q. Okay. For a student that actually was, let's say, proven to be harassing or bullying or whatnot, did the District, you know, did the District follow the proper policy when addressing those kind of cases?

A. I can't speak for the District, but I can speak for my administrators for Dr.

Page 27

Trevathan and for Dr. Harleman, yes. But the argument I always made was that these were structural issues. The goal was to stop these from happening in the first place rather than just address it as the issues arise.

Q. And what that -- if I understand you correctly, what you are wanting is more training to be able to accomplish that; is that accurate?

A. Yes. Yes.

Q. Okay. All right. Let's go to the next sentence here. "I believe that members of the Little Miami School District School Board have demonstrated animus towards LGBTQ+ students."

What exactly are you referring to?

A. Well, a number of things over the years. Can I go through each one?

Q. Yeah.

A. Okay. Yes, I guess most recently we'll talk about David Wallace. David, whether we're talking about his walkthroughs, taking photographs of things that he found objectionable. That would certainly be one. I would talk about the agenda and the hostility

Page 28

that David Wallace and some of his ideological counterparts. I'm talking about convicted felon Silas Sheldon. I'm talking about the Nazi sympathizer Dan Smith.

Q. I'm sorry, can you -- I'm trying to write down the names.

MR. ENGEL: Let him finish the answer.

A. These people essentially, yeah, went through great lengths in order to make what I believe to be Little Miami High School a hostile place for my LGBTQ students.

Q. Okay. Let's go through them one by one, but go through it slowly so I can write.

So you mention the first one was David Wallace walking through and taking pictures?

A. Yeah.

Q. Okay. What is your knowledge about that topic? What is your personal knowledge relating to that topic?

A. My personal knowledge is that he was walking around and taking photographs of classroom imagery that he found to be objectionable such as rainbows.

Page 29

Q. And how do you have that personal knowledge? Did you see him do it?

A. No. I was told -- I can't remember at this point who had told me, but I certainly didn't make it up.

Q. Okay. So this one was based on somebody told you?

A. I can't tell if you're saying that this didn't happen because I think David would admit that this happened.

Q. That's not the point of this. The point is is what do you personally know. Whether something did or didn't happen is a separate question.

A. No. I'm fortunate that he never came into my classroom while I was there or while students were there.

Q. Did you ever have any interaction with David Wallace?

A. Fortunately, no.

Q. Okay. Have you ever had any personal interaction with any of the current board members?

A. I've had personal with the current ones. I met Bobbie. Is Bobbie still on the

Page 30

school board? I think Bobbie is still on the school board. I've had encounters over the years and I met Wayne Siebert, but I met him as a candidate. I have met Wayne Siebert, but not since he has been elected school board, at least to my knowledge.
Q. Bobbie, what's the name, full name?
A. B-O-B-B-I-E.
Q. Yeah, but --
A. Last name Grice, G-R-I-C-E.
Q. Okay. I don't believe that individual is currently on the school board.
A. Okay.
Q. So do you have any idea when you may have talked to this individual, this board member?
A. Maybe, I'm guessing a handful of times over the course of 20 years. That's an estimate. We're talking about things like, you know, teacher luncheons, general stuff like that. Never on a 1:1 basis.
Q. Okay. So did either -- so you've only talked to two board members over the 20 years and it was these two individuals, correct?

Page 31

A. I thought you asked about current board members and I didn't know if Bobbie was currently on the school board or not.
Q. I apologize for that question. The current board members. Wayne Siebert is on the current board?
A. Yep. Yep. I've met Wayne.
Q. Okay. Now, when you met him you met him as a candidate and did you have conversations with him about anything to do with LGBTQ?
A. I can't remember. I can't remember.
Q. You next start talking about a few years ago a series of recorded interviews with GSA students about their experiences. And this is in your affidavit here.
A. Yep.
Q. And you had planned a professional development program for teachers based on these interviews.
Do you recall when approximately that occurred?
A. [redacted] is the approximate date, approximate year.

Page 32

Q. Were these interviews actually recorded?
A. Yes.
Q. Did you ever send any e-mails to anybody regarding this topic?
A. I can't remember.
Q. Did you ever get written permission to even start this project? Do you recall that?
A. I can't remember. I received permission from administration, but I can't remember if it was written or verbal.
Q. You can't remember if you got it or you can't remember if it was verbal or oral?
A. Oh, I received permission, but I cannot remember if it was written or verbal permission.
Q. Okay. Who would have given permission?
A. Dr. Trevathan.
Q. And that was the principal at the time?
A. Yes.
Q. Did you get these videos that you were doing with the students, were you the one

Page 33

recording the videos or were they recording the videos?
A. I was not the videographer. I was -- again, I do my best to recall, but I was asking questions and moderating.
Q. Okay. Was there any kind of parent permission acquired for this project?
A. No.
Q. You say, "This program was canceled."
Who informed you that it was canceled?
A. Dr. Trevathan.
Q. And do you recall how that was communicated?
A. Verbally.
Q. Do you recall the substance of the conversation?
A. I do.
Q. Okay. What was said?
A. When we -- when I say "we," when Dr. Trevathan had notified staff about this, that there was one, at least one maybe, staff member who objected and went to a school board member. That school board member was Mary

Page 34

Elmer.
Q. Hold on. Can I pause you?
A. Yep.
Q. Is this what Dr. Trevathan was telling you or you heard from some other source?
A. That's what she was telling me.
Q. Okay. So Dr. Trevathan is telling you. You can continue.
A. Yeah. That a staff member found the professional development to be objectionable. This staff member went to Mary Elmer, who was a school board member at the time, and I don't know exactly what transpired from there, if Mary went straight to Dr. Trevathan or if she went to somebody else in central office, but essentially the entire PD was shutdown.
Q. What does PD stand for?
A. PD, professional development. Excuse me.
Q. And this would have been by -- now, what exactly though was Dr. Trevathan telling you? Was she telling you that this board member went to somebody or was that something

Page 35

you're assuming?
A. I can't remember that detail, but I know it was because a board member found it objectionable.
Q. But -- and that's exactly what Dr. Trevathan told you?
A. That, yes, the board member did not approve.
Q. And it's specifically this Mary Elmer?
A. Yes.
Q. Okay. And for that reason your principal at the time decided to cancel this professional development?
A. I don't know -- I don't think it was her decision, but I don't want to speak for her. I mean, you may know this already, Omar, but all of the administrators, their contracts get renewed by a school board vote. So, you know, I think what often happens here is they are reading the room and they've got to essentially do what the school board members demand.
Q. But there was no public discussion of this or public vote or anything like that to

Page 36

your knowledge?
A. Public as in a board vote, a school board vote?
Q. School board meeting, discussions, anything --
A. I honestly don't know.
Q. And you don't -- if this occurred you wouldn't know the specific objection as to why -- like you never got a specific "these are why there is an objection" from whoever the board member, if, you know, as it was conveyed?
A. I can make a pretty safe guess as to what the objection was.
Q. Okay. Now, you have this paragraph eight where you say, "I attempted to get additional training for teachers on how to better respond to LGBTQ+ student issues and raise awareness. I sought to have these types of programs to teacher trainings."
What additional training are you referring to exactly?
A. Yeah. Give me a second here to collect my thoughts because this came up a number of times. You know, more than anything I wanted my colleagues, my fellow professional

Page 37

educators, to see LGBTQ+ students as human beings and to understand the unique vulnerabilities that they face on a daily basis. So we'll start with that, is to build empathy.
After that, there is more practical things such as if a teacher witnesses some sort of confrontation. If a teacher witnesses the harassment or taunting firsthand, you know, what are best practices to do in the moment? So that would be one. Another one would be center around data collections. I mentioned Public School Works earlier, our behavior management system. Understanding the importance, but also the language to use and how to properly submit one of these reports so that way we can inventory and track the amount of harassment and taunting that is happening because you do have people out there who would argue, "Oh, no, it's not a problem and it is clearly a problem and we'll show you why. We'll show you evidence of this." So those are the types of trainings that I push for.
Q. Okay. But you state here this was before Mr. Morgan was superintendent?

A. It predated her as well as during her time as superintendent. Most of my teaching career she was not my superintendent for most of my teaching careers. Only the final year or two, I think.

Q. Okay. Well, let's go through -- so if you said the one from paragraph seven we discussed was in [redacted]. These other attempted trainings or additional trainings that you wanted to do, was that before [redacted] or after the [redacted] video project?

A. Both.

Q. Okay. Can you give me some more detail as to how many times and when?

A. I don't have the exact number of times when I encouraged more professional development.

Q. Okay. And after that, when it was Ms. Morgan was superintendent, was there any training related to diversity and inclusion and LGBTQ issues that was done from that point forward?

MR. ENGEL: I'm going to object to the form. I think our focus is on LGBTQ issues. I don't know where you got the DEI



stuff from. Lets take the stuff that's in the record.

MR. TARAZI: Well, because he mentioned he was on the diversity and they did similar things.

MR. ENGEL: Yeah, but we're just jumping in. Like you just threw that in there. That's why we were objecting to the form of the question.

MR. TARAZI: Fine. I'll do it one at a time.

MR. ENGEL: But if you're going into DEI stuff we're getting well beyond the scope of what this deponent is here for, I think, but you can try and lay a foundation, but let's try to stick to the issues that we're here for, Omar.

Q. So going back to the question, you were proposing additional trainings for teachers. You're saying that you're being rebuffed.

What happened after Mrs. Morgan was superintendent? Did that also get rebuffed or was it ever integrated at all?

A. It was always rebuffed.



Q. Okay. Can you give specific incidents when Mrs. Morgan was superintendent where she told you no for something?

A. I asked to put the stickers back up, for teachers to be allowed to put our stickers back up.

Q. Okay. Was that -- I'm talking about training because you're mentioning additional training here.

A. Well, I would -- I think this is relevant to training. I think putting up -- the importance of having inclusive imagery in your classroom so that way students feel safe to learn, I think that falls as part of the training umbrella.

Q. Okay. Let's talk specifically then so that we're clear on definitions. You were -- in the previous paragraph seven you were talking about specifically PD, professional development training; is that correct?

A. Yes.

Q. Okay. So what additional professional development training did you propose beyond that that was rejected?

A. Do you want me to reiterate what I



have already told you?

Q. No. I want -- like, I guess I'm unclear right now because there is -- professional development training is a very specific thing.

Did you propose additional professional development training?

A. I will tell this again. Training to build empathy and to understand the lived-in experiences of our LGBTQ+ students, training on data collection as well and training on intervention when taunting or harassment occurs.

Q. Correct. And did you make proposals as it relates to that after the [redacted] proposal?

A. If I were to guess, yes. It would be on those topics though but, again, I don't know the exact dates.

Q. You say, "If I were to guess." If you don't remember, you don't remember. So is it do you remember or you don't remember?

A. I'm telling you I think so.

Q. And so with these requested -- would any of these requests appear in any of

your e-mails to your principal or to your -- to the superintendent?
A. I think so. I do recall sending e-mails advocating for this type of training, but I no longer have access to my old school e-mail.
Q. Did the school do any training that was maybe not customized in the way that you wanted it, but was doing training related to harassment, bullying and all of those issues?
A. No. But I should mention the whole child training that the entire state of Ohio did. That was a statewide initiative. Whole child training essentially trains teachers to accept and to appreciate and to celebrate exactly that, the whole child, all parts of the child, all parts of their identity. So I was privileged enough to be able to go through that training.
Q. Okay. So that was a training that was provided by the school?
A. The school carried out the training, yes, or brought in people from the -- I believe from the Educational Service Center to carry out the training.



Q. Okay. Was there any other training that was conducted by the school relating to bullying and harassment issues?
A. I cannot think of anything schoolwide.
Q. Did it ever occur at the -- what do you mean schoolwide versus, what, Districtwide or?
A. Either one. I cannot recall any sort of anti-bullying training Districtwide or building wide. It doesn't mean it didn't happen. I just don't recall any.
Q. Was there any -- so there was -- but you don't remember any training regarding the existing board policies on dealing with bullying, harassment and those that exist already in the District?
A. No. I don't recall any.
Q. Okay. And then here you say, "I believe these efforts were blocked either because of direct instruction from school board members or a desire by the superintendent's office to not upset school board members who held anti-LGBTQ+ views."
This belief, do you have any



firsthand direct personal experience, knowledge relating to it?
A. I can give I think with pretty high confidence that this is what happened.
Q. But do you have personal firsthand knowledge?
A. I have --
MR. ENGEL: Object to the form of that. I think this might be getting into a legal term. You know, if you want to ask him what he knows and why he thought that, that might be a better way to word it. It's your deposition. I'm just objecting to the form and trying to help out.
Q. Did you personally see any e-mail or overhear any conversation or participate in any conversation where a board member instructed or, you know, anything that would -- where you have personal direct knowledge on this topic?
MR. ENGEL: I'm going to object to the form of that compound question, but you can answer if you can.
A. If you can break up the question for me, Omar.



Q. So you say, "Were blocked either because of direct instructions from school board members."
Did you personally ever see an e-mail or overhear a conversation where a school board member made a direction regarding anything to do with this topic?
A. I heard and witnessed an anti-LGBTQ+ animus from school board members at school board meetings and from candidates who would later become school board members.
Q. Well, the question is: Did you actually -- do you have personal knowledge about direction from a school board member to block one of your proposals?
A. I never saw an e-mail, nor did I hear a school board member firsthand give any sort of instruction to an administrator.
Q. Okay. And then do you have any direct -- like did a superintendent ever tell you that they are not telling you no because they don't want to upset a board member or is that just your opinion of what you think was going through their head?
MR. ENGEL: Object to the form.

Page 46

You can answer if you understand it.
A. I think I understand. Just for the sake of clarity, you're asking me whether or not I knew firsthand that decisions were being made by central office as the result of pressure from school board members?
Q. Correct.
A. Well, I'm thinking and I believe so, yes.
Q. Okay. So how do you know that to be true?
A. We had a number of conversations over the years and Ms. Morgan had admitted that there -- that the school board members objected to what we were trying to accomplish.
Q. Okay. When did this conversation from Ms. Morgan occur?
A. In the final -- within the final two years of my employment there.
Q. Okay. Can you narrow that down at all?
A. No.
Q. And can you narrow down the subject? Was this regarding a specific proposal or that was being rejected or that she

Page 47

was rejecting?
A. Training. Training in general, but then I'm also going to come back to the stickers as well.
Q. So is it --
A. Josh asked me to clarify what I meant by stickers. The stickers that we put in the affidavit or in the response to your subpoena. Those are the stickers I'm referring to.
Q. Okay. And so was it one conversation or more than one conversation?
A. I honestly can't remember.
Q. Let me jump in to clarify, you mean the safe space stickers?
A. Yes. I'm referring to the safe space stickers.
Q. And you don't recall -- it was within a two-year window and you don't recall beyond that?
A. No.
Q. And was it specifically a conversation about safe space stickers or was it about safe space stickers and additional training?

Page 48

A. Conversations about training had taken place over the years, but at that moment I remember in the final two years I was prioritizing the safe space stickers hoping to get some momentum with that first.
Q. Okay. So your recollection is that she -- what did she say specifically about the safe space stickers?
A. When I asked permission to put them back up that she would not allow it.
Q. And did she say specifically why?
A. At that moment, no, but over the course of conversations we've had she had told me that there were some board members who objected to it.
Q. So that -- so those other conversations did they occur within the two-year window or was that prior to the two-year window?
A. She was only superintendent within that two-year window.
Q. Okay. Just so I understand what you remember. So you remember a conversation where you asked, "I want to put up the safe space stickers" and she said no?

Page 49

A. Yes. I do remember that conversation.
Q. Okay. And you're saying that there was a completely separate conversation where she said you can't because of school board members or is it the same conversation or you don't remember?
A. I don't remember exactly when those took place.
Q. Okay. But you do have a memory that one time where she said no and the other is -- and you don't recall, but you think there was another conversation where she explained why?
A. Yes.
Q. Okay. And do you recall exactly the words she said?
A. No.
Q. Okay. You state in paragraph 10 that the prior superintendent ordered that all the stickers be removed over the summer break; is that accurate?
A. Yes.
Q. Okay. And that was in 2022? Sorry, 2020?

Page 50

A. No. That was a few years later.
Q. Okay. So which summer break are we talking about?
A. Either '23, the summer of '23 or the summer of '24. I can't remember which one.
Q. So one of those two summers the prior superintendent -- which superintendent are you referring to?
A. Greg Power.
Q. And he ordered them the stickers to be removed?
A. Yes.
Q. Okay. Did he explain why?
A. He never told me. This was -- this message was delivered to me by Dr. Trevathan.
Q. Okay. And that -- and the why wasn't communicated?
A. He found them objectionable or the school board members found it objectionable.
Q. Well, was that communicated to you or was that -- is that what you're assuming?
A. If they are taking down the stickers, then I think that's a pretty safe conclusion to make.
Q. Right. But I'm just trying to get

Page 51

to what was told to you. You were just simply told to take them down and that's it?
A. Somebody didn't like it.
Q. Okay. Who -- okay. Is that what you were told?
A. I don't remember the exact words.
Q. Okay. And when you say here, "I asked the new superintendent if the safe space stickers could be," I guess that's a typo, "put back up," she simply said, "I can't allow that;" is that accurate?
A. Yes, it is.
Q. So the new superintendent is Regina Morgan, correct?
A. Yes.
Q. And you're making a very specific quote here of "I can't allow that." Is that an accurate quote?
A. That's what I recall.
Q. Was there any other explanation given?
A. No.
Q. Okay.
MR. ENGEL: I'm going to object to form. I think you mean any other explanation

Page 52

given during that conversation or at any time because I think there was some prior testimony about different conversations.
A. Yeah. There were a few staff members who objected to it and I was also told that there was school board members who objected to it.
Q. Okay. Who told you that?
A. Well, Dr. Trevathan and then Mrs. Morgan.
Q. So you're saying that both Dr. Trevathan and Morgan, Ms. Morgan, both told you that the safe space stickers there was some objections from a school board member?
A. At least one, yes.
Q. But what do you mean by -- both of them told you that at least one board member had an objection?
A. Yeah. Because, you know, there were school board members who literally ran on a platform of what I would call anti-LGBTQ+ agenda.
Q. Okay. Can you explain what that is you're referring to exactly?
A. You want more names?

Page 53

Q. Yeah.
A. Okay. Well, the ones I recall, the three that I recall more than anyone are Mary Elmer, David Wallace and Dan smith.
Q. Okay. And the -- what was the campaign substance that they wanted removed out of the classroom or out of the school or what was it that you believed was the very specific I guess ask that you feel was anti-LGBTQ+?
A. I think conflating any sort of acknowledgement that LGBTQ+ students exist with sexuality. That's what I'm talking about.
Q. Okay. So in other words, can you explain a little bit more what you mean? So they were campaigning that they don't want sexuality in the school? Is that -- or they don't want LGBTQ+ in the school?
A. They clearly conflated the existence of LGBTQ+ kids, acknowledging their existence, protecting them, and making sure they are represented in both offerings as sexuality.
Q. Okay. So they were -- if I understand you correctly, they were saying that they were against sexuality being presented and

then the consequence of that is LGBTQ material being censored; is that -- am I hearing you correctly?
A. That is accurate, yes.
Q. Okay. You state here that Wallace then a candidate for school board objected to the presence of any stories that included LGBTQ+ characters.
Is that something that you have personal knowledge regarding?
A. Yes.
Q. Okay. Can you -- you know, what exactly did you specifically hear him say?
A. I don't know the exact words, but I can remember his presence at the school board meetings. I can remember in the presence again of his political allies: Silas Sheldon and Dan Smith. And I remember, you know, just the great lengths that he went to in order to make sure that there were no stories being made available whatsoever that had gay characters in them -- excuse me, that had gay characters existing in the world.
Q. So what like specifically did you hear him say or do, and this seems like it's a



conclusion, fine, but what is the specific acts that you're -- that you personally witnessed?
A. I mean, I can go back into -- I can go to Little Miami School Board's website and mine, all of the transcripts and mine, all of the videos for evidence of this. If you want to do that we can do that, but I do recall this happening at school board meetings. And I remember people talking about it the following days. So hopefully that answers your question.
Q. Okay. Well, I mean, was he specifically at a school board meeting saying, "I don't want to have any LGBTQ+ characters at Little Miami School District"? Is that what you're saying happened?
A. The scholastic book fair, yeah. Yeah. There were news stories reported on it. He was quoted.
Q. So the characterization --
A. I mean, we can do a little search here if you want. We can go into any search engine of your choice and find it.
Q. Was his specific objection to a specific book at the scholastic book fair? In other words, was there sort of a -- was he



trying to pass a rule that, a general rule, or was he objecting to a very specific book or a couple of books or whatnot that were at --
A. The practical consequence is that it resulted in a pause of the presence of the scholastic book fair as a whole until everything could be inventoried until a policy could be made about how to proceed from this.
Q. Okay.
A. So scholastic was put on pause.
Q. Scholastic was put on pause, but was the complaint, "I don't want LGBTQ books" or was the complaint, "There is too much sexuality in books. Let's review that"?
A. Well, like I said earlier, for him it really seemed to be one and the same.
Q. And that's based upon your -- that's your opinion that -- I mean, you didn't -- did you hear him say that these are one and the same?
A. Did I hear him say --
MR. ENGEL: We're getting argumentative here. Just ask questions.
A. Go ahead, Omar. What would you like to ask me?



Q. Okay. So we have Heartstopper. You specifically mention this Heartstopper book, right, by Alice Oseman?
A. Yep.
Q. Was that one book the main center of the controversy at the time or was there more than one?
A. I think it was the starting point. I don't know if there was more material or not, but I do think there was.
Q. Okay. So there was this one book. There was this book. There might have been others, but this book and then this led to a pause in the program and then what happened?
A. I don't know. I don't know. I resigned I think when a lot of this was resolved. I couldn't tell you right now if scholastic has a presence at Little Miami.
Q. Then you say, after this public conversation about these books -- and by the way, was Dave Wallace on the board at the time?
A. No. I believe not. I believe he was agitating.
Q. Okay. So you have here that Wallace was a candidate and then you mentioned

Page 58

school board meetings.
Was he always talking as a candidate during school board meetings?
A. I think as a resident and then possibly later as a candidate.
Q. Okay. But then the formal action would have occurred by the board at the time?
A. Yeah. Correct.
Q. And do you recall what the board at the time did?
A. Well, they hired you for one.
Q. You're talking about --
A. Okay. Let me be more clear here. I believe one of the reasons why you were hired was because you would back them in these types of cases.
Q. Okay. Let's take one step at a time. You're talking about September of '23. There is this issue with school book fair, the scholastic story at the time with the then board; is that accurate?
A. Yes.
Q. So what did the then board decide to do at that time regarding this topic? Do you recall?

Page 59

A. Yeah. I remember scholastic being shutdown.
Q. Okay. By the then board and then what happened? You don't remember what happened after that?
A. Well, I remember my students being distressed.
Q. Okay. But then what happened after that with the scholastic program?
A. Well, I'll say it again. I don't know exactly how scholastic was resolved.
Q. Okay. And then in paragraph 11 you say, "Despite an exemplary teaching record, the ongoing treatment of our LGBTQ+ and other vulnerable students have caused me severe distress and was therefore a major reason why I resigned from Little Miami;" is that accurate?
A. That is very accurate, yes.
Q. Okay. And if I'm trying to read these two paragraphs together, it sounds like this conversation about the Heartstopper issue back in '23 resulted in some students complaining to you or feeling unwelcome as a result of that conversation; is that accurate?
A. I would say they were under severe

Page 60

distress.
Q. How many students complained to you?
A. Dozens.
Q. So can you give me a rough number?
A. Dozens.
Q. Okay. How many of those people that -- of the students complained experienced anything that resulted in a formal report or formal action relating to discipline?
A. Were they the subject of taunts and harassment? Is that what you're asking?
Q. I'm saying if somebody -- let me make sure I'm clear. If a student comes to you and says, "Hey, other student here is bullying me," and I believe earlier you said the process is you -- there is a process for handling those kind of issues.
Did any of these students' complaints to you result in those additional administrative actions occurring?
A. And, I'm sorry, I don't fully understand the question.
Q. Okay. If a student comes to you and says, "I'm being bullied by student Y,"

Page 61

correct?
A. Correct.
Q. Isn't there a formal policy per board policy that you have to follow in those circumstance?
A. Yes.
Q. Okay. And earlier you testified that you documented, I don't recall what system, but it sounds like there was a system you documented?
A. Public School Works.
Q. Okay. So did any of these, you know, dozens that complained to you about hostility and harassment result in you documenting anything in Public School Works?
A. Yes.
Q. How many incidents were actually documented?
A. I don't have access to Public School Works anymore so I don't know.
Q. Was there any other reasons why you chose to resign? And this was at the end of the [redacted] school year, right?
A. Yes.
Q. Like it wasn't midyear --

Page 62

A. No. When I offered my resignation it was in the spring of [redacted]. It was meant to be effective at the end of that school year. And your question was whether there were other reasons, too?
Q. Yeah.
A. Sure. Yes. I mean, this was a contributing factor. Certainly, I mean, I was -- I kind of saw the writing on the wall with who the community had elected that animus that the newly board -- the newly elected school board members had towards LGBTQ+ students as well as other vulnerable groups, like I put in my resignation letter. And I was worried about the blow-back toward them and I was worried about the blow-back towards myself, that I would be targeted.
Q. Okay. Was anything -- were you ever actually, in fact, targeted for any complaints or anything done specifically towards you?
A. Yes. People complained about me and the existence of our clubs, yes.
Q. Yeah. I think you mentioned that earlier generically there was complaints, but

Page 63

I'm talking about specific, let's say, employer actions against you. Were you ever written up?
A. Never. A squeaky clean disciplinary record.
Q. Were you ever given a bad performance review?
A. Never.
Q. Were you ever -- I guess like was there any adverse employment action that was ever done against you?
A. Never. The highest degree of professional conduct.
MR. TARAZI: Can we pause for five minutes? I'm going to switch now to some additional exhibits, but maybe we can take a three-minute break.
MR. ENGEL: Sure. Before you do that, are you done with Exhibit AA-1?
MR. TARAZI: Yeah.
MR. ENGEL: Okay. Let me just put on the record that what you've marked as AA-1, just so we can find it later, is the document filed in the court with Docket No. 29-31 beginning of page ID No. 2331.
MR. TARAZI: Correct.

Page 64

MR. ENGEL: Okay. How long do you want?
MR. TARAZI: It won't take too much longer when we come back so if you want to take a five-minute break or 10 minutes.
MR. ENGEL: Let's do 10 minutes. Let's come back at 2:25.
MR. TARAZI: Okay. 2:25 then.
(Whereupon, a recess was taken.)
MR. ENGEL: Back on the record. During the break, the witness indicated that he remembered an additional conversation he had with Mrs. Morgan I believe it was that may impact some of the testimony he gave before so I want to give him a chance to explain that conversation and give counsel a chance to ask questions about it.
So do you want to go ahead and explain what you now recollect?
A. It was, again, in that 2022 to 2023 range, you know, somewhere in there. I remember having a conversation with Mrs. Morgan after school one day, and I can't remember why she was in the building, but specifically about some of the things we talked about: Training,

Page 65

the classroom imageries such as the safe space stickers. And I do recall her acknowledging that she knew what was best for students, but was not able to carry out my recommendations. She did not specify why, but I think for me the inference was clear.
Q. Did you review anything to refresh your memory to get this memory now or did it just pop in your head?
A. No. But, again, this is my first deposition. I'm now [redacted] removed from Little Miami. What I experienced at Little Miami, especially the last few years, I would say I went through a lot of trauma, and I have forgotten. Sometimes I'll even be laying in bed at night and these memories will resurface and that's what happened is we got out and I thought to myself, "Oh, I should have brought this up."
Q. Okay. No problem. I guess as a starting point, how did you end up getting to a place where you're submitting an affidavit in this case? Were you approached by somebody for that or you volunteered or how did that get there?

Page 66

A. I don't remember exactly, but Josh and I had a conversation.
Q. Did you call him or he called you?
A. I honestly can't remember.
Q. And by "Josh" you mean your current counsel?
A. Yeah. My counsel.
Q. Okay. And this was -- when did he become your official counsel? Like when did you retain him?
A. I'm guessing a week-ish ago is when I signed the paperwork. I don't remember exactly.
Q. Okay. So he wasn't your attorney when you put this affidavit together?
A. No. No. I don't think I had signed anything yet.
Q. Okay. Did he ask you to make this affidavit or you volunteered?
A. I would say he asked me if I wanted to and this was entirely voluntary on my end. I was happy to do it.
Q. Did he explain why it would be helpful at the time?
A. I don't think he needed to. I

Page 67

think I was able to figure that out.
Q. Okay. I am going to -- and I just want to be clear just from a timeline cleanup. After you resigned from Little Miami, did you have anything further to do with Little Miami? I would assume no, but I want -- did you have --
A. Yeah. No official capacity.
Q. Okay. Did you continue to like attend board meetings and things like that?
A. No. I would see like the news articles. I saw what was happening with Dan Smith. I saw what was happening with Silas Sheldon. I saw, you know, you being hired. All of this stuff.
Q. Okay. But like, in other words, you were at that point just a member of the general public. You weren't still going to any -- I mean, there was no formal involvement from the point you resigned onward? You weren't still advising?
A. No. No formal involvement.
Q. Okay. I'm going to show you a handful of e-mails that came off of the Little Miami School District System and I'm just going

Page 68

to ask you a couple of questions about a couple of these.
MR. ENGEL: Omar, have these been produced in discovery?
MR. TARAZI: These weren't requested in discovery.
MR. ENGEL: I'm sorry, we're going to object to the use of any e-mails here that weren't produced in discovery. I don't know what you mean by "weren't requested." I think we requested all documents relevant to this case, so if you're going to use them, you know, this is a big problem if you're just going to drop exhibits into a deposition that haven't been disclosed beforehand.
MR. TARAZI: Well, recall that we never were able to run a search on [redacted] e-mail before this deposition.
MR. ENGEL: Still, I mean, when did you obtain these e-mails?
MR. TARAZI: Literally in the last couple of days.
MR. ENGEL: And why didn't you give them to me when you obtained them?
MR. TARAZI: I wasn't sure what I

Page 69

would be using or not. It's been all last minute.
MR. ENGEL: But if they were relevant to the case and you haven't disclosed them, we have a real problem here with your, again, using evidence that you believe is relevant to the case that was in your possession in a deposition that you had for a couple of days and you did not disclose to us. That's a big problem here.
MR. TARAZI: Well, he is the one who referenced his resignation letter and e-mail, and I have a copy of his resignation and I want to show it to him and ask him --
MR. ENGEL: I think we produced that to you so that is fine. If you want to use that, that's fine, but you mentioned some other e-mails that you obtained beforehand.
MR. TARAZI: I'm saying --
MR. ENGEL: It's highly -- I mean, let's see where it goes, but it's really problematic here that you are trying to ask him questions about other e-mails that you've had in your possession and did not disclose. That's really underhand attackage here.

MR. TARAZI: Let me ask him about this e-mail.

- - - - -

(Thereupon, Deposition Exhibit AA-3 Resignation Letter, was marked for purposes of identification.)

- - - - -

MR. ENGEL: And just to be clear, I think you mentioned you had a bunch of e-mails, right? I know we've had -- we produced the resignation e-mail. So we have no problem with you asking about the resignation e-mail. It's that other stuff that you said that you had that's going to be a big problem.

MR. TARAZI: Okay. Well, one question at a time.

Q. So I'm showing you Exhibit AA-3. And this is your resignation letter e-mail?

A. Yes.

Q. Okay. In it you say, "I would like to thank Dr. Harleman and Dr. Huelsman." I'm sorry if I'm mispronouncing it. Who is that?

A. Dr. Chad Huelsman.

Q. Okay. Who is he and what is his role?



A. Assistant principal at the high school.

Q. Oh, okay. "Fantastic administrators to work with."

Did you -- did they ever not fully support you in what it is that you were doing at the school?

A. I cannot recall a single instance where they did not support me.

Q. Okay. When you -- after you submitted this resignation, were you ever approached by anyone? Meaning specifically the superintendent to ask you questions about it?

A. Yes. Not approached. Mrs. Morgan called me.

Q. Okay. Do you recall the substance of that conversation?

A. A little bit.

Q. Okay. Go ahead.

A. She asked me to reconsider. I outlined the reasons that were in this letter. I detailed some of the distress and some of the specifics, the stickers being one, but ultimately we were not able to come to a satisfying agreement. One that would have kept



me employed there.

Q. Okay. So there was some kind of a negotiation or?

A. Not a negotiation. I think she asked for more details. I mean, it's -- I'm sure from her standpoint it's alarming. I had been there a long time. I was extremely involved with the school. You know, it's a public sector job. It carries with it benefits. I had, as we've already discussed, an impeccable employment rating. A high degree of professionalism over the course of those two decades so I think from her standpoint it was probably alarming. "Why is one of my most experienced and reputed and accomplished teachers resigning?"

Q. So what is the -- did she mention anything about David Wallace in that conversation?

A. I don't remember.

Q. Do you recall anything about him asking or that David Wallace had expressed any concerns about your resignation?

A. Something after the fact. I think, again, this was after it happened. I think



before school let out. So I'm guessing April, May-ish. Omar, I don't even remember how I remember this, but I remember him seeing my resignation letter and raising the issue. Wondering like, hey -- because I think my resignation letter, yes, I brought up the -- I cited the concerns I have over physical and emotional safety.

So the conclusion that I made was that maybe he saw this as an opportunity to paint Regina as an administrator who was not protecting the physical and emotional safety of the staff, but he didn't know -- I don't think he knew me at the time or, you know, the students who I supported, otherwise he probably would not have advocated for me.

Q. So you do not believe he's aware that you're -- of your involvement in GSA?

A. Oh, at the moment of him seeing this letter I don't think so. I don't think so, but I could be wrong.

Q. Okay. So you never saw any e-mails before about him or the questions that he was asking about you or anything like that? You never saw any of that?

A. I don't remember. I don't think so.

Q. Okay. Do you recall getting e-mails from Ms. Morgan periodically about encouraging participation in groups like the student groups? Would she ever send out e-mails to that effect encouraging people to participate in student groups including LGBTQ student group?

A. Asking staff to participate in groups, I don't recall any.

Q. So you don't remember her ever encouraging anybody to -- or being positive or was she supportive at all to other LGBTQ members?

A. I don't know what's in her heart. I don't know.

Q. Okay. But you don't recall objective -- I know about heart. I'm talking about objective actions. You don't recall any objective actions that relate to LGBTQ encouragement from her side?

A. Specifically for LGBTQ+ students, I don't recall any.

Q. Okay. You mentioned that you



taught history and AP euro and so forth. Is LGBTQ history taught in your classes?

A. Their existence are they taught? Do you mean do gay people exist? Do trans people exist?

Q. I'm talking about the civil rights movement as it relates to the LGBTQ rights, the marriage, all of those kind of issues? Do you teach those subjects?

MR. ENGEL: I'm just going to put an objection to the floor. I think it's a very confusing question.

A. I was hoping you would bring up curriculum so this is great.

Q. Okay. So, well --

MR. ENGEL: Yeah, if you understand it you can answer it.

A. I understand it. I just want to make sure that I understand where you're coming from. I think what you're trying to get to here, Omar, is was I teaching sexuality in the classroom. That's probably ultimately what you want to know. If you're asking me whether or not I would acknowledge that gay people exist, of course. Do trans people exist, of course.



A big part of history and a big part about teaching history is about the expansion and the contraction of rights over the course of time.

So there is an ebb and flow to this that is reflected in all of the curriculum that I taught, whether this was freshman year world history, whether this was AP European history and whether this was AP euro or AP world history. And along with the expansion and contraction of rights is also about how gender norms change over the years. Not about advocating for changing gender norms, but just that gender norms do change over time. This is basic level history.

Q. Okay. And does that include civil rights related history for these topics?

A. 10th grade is when most -- is the most direct connection for the civil rights movement, but if I may, I'm going to talk about this for a second because it's related. Any good teacher is able to connect what students are currently learning about to content they learned about in the past as well as the content they are going to learn about in the future as well as the content that is taking



place in the real world to make it relevant to students.

So I would say to any 9th grade teacher as you discuss, the expansion or contraction of rights that the gay liberation movement, which is addressed in the model curricula of the 10th grade, would be fair game as a best practice.

Q. Okay. So you did teach that because it's part of the model curriculum, correct?

A. It's part of the model curriculum so it was fair game, yes.

Q. Okay. And you taught it all of the way through until your point of resignation, correct?

A. Let's -- what do you mean by taught it? Do I have full units on it or if a student asked me "Hey, you know, in the 18th century when philosophers were debating about who should have rights and who shouldn't, did this include gay people?" So questions like that would sometimes arise organically, but it's not like, "Hey, class, guess what? I know that this is content that you're going to get next

Page 78

year in 10th grade, but I'm going to use the next three to four weeks with you to discuss the gay liberation in the 9th grade with the 10th grade curriculum." That never happened.

Q. Okay. So you're saying that it existed in curriculum, but it existed in 10th grade and you didn't teach 10th grade?

A. I had not taught 10th grade American History in a long time.

Q. Okay. So of the subjects you did teach, was any of the LGBTQ+ or sexuality-related matters, civil rights related as it relates to these topics, was that included in any of the content that you taught?

A. Yes. But because I don't -- I'm not convinced that when you use the word sexuality that you mean it the same way that I do. So I do want you to clarify what you mean by sexuality and I'll tell you what I think it is.

Q. Well, I'm not testifying so go ahead. How will you define it? Explain what it is.

A. When we're talking about sexuality we're just talking about romantic attraction

Page 79

because I can see how somebody in bad faith would try to spin that word to mean something explicit or pornographic in nature, which is not the case.

Q. Okay. So what exactly are the contents of subjects that you actually taught that would cover any of these, of the LGBTQ history. I understand your testimony that there are individuals and it would come up occasionally, that piece. I guess the gay liberation movement is taught only in 10th grade.

So was there any other topics that were taught in the classes that you were teaching as the main subject matter?

A. Well, again, this is something that you can look up, but if you go to the curriculum of the AP European history, AP world history course, again, I don't know that these are the exact words used, but the spirit is certainly the same. Over the course of the last few centuries there have been debates about the expansion and contraction of rights. And, yes, this would include gay people and trans people and other groups who fall within

Page 80

the LGBTQ+ umbrella.

Q. Okay. And when are these taught? Like are they taught as a full -- like how is it taught? Is it taught for a week? A day? How long is the subject spent on this?

A. I'll resist the urge to be snarky here and just tell you I don't know how many total minutes were allotted to this.

Q. Well, I guess my question is: Was it a unit of study or was it like a lesson or something in between?

A. We do not have a gay unit, no.

Q. No. That's what you described as the title. You said it's both AP euro and an AP history that these topics are covered.

So is it covered for what extensive time? Is it a chapter? A unit? A lesson?

A. The way the curricula is organized is that there are -- we call them in content stands. By the end of the course students should know this content. And, again, I remember a few line items where it is addressed in the AP history courses.

Q. Okay. Did you send any -- was there any e-mails that you sent that documented

Page 81

anything relating to, you know, your opinions on the elections? I guess you're tying a lot of things to the election so did you send any e-mails related to that or communicate at all related to that?

MR. ENGEL: We're going to object. This is well beyond the scope of what's in there. I mean, the elections has nothing to do -- are you talking about general elections? The elections for school board?

MR. TARAZI: Well, that's what I'm asking. I'm asking him as it related to his instruction and his, you know --

MR. ENGEL: We're going to not -- that is well beyond the scope of anything that is permissible or relevant to this case here. His personal opinions or e-mails that he might have sent to somebody about some election at some time. I mean, how is that relevant to any of the issues in this case?

MR. TARAZI: Well, he was stating, testifying that the election of certain people to the board affected his decisionmaking and so I'm just wondering, asking if he documented that in any way.

A. I don't know.
MR. ENGEL: Yeah. That seems -- I mean, if you're asking about -- so just so we're clarifying so we can answer, you're limiting that question to just asking about the school board elections?
MR. TARAZI: Correct.
A. Yeah, I don't know. It's possible that maybe I raised concern that there would be a trickle down effect if certain people were elected that it would have an impact on some people more than others.
Q. Okay. But here today you don't remember anything as it relates to e-mails related to that, correct?
A. I don't remember. I don't remember.
Q. Okay. For the content that you were teaching, AP euro and AP history and so forth, did anybody ever come to try to prevent you from teaching those materials?
A. Not that I recall.
Q. Was there ever any interference with what you could teach in the classroom?
A. Interference, I'm going to define



this broadly and let you know that we were told by administration to be very careful about what we taught. You know, I raised the question about whether or not, you know, the curriculum is a minimum or if the curriculum is a maximum amount of what we taught. And more or less what we were told by administration was that they could not protect us if we deviated from the official curriculum, but as I stated before, you know, best practice is in education as well as the Ohio Teacher Evaluation System, what's otherwise known as OTES. In other words, how teachers are being assessed. The expectation in that rubric is that we are connecting the historical content to students' lives and making it relevant for them.
Q. Do you recall who told you that? Which admin and when?
A. It was one of our three administrators between -- I want to say around 2021, '22, in that range.
Q. And you don't recall who that was?
A. No.
Q. Okay. So other than, I guess, going -- other than that one comment, was there



any other effect or effort to try to block or limit what you could teach in the classroom?
A. I don't remember any specifics at this moment.
Q. Okay. Did you end up -- was there any parent, other than I guess the syllabus, was there any other parent noticed an opportunity to opt out that was ever done with anything to do with any of your classroom material?
A. I don't recall ever a parent opting out of any content.
Q. Did you ever give them an opportunity to opt out?
A. They signed up for the course. What would I have done?
Q. Well, I'm just -- was there any kind of -- when you provided course materials and whatnot, was there any kind of, "Hey, you can opt out if you don't want your student to be participating in any particular lesson or video" or was that ever -- did anything like that ever happen?
A. I just want to make sure that I'm clear on what you're saying here, Omar. So,



for instance, if there was the possibility that we acknowledged as a class that gender norms have changed over the years and that some people who identify as gay were more comfortable being out in the open would a -- you know, would I have explicitly invited parents to opt out of that, no.
Q. I'm saying, for example, we're going to have a lesson next week on any topic, was there ever sort of like parents given the opportunity to, "Hey, we're going to -- just to let you know, we're teaching this subject." Or was that all just communicated in the syllabus basically?
A. Yeah. There was never a conversation like, "Hey, next week we're learning about child labor during the industrial revolution. You have the opportunity to opt out." There was never anything like that.
Q. Okay. Give me a second. All of the -- just to clarify, we did ask you for documents, correct? And you did produce some documents in response. Do you recall that?
A. Yes. I do recall that.

Page 86

Q. Okay. And I just want to confirm, you don't have in your possession any further documents relating to harassment or, you know, anything beyond what we already have in this case or has already been produced?

MR. ENGEL: Yeah, I mean, I think our response is -- it's set forth in the letter that was sent to you. So I think there is an objection to that request as well.

A. Yeah. I don't have access to my school e-mail. I don't have access to Public School Works. I don't have access to the GSA stuff on Schoology. So, no.

Q. Okay. So the stuff -- I understand you objected to certain items, but the ones you said you don't have any possession you still don't have any in your possession at this stage?

A. No, I don't. I don't have access to e-mail. I don't have access to Public School Works.

MR. TARAZI: Okay. No further questions for this witness at this time.

MR. ENGEL: I'm going to have a couple of questions. Give me a second because

Page 87

I want to share some documents. I'm going to log in with a separate computer to the Zoom call so bear with me for second.

EXAMINATION OF [redacted]

BY MR. ENGEL:

Q. So let me pull it back into, you know, why we're here. Are you familiar with the flag that Mr. McIntyre had in his classroom?

A. Yes.

Q. Okay. And you're also familiar -- well, let me start over. While you were at Little Miami Schools, was there any policies in place about what people could put on their classroom walls?

A. No.

Q. What sort of materials would you have on your classroom walls?

A. Pictures of historical figures, posters that I would call kind of being like -- they were meant to be funny or ironic. That kind of stuff. Flags, American flag maps.

Q. Did you use those materials as part of the curriculum in the classroom?

A. No. It's meant to create a

Page 88

welcoming environment.

Q. Did you use those materials to aid in your teaching or anything like that?

A. An occasional reference here or there, but in general, it was not always directly related to those.

Q. When you say an occasional reference, what do you mean by that?

A. You know, I might direct them to the map on the wall as an example. Or, you know, I had a poster of Thomas Payne so when we got to the enlightenment I would point to Thomas Payne or pointed to Nelson Mandela when we got to South Africa.

Q. You're familiar with the class that Mr. McIntyre teaches?

A. I remember.

Q. You taught some of the same classes?

A. I have.

Q. I'm going to show you what was filed in the case is Document No. 25-9, which is the Parental Bill of Rights Policy for the school.

Are you familiar with this policy?

Page 89

A. Yeah. Vaguely.

Q. Okay. And have you ever read the part that describes the term sexual content?

A. I can do it right now.

Q. Sorry, I said that wrong. Sexuality content.

A. Okay.

Q. Did any of the materials that you taught during the school year constitute sexuality content that is defined in that policy?

A. No.

Q. Did any of the materials that you had on the wall constitute sexuality content?

A. No.

Q. Now, you were asked some questions about teaching about LGBTQ rights or things like that in the civil rights movement. Does that constitute sexuality content?

A. I would say no.

Q. Why do you say that?

A. Because there is nothing explicit or pornographic that was discussed.

Q. And just using the terms here, did it include instruction, presentation or

Page 90

description of sexual concepts or gender ideology in the classroom setting?
A. Yeah. I don't -- I mean, I think I know what they mean by gender ideology, but I don't know. Maybe Omar being the Board attorney can clarify what is meant by gender ideology.
Does that just mean that genders exist, Omar?
MR. TARAZI: I think he's asking you the question.
Q. Yeah. As you understand those terms, did anything that was taught constitute sexuality content?
A. No.
Q. And are you aware if Mr. McIntyre taught anything that involved sexuality content?
A. No.
Q. Would the presence of some of the materials that you had on your walls constitute sexuality content?
A. No.
Q. Okay. And in particular would the flag that is the subject of this litigation

Page 91

constitute sexuality content?
A. No.
MR. TARAZI: I would object in so far as a legal opinion, but he's entitled to have a personal opinion on all of these issues.
A. I think having various accommodations of colors arranged in a specific order with the message, "Hate has no home here," that there is nothing sexual about that.
Q. So could you -- I just want to make sure you had a chance to explain how you understand the difference between recognizing the existence of certain groups. Let me rephrase that question.
I want to give you a chance to explain what you meant by the difference between recognizing the existence of gay and trans students and the teaching of sexuality content.
A. What they mean by -- what I think they mean by it?
Q. Well, do you believe there is a difference between those?
A. I do. I think there is a difference by what I mean by it, I think what a

Page 92

reasonable person means by it and what the authors of these provisions would say.
Q. Tell me what you mean by that.
A. Well, I'm -- I think people tend to see themselves in their own identities as the default. So as an example, somebody maybe who is heterosexual that they see themselves as the default and they see homosexuality as inherently sexual or someone who is cisgender, they're like, "Well, I'm the default and somebody who is transgender that is inherently sexual." So the way I've come to interpret this, and I think this is based off of good reason, is that any conversation about the mere existence of people who are not heterosexual, who are not cisgender is inherently sexual and I object strongly to that assertion.
Q. Okay. You were asked earlier about the safe space stickers in the school and I think we got a little confused -- or not confused. I think the record wasn't totally clear about that.
Can you just explain in your own words what happened with these safe space stickers?

Page 93

A. Yeah. I'd be happy to. I had those stickers up, I don't know for how long, years. And towards the end of the school year, this was at the outgoing Superintendent Mr. Power, had informed my principal at the time, Dr. Trevathan, that they would be coming down over the summer.
I took that as an opportunity to document it. That's why I took the picture was because I wanted to remember the stickers that I had up, and given the subpoena, really glad that I did. You know, so I was told that the stickers were coming down. I did not take them down. I would not have taken them down, but when we returned to the school year, because you have to understand that teachers don't have access to the building the entire summer. So when we returned in August, mine were noticeably down as were my colleagues' stickers as well.
Q. Let me take a step back. What were these stickers implying that some teachers put them on their rooms?
A. These stickers were all in the spirit of what we call safe space stickers,

Page 94

signaling to students that they were about to enter a welcoming environment. An environment where they could be themselves. Where they knew that their teacher accepted them regardless of who they were.

Q. Did those stickers constitute sexuality content as it is defined in the Board policy?

A. No. No. Not even close.

Q. Does the fact that they had rainbows on them change your opinion in anyway?

A. Not for me. Not for me.

Q. For somebody else?

A. For somebody of bad faith, I think so.

Q. What do you mean by that?

A. Because I think they are primed to see any sort of, you know, colors that are arranged together in a certain order, in a certain shape. They are primed to automatically see something inherently sexual in them.

Q. You used the term bad faith. Why did you use that term? You've used it a couple of times.

Page 95

A. Yeah. Because I think deep down they know that there is nothing sexual about a rainbow. There is nothing sexual about letting students know I see you. That the rest -- that there might be other people out there who bully and taunt you and don't accept you, but I'm not one of them. That you're going to be safe to learn in my classroom.

Q. I think you mentioned a little bit in your affidavit about the benefits to students indicating to them that they have a safe space.

What is the basis of your knowledge and what do you know about that?

A. Right. Well, I think we have to understand this on a very primal psychological level that if a student knows or perceives that they are not accepted, it's going to be very difficult to learn in that environment that they are under constant duress. They are -- on a neurological level they are unable to accept additional content.

So even if somebody were to say, "I don't agree at all that anybody should be gay ever," from a pure pedagogical standpoint it's

Page 96

still contrary to that because if our goal is to get students to learn and to enjoy learning then there is certainly a place for inclusive imagery within the classroom. It would be like saying, "Omar and I both have ears." It would be like telling a person, "Hey, you were born" -- for argument's sake let's say I was born with a beard. "You were born with a beard and therefore I don't agree with your lifestyle. I think you're going to be damned to eternity. I don't believe you should have the same rights as me."

If you know that about a person instructing you, it's going to be very difficult to learn within that environment. Or along those lines, if you know that that teacher is going to turn a blind eye to harassment and taunting that one faces because deep down they are celebrating that taunting and harassment then it's also going to be very difficult to learn.

Q. Let me ask you a couple more questions about the curriculum.

How did parents know what was being taught in your class?

Page 97

A. This was all easily available, you know, at the core, on the Ohio Department of Education website there are PDF files of the model curriculum. The college board also has PDF files of their curriculum as well, which is easy to find. You can find it within five seconds.

My syllabus was made public on our learning management system. Schoology as well and any time a parent -- I don't recall this ever happening, but my contact information was there as well if they ever had more specific question about the content.

Q. And is what you did consistent with the general practice of teachers at Little Miami schools?

A. I would say the general practice of education nationwide.

Q. I think at some point during your deposition you said that the removal of the safe space stickers or something specifically going on caused distress to your students.

Can you explain what you mean by that?

A. Yeah. I mean, I remember even our

Page 98

open house. This was before classes even began. Students in tears. "[redacted], what happened? Did you do this? Who is responsible?" And of course my only real -- the only real thing I could say to them was to contact administration. Contact central office if you have a question about it to assure them that I had nothing to do with the removal.

And once school started students would bring it up as well when classes began and it was the primary focus of our conversations at our early GSA meetings in the fall.

Q. Do you believe that the decision to remove the safe space stickers in particular was a result of animus by school board members towards members of the LGBTQ community?

A. Yeah. I don't know what's in Mr. Power's heart. I don't know what's in Mrs. Morgan's heart, but I do believe, since I'm under oath, I want to be very clear about this, I believe this from the bottom of my heart that decisions were made as a result of pressure put on them by school board members about protecting their own jobs.

Page 99

Q. What was the nature of that pressure?

A. That if you protect --

MR. TARAZI: Objection. He testified he didn't know the exact -- he wasn't there.

A. I said I believe. I believe so I don't know. This is my belief.

Q. You can answer. Go ahead.

A. That they knew that if they showed too much empathy toward all of our groups, but in this case our LGBTQ+ students, that this would be -- this would be seen as a detriment when it comes time for their contract to be renewed.

Q. And so my question was specifically about the safe space stickers. You believe that applied to the safe space stickers?

A. Yes. If they had advocated and resisted this that their jobs would have not been safe.

Q. Do you believe it applied to other actions involving LGBTQ students with GSA at Little Miami School?

A. Yeah. I think it sent a pretty

Page 100

clear message that if the safe space stickers weren't allowed then no advocacy would be allowed for those student populations.

Q. Based on your experience at Little Miami Schools, do you believe that same animus would have driven the decision --

MR. TARAZI: Objection as to leading.

MR. ENGEL: Noted.

Q. Based on your experiences at Little Miami Schools, do you believe that that animus would have driven the decision to force the removal of the "hate has no home here"?

MR. TARAZI: Just did a leading question again.

A. I do. I do believe that.

Q. Why do you say that?

A. Because I think the imagery there are related to one another. I think the message, the spirit of the safe space sticker is similar to the spirit of the hate has no home here flag.

Q. And I apologize if I asked this before. Do you have any reason to believe that the hate has no home here flag constitutes

Page 101

sexuality content as is defined in that policy?

A. I don't think a flag that says "hate has no home here" with various colors on it, I don't think there is anything sexual about that.

Q. Are you -- did the flag in any way to your knowledge affect the ability of the school district to officially deliver services to students?

A. No.

Q. Why do you say that?

A. Well, if anything it enhanced it, but, no. In terms of carrying out the curriculum there was no interference whatsoever as a result of the flag.

Q. Are you aware of any materials on the walls that would have had a detrimental impact on the ability of the District to officially deliver services to students?

A. Certainly not on my wall and not on Dr. McIntyre's wall.

MR. ENGEL: Give me one second. Let's go off the record.

(Whereupon, a recess was taken.)

Q. We're back on the record. There

was some discussion before about the teacher evaluation system. What is that and how did that work?
A. It's called OTES. It's stands for the Ohio Teacher Evaluation System.
Q. And how did that work?
A. Part of it involves classroom observations from administrators who were trained on OTES. There is a very, I'll call it, rigid rubric that the observer is essentially scoring the teacher on. So you have to, you know, depending on how that lesson goes, the evaluator will then make a judgment as to what your scoring will be, your end-of-the-year evaluation.
Q. And did that relate in any way to the issues that brought us here for this case?
A. Yeah. I mentioned earlier, but I think it's worth noting again maybe being a little bit more clear on. One aspect of the OTES rubric, in order to gain an accomplished rating, which was my rating and which was also the highest that you get in the State of Ohio, is that you have to clearly show that you are connecting the content of that lesson somehow



to students' lives.
That includes previously learned content. So when I'm teaching 9th graders as an example, that's content they've learned in junior high. To content to be learned in the future so it might involve even saying something like, "Hey, in 10th grade or 11th grade you're going to learn something similar to this and this is why." This could also mean, and often does mean, also connecting it to current events and to real world topics, which of course we've already stated in this deposition that there has been a great debate about who gets rights and who does not.
There has been -- this is also part of teaching history is discussing how rights have expanded over the course of human history whereas how have rights contracted over the course of the industry.
Q. So how would that relate to the flag that was in Mr. McIntyre's classroom?
A. Maybe no direct relations, but, you know, it is -- Dr. McIntyre taught, you know, taught 10th grade. He now teaches AP course content as well. He teaches a law class. So,



yeah, those topics certainly could come up in those courses I would imagine, but even so, you know, when I teach about the 9th grade, you know, I'm anticipating that in the 10th they're going to get content on civil rights. They are going to get content on gay liberation. My future AP students are going to get content on changing genitals.
Q. And then I'm going to share my screen again here. I'm going to show you what we'll mark as exhibit -- we'll call this 101.

\- - - - -

(Thereupon, Deposition Exhibit 101, Set of Articles, was marked for purposes of identification.)

\- - - - -

Q. And it is a set of documents that were produced to us. This Exhibit 101 is a set of documents, MS27 through MS -- I believe it's 189. What are these documents?
A. Yeah. I'd ask you go back to the top page.
Q. Is it a set of articles?
A. Yeah. I recognize this. Yeah, this is consistent with the studies that I've



seen before detailing the unique vulnerabilities that our LGBTQ+ students face.
Q. And did you pull these because these were articles that you relied upon in your affidavit to --
MR. TARAZI: Objection.
Q. -- vulnerabilities of LGBTQ+?
MR. TARAZI: Leading question.
A. I did.
Q. And then what is the significance of these? What lesson did you learn?
A. The lesson I learned -- well, first of all, they are educational. And so somebody who is approaching the topic for the first time, this is a great starting point because you do understand the, again, the vulnerabilities that they face. So if some of the things are much higher rates of anxiety, depression, much higher risk of self-harm and suicide, of truancy, and skipping class of being bullied and taunted. So hopefully that's a good summary of what's in this document.
Q. And part of your work in leading the GSA was to try to minimize these risks?
A. Absolutely, yes.

Page 106

Q. I don't have any other questions. Thank you.

EXAMINATION OF [redacted]

BY MR. TARAZI:

Q. I have a couple of follow-ups on what you just testified to.

Just going back to the safe space sticker. If I heard you correctly and, again, correct me, but the purpose is to identify which classrooms are safe for LGBTQ students. Is that the purpose of those stickers?

A. I would -- I don't know if I would use the word "identify." I would say it's certainly a signal to students that when they walk through my classroom they are going to be accepted.

Q. Okay. And this signal, once removed signal, that that means that they are not welcome? Is that the opposite? In other words, its lack of presence means they are not present and they are not welcomed? At least that's what's perceived in your opinion?

A. I think it could be perceived that way.

Q. Okay. So if you have a school

Page 107

where -- did every single door have a safe space sticker on it or some did and some didn't?

A. Some did, some did not.

Q. Okay. So what was that -- if somebody said, "Hey, this is signaling something wrong to students that certain teachers are safe and certain are not, is that the only -- in your mind the only reason somebody would say that if they hate LGBTQ kids or have a personal animus towards other LGBTQ kids?

A. I think it's one possibility. It's not the only one. Again, I don't know what's in the heart of all of my colleagues.

Q. Okay. But is that, you know, at least the plausibly legitimate reason to say we either have them on every door or we have them on no doors because we're signaling something improper to students here?

A. I would hope that anybody who gets the professional education would show their support in some way. Whether that's a sticker or whether that's some other way. That's up to them and their professional judgment. I can

Page 108

only speak to myself that it gave me peace of mind and over the course of 20 years, little things like that went a long way with students. Lots of appreciation either for students who identified as LGBTQ+ or sometimes even as students who might have a family member or a friend who are going through hard times that they knew that they were being safe as well.

Q. Okay. And you also testified about the House Bill 8 policy that you used the word it's not explicit or pornographic.

Is that your interpretation and understanding of the policy as it only applies to explicit and pornographic material that you need parent permission for?

A. When I'm thinking sexual in nature, again, those are the first words that came in mind when I hear sexual. Something involving genitals. When you said explicit, that's immediately what I thought of. Or when I said explicit, that's something that involves genitals or pornography.

Q. Okay. So in your understanding of this board policy, when does parent notice and opportunity to opt out occur? When is that

Page 109

triggered? Is it only when there is discussion of genitals and pornographic material?

A. I don't know. Like I said, if there was a strong objection to somebody learning about child labor in the industrial revolution and they found, you know, they had a valid reason for that, maybe it was triggering for whatever reason, then sure. You know, I'm a reasonable person and I would find alternative assignments for students who maybe objected to one topic or another or families who object to one topic or another.

Q. So let's say, for example, abortion, right? So Supreme Court decision or whatnot, there is going to be some discussion about abortion in the classroom. In your understanding, would that policy trigger sexuality content therefore I need to give parents an opportunity to opt out if they want to or it doesn't cover it?

A. That's above my pay grade, I'll be honest with you. I don't know. I don't know, but I would not personally object to a family who didn't want their child learning about that, but the way we taught in the classroom is

just that, again, under the context of contracting and expanding rights.

Q. Okay. And if a particular parent didn't like the way you were teaching or somebody was teaching, the gay liberation movement, they felt it was one sided or whatever and they wanted to opt their child out, is that a requirement that you have to opt them out or is that something optional in your understanding?

A. I have no idea. I think for me it depends on do they just not want their child learning that gay people exist, you know, or did I show or did a teacher show too much sympathy towards gay people. Believe me that's, hey, maybe they shouldn't be lynched or they shouldn't be taunted or they shouldn't be harassed. So I think it depends entirely on the context here.

Q. Well, if a parent simply says, "I just want my child opted out of this," would it become or did they think under the policy, under the law do they have that right or is it they have to be interrogated as to exactly why?

MR. ENGEL: Objection.



Mischaracterizes the policy. The policy talks about opting out for sexuality content. So you're assuming a fact not in evidence in that question. If you understand the question, you can answer.

A. Yeah. Again, I don't know if I can classify abortion as sexual content, but that's -- I honestly don't know, Omar. I don't have a background in educational law. I don't know if you do or not, but it's -- you know, I don't know. You'd have to go to an attorney.

Q. Okay. Not a problem. So you don't -- so basically you don't actually have a clear idea as to how that policy should be implemented in the classroom?

A. I'm really glad you asked me this question because, yeah. I need to get something off my chest here. I think that it was deliberately vague. So now you could essentially label anything as sexual. So when you use phrases like general ideology or sexuality that they are deliberately vague in order to just encompass anything that you don't like.

Q. Okay. So as -- is it -- I'm just



asking about your personal opinion. Your understanding -- your understanding is that the language is vague or the language is extremely broad and can be applied to many things?

A. My opinion is that it was intentionally vague.

Q. Okay. So do you have any understanding of it that you actually applied in your classroom?

A. That what was applied in my classroom?

Q. That policy. Like how -- did you implement that policy in your classroom in any way?

A. Again, my time might be off, but I don't think it went into effect while I was at Little Miami, but I could be wrong.

Q. You might be right. I don't know have the timeline directly in front of me right now.

A. I think it was after my employment there and was probably a contributing reason why I resigned.

Q. Because the state passed the policy?



A. Yeah. I'm at an independent school right now.

Q. No further questions.

EXAMINATION OF [redacted]

BY MR. ENGEL:

Q. One follow-up to that last question. You said one of the reasons that you're at an independent school right now is partly because of this policy?

A. Yes.

Q. Is it because you disagree that parents should have the right to notice about sexuality content or is it because you believe that the policy would be applied in the bad faith manner to silence views that people disagree with?

A. Certainly the latter. Certainly the latter.

Q. Okay. And do you believe that's what happened in this case?

A. Yes.

Q. And that's why you submitted an affidavit?

A. Yes.

Q. And that's based on your experience

at Little Miami?
A. Yes. And accumulation of 20 years of experience there.
Q. Okay. Nothing else.
MR. TARAZI: Let me follow-up on that. Just one question.
EXAMINATION OF [redacted]
BY MR. TARAZI:
Q. So if they -- if the policy -- were you part of any -- well, I think I'm good. I'm done. No problem. We're done.
A. I'm happy to answer anymore questions you have.
Q. Well, you just said that it would be applied in a discriminatory matter. I would like you to ask -- I'd like to understand how a opportunity for parents to be aware of something and opt out creates a discriminatory scenario because if the parents are not objecting then nothing ever happens. Nothing ever -- nothing changes in the classroom.
A. What if you just have a parent? A David Wallace, a Silas Sheldon objects and now that becomes a policy for all students. So I do think that it would be applied in a bad



faith way. I do believe that it was intentionally made, you know, for that the reason. It's like, "Hey, I don't want this subject taught because the fear is that maybe the teacher might show a little bit too much empathy towards the side that I don't like."
Q. But it's not -- again, I'm not trying to get argumentative here, but there is nothing in the policy that says you can't teach it. It says, "Parents have an opportunity to opt out." Now, if no parent opts out you still teach it like normal.
A. Yeah.
Q. But it would also be opt out only for the one student. That's why I'm having trouble following your logic.
A. That's okay. The practical effect is that teachers is ultimately the self-censor as well because they read what's happening with the school board members and their job is to get through the school day fully employed so that their family members can go home and receive medical care and continue to live their life normally. So I think that's the practical thing is it has a chilling effect among the



staff.
Q. Okay. Are you aware of any parent ever opting out their student from anything involving your classrooms?
A. Not my classroom, no.
Q. Okay. So did that possibility ever resulting you as -- some chilling effect on you that that was possible to happen?
A. Sure. Yeah.
Q. Okay. So what did you like self-censor because a parent couldn't theoretically object to it and decide they want their kid to have another lesson?
A. Well, you know, if we go back to this, you know, what I'm about to say goes beyond LGBTQ+ issues, but just -- you know, there was a offense taken by some members of the community. You know, probably ones that you're politically affiliated with, Omar, that there were -- that structural racism should be taught. This was CRT or DEI or whatever it is that you want to talk about. You know, it's an adjacent topic because we're still talking about the expansion of the contraction of rights, but just simply talking about the



history of structural racism or making real life connections had a chilling effect on teachers. I know because of conversations that I've had with them.
Q. But it didn't affect you in your teaching?
A. I was very careful. Very careful about the real world connections that I made. And, again, that caused me severe distress and was the primary contributing factor to my resignation.
Q. What was, the distress relating to connecting with the real world?
A. Yes. So bringing up celebrating black history too much. Celebrating LGBTQ+ history too much. That this might anger somebody like yourself. Somebody like Silas. Somebody like Dan Smith. Somebody like David Wallace and now they go to my administrators and apply pressure on them to discipline.
Q. Okay. But no discipline ever actually occurred, correct?
A. No.
Q. Okay. And nobody ever opted out of anything that you were doing in your classroom?

A. No.
Q. Okay.
A. I mean, not that I remember. Not that remember.
Q. Okay. No further questions.
MR. ENGEL: We'll read and sign.
(Deposition concluded at 3:31 p.m.)



Whereupon, counsel was requested to give instruction regarding the witness' review of the transcript pursuant to the Civil Rules.

SIGNATURE:

Transcript review was requested pursuant to the applicable Rules of Civil Procedure.

TRANSCRIPT DELIVERY:

Counsel was requested to give instruction regarding delivery date of transcript.



REPORTER'S CERTIFICATE

The State of Ohio, )
SS:
County of Cuyahoga. )

I, Jillian Adamovicz, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, [redacted] was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.



I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 18th day of August, 2026.

Jillian Adamovicz, Notary Public
within and for the State of Ohio

My commission expires September 25, 2027

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| GEORGE MCINTYRE<br><br>Plaintiff<br><br>v.<br><br>LITTLE MIAMI SCHOOL DISTRICT, ET AL<br><br>Defendants | Case No. 1:26-cv-00351-MWM<br><br>Judge: Matthew W. McFarland<br><br>CERTIFICATION OF WITNESS |

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony. I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s). I request that these changes be entered as part of the record of my testimony.

I have executed the attached Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 19th day of August 2026.

[redacted]

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8384269

PAGE/LINE(S) / CHANGE /REASON

101/8 Should read "Efficiently" not "Officially" to follow Supreme Court language

101/19 Should read "Efficiently" not "Officially" to follow Supreme Court language

111/20 Should read "Gender" not "General"

Date [redacted]

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

Notary Public

Commission Expiration Date