**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| GEORGE MCINTYRE<br><br>Plaintiff<br><br>v.<br><br>LITTLE MIAMI SCHOOL DISTRICT, ET AL<br><br>Defendants | Case No. 1:26-cv-00351-MWM<br><br>Judge: Matthew W. McFarland<br><br>REPLY TO RESPONSE TO MOTION FOR SUMMARY JUDGMENT<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff respectfully submits this combined Motion for Summary Judgment and Sur-Reply in Support of Motion for Preliminary Injunction (Doc#3.)

The Supreme Court's decision in *Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022), refutes much of Defendants' arguments. The *Kennedy* Court cautioned against "treating everything teachers… say in the workplace as government speech subject to government control." 597 U.S. at 509. *See also Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (rejecting idea that "all speech within the office is automatically exposed to restriction"). This Court should be wary of holding, as Defendants essentially urge, that everything that happens in a classroom constitutes government speech outside the ambit of the First Amendment. Defendant's expansive view of government speech, which would include anything that could be remotely 'connected' to the curriculum, leaves the First Amendment on the wrong side of the schoolhouse gate.

**TABLE OF CONTENTS**


A. *Pickering* Step One: There Is No Issue Of Fact That In Displaying The Flag Plaintiff Was Speaking As A Citizen Rather About A Matter Of Public Concern ........ 1

1. Defendants Lose Under *Kennedy* ........ 1

2. The Defendants' Invented "Connected To" Standard Is Unsupported By Law Or Evidence ........ 3

A. No Authority Supports The "Connected To" Standard Invented By Defendants ........ 3

B. *Pickering* Step Two: Defendants Do Not Have Any Evidence To Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is Outweighed By The District's Interests In Promoting The Efficient Delivery Of Public Services ........ 8

C. The Board's Action Is Not Immunized Simply By Asserting An Allegedly Viewpoint-Neutral Explanation ........ 9

1. There Is No Issue Of Fact That The Parents Right Policy Does Not Apply To The Flag ........ 10

2. The Board Engaged In Viewpoint Discrimination ........ 11

D. The Cases Cited By Defendants Are Inapposite ........ 12

CONCLUSION ........ 14

**TABLE OF AUTHORITIES**

Cases

*Cahall v. New Richmond Exempted Village School Dist. Bd. of Edn.,* S.D.Ohio No. 1:24-cv-688, 2025 U.S. Dist. LEXIS 191640 (Sep. 29, 2025) ........ 13

*Citizens Utd. v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ........ 9

*DeCrane v. Eckart*, 12 F.4th 586 (6th Cir. 2021) ........ 4

*Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 158 F.4th 732 (6th Cir. 2025) ........ 13

*Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332 (6th Cir. 2010) ........ 3, 4

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ........ 11

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........ i

*Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ........ 4

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011) ........ 13

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) ........ *passim*

*Lane v. Franks*, 573 U.S. 228 (2014) ........ 2

*Mahanoy Area School Dist. v. B.L.*, 594 U.S. 180 (2021) ........ 9

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ........ 12

*Mayhew v. Town of Smyrna*, 856 F.3d 456 (6th Cir. 2017) ........ 4

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ........ 13

*Mt. Healthy City School Dist. Bd. of Edn. v. Doyle*, 429 U.S. 274 (1977) ........ 12

*Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) ........ 9

*Theis v. Intermountain Edn. Serv. Dist. - Bd. of Dirs.*, 182 F.4th 1091 (9th Cir. 2026) ........ 5

*Webster v. New Lenox School District No. 122*, 917 F.2d 1004 (7th Cir. 1990) ........ 5

*Wood v. Florida Dept. of Edn.*, 142 F.4th 1286 (11th Cir. 2025) ........ 13

### A. *Pickering* Step One: There Is No Issue Of Fact That In Displaying The Flag Plaintiff Was Speaking As A Citizen Rather About A Matter Of Public Concern

Defendants do not contest that the message conveyed on the Hate Has No Home Here Flag related to matters of political, social, or other concern to the community.

#### 1. Defendants Lose Under *Kennedy*

Defendants do not even cite in the Opposition to the Motion for Summary Judgment – much less seek to distinguish – the Supreme Court's decision in *Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022).[1] *Kennedy* makes it clear that McIntyre's display of the Hate Has No Home Here Flag as one of many decorations in his classroom was his own personal speech, not government speech. The *Kennedy* Court emphasized that in determining whether public employees speak in their personal capacity, the "critical question… is whether the speech at issue is itself ordinarily within the scope of

---

[1] Defendants do mention *Kennedy* in their cross-Motion for Summary Judgment. Doc.43, PageID#3168. Defendants devote one sentence to the decision, suggesting that *Kennedy* is distinguishable because it involved a "personal religious observance undertaken when the coach was neither instructing students nor otherwise performing his coaching duties." This fails to recognize the speech by the coach in *Kennedy* was "observable to students" and occurred while "on duty," yet was still recognized as personal speech. 597 U.S. at 519. The Court in *Kennedy* recognized the difference between school-sponsored speech and private speech that occurs on school property, and noted that students are mature enough to understand that a school does not endorse speech that it merely permits on a nondiscriminatory basis. 597 U.S. at 538. (*See* Harleman Depo., Doc25-3, PageID#419 (acknowledging that "students and everyone else in the district understand that what [teachers] put on their walls is their own personal views").

Defendants also fail to recognize that *Kennedy* is clear that the fact that personal speech occurs simultaneously with government speech is not dispositive. Wearing a religious adornment, such as a cross or a headscarf, remains constitutionally protected speech by a teacher notwithstanding that it is visible to students in a classroom during school hours. If anything, *McIntyre* has a stronger case than Coach Kennedy because, instead of seeking to limit expressive activity, Little Miami Schools permitted teachers to engage in personal expression detached from their roles while they were on duty, decorating their classrooms with personal items. This illustrates, perhaps, the most important similarity between this case and *Kennedy*: the actions against both McIntyre and Coach Kennedy targeted employees with disfavored viewpoints instead of enforcing policies on free speech "in an evenhanded, across-the-board way." *Kennedy*, 597 U.S. at 527.

an employee's duties." *Kennedy*, 597 U.S. at 529 *citing Lane v. Franks*, 573 U.S. 228, 240 (2014). The Court further cautioned against efforts by school districts to do what Defendants attempt here: to limit teachers' private speech rights simply by describing "excessively broad job descriptions" that would encompass all possible expression in the classroom. *Kennedy*, 597 U.S. at 529. *See also Garcetti v. Ceballos*, 547 U.S. at 424 (2006) ("We reject… the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.").

Defendants point out that the Hate Has No Home Here Flag was "a permanent visual message on the wall of [McIntyre's] assigned classroom, where it remained visible to the students he taught." Def. Memo. at PageID#3417.[2] This is of no matter; Defendants incorrectly assume that it is impossible for teachers to speak in a personal capacity where their expression might be observed by students – an assumption that is contrary to *Kennedy, Garcetti,* and *Lane.* The *Garcetti* Court rejected the idea that "all speech within the office is automatically exposed to restriction." 547 U.S. at 421. The *Lane* Court later explained that the "critical question… is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S. at 240. *Kennedy* went further. *Kennedy* established beyond question that not "everything teachers… say in the workplace [is] government speech subject to government control." 597 U.S. at 530-31. Instead, the correct question is not whether the speech was merely visible to students, but whether it was produced "pursuant to government policy" and seeks "to convey a government-created message."

---

[2] Defendants point out that the school is "responsible" for what is on classroom walls. Def. Memo. at PageID#3418. This is a meaningless observation. The school *could* have adopted viewpoint neutral policies about how teachers decorate classrooms, but chose not to. (Affiant Depo., Doc. 41-1, PageID#2972 ("While you were at Little Miami Schools, was there any policies in place about what people could put on their classroom walls? A. No.")); (Emails, Doc.25-28, PageID1296-1298.) The same could have been said about the midfield prayers in *Kennedy,* as the school *could* have passed a viewpoint neutral rule prohibiting *everyone* from being on the field after games. This illustrates, perhaps, the most important similarity between this case and *Kennedy*: the actions against both McIntyre and Coach Kennedy targeted employees with disfavored viewpoints instead of enforcing policies on free speech "in an evenhanded, across-the-board way." *Kennedy*, 597 U.S. at 527.

*Kennedy*, 597 U.S. at 529. Here, in the relevant context of classroom displays, the record shows that Little Miami Schools permitted McIntyre and other teachers to engage in significant personal expression detached from their roles while they were on duty, decorating their offices with team flags, movie quotes, and items "meant to be funny or ironic." (Affiant Depo., Doc.41-1, PageID#2972.) These classroom decorations were clearly not within the scope of a teacher's duties, were not expressions pursuant to government policy, and did not convey a government-created message.[3] (Pl. Aff., Doc22-1, PageID#306-307.)

### 2. The Defendants' Invented "Connected To" Standard Is Unsupported By Law Or Evidence

Defendants devote a significant portion of the response to an argument that the Hate Has No Home Here Flag was "connected" to the curriculum. Def. Memo. at PageID#3417. This argument is unsupported by any law and relies on a severe misrepresentation of the record.

#### a. No Authority Supports The "Connected To" Standard Invented By Defendants

The Sixth Circuit in *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 334 (6th Cir. 2010), said that "the right to free speech protected by the First Amendment does not extend to the in-class curricular speech of teachers in primary and secondary schools." The Sixth Circuit, in *Evans-Marshall*, *did not make* the broader statement that that the free speech guarantees of the First Amendment do not extend to the in-class speech of teachers 'connected to' curricular matters. Defendants cite to no authority extending the *Evans-Marshall* curricular speech rule to speech

[3] The *Pickering* test easily resolves the obvious concern: can the school act if a teacher put an obscene or offensive image on the wall? A First Amendment claim by the teacher would fail under both prongs of *Pickering*: (i) the image would not be a matter of public concern; and (ii) it would likely lead to classroom disruption.

that is merely "connected to" the curriculum. This "connected to" standard is, accordingly, essentially invented out of whole cloth by Defendants and has no doctrinal basis. [4]

The real issue here is not whether there is a "connection" between the Hate Has No Home Here Flag and the curriculum (indeed, almost everything could be 'connected' to a history class). What matters is whether the Hate Has No Home Here Flag is actually as part of instruction.[5] In *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988), the Supreme Court held that a school could lawfully censor the articles in a high school newspaper because it occurred in a curricular activity. Curricular speech was defined in *Hazelwood* in a way that focused on the perception of the listener. The Court defined curricular speech as including "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. The key idea in *Hazelwood* was that curricular matters were "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." In *Evans-Marshall,* the Sixth Cicruit found that the selection of books in a class was part of the curriculum because it concerned "what, when and how" students are taught. 624 F.3d at 340. *Hazelwood* and *Evans-Marshall,* thus, stand for the idea that speech directly relates to a school's curriculum if (i) the subject matter of the speech is actually taught in a regularly offered course; and (ii) parents and students would understand that the speech was school-sponsored. The broad "connected to" rule urged by Defendants would essentially mean that that all expression by public-school employees that might be observed by students is necessarily government speech, and not the personal speech of a citizen, even

---

[4] Defendants also cite *DeCrane v. Eckart*, 12 F.4th 586, 595-96 (6th Cir. 2021), and *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463-65 (6th Cir. 2017). Neither of these cases address comparable situations or support the "connected to the curriculum" test. *DeCrane* concerned City of Cleveland's fire department leaks to the media about a fire chief's insufficient training hours. *Mayhew* concerned an employee's complaints regarding a city's promotions practices.

[5] In terms of *Kennedy,* curricular speech is produced "pursuant to government policy" and seeks "to convey a government-created message."

when it is not part of formal instruction and any reasonable observer would perceive the speech as the teacher's own personal expression.[6]

**b. Defendants Misrepresent The Record**

The record is clear that the Hate Has No Home Here Flag was not used for teaching purposes.[7] (*See* Pl. Aff., Doc22-1, PageID#306-307; Harleman Depo., Doc25-3, PageID#425; Morgan Depo., Doc.25-2, PageID#405.) Defendants do not challenge this testimony, some of which came from their own witnesses. Instead, Defendants continue to insist that the Hate Has No Home Here Flag's "actual function" was "connected" to the curriculum "as a continuing teacher-to-student communication reinforcing learning, course content, classroom expectations, and the environment Plaintiff sought to create for his students." Def. Memo. at PageID#3417-3418.

Defendants cite to portions of Plaintiff's deposition to support their view of the record. This is not enough to create an issue of fact because much is taken out of context. This testimony was mostly Plaintiff explaining the state content standards for his courses. (Pl. Depo., Doc.25-1, PageID#362-363.) Plaintiff's relevant testimony explains the reason the Hate Has No Home Here Flag was actually displayed:

> …that's what the flag was meant for… just a reminder to students that we need to be respectful of each other, regardless of differences of opinions or thought.

---

[6] This would be a different case if the teacher sought to put up flags and posters that undermined the school's curriculum. *See e.g Webster v. New Lenox School District No. 122*, 917 F.2d 1004 (7th Cir. 1990) (teacher could be prohibited to expressing views that the world is much younger than the four-billion-year age given in the textbook the class was using). Such a situation would likely still be protected speech under the First Amendment, but could be prohibited under part two of the *Pickering* test since it would undermine the efficiency of the provision of educational services. No such argument is made here and the record is otherwise. (Harleman Depo., Doc25-3, PageID#424 ("Q And you believe this poster did not undermine his teaching in any way? A I -- I don't believe so.").

[7] The recent decision by the Ninth Circuit in *Theis v. Intermountain Edn. Serv. Dist. - Bd. of Dirs.*, 182 F.4th 1091 (9th Cir. 2026), illustrates the importance of whether the material was actually used in instruction. In *Theis* the Ninth Circuit held that a teacher's display of books in his classroom was not protected by the First Amendment. The court noted that "In at least one instance, the teacher discussed the content of the books with students."

(Pl. Depo., Doc.25-1, PageID#370.) He later testified:

> So, yeah, and I have different students of different religions in my class, and it's -- it can get a little hairy sometimes with the student debate in there. So again, we need -- I want them to center it on factual information, not making attacks personal, and being respectful of other people's beliefs, whether they agree with them or approve of them or not.

(Pl. Depo., Doc.25-1, PageID#372.) Defendants ignore *this* testimony which tracks the language of *Hazelwood* and *Evans-Marshall*:

> Q. Why do you have the Hate Has No Home Here flag on your wall?
> A. … I wanted something in my classroom that kind of signified that, like, no matter what, like, we're not going to judge people or not -- like, all -- any of our coursework or course discussion is going to be grounded on fact, and we're, you know, going to respect differences of opinions.
> Q. Okay. Did you use the flag for any teaching purposes?
> A. No.
> Q. Was it a school-sponsored expression [bearing] the imprimatur of the school?
> A. No.
> Q. Was it designed to impart any particular knowledge to the students?
> A. No.
> Q. Did you ever use it as part of your methodology of instruction?
> A. No.
> Q. Did you ever seek to instruct students or impart particular substantive knowledge on curricular matters through the use of the flag?
> A. No.

(Pl. Depo., Doc.25-1, PageID#382-383.)

Defendants ignore testimony from the principal that even though the poster related to some of the topics in class, Plaintiff was not "referencing the poster in his room." (Harleman Depo., Doc.25-3, PageID#424.) Defendants' claim is further refuted by the testimony of one of their own witnesses, the Superintendent, that the Hate Has No Home Here flag was not connected to or reinforcing the materials taught in class:

> Q … There is a claim that it was never -- you know, that it wasn't directly used. But it's sort of a perception of is this reinforcing or connected to the LGBTQ lessons that are being taught and whether that falls on one side of the line or the other side of the line as from a board policy perspective…
> A I think there's like five hearts and only one of them was a rainbow heart. So I -- I think the -- the purpose of the flag was exactly what Mr. McIntyre said it was, which

> is to state that hate has no home here. And these are all different types of people that -- that are included in that message hate has no home here.

(Morgan Depo., Doc.25-2, PageID#410.) The Superintendent added this explanation of why simply because something is "connected to" the curriculum, it is not curricular speech:

> But I would not say that a Bengals flag in a math classroom, and I'm teaching statistics. I'm not using that Bengals flag to -- to bring along statistics. I don't know that he's bringing -- he's using that flag to bring it along. But he did put the flag in his room, I believe, to share the message that he wants people to be kind in his classroom.

(Morgan Depo., Doc.25-2, PageID#410.)

Beyond ignoring the testimony of their own witnesses, Defendants take out of context emails Plaintiff sent in response to an inquiry from the Principal explaining how the Hate Has No Home Here Flag was "relevant" topics he taught. (Pl. Depo., Doc.25-1, PageID#382, 384.) Defendant clearly stated that that the Hate Has No Home Here Flag was not used for teaching:

> The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology. My purpose and intent in purchasing that flag for my classroom four years ago was to convey a general message of inclusion. There is no subversive message or hidden intent underlying the flag. It is simply intended to convey that bullying and/or targeting will not be tolerated. I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class. Additionally, from what I can tell, it has not had the effect of engaging students on sexual concepts or gender ideology, as they have for the most part not mentioned the flag to me at all, either during in-class discussions, in submitted assignments, or during one-on-one discussions outside of class. As the flag is neither intended to engage students on sexual concepts or gender ideology nor is it not having the practical effect of engaging students on issues of sexual concepts or gender ideology, I am hopeful that the board will see that this is not its primary purpose.

(Email, Doc.25-22, PageID#644.) Defendants ignore the testimony from their own witness that the emails, in context, accurately state that the Hate Has No Home Here Flag was not used in instruction.

> Q He says [in the email], "I have never incorporated the flag into the curriculum itself or used it as an instructional item…" Do you have any reason to believe that's not true?
> A I do not…

(Morgan Depo., Doc.25-2, PageID#405.) *More importantly, Defendants do not deny that they previously misrepresented the record surrounding this contemporaneous email to the Court.* Defendants, in response to the

Motion, do not deny that failed to provide this Court with a copy of this email – despite stating that they were providing the "full written record" and "the full undisputed record." (Doc.13, PageID#97.) Defendants, instead, mischaracterize the significance of the undisclosed emails (again, without denying that they failed to provide the complete set of emails to the Court), suggesting that "there is no evidence [the Board] received" the email. Def. Response at PageID#3421. Defendants provide no affidavits or other evidence supporting this claim, and the Superintended responded to the email otherwise: "I will share your response with Mr. Tarazi and our Board." (Email, Doc. 25-22, PageID#644.)

### B. *Pickering* Step Two: Defendants Do Not Have Any Evidence To Meet Their Burden Of Showing Plaintiff's Interest In Speaking Is Outweighed By The District's Interests In Promoting The Efficient Delivery Of Public Services

Defendants have failed to meet their burden of showing that any legitimate interests outweigh McIntyre's free speech interest. Defendants fail to point to any evidence of detrimental impacts on close working relationships, undermining of a legitimate goals of the District, or any impact on employee performance.[8] The best Defendants can offer is a claim that the "continuing controversy [was] disruptive." Def. Memo. at PageID#3419. The record, however, merely shows administrators and elected officials doing their jobs – there is no evidence of an impact on the efficient delivery of education to students. In fact, Defendants elsewhere admitted that "operational impact" was "not the basis for the Board's decision." (Def. Response to Interrogatories, Doc.25-7, PageID#483.)

---

[8] Defendants cite *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017), for the contention that "a public employer need not show actual disruption of the public agency in all cases in order to prevail under the *Pickering* balancing test." This does not help Defendants' cause. The Sixth Circuit observed that "when the employer does not offer such evidence, we must assess whether the employer could reasonably predict that the employee speech would cause disruption." *Id.* The focus, thus, was on the direct impact of the employee's speech, not the impact of the response to the response to the speech.

More importantly from a constitutional law viewpoint, Defendants have things backward. There was no evidence of disruption from the Hate Has No Home Here flag for years until Wallace created the controversy. Defendants are essentially claiming an impermissibly circular "heckler's veto" – they create a controversy and then point to that controversy as a justification to restrict speech based on the disruption they caused. *Cf. Mahanoy Area School Dist. v. B.L.*, 594 U.S. 180, 206 (2021) (Alito, J. concurring) ("The school may suppress the disruption, but it may not punish the… speech that prompted" the disruption); *Norse v. City of Santa Cruz*, 629 F.3d 966, 979 (9th Cir. 2010) (noting that "petty pique" from listener cannot be used as a disruption to justify suppressing speech).

**C. The Board's Action Is Not Immunized Simply By Asserting An Allegedly Viewpoint-Neutral Explanation[9]**

Defendants do not create an issue of fact that the apparent inapplicability of the policy, along with the hostility towards LGBTQ students previously demonstrated by the Board, permit the inference that the Board was not applying a preexisting policy in a neutral way, but was instead using an evolving policy as pretext for targeting McIntyre's viewpoint.

[9] Plaintiff is not asserting a facial challenge to the Policy. *Compare* Def. Memo. at PageID#3427. Defendants claim that their decisions are simply an "exercise of judgment within a defined, publicly recorded, and reviewable [how?? – Pl.] process." Def. Memo. at PageOD#3430. Even in as applied challenges, courts are wary of policies which leave too much discretion in the decision maker without any standards for that decision maker to base his or her determination. *See Pl. Memo.* at ___.

Based on the facts developed, the Policy was applied against the Plaintiff by a determination of the School Board that the Hate Has No Home Here Flag constituted "sexuality content." This was the result of unchecked discretion in the cause of viewpoint discrimination. Regardless, this is an as-applied case because Plaintiff does not seek to invalidate the entire policy; Plaintiff seeks only to vindicate his free speech rights with respect to the Hate Has No Home Here flag. *Citizens Utd. v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (noting that the distinction between facial and as-applied challenges, though sometimes difficult to discern, generally "goes to the breadth of the remedy").

### 1. There Is No Issue Of Fact That The Parents Right Policy Does Not Apply To The Flag

Defendants do not seem to defend the claim that the Hate Has No Home Here Flag does not meet the definition of "sexuality content" in Board Policy or Ohio law. Defendants do not challenge the basis for the conclusions of the Principal and Superintendent that the Hate Has No Home Here Flag was not "sexuality content." (Parents Bill of Rights Policy, Doc.25-9, PageID#493-494; Parents Bill of Rights Statute, Doc.25-8, PageID#490-491.; Harleman Depo., Doc25-3, PageID#425; Morgan Depo., Doc.25-2, PageID#404.) The response from Defendants is wholly conclusory and descriptive. Defendants suggest only that there was "disagreement" about the interpretation of the Policy and that the "Board reached a different application." Notably, Defendants make this argument without offering any serious effort to defend the Board's analysis or explain why the Principal and Superintendent were wrong in declining to order the removal of the Hate Has No Home Here flag.[10] Def. Memo. at PageID#3428-3429. Instead, Defendants' Memorandum illustrates precisely the type of "unbridled discretion" by governments to regulate free speech which worried the Supreme Court

---

[10] Defendants on a number of occasions suggest that they did not actually "remove" the Hate Has No Home Here Flag, but merely wished McIntyre to provide notice to parents. Def. Memo. at PageIDF#3420-3421. Defendants misrepresent the record here. In response to Interrogatories for example, Defendants state that "Plaintiff removed the Flag from his classroom… following the Board's February 25, 2026 vote, in order to avoid disciplinary action" and that "All [Board] members gave their opinion on the poster and whether they felt it met the criteria to be removed." (Def. Response to Interrogatories, Doc.25-7, PageID#479-480.) Wallace testified that the Hate Has No Home Here Flag was removed: "I went to the superintendent, and I had this and there was another item that I asked if she can get removed." (Wallce Depo., Doc.25-4, PageID#463; *See also Id.* at PageID#441, PageID#443.)

Defendants push this argument further, suggesting that Plaintiff "chose not to follow the Policy's notice and opt out procedure." Def Memo. at PageID#3420. This, too, misrepresents the record by shifting responsibility for notice from the Board to teachers. The policy states that "the Board [not teachers] will provide parents the opportunity to review any instructional material that includes sexuality content." (Policy, Doc.25-9, PageID#494.)

in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), and other cases cited by Plaintiff. *See* Pl. Memo. (collecting cases). Defendants make no effort to distinguish these cases or address the concern that that purportedly viewpoint-neutral reasons may be merely a pretext for viewpoint discrimination.

**2. The Board Engaged In Viewpoint Discrimination**

The response of Defendants to the evidence that the Board harbored animus towards LGBTQ students and was using the Parents Rights laws and policy as pretext for viewpoint discrimination is telling. Defendants do not offer any evidence contesting LMSD has a history of animus towards the message that LGTBQ individuals are entitled to equal rights. ([Redacted] Aff., Doc.25-31, PageID#1313, 1316; [Redacted] Depo., Doc.41-1, PageID#2975.) At his deposition, a former teacher noted that his accusation of animus was based on an "accumulation of 20 years' experience there" and his belief that the Parental Rights Policy would be applied in the bad faith manner to silence views that people disagrees with. ([Redacted] Depo., Doc.41-1, PageID#2978.) He testified:

> I do believe that [the Policy] was intentionally made, you know, for that the reason. It's like, "Hey, I don't want this subject taught because the fear is that maybe the teacher might show a little bit too much empathy towards the side that I don't like."

([Redacted] Depo., Doc.41-1, PageID#2979.) Defendants' response is more notable for what is not included. Defendants do not submit Affidavits or other evidence from Board members denying an anti-LGBTQ animus. This, combined with the statements of Board members and this history of animus in the District, supports a finding that anti-LGBTQ animus was a motivating factor of the decision to remove the Hate Has No Home Here Flag.

All Defendants offer, instead, is a claim that "testimony shows a strong policy preference about classroom walls." Def. Memo. at PageID#3423. This (again) misrepresents the record. In response to an Interrogatory, Defendants had stated, "The District's longstanding practice has been to afford teachers considerable latitude in personalizing their classroom environments, including

displays of personal items, sports team flags, motivational posters, family photographs, and similar materials." (Response to Interrogatories, Doc.25-7, PageID#482. *See also* Wallace Depo., Doc.25-4, PageID#457 (noting that "the teacher does have some leeway" in classroom displays and that the school does not "endorse" the content of all displays).) In fact, the opposite to what Defendants no claim is true: the District had considered, but rejected, what Wallace described as a "scorched earth" policy that would have severely restricted classroom displays. (Wallace Depo., Doc.2504, PageID#463.)

**D. The Cases Cited By Defendants Are Inapposite**

Defendants cite two additional cases, *Mahmoud v. Taylor*, 606 U.S. 522 (2025), and *Mt. Healthy City School Dist. Bd. of Edn. v. Doyle*, 429 U.S. 274 (1977). Neither helps Defendants.

Defendants claim that *Mahmoud* "confirms that accommodating parental interests is a constitutionally legitimate consideration." Defendants Memo. at PageID#3426. Nobody is suggesting otherwise. Mahmoud was not a free speech case, however; *Mahmoud* addressed whether the pro-LGBTQ policies at issue in that case unconstitutionally burdened the religious exercise rights of the parents. 606 U.S. at 546. *Mahmoud* cautioned that the free exercise analysis "will depend on the specific religious beliefs and practices asserted, as well as the specific nature of the educational requirement or curricular feature at issue." 606 U.S. at 550. This case, in contrast, concerns the free speech rights of a teacher, not the free exercise rights of parents considered in *Mahmoud*, and is not a vehicle for debating the wisdom or facial constitutionality of these parental rights policies. Nothing in the record of this case suggests that Plaintiff used the Hate Has No Home Here Flag as part of instruction and class discussion in a way that would implicate *Mahmoud.*

It is similarly unclear how *Mt. Healthy* applies to this case. In *Mt Healthy* a teacher alleged that his telephone call to a Cincinnati radio station about a teacher dress code played a substantial part in the decision of the Board not to renew his employment. The *Mt. Healthy* Court ruled that where a

party proves that his conduct was legally protected, and this conduct was a "substantial" or "motivating" factor in the decision to take adverse action against him, the employer may defeat a damages claim by proving that it would have made the same decision even in the absence of the protected conduct. *Id.* This decision is completely inapposite for two reasons. First, Plaintiff here is seeking injunctive relief only, not damages. Second, absent Plaintiff's protected speech there would have been no basis for the Board's actions. [11]

---

[11] Defendants, in their Motion for Summary Judgment (but in the Response to Plaintiff's Motion), rely on *Wood v. Florida Dept. of Edn.*, 142 F.4th 1286 (11th Cir. 2025), *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011), and *Cahall v. New Richmond Exempted Village School Dist. Bd. of Edn.,* S.D.Ohio No. 1:24-cv-688, 2025 U.S. Dist. LEXIS 191640 (Sep. 29, 2025). Def. M. for Summary Judgement, Doc.43, PageID#3165-3166. In *Wood*, the Court held that when a transgender teacher identified to students in the classroom using preferred pronouns, the teacher did so as a government employee and not as a private citizen. The *Wood* court emphasized that its decision was "a narrow one" and distinguished *Kennedy* by noting that the speech occurred during instruction. 142 F.4th at 1293. In *Johnson* the Ninth Circuit held a high school math teacher's use of religious messages as decorations in his classroom was not protected speech. The Ninth Circuit reasoned that "because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers necessarily act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." 658 F.3d at 968. While not explicitly overruled by *Kennedy*, this aspect of *Johnson* is directly contrary to the subsequent holding in *Kennedy*. The Supreme Court in *Kennedy* rejected the Ninth Circuit's broad view of the role of school employees, noting that it is not dispositive that a teacher is speaking within the environment of a school or serve as role models.

Both *Wood* and *Johnson* are in conflict with *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). In *Meriwether*, the Sixth Circuit held that the Free Speech Clause barred a university from punishing a professor for refusing to use preferred pronouns during class discussions.. That decision involved on-the-job speech that a professor conveyed during official instruction. Although *Merriwether* occurred in the university, not high school setting, the case still recognizes that not all personal expression during in the classroom is school-sponsored speech. *Cf. Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 158 F.4th 732, 758 (6th Cir. 2025) (school could not restrict the personal expression about gender identity that students use during the school day).

*Cahall* involved the selection of books which would be available in the classroom, a uniquely curricular decision, and did not involve a free-speech claim under the First Amendment (plaintiff brought claims for violations of the Due Process, Equal Protection, Establishment, and Free Exercise Clauses). One additional challenge presented by *Cahall* is that the decision fails to consider, as the Supreme Court held in *Kennedy*, that not everything teachers say in view of their students is government speech subject to government control." 597 U.S. at 530-31. By failing to address the *Kennedy* decision, this Court in *Cahall* did not consider that the pursuant to official-duties inquiry is supposed to be "practical," asking

**CONCLUSION**

Judgment should be entered in favor of Plaintiff. Plaintiff requests the following relief consistent with that Judgment:

- A declaration that the actions of the Little Miami School Board is removing the Hate Has No Home Here Flag is invalid under the First and Fourteenth Amendments to the United States Constitution.
- A Permanent Injunction permitting Plaintiff to Display the Hate Has No Home Here Flag as before, and prohibiting further acts in a manner that violates the First and Fourteenth Amendments to the United States Constitution.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

Respectfully submitted,

/s/ Joshua Engel

Joshua Adam Engel (OH 0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

whether, given the "timing and circumstances" of the speech itself, the speech at issue is speech "the employee [is] expected to deliver in the course of carrying out his job." *Kennedy*, 597 U.S. at 529-30.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this September 8, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel