**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| GEORGE MCINTYRE<br><br>Plaintiff<br><br>v.<br><br>LITTLE MIAMI SCHOOL DISTRICT, ET AL<br><br>Defendants | Case No. 1:26-cv-00351-MWM<br><br>Judge: Matthew W. McFarland<br><br>RESPONSE TO DEFENDANT'S PROPOSED UNDISPUTED FACTS<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff respectfully submits this combined Response to Defendant's Proposed Undisputed Facts in Support of the Motion for Summary Judgment (Doc.43-1).

1. Plaintiff George McIntyre is a history teacher at Little Miami High School and began teaching at Little Miami during the 2022-2023 school year. (Am. Compl., Doc. 18, paras. 2, 5, PageID#247-248, PDF pp. 1-2; Pl. Dep., Doc. 29-1, PageID#1368, PDF p. 4; Tr. 10:23-11:7.)

*Response:* Agreed.

2. Plaintiff teaches American History and AP European History and testified that he teaches to Ohio's model curriculum. (Pl. Dep., Doc. 29-1, PageID#1375, PDF p. 11; Tr. 39:23-40:17.)

*Response:* Agreed.

3. Principal Kevin Harleman supervises and evaluates Plaintiff, and Harleman and his administrative team enter teachers' classrooms throughout the school day to listen, check on things, and remain visible. (Harleman Dep., Doc. 29-3, PageID#1438, PDF p. 8; Tr. 27:21-28:19.)

*Response:* Agreed.

4. Plaintiff prepares his course syllabi, provides them to parents with an acknowledgment form, and sends his syllabi, course maps, and discipline policies to District administrators. The District asks teachers to post syllabi identifying the topics or general concepts taught, and department chairs review curricular materials. (Pl. Dep., Doc. 29-1, PageID#1375, PDF p. 11; Tr. 40:18-41:24; Morgan Dep., Doc. 29-2, PageID#1427, PDF p. 20; Tr. 76:21-77:8; Harleman Dep., Doc. 29-3, PageID#1449, PDF p. 19; Tr. 70:14-24.)

*Response:* Agreed.

5. Plaintiff's American History I syllabus states course goals that include appreciating the contributions of people of all races, ethnicities, genders, and backgrounds. (American History I Syllabus, Doc. 29-29, PageID#2319, PDF p. 1.)

*Response:* McIntyre taught U.S. History and AP European History in accordance with the State model curriculum and AP European History standards. The model curriculum and standards are readily accessible online. (Pl. Depo., Doc.25.1, PageID#357, 369; Harlemen Depo. at 22-23; AP European History Standards, Doc.25-13; Model Standards, Doc.25-12.) Parents have access to class materials prior to instruction in classes through the Department of Education website and 'schoology,' a web platform used by LMSD. McIntyre posted all of his teaching materials, syllabi, and assignments on Schoology. (Harleman Depo., Doc.25-3, PageID#428; Pl. Depo., Doc.25.1, PageID#357.)

6. The same syllabus instructs students to be 'respectful and kind towards one another at all times.' (American History I Syllabus, Doc. 29-29, PageID#2319, PDF p. 1.)

*Response*: Agreed.

7. The syllabus tells students that social studies will involve sensitive material, requires mature and respectful participation, and explains that students may be challenged to explain or defend their positions to build critical-thinking skills. (American History I Syllabus, Doc. 29-29, PageID#2323, PDF p. 5.)

*Response*: Agreed. Plaintiff further notes that McIntyre taught U.S. History and AP European History in accordance with the State model curriculum and AP European History standards. The model curriculum and standards are readily accessible online. (Pl. Depo., Doc.25.1, PageID#357, 369; Harlemen Depo. at 22-23; AP European History Standards, Doc.25-13; Model Standards, Doc.25-12.) Parents have access to class materials prior to instruction in classes through the Department of Education website and 'schoology,' a web platform used by LMSD. McIntyre posted all of his teaching materials, syllabi, and assignments on Schoology. (Harleman Depo., Doc.25-3, PageID#428; Pl. Depo., Doc.25.1, PageID#357.) The Principal did not believe that the state content standards or any of McIntyre's instruction involved the teaching of sexuality content. (Harleman Depo., Doc.25-3, PageID#417-419.)

8. Plaintiff maintained a "Hate Has No Home Here" display on the wall behind his desk in his assigned classroom, where it remained visible to the students he taught. The display included, among other images, rainbow-pride and transgender-pride flags. Superintendent Morgan identified the photographed display as hanging on that wall behind Plaintiff's desk. Plaintiff confirmed the display was on his classroom wall. (Am. Compl., Doc. 18, paras. 3, 4, 10, PageID#247, 249, PDF pp. 1, 3; Morgan Dep., Doc. 29-2, PageID#1413, PDF p. 6; Tr. 19:14–20:7; Pl. Dep., Doc. 29-1, PageID#1401, PDF p. 37; Tr. 145:12–17.)

*Response*: McIntyre hung a flag bearing the message Hate Has No Home Here in his classroom. The Flag displayed five hands holding heart-shaped icons representing, among other things, the American flag, a peace sign, different skin tones, and a rainbow Pride flag. The flag had hung in McIntyre's classroom for approximately four years without generating any complaints. (Verified Complaint, Doc.1, PageID#2; Flag, Doc.25-6; PageID#476; Pl. Depo., Doc.25.1, PageID#363. *See also* Verified Complaint, Doc.1, PageID#2; Flag, Doc.25-6, PageID#475-476 (depicting flag).

9. Plaintiff selected the display because he wanted something in his classroom through which marginalized youth, including LGBTQ students, would know that they had support. (Pl. Dep., Doc. 29-1, PageID#1401-1402, PDF pp. 37-38; Tr. 145:12-146:17.)

*Response*: McIntyre displayed the Flag to express "legal, ethical, and moral" support for Little Miami's a diverse student population among the myriad personal items he and other teachers displayed in their classrooms. Plaintiff's intent was to symbolize support for marginalized students who could be some of the most at-risk students. The Hate Has No Home Here Flag was part of his efforts to symbolize support for marginalized students who could be some of the most at-risk students. McIntyre believed that some members of the school board and the community at large have, through actions and public statements, expressed hostility towards many marginalized students, particularly LGBTQ students. The Hate Has No Home Here Flag was simply a reminder that students must treat all of their classmates with mutual respect, regardless of personal opinions or beliefs. (Pl. Response to Interrogatories, Doc.25-23, PageID#661; Pl. Aff., Doc.22-1, PageID#306; Pl. Depo., Doc.25.1, PageID#382-383.) The Flag's imagery was perceived by community members as conveying positions

on contested social issues. The Flag conveyed a position on a matter of political, social, or other concern of community. (Def. Response to Interrogatories, Doc.25-7, PageID#484; Wallace Depo., Doc.25-4, PageID#443.) LMSD did not receive any complaints from about the Hate Has No Home Here Flag before the events in this lawsuit. The only complaint that was ever received was from Wallace. (Harlemen Depo. at 34.)

LMSD generally permits teachers to display personal items on the walls of their classrooms and teachers are given a lot of freedom to decorate classrooms. Examples of posters or flags displayed by teachers include: flags for various sports teams, images of movie stars, and letters from colleges and universities that former students attend. Some teachers have family photos. (Harleman Depo., Doc.25-3, PageID#420; Classroom Displays, Doc.25-20;PageID#578-642.) Teachers can post things that aren't necessarily curriculum-related on their school walls and wall displays are not considered to be endorsement by LMSD. (Wallce Depo. at 94- 96; Morgan Depo., Doc.25.2, PageID#401.) The Hate Has No Home Here Flag is a displayed on a wall next to other flags/posters, including a Bengals Flag, an American Flag, and a flag with a quote from A Christmas Story. McIntyre also has a "COEXIST" poster in another location of his classroom, that uses various religious symbols from around the world for letters, including the Star of David. McIntyre has framed photographs of Presidents and civil rights leaders with quotes, a Rosie the Riveter poster, and some Uncle Sam "I Want You" recruitment posters. He has some personal items, including West Virginia University flags, a batman poster, and pictures of his family. (Pl. Aff., Doc.22-1, PageID#302-306; Pl. Depo., Doc.25.1, PageID#382.)

10. Plaintiff testified that students' knowledge that they have support can increase their learning ability and aid their mental health. (Pl. Dep., Doc. 29-1, PageID#1402, PDF p. 38; Tr. 146:1-10.)

*Response*: Agreed. Many LGBTQ students report or fear bullying, harassment, and physical assault because of their gender identity. Studies have suggested that LGBTQ youth in Ohio are more

likely to report poor mental health and suicide attempts compared to heterosexual teens. Training on these issues were blocked either because of direct instructions from school board members or a desire by the Superintendent's office to not upset school board members who held anti-LGBTQ views. ([REDACTED] Affidavit, Doc.25-31, PageID#1313-1316; Pl. Answer to Interrogatories, Doc.25-23, PageID#662.)

11. Plaintiff testified that he wanted something in his classroom signifying that 'any of our coursework or course discussion' would be grounded in fact and would respect differences of opinion. (Pl. Dep., Doc. 29-1, PageID#1402, PDF p. 38; Tr. 146:11-17.)

*Response:* McIntyre displayed the Flag to express "legal, ethical, and moral" support for Little Miami's a diverse student population among the myriad personal items he and other teachers displayed in their classrooms. Plaintiff's intent was to symbolize support for marginalized students who could be some of the most at-risk students. The Hate Has No Home Here Flag was part of his efforts to symbolize support for marginalized students who could be some of the most at-risk students. McIntyre believed that some members of the school board and the community at large have, through actions and public statements, expressed hostility towards many marginalized students, particularly LGBTQ students. The Hate Has No Home Here Flag was simply a reminder that students must treat all of their classmates with mutual respect, regardless of personal opinions or beliefs. (Pl. Response to Interrogatories, Doc.25-23, PageID#661; Pl. Aff., Doc.22-1, PageID#306; Pl. Depo., Doc.25.1, PageID#382-383.) The Flag's imagery was perceived by community members as conveying positions on contested social issues. The Flag conveyed a position on a matter of political, social, or other concern of community. (Def. Response to Interrogatories, Doc.25-7, PageID#484; Wallace Depo., Doc.25-4, PageID#443.) LMSD did not receive any complaints from about the Hate Has No Home Here Flag before the events in this lawsuit. The only complaint that was ever received was from Wallace. (Harlemen Depo. at 34.)

LMSD generally permits teachers to display personal items on the walls of their classrooms and teachers are given a lot of freedom to decorate classrooms. Examples of posters or flags displayed by teachers include: flags for various sports teams, images of movie stars, and letters from colleges and universities that former students attend. Some teachers have family photos. (Harleman Depo., Doc.25-3, PageID#420; Classroom Displays, Doc.25-20;PageID#578-642.) Teachers can post things that aren't necessarily curriculum-related on their school walls and wall displays are not considered to be endorsement by LMSD. (Wallce Depo. at 94- 96; Morgan Depo., Doc.25.2, PageID#401.) The Hate Has No Home Here Flag is a displayed on a wall next to other flags/posters, including a Bengals Flag, an American Flag, and a flag with a quote from A Christmas Story. McIntyre also has a "COEXIST" poster in another location of his classroom, that uses various religious symbols from around the world for letters, including the Star of David. McIntyre has framed photographs of Presidents and civil rights leaders with quotes, a Rosie the Riveter poster, and some Uncle Sam "I Want You" recruitment posters. He has some personal items, including West Virginia University flags, a batman poster, and pictures of his family. (Pl. Aff., Doc.22-1, PageID#302-306; Pl. Depo., Doc.25.1, PageID#382.)

12. In a February 9 email, Plaintiff wrote that he would tend to agree with the characterization that the display was for two purposes: supporting aspects of the social-studies curriculum, including topics involving sexual orientation or gender identity in historical context, and signaling a respectful classroom environment. In the same email, Plaintiff disputed that Policy 5780.01 applied and described the display as incidental. (Pl.'s Standards Email, Doc. 29-22, PageID#1665-1666, PDF pp. 3-4.)

13. Harleman asked Plaintiff to review the governing standards and prepare an email identifying standards to which Plaintiff believed the display was especially applicable. (Pl. Dep., Doc. 29-1, PageID#1375, PDF p. 11; Tr. 39:1-40:3.)

14. Plaintiff used the Ohio Social Studies Model Curriculum and the AP European History Course and Exam Description to prepare the email. (Pl. Dep., Doc. 29-1, PageID#1375, PDF p. 11; Tr. 39:1-40:3; Pl.'s Standards Email, Doc. 29-22, PageID#1669-1670, PDF pp. 7-8.)

15. Plaintiff had Harleman review the email before he sent it through the school email system, and Harleman said it was 'perfect.' Harleman testified that he had no reason to doubt Plaintiff's

account and believed it was accurate. (Pl. Dep., Doc. 29-1, PageID#1375, PDF p. 11; Tr. 39:1-40:3; Harleman Dep., Doc. 29-3, PageID#1451, PDF p. 21; Tr. 78:3-15.)

16. Plaintiff's contemporaneous email identified eight American History standards and twenty AP European History topics to which he believed the display was especially applicable. (Pl.'s Standards Email, Doc. 29-22, PageID#1669-1670, PDF pp. 7-8.)

17. Plaintiff wrote that students must engage with assigned material 'in a respectful and intellectual manner grounded in facts.' (Pl.'s Standards Email, Doc. 29-22, PageID#1670, PDF p. 8.)

18. In that same email, Plaintiff wrote: 'The flag is a reminder that they must treat their classmates with mutual respect, regardless of personal opinions or beliefs.' (Pl.'s Standards Email, Doc. 29-22, PageID#1670, PDF p. 8.)

*Combined Response to Proposed Facts 12-18:* Defendants take out of context emails Plaintiff sent in response to an inquiry from the Principal explaining how the Hate Has No Home Here Flag was "relevant" topics he taught. (Pl. Depo., Doc.25-1, PageID#382, 384.)

McIntyre, at the Principal's request, drafted an email to defend the display of the Hate Has No Home Here Poster. McIntyre provided specific American History and AP European History curriculum standards indicating that "the specific content standards … where I feel the flag I have in my room… is especially applicable." This email was forwarded to the superintendent. McIntyre explained this email was in response to a question from the Principal meant just meant the flag was "relevant" topics he taught. The Superintendent confirmed this understanding. (Pl. Depo., Doc.25.1, PageID#371; Morgan Depo., Doc.25-2, PageID#403; Email, Doc.13-8, PageID#147-148.)

On February 3, 2026 the Superintendent wrote an email indicating that she had "reviewed the poster in question and its association with the attached curricula standards." She provided her opinion that while the poster "contains symbols of identities" she did not "believe a reasonable observer would conclude its primary purpose is to prompt discussion, provide instruction, or solicit student engagement on sexual concepts or gender ideology." (Emails, Doc.13-8, PageID#146.)

On February 4, 2026 McIntyre met with the Principal and Superintendent. The Superintendent explained she had relayed the Principal's refusal to order McIntyre to take down the

Hate Has No Home Here Flag to Wallace, as well as McIntyre's refusal to comply with Wallace's request, to Wallace. (Verified Complaint, Doc.1, PageID#9.) The Superintendent indicated that Wallace was now requesting that the Superintendent order McIntyre to remove the Hate Has No Home Here Flag. McIntyre explained that the Hate Has No Home Here Flag was not some "meaningless display" but that he had put a lot of thought into purchasing and displaying the Flag. McIntyre expressed his belief that Little Miami had a diverse student population that the District had a legal, ethical, and moral obligation to support. McIntyre indicated that the Hate Has No Home Here Flag was intended to symbolize support for marginalized students who could be some of the most at-risk students. He further explained that he chose a flag with multiple skin tones because it was important for that all of his students saw themselves represented in the Flag. (Pl. Aff., Doc.22-1, PageID#306.) The Superintendent told McIntyre that she would not order him to take down the Hate Has No Home Here Flag. The Superintendent further explained that if the School Board voted to remove the Hate Has No Home Here Flag, a refusal would be insubordination and subject McIntyre to discipline in accordance with union procedures. (Verified Complaint, Doc.1, PageID#10.)

On February 4, 2026, following McIntyre's meeting with the Superintendent and the High School Principal, the Board's outside counsel, Omar Tarazi, emailed the Superintendent and Wallace. Tarazi focused on the message conveyed by the rainbow image in the Hate Has No Home Here Flag. Tarazi stated that "Board Policy 5780.01 is not directed at general messages encouraging kindness, respect, or anti-bullying" and suggested further that the Board policy would not be implicated if the same message is "displayed over a neutral image, such as the American flag or a generic student image." (Emails, Doc.13-8, PageID#143.) Tarazi claimed that "depending on context and interpretation, displays incorporating images that could reasonably be viewed as presenting or describing sexual concepts or gender ideology may implicate parental notification and opt-out

requirements under HB 8 and District policy." Tarazi suggested that the teacher "utilize more neutral versions of the anti-hate and respect theme images…" (Emails, Doc.13-8, PageID#143.)

On February 9, 2026, McIntyre responded that "this flag is at most an incidental reference as I do not explicitly provide instruction on the flag or incorporate it into my curricular materials." McIntyre also noted the alternative display suggested by Tarazi was not acceptable. He wrote: "My concern is that attempting to find a different, "neutral" image may inadvertently lead to the erasure of LGBTQ+ representation. My preference would be to discuss any additional representation that could potentially be added to the existing flag, rather than removing any of the represented groups." (Emails, Doc.13-8, PageID#144; Pl. Depo., Doc.25.1, PageID#384.) McIntyre clearly stated that that the Hate Has No Home Here Flag was not used for teaching. (Email, Doc.25-22, PageID#644.) The emails, in context, accurately state that the Hate Has No Home Here Flag was not used in instruction. (Morgan Depo., Doc.25-2, PageID#405.)

On February 10, 2026 Tarazi emailed the Superintendent to inform her that Wallace has asked for the matter to be placed on the agenda for the next Board meeting. (Emails, Doc.13-8, PageID#143.)

On February 16, 2026 McIntyre sent another email to the Superintendent to reiterate that the Hate Has No Home Here Flag's sole intent has always been a general message of inclusion and anti-bullying. He stated:

> The flag is not, nor has it ever been, intended to engage students on sexual concepts or gender ideology. My purpose and intent in purchasing that flag for my classroom four years ago was to convey a general message of inclusion. There is no subversive message or hidden intent underlying the flag. It is simply intended to convey that bullying and/or targeting will not be tolerated. I have never incorporated the flag into the curriculum itself or used it as an instructional item when covering any sensitive topics in class.
>
> Additionally, from what I can tell, it has not had the effect of engaging students on sexual concepts or gender ideology, as they have for the most part not mentioned the flag to me at all, either during in-class discussions, in submitted assignments, or during one-on-one discussions outside of class.

(Emails, Doc.25-22, PageID#644; Pl. Depo., Doc.25.1, PageID#371; Morgan Depo., Doc.25-2, PageID#403, 406.)

19. Plaintiff confirmed under oath that the display was "especially applicable" to numerous American History standards. Walking through several standards individually, he testified that the pride and transgender-pride images represented LGBTQ groups addressed under Content Standard 27, including the Gay Liberation movement, and connected those images to the Lavender Scare under Content Standard 24, the Second Red Scare. He also connected the display's words and images to the treatment of Native Americans and the Plains Wars; Reconstruction and institutionalized racism; post-World War I racial intolerance; the Harlem Renaissance; marginalized groups in World War II; the broader Civil Rights Movement; and white flight, immigration reform, and urban riots. He further testified that the display was applicable to post-9/11 material and "applies to most of the curriculum, if not all of it." (Pl. Dep., Doc. 29-1, PageID#1381-1383, PDF pp. 17-19; Tr. 62:13-70:7; Pl.'s Standards Email, Doc. 29-22, PageID#1669-1670, PDF pp. 7-8.)

20. Plaintiff testified that he did not point to the display as a formal teaching device, use it as a formal methodology of instruction, or use it to impart particular substantive knowledge. His February 16 email said he had not incorporated it into the curriculum or used it as an instructional item. (Pl. Dep., Doc. 29-1, PageID#1402, PDF p. 38; Tr. 146:18-147:8; Pl.'s Standards Email, Doc. 29-22, PageID#1663, PDF p. 1.)

*Combined Response to Proposed Facts 19-20:* Defendants take the testimony out of context. Even though the Hate Has No Home Here Flag related to some of the topics in class, Plaintiff was not "referencing the poster in his room." (Harleman Depo., Doc.25-3, PageID#424; Morgan Depo., Doc.25-2, PageID#410.) The Superintendent explained that simply because something is "connected to" the curriculum, it is not curricular speech. (Morgan Depo., Doc.25-2, PageID#410.)

The Hate Has No Home Here Flag was not curricular, as it was not part of activities supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences. The Hate Has No Home Here Flag was not a school-sponsored expression bearing the imprimatur of the school. McIntyre never used the Hate Has No Home Here Flag as part of his methodology of instruction, and never sought to instruct students or impart particular substantive knowledge on curricular matters through the use of the Hate Has No Home Here Flag. Similar to other items McIntyre displayed in his classroom, the Hate Has No Home Here Flag was at most an incidental reference to topics discussed in class; he did not explicitly provide instruction on the Hate

Has No Home Here Flag or incorporate it into my curricular materials. (Pl. Aff., Doc.22-1, PageID#306-307; Morgan Depo., Doc.25-2, PageID#404, 406; Harleman Depo., Doc.25-3, PageID#425, 427.)

The testimony referenced here was mostly Plaintiff explaining the state content standards for his courses. (Pl. Depo., Doc.25-1, PageID#362-363.) Plaintiff's relevant testimony explains the reason the Hate Has No Home Here Flag was actually displayed: "…that's what the flag was meant for… just a reminder to students that we need to be respectful of each other, regardless of differences of opinions or thought." (Pl. Depo., Doc.25-1, PageID#370. *See also* Pl. Depo., Doc.25-1, PageID#372. The relevant testimony and context is:

> Q. Why do you have the Hate Has No Home Here flag on your wall?
> A. … I wanted something in my classroom that kind of signified that, like, no matter what, like, we're not going to judge people or not -- like, all -- any of our coursework or course discussion is going to be grounded on fact, and we're, you know, going to respect differences of opinions.
> Q. Okay. Did you use the flag for any teaching purposes?
> A. No.
> Q. Was it a school-sponsored expression [bearing] the imprimatur of the school?
> A. No.
> Q. Was it designed to impart any particular knowledge to the students?
> A. No.
> Q. Did you ever use it as part of your methodology of instruction?
> A. No.
> Q. Did you ever seek to instruct students or impart particular substantive knowledge on curricular matters through the use of the flag?
> A. No.

(Pl. Depo., Doc.25-1, PageID#382-383.)

21. The District's verified response states that teachers receive 'considerable latitude' to display personal items, including sports-team flags, motivational posters, and family photographs, but that this latitude 'is defined by applicable Board policy.' (Defs.' Verified Resp. to Interrogs., Doc. 29-7, PageID#1501, PDF p. 6.)

22. Wallace testified that teachers have leeway to decorate and that a personal item does not necessarily communicate District endorsement, but that, 'at the end of the day,' the school remains responsible for what is and is not on classroom walls. (Wallace Dep., Doc. 29-4, PageID#1476, PDF p. 23; Tr. 87:12-88:9.)

23. Harleman testified that the Board could adopt a policy governing classroom-wall decorations and that, as principal, he would be required to enforce it. (Harleman Dep., Doc. 29-3, PageID#1452, PDF p. 22; Tr. pp. 82-85.)

*Combined Response to Proposed Facts 21-23:* Teachers in the Little Miami School District routinely post personal expressive items related to matters of public concern on classroom walls. The School District does not have any policy limiting these displays. (Response to Interrogatories, Doc.25-7, PageID#482; Harleman Depo., Doc.25-3, PageID#420.) The District's 30(b)(6) witness acknowledged that teachers can post things that are not necessarily curriculum-related on their school walls and that: (i) simply because a display is on the wall does not mean the display is related to the curriculum; and (ii) simply because it's on the wall doesn't mean that the Little Miami Schools is endorsing that viewpoint. (Wallace Depo., Doc.25-4, PageID#459.) The LMSD Board considered, but did not adopt, a policy restricting teacher classroom displays. (Morgan Depo., Doc.25-2, PageID#397.)

24. Policy 5780.01 was adopted on October 28, 2025, defined 'sexuality content' to include an 'image' in a classroom setting, and prescribed parental-notice, review, and opt-out procedures. (Policy 5780.01, Doc. 29-9, PageID#1512-1514, PDF pp. 1-3.)

*Response*: In January 2025, the Ohio Assembly passed H.B. 8, known as the Ohio Parent's Bill of Rights. This Statute provides that school districts "provide parents the opportunity to review any instructional material that includes sexuality content." and "Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and be permitted to participate in an alternative assignment." R.C. 3313.473(B)(1)(b). The Statute, R.C. 3113.473(G)(5), defines "sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting.
>
> "Sexuality content" does not mean any of the following:
>
> > (a) Instruction or presentations in sexually transmitted infection education, child sexual abuse prevention, and sexual violence prevention education

> provided under division (A)(5) of section 3313.60 or section 3314.0310 or 3326.091 of the Revised Code;
>
> (b) Instruction or presentations in sexually transmitted infection education emphasizing abstinence provided under section 3313.6011 of the Revised Code;
>
> (c) Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Statute, Doc.25-8, PageID#487-492.) In October 2025, following the adoption of HB5, the School Board adopted Board Policy 5780.01, entitled Parents' Bill of Rights. This Policy provides:

> Prior to providing instruction that includes sexuality content or permitting a third party to provide such instruction on behalf of the District, the Board will provide parents the opportunity to review any instructional material that includes sexuality content. Upon request of the student's parent, a student shall be excused from instruction that includes sexuality content and shall be permitted to participate in an alternative assignment.

The Policy defines "Sexuality content" as follows:

> "Sexuality content" means any oral or written instruction, presentation, image, or description of sexual concepts or gender ideology provided in a classroom setting. "Sexuality content" does not mean any of the following:
>
> > A. Instruction or presentations in sexually transmitted infection education, child sexual abuse prevention, and sexual violence prevention education provided under division (A)(5) of section 3313.60 or section 3314.0310 or 3326.091 of the Revised Code;
> >
> > B. Instruction or presentations in sexually transmitted infection education emphasizing abstinence provided under section 3313.6011 of the Revised Code;
> >
> > C. Incidental references to sexual concepts or gender ideology occurring outside of formal instruction or presentations on such topics, including references made during class participation and in schoolwork.

(Policy, Doc.25-9, PageID#493-495.)

25. Before the February 25 vote, the Superintendent forwarded written classroom-display guidance to principals, assistant principals, and academic staff, stating that it 'will be used moving forward,' and reported that it was being shared with the teachers' association. The guidance stated that

the Board retained final authority over classroom displays under Policy 5780.01. (Classroom-Display Guidance, Doc. 29-28, PageID#2314-2315, 2317, PDF pp. 1-2, 4.)

*Response*: There is no testimony or evidence that this document represents school policy or was adopted by the Board. This appears to reference a January 23, 2026, Email from Counsel interpreting the Parental Rights Policy. (Doc. 29-28, PageID#2316.) The Superintendeht testified about this email:

> Q Okay. Do you know where [Mr. Tarazi] came up with this standard from?
> A I do not.
> Q Okay. Do you know if he relied on any cases, statutes, laws, anything like that?
> A I do not know.
> Q You know, and he applies what he calls a reasonable observer standard, it looks like. Do you know where that came from?
> A I do not.
> Q And he talks about primary purpose. Do you know where the term primary purpose came from?
> A I do not.

(Morgan Depo., Doc. 25-2 PageID#399. Regardless, after receiving this email and applying the test proposed by Counsel, the Superintendent still concluded that the Hate Has No Home Here Flag is not prohibited by the Parental Rights policies. (Email, Doc.29-22, PageID#1668.)

26. The Board's approved minutes record a motion 'to determine if poster constitutes sexuality content as defined by LM Policy 5780.01.' Bullock made the motion, Smith seconded it, and it carried four to one. (Feb. 25, 2026 Board Minutes, Doc. 13-3, PageID#114, PDF p. 3.)

*Response*: Agreed. Plaintiff notes that statements by Board Members made it clear that the motivation for the decision was not about curricular matters but whether the inclusion of LGBTQ symbols on the Hate Had No Home Here Flag was contrary to the viewpoints of the Board Members. (Transcript, Doc#13-4, PageID#119; Transcript, Doc#13-4, PageID#121.) The Principal and Superintendent declined to defend that School Board against charges of animus. (Harleman Depo., Doc25-3, PageID#425-426; Morgan Depo., Doc.25-2, PageID#394.) Evidence of animus, and thus of viewpoint discrimination, arises in the context of a District that does not include harassment based on sexual orientation as prohibited conduct in its policies and other conduct. (Policy, Doc.25-14;

Policy, Doc.25-15; Policy, Doc25-16; Verified Complaint, Doc.1, PageID#4-6; Pl. Aff, Doc.22-2, PageID#306; [Redacted] Aff., Doc.25-31, PageID#1314-1315.)

Respectfully submitted,

/s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this September 14, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel